**UNITED STATES DISTRICT COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

|  |  |
|---|---|
| CESAR TORRES, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>     v.<br><br>VESTIS CORPORATION, KIMBERLY T. SCOTT, and RICKY T. DILLON,<br><br>               Defendants. | Case No. 1:25-cv-4844<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Cesar Torres ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Vestis Corporation ("Vestis" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Vestis' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Vestis securities between May 2, 2024, to May 6, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning Vestis' expected growth for the fiscal year 2025. Defendants' statements included, among other things, confidence in their forecasting ability and, in turn, in their ability to execute strategic initiatives to improve customer experience and retention while enacting annual price increases.

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Vestis' ability to grow its business; notably that Vestis would be unable to execute on planned strategic initiatives to drive purported improvements to the customer experience and its onboarding efforts in order to drive new customer growth, increased customer retention, and increased revenue from existing customers.

4.     Such statements absent these material facts caused Plaintiff and other shareholders to purchase Vestis' securities at artificially inflated prices.

5.     On May 7, 2025, Vestis announced its financial results for the second quarter of fiscal 2025, withdrew its revenue and growth guidance for the full fiscal year 2025, and provided guidance for the third quarter of fiscal 2025 that fell significantly below market expectations. The Company attributed its poor results partially to "lost business in excess of new business," but primarily on "lower adds over stops, which is how we describe volume changes with our existing

customers." The Company attributed its decision to pull full-year guidance and provide disappointing third quarter targets to the "increasingly uncertain macro environment."

6.    Investors and analysts reacted immediately to Vestis' revelation. The price of Vestis' common stock declined dramatically. From a closing market price of $8.71 per share on May 6, 2025, Vestis' stock price fell to $5.44 per share on May 7, 2025, a decline of about 37.54% in the span of just a single day.

## JURISDICTION AND VENUE

7.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

8.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Vestis' stock is publicly listed and trades within this District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

12.    Plaintiff purchased Vestis common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Vestis is attached hereto.

13.    Vestis' common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "VSTS" during the Class Period. Vestis' operations extend around the United States and into Canada.

14.    Defendant Kimberly T. Scott ("Scott") was, at all relevant times until March 18, 2025, the President, Chief Executive Officer, and Director of Vestis, at which point Scott was scheduled to leave her positions with Vestis and resign from the company's Board of Directors.

15.    Defendant Ricky T. Dillon ("Dillon") was, at all relevant times until February 14, 2025, the Executive Vice President and Chief Financial Officer of Vestis, at which point Dillon was scheduled to leave his positions with Vestis.

16.    Defendants Scott and Dillon are sometimes referred to herein as the "Individual Defendants." Vestis together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Vestis' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual

Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.    Vestis is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Vestis under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Company Background

20.    Vestis is a North American company that provides uniform rentals and workplace supplies across the United States and Canada

21.    More specifically, Vestis manufactures and distributes uniforms, mats, towels, linens, restroom supplies, first-aid supplies, safety products, and other workplace supplies.

### The Defendants Materially Misled Investors Concerning

### Vestis' Growth Expectations for Fiscal Year 2025

#### May 2, 2024

22.    On May 2, 2024, Defendants issued a press release announcing second quarter fiscal 2024 results.  In tandem, Defendant Scott outlined strategic "corrections" Vestis was making as they were "not satisfied with our performance and this outlook for the full year" at the time.  In pertinent part, Defendant Scott spoke to these "strategic initiatives," stating:

We are delivering results against many of our key strategic initiatives while taking swift and assertive action to enhance our sales productivity and service efficacy to accelerate growth. We are also keenly focused on managing and reducing costs across the company.

. . .

We are taking decisive and immediate actions to address our short-term challenges in the year. ***We are mobilized to improve sales productivity related to new business wins and focus on building a high-performing sales team***. I have spent significant time over the past few months assessing our sales team, structure and talent as well as our processes from teammate training and onboarding to collateral and go-to-market strategies for our various product lines. ***We've identified enhancing selling skills and capabilities as well as improving teammate tenure as our highest priorities to support our frontline sales teammates in improving their close rates and deal sizes.*** In support of this, we have launched improved recruiting, onboarding and retention programs as well as enablement tools such as improved collateral and sample kits. We are also strengthening our national account pipeline.

I have spent a great deal of time with our national account sales leaders and our customers. It's a privilege to support so many great companies and brands. Not only do we have opportunity to win new national accounts but we have opportunity to grow share of wallet with existing customers. Our national account team is energized by the support and focus they are receiving from leadership to grow national accounts as this has not been a priority for past leadership. ***We are taking actions to enhance our service in order to deliver a higher level of customer satisfaction, loyalty and retention***. This effort will also allow us to revisit pricing as we see customers respond positively to these process improvements.

We are conducting assessments all the way to our route service representatives in the field to identify, improve and retrain on specific procedures that can enhance our customers' experience and garner loyalty. We will also be creating a new leadership role on our team that will be accountable for service across the company. ***While we work through these improvements, we have deliberately moderated planned price increases we had scheduled for the second quarter and in the second half of the year in order to reduce customer churn***, with a focus on improving customer lifetime value while we enhance our service processes.

***We will continue to strategically and surgically price in a thoughtful way with focus on lifetime customer value. We believe service gaps have driven price sensitivity as fully satisfied customers typically don't leave because they've received a price increase. But the price increase can be a catalyst for cancellations or quits***.

. . .

Now let's shift to our strategic plan. We remain confident in our strategic plan, and we will continue to advance it. On Slide 7, this scorecard depicts our rating of how we are doing against several key initiatives. We talked a lot about sales today, and we are undoubtedly focused on accelerating revenue growth through addressing sales productivity. ***Customer retention is one of the single most important levers in our recurring revenue model and critical to our strategy to strengthen the base, capture share of wallet through cross-selling, to leverage idle capacity and fixed assets and enhance customer lifetime value.***

***We are hyper-focused on improving retention in support of our strategy as we already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers. Retention is moving back in the right direction. But even when at historical norms, we believe that it's still lower than our peers***. This presents a great opportunity for Vestis to create shareholder value as we enhance our service processes and ultimately increase retention and customer penetration. While we are working to enhance our service processes, we will be strategic about how and when we price so that we are building the company for the long term.

(Emphasis added).

23.    During the question-and-answer segment that followed, the following exchange occurred, highlighting management's faith and confidence in the company plan:

<Q: Stephanie Lynn Benjamin Moore – Jefferies LLC – Research Analyst> So maybe, Kim, given such a change in tone here in the last 90 days since you reported 1Q, I think including in the short period of time an erosion in national account business and now a reversal in pricing capabilities. How do we get comfortable that you have her arms around the operations and can meet this revised guidance for the year?

<A: Kimberly T. Scott> So Stephanie, we feel very confident in the strategy. We remain incredibly committed and we know that the value creation opportunity for Vestis this year. So ***this is about improving some service processes to make sure that our service experience with our customers is outstanding*** because improving revenue -- or excuse me, ***improving retention is the heartbeat of this model***. So our strategy is built on keeping loyal customers and then enhancing the lifetime value by cross-selling them. So we feel it's really imperative that we continue to enhance our processes and improve the retention experience. As we drive up that experience and it continues to improve and more customers continue to be loyal, it just fully supports our cross-sell initiatives and our desire to penetrate those customers and cross-sell other products and services. ***So we feel incredibly confident that we are on the right path and that making these corrections around service efficacy is just going to further strengthen our plan.***

As it relates to sales, there is without a doubt an opportunity to have a more high-performing sales team. We have great people who absolutely want to do a great job for the company and drive sales, but *we need to support them with better enablement tools. We need to have more sophisticated processes around how we go to market. We are doing things like improving sales collateral, working on onboarding, recruiting the right profile of teammate who will thrive in this environment, but also training them and getting them the right tools and resources to sell effectively. So these are very known and understood opportunities, and we're incredibly mobilized around them.* But I do want to reiterate, Stephanie, we believe in this plan. We believe in the value creation opportunity, and we have no doubt that there's going to be great value generated here over the long term.

<Q: Stephanie Lynn Benjamin Moore> Got it. And then just as a follow-up. I mean, clearly, it does sound like a lot of changes are being implemented, and you kind of noted just that we should start to see the benefits in fiscal 2025. So does that mean in your minds, we should be able to return to revenue growth in 2025, maybe in line with the targets you provided at your Analyst Day? And then how will pricing be part of that so -- since it looks like you're probably going to be a pretty decent comp on the pricing front as we look to 2025?

<A: Kimberly T. Scott> *Yes. So as it relates to growth, we absolutely intend to return to positive growth in FY '25.* We'll talk more about what those growth rates will look like when we guide for the year. *But we absolutely are accountable to and expect to return growth in FY '25. So you can count on that happening for sure, and we'll talk about those rates as we exit '24 and we guide for '25. So without a doubt.* And then as it relates to pricing, we believe very strongly that we could take more price right now if we wanted to. *But we believe strongly that it is important to improve service efficacy and to make sure that we are not taking price in the short term only to jeopardize customer retention rate in the long term.* So we will return to the ability to take more pricing, and we still feel strongly that inflationary environments, we can pass that price through as appropriate and that price will stick. So we will definitely continue to address pricing. We feel that we will improve our ability to take more price as we improve our service processes and our customer experience.

And so we also will take price though, and we are taking price this year, and I want to be really clear about that. We have annual price increases and we have off-cycle price increases. We continue to take our normal annual price increases but our subjective discretionary off-cycle price increases are the price increases that we're moderating. We will also still be surgical and take price in certain areas as it relates to multiple stops in a week or a customer that is largely underpriced versus the average in the market. So there will still be pricing taking place. We're not shutting off pricing. We are just moderating pricing as it relates to the discretionary off-cycle pricing.

(Emphasis added).

*August 7, 2024*

24.    On August 7, 2024, Defendants published their third quarter fiscal 2024 results. During the associated earnings call, while Defendant Scott noted they would "not discuss [their] expectations or provide guidance for fiscal 2025 today," Defendant Dillon briefly noted that:

> we saw improvement in our year-to-date retention rate over fiscal '23, and we expect this will drive lower carryover losses in '25. This is an important point that I want to emphasize: the prior year retention rate was a bigger headwind in 2024 than we expect it will be in 2025. Said differently, we begin fiscal 2025 in less of a hole from lost business than 2024

*November 21, 2024*

25.    On November 21, 2024, Defendants published their fourth quarter fiscal 2024 results and, pertinently, their fiscal 2025 outlook, as follows:

> The Company expects fiscal 2025 revenue to be in the range of $2.8 billion to $2.83 billion and fiscal 2025 Adjusted EBITDA to be in the range of $345 million to $360 million.

> The Company's fiscal 2025 guidance is provided on a normalized 52-week fiscal year basis. Fiscal 2025 reported financials will include the impact of a 53rd week, with the extra week impacting the fourth quarter.

> The Company's strategic imperatives include disciplined capital allocation with deleveraging as a priority. The Company continues to expect strong free cash flow conversion and anticipate a ratio of free cash flow to Adjusted EBITDA of approximately 50%.

26.    Speaking on the outlook, Defendant Scott noted:

> I am excited about the commercial momentum that is building across Vestis, the progress we are making executing against our efficient operations initiatives, and the way our organization has embraced our mission to deliver a best-in-class customer experience. As a result, we expect both revenue and Adjusted EBITDA to grow on an underlying basis in Fiscal 2025 as we continue to deliver against our strategic priorities.

27.     During the corresponding earnings call, Defendant Dillon pertinently outlined the

guide to investors:

> we expect **revenue of $2.8 billion to $2.83 billion and adjusted EBITDA of $345 million to $360 million**. This results in a revenue growth from approximately 0% to 1% and an EBITDA margin of 12.3% to 12.7%. As Kim noted, our revenue guide reflects the absence of $13 million in onetime cost -- exit cost billings in fiscal '24 and $15 million associated with strategic exit of a large direct sale customer in 2024.
>
> **As you think about the phasing of our guidance for the next year, it is important to note that both of these items**, along with fiscal '23 carryover pricing primarily impacted the front half of 2024 and the back half of fiscal '24 **is more indicative of the starting point for our business heading into fiscal '25. As a result, we anticipate Q1 of fiscal '25 revenue and EBITDA will look similar to the fourth quarter of '24, with incremental improvement throughout the year** as we continue to implement our strategic initiatives and cost structure enhancements.
>
> In closing, we're excited about the momentum of our business. **We are confident in our ability to deliver against our 2025 commitments and our trajectory heading into 2026**.

(Emphasis added).

28.     Defendant Scott further touched on management's perception of the achievability

of the guidance, stating, in pertinent part:

> I will also touch on some cost initiatives that give us great confidence in our ability to deliver against our commitments in fiscal 2025 and set us up for continued profitable growth as we move into fiscal 2026 and beyond.
>
> . . .
>
> In addition to new customer acquisition, we also continued to deliver strong results from route sales. Our route sales increased approximately 50% in fiscal 2024 and added more than 100 basis points of in-year revenue growth at high margin flow through. We have sustained this momentum into 2025, with route sales continuing to grow more than 50% on a year-to-date basis and in line with our objectives for 2025.
>
> . . .
>
> **Now I want to discuss an area of our strategy where we are moving in the right direction, but still have opportunity to continue to improve the customer**

*experience. We remain laser-focused on delivering a best-in-class customer experience that will support retaining and growing with our existing customers*. Importantly, our fiscal 2024 retention rate improved by 150 basis points year-over-year to 91.9%, which will position us better entering 2025 versus 2024. We are pleased with the year-over-year improvement in the fiscal 2024 rate.

As we've mentioned in the past, there can be some seasonality in this metric, and we believe it is most useful to evaluate retention on a full year basis. That said, we are also pleased that our fourth quarter retention improved more than 400 basis points year-over-year and what has historically been our lowest quarter of the year from a seasonality perspective. As a reminder, our retention in the fourth quarter of fiscal 2023 included the impact of national account losses and customer response to significant fiscal 2023 pricing action.

*We are keenly focused on continued improvement in service measures, responding quickly to our customers' needs and always putting the customer first. We believe we can further improve our retention rate in fiscal 2025* and we feel good about where the year has started with a retention rate of 93.7% in October.

(Emphasis added).

<u>*January 31, 2025*</u>

29.     On January 31, 2025, Defendants published their first quarter fiscal 2025 results and provided specific guidance for the second quarter.  In pertinent part Defendant Scott provided the following:

Our Q1 results came in as we expected. Last quarter, we communicated Q1 revenue and EBITDA would look similar to the fourth quarter of FY '24. We delivered results in line with this commentary with Q1 revenue of $684 million, *flat sequentially* from fourth quarter 2024 and adjusted EBITDA of $81.2 million, *up approximately 1% sequentially* from fourth quarter 2024.

We also note our Q1 revenue was impacted by unfavorable movement in the Canadian dollar exchange rate, which had a negative impact relative to last year and the assumption in our guidance. Compared to the first quarter of fiscal 2024, revenue was down 4.7% or 4.5% on a constant currency basis. As we previously discussed, our 2025 results exclude the benefit of onetime customer exit billings and revenue from the large direct sales customer that we exited in FY '24 as part of our profit improvement plan for this line of business.

Adjusted for these items, which we believe represents a more accurate reflection of the underlying performance of our business, *first quarter revenue declined 2.8%*

***on a normalized constant currency basis and what we expect will be both the toughest comp and the low point for our quarterly revenue in fiscal 2025.***

. . .

I'm excited by all aspects of our business, but especially by a particular milestone we expect to hit in Q2. ***Toward the end of the second quarter, we expect new volume growth will exceed lost business driven by field sales productivity, national account wins, new frontline sales headcount growth and solid retention metrics***.

Further, ***we started taking price in Q1, which held well and will continue through the year***. In addition to core volume growth and price, we have cost savings benefits throughout the year. And to that end, we are reaffirming our full year FY '25 guidance for revenue and EBITDA.

We expect our business will grow sales at a rate of 3% to 4% with EBITDA growth approaching or exceeding 10% in the second half of the year.

For FY '25 revenues, there are 4 main drivers that will support our sequential ramp. The first driver is strong new volume wins across SME field sales and national accounts.

. . .

The second driver in our sequential acceleration is growth with existing customers. During Q1, our revenue from route sales to existing customers increased by more than 50% year-over-year.

The third driver is our hiring pipeline for frontline sales teammates. After intentionally slowing our frontline sales hiring in 2024, we have once again resumed hiring in 2025.

. . .

The fifth (sic) [fourth] driver is our retention metric. In the first quarter, our customer retention rate was 92.9%, up 30 basis points year-over-year and up 280 basis points versus the fourth quarter. As we've mentioned in the past, we feel it is most useful to evaluate retention on a full year basis, which we believe is most indicative of our underlying performance. Going forward, we will continue to report customer retention on an annual basis with quarterly disclosure focused on the in-period revenue impact from lost business.

To recap, I believe in our sequential revenue guidance because of the new customers we're winning across SMEs and national accounts. Our ramp in sales force hiring, our growth with existing customers and our Q1 retention metrics.

> For FY '25 EBITDA, in addition to the net volume improvement, there are 3 main drivers that support our sequential ramp. The first driver is meaningful cost savings from operating more efficiently.
>
> . . .
>
> The second driver is optimizing our workforce to further drive cost performance and structural profitability of our business
>
> . . .
>
> The final driver of our EBITDA ramp is our in-select in-year pricing. We have improved our market segmentation, and we observed pricing in Q1 stuck better than in other quarters. We expect to continue to realize net positive price increases with our existing customer base in FY '25.

(Emphasis added).

30.     During the call, Defendant Scott additionally announced the departure of Defendant Dillon from his position as Chief Financial Officer, stating, in pertinent part:

> Additionally, we announced that our Chief Financial Officer, Rick Dillon, will be leading [sic] the company as a part of the transition of the CFO role. I want to sincerely thank Rick for his significant contributions to Vestis. His leadership in preparing for Vestis' separation as a stand-alone public company and building out our public company finance capabilities will have a lasting positive impact on our company. We remain grateful for his service to the company, and we wish him continued success.
>
> I'm also excited to announce that Kelly Janzen will be joining Vestis as our new CFO. Kelly has over 25 years of financial leadership experience. And since October, she has been supporting us as a finance consultant. Previously, Kelly worked in the industrial distribution space as the CFO of BlueLinx from 2020 to 2023. Kelly brings a tremendous skill set, particularly in financial and business process optimization. And under her proven leadership, we believe we will be able to significantly advance our finance organization in support of future value creation.

31.     Pursuant to the Company's same-day 8-k filing, Defendant Dillon's departure was "effective February 14, 2025."

<u>March 18, 2025</u>

32.    On March 18, 2025, Defendants issued a press release announcing that "the Board of Directors of Vestis Corporation … determined that Kim Scott, President and Chief Executive Officer, will leave her positions with the Company effective March 18, 2025. Ms. Scott also resigned from the Company's Board of Directors on March 18, 2025." According to the release, Phillip Holloman, the Company's Chairman since September 2024, was appointed to serve as interim Executive Chairman, President, and Chief Executive Officer in Defendant Scott's stead ("Interim CEO Holloman").

33.    The above statements in Paragraphs 22 to 32 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Vestis' optimistic guide, promising a return to positive growth in fiscal 2025 on the back of improving service efficacy and annual price increases while improving "satisfaction, loyalty, and retention" rates fell short of reality; the Company was simply not equipped achieve its growth guidance as the realization of these efforts instead resulted in a significant decline of revenue from existing customers.

**The Truth Emerges during Vestis' Second Quarter Fiscal 2025 Earnings Report**

<u>May 7, 2025</u>

34.    On May 7, 2025, Defendants released their Q2FY25 results below expectations and withdrew their full-year guide for fiscal 2025.  Interim CEO Holloman spoke broadly to the results and announced the appointment of the company's new CEO, stating, in pertinent part:

> **Jim Barber, former Chief Operating Officer of UPS, will be stepping into the role of President and Chief Executive Officer, effective June 2, 2025**. At that time, I

will return to my role as Chairman of the Board. Jim is a proven leader with a track record of driving profitable growth, and I look forward to working closely with him to ensure a seamless transition.

I will begin my remarks with an overview of the second quarter performance, specifically what changed between Q1 and Q2 and why we did not deliver the revenue growth that we expected this quarter

. . .

***Second quarter revenue was $665 million, which declined approximately $18 million from Q1 or 2.7%, a significant difference from the growth we implied in our guidance.*** Excluding a $15 million onetime bad debt adjustment that Kelly will discuss, adjusted EBITDA was $63 million or 9.4% of revenue, a 250-basis point reduction compared to Q1. This decrease in margin from our lower revenue demonstrates the operating leverage inherent in our relatively fixed cost structure, which in times of revenue growth is beneficial.

***During the quarter, $7 million of decline was related to direct sales and $11 million of the decline was from our rental business, which we had expected to grow given the previous trends. While this was partially driven by lost business and excess of new business, the main reason for the decrease was lower adds over stops, which is how we describe volume changes with our existing customers.***

***In January, we saw a significant decline in volume as some customers seasonally adjusted their demand for our products, specifically workplace supplies***. For example, many of our hospitality customers have lower demand in the weeks following the holiday season. Additionally, within our rental business, we periodically bill customers for inventory that they have either lost or ruined, which we call L&Rs. This revenue can fluctuate from quarter-to-quarter. And during quarter 2, we had approximately $4 million less L&R compared to Q1.

And while these are not the results we expected to deliver, I want to convey a few things. First, over the course of the second quarter, we have recovered the majority of the January decline in rental revenue. Second, we have taken meaningful actions to further improve revenue, including focusing on decreasing the number of credits being issued to our customers. We have done this by improving specific customer service issues, such as product shortages and cleaning quality and have seen a positive impact from these actions on our revenue run rate in a relatively short time frame. Together, these improvements supported our April average weekly revenue returning back to December levels. And finally, we continue to take steps to improve our forecasting capability.

***Let me be clear, we are disappointed with our second quarter performance*** …

(Emphasis added).

35.     Chief Financial Officer, Kelly Janzen, reiterated and elaborated upon the reported second quarter results and further announced the recission of the company's full-year 2025 guidance, providing, in pertinent part:

> On a rolling 12-month basis, our customer retention was 92.4% at the end of Q2, which is relatively consistent with the annual rates we have seen in previous years. We remain highly focused on both generating new business and effectively managing our lost business.
>
> ***Revenue from existing customers declined approximately $8 million in the second quarter compared to Q1, which includes the $4 million in L&R revenue that Phillip discussed.*** We continue to realize price increases with our existing customers. And while new pricing has been partially offset by price adjustments elsewhere, our overall net pricing was positive by $3.5 million as compared to the first quarter.
>
> Net volume from existing customers, which we call adds over stops, declined $6.5 million in Q2 relative to the first quarter. ***We saw a significant decline in volume as some customers seasonally adjusted demand for our products, specifically workplace supplies.*** Additionally, our revenue was negatively impacted by volume-related credits issued to customers to address service concerns. Over the course of the last 2 months, we have further increased our efforts to mitigate these issues and as a result, have seen a significant reduction in weekly customer credits.
>
> . . .
>
> Second quarter reported adjusted EBITDA was $48 million and excluding the $15 million onetime bad debt adjustment was $63 million, representing a margin of 9.4%. This compares to 11.9% in the first quarter of 2025 and 12.4% in Q2 of 2024.
>
> . . .
>
> Now turning to guidance. ***Given the recent events as well as the increasingly uncertain macro environment, we are shifting to quarterly guidance rather than providing a full year outlook***. Our recent weekly revenue trends suggest that our third quarter revenue will be in the range of $674 million to $682 million, and we expect adjusted EBITDA to be at least $63 million, indicating sequential improvement as we continue to invest in the resources we need to drive sustainable and profitable growth. We will continue to focus on improving free cash flow conversion over the long term, but we will no longer be providing guidance for free cash flow.
>
> ***We are disappointed with our first half results***.

(Emphasis added).

36.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the May 2, 2024, August 7, 2024, November 21, 2024, and January 31, 2025, earnings calls. On those calls, Defendants continually praised their ability to secure and maintain retention through price increases through purported improvements in service measures to achieve their goal of providing a "best-in-class customer experience."

37.     Investors and analysts reacted immediately to Vestis' revelation. The price of Vestis' common stock declined dramatically. From a closing market price of $8.71 per share on May 6, 2025, Vestis' stock price fell to $5.44 per share on May 7, 2025, a decline of about 37.54% in the span of just a single day.

38.     A number of well-known analysts who had been following Vestis lowered their price targets in response to Vestis' disclosures. For example, Barclays, while reiterating their underweight rating and lowering their price target 50%, noted they were "at a loss for words," stating, in pertinent part:

> Last year, when VSTS lowered their FY24 guided top line growth from 4%-4.5% to declining (-1)% to 0% … In both instances, ***communication proved poor, forecasting clearly inadequate, and the root cause/issues*** (service culture) ***remain*** and management has so far been unable to rectify them"

(Emphasis added).

39.     Barclays' analyst went on to warn that "VSTS ***clearly has fundamental customer service issues*** and is in desperate need of a cultural transformation – which is going to be hard to come by, and if it does, take a long long time" (Emphasis added).

40.    Similarly, Wolfe, while considerably reducing their price target, cautioned that "Lose business in excess of new customers continues to be a major headwind consistent with prior quarters." The analyst further addressed Vestis' forecasting and growth difficulties, stating that "the Co's continued execution failures to retain customers and drive positive net volume growth is the result of underlying service issues and believe the company has lost significant credibility with investors." In conclusion, the analyst pertinently summarized the issues as follows:

> The VSTS 2Q quarter was ***extremely underwhelming***. In previous quarters, the ***company stated they were reaching an inflection point on lost business and expected volumes from new growth to exceed its churn***. However, company's ***execution failures continue to persist*** leading to significant loss of credibility. Moreover, we believe the ***company's churn is reflective of deeper underlying service operations as opposed to macro impacts as peers have recently grown organic revenue presumably at VSTS's expense***.

(Emphasis added).

41.    The fact that these analysts, and others, discussed Vestis' shortfall and below-expectation projections suggests the public placed significant weight on Vestis' prior revenue and sales estimates. The frequent, in-depth discussion of Vestis' guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

42.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Vestis' common stock and operated as a fraud or deceit on Class Period purchasers of Vestis' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Vestis' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Vestis' common stock during the Class Period,

Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

43.    Vestis' stock price fell in response to the corrective event on May 7, 2025, as alleged *supra*. On May 7, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Vestis' forecasting processes and growth guidance.

44.    In particular, on May 7, 2025, Vestis announced results that significantly missed revenue and earnings estimates, withdrew their own full fiscal 2025 guide, and provided new third quarter guidance that was well below market expectations.

### *Presumption of Reliance; Fraud-On-The-Market*

45.    At all relevant times, the market for Vestis' common stock was an efficient market for the following reasons, among others:

(a)    Vestis' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Vestis communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Vestis was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Vestis was reflected in and incorporated into the Company's stock price during the Class Period.

46.     As a result of the foregoing, the market for Vestis' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Vestis' stock price. Under these circumstances, all purchasers of Vestis' common stock during the Class Period suffered similar injury through their purchase of Vestis' common stock at artificially inflated prices, and a presumption of reliance applies.

47.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with growth projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for their own execution shortcomings and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

49.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

50.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Vestis who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Vestis' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vestis' common stock were actively traded on the

NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Vestis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 2, 2025, there were 131.78 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Vestis;

(c)     whether the Individual Defendants caused Vestis to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Vestis' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vestis common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Vestis' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Vestis' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

61.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Vestis' internal affairs.

63.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Vestis' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Vestis' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Vestis' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

64.    During the Class Period, Vestis' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Vestis' common stock at prices artificially inflated by defendants' wrongful conduct. Had

Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Vestis' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Vestis' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

67.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Vestis' misstatements.

69.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Vestis which had become materially false or misleading.

70.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Vestis disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Vestis to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Vestis' common stock.

71.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Vestis to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72.     By reason of the above conduct, the Individual Defendants and/or Vestis are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: June 9, 2025                                         Respectfully submitted,

                                                           **LEVI & KORSINSKY, LLP**


                                                           */s/ Adam M. Apton*
                                                           Adam M. Apton
                                                           33 Whitehall Street, 17th Floor
                                                           New York, New York 10004
                                                           Tel.: (212) 363-7500
                                                           Fax: (212) 363-7171
                                                           Email: aapton@zlk.com

                                                           *Attorneys for Plaintiff*