**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BOARD OF TRUSTEES OF THE POLICE OFFICERS' RETIREMENT PLAN AND TRUST FUND FOR THE CITY OF MIRAMAR, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:25-cv-4844-GHW |
| Plaintiff, | Hon. Gregory H. Woods |
| v. | |
| VESTIS CORPORATION, KIMBERLY T. SCOTT, and RICKY T. DILLON, | |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**LEVI & KORSINSKY, LLP**

Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-1275)
Morgan Embleton (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zlk.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

## <u>TABLE OF CONTENTS</u>

I.     NATURE OF THE ACTION ........................................................................... 2

II.    JURISDICTION AND VENUE ................................................................... 10

III.   PARTIES ........................................................................................................ 11

IV.   RELEVANT NON-PARTIES ..................................................................... 12

V.    SUBSTANTIVE  ALLEGATIONS ............................................................ 17

   A.   Vestis Is a North American Uniform and Workplace Supplies Company Whose Core Business Is Recurring Rentals ............................................................ 17

     1.  Vestis' Customers and Operations ................................................. 17

     2.  Vestis Relies on Multiple Software Systems to Track the Company's Operations ....... 19

   B.   Leading Up to the Class Period, Vestis Emphasized Its Strategic Growth Plan Which Contemplated Superior Customer Service and Rigorous Executive Oversight............... 23

   C.   Prior to the Class Period, Mounting Lost Business Due to Customer Service Issues Attracts Immense Investor and Analyst Scrutiny Prompting Defendants to Personally Review Operational Shortcomings and Assure the Market That Corrective Measures Were Already Underway ........ 25

   D.   Despite Defendants' Assurances, Vestis' Customer Service Issues Were Far More Severe Than Disclosed and Persisted Throughout the Class Period ............................................. 28

     1.  Vestis' Extensive Customer Service and Inventory Issues Persist Throughout the Class Period Resulting in Company-Wide Customer Dissatisfaction.................................... 29

        i.  Vestis Regularly Provided Customers with Less Product Than Ordered Due to Insufficient Inventory........................................... 29

        ii. Vestis Frequently Delivered Poor Quality Products to Its Customers.................. 33

     2.  Vestis' Outdated Facilities Cause Massive Delays in Customer Service ..................... 34

     3.  Vestis Regularly Received Customer Complaints and Service Requests Given the Company's Recurrent Service Issues............................................................... 40

     4.  Vestis' Installation Process Inefficiencies Delay New Customer Sales, Which Defendants Knew from Dashboards and Meetings ........................................ 43

     5.  Vestis' Severely Dissatisfied Customers Seek Credits, Lower Order Volumes, and Pursue Contract Deviations and Buyouts in Response to Pervasive Service Issues...... 45

        i.  Vestis Implements a Strict Procedure in Response to Increased Customer Credits That Exacerbates Customers' Negative Experience with the Company.. 46

        ii. Throughout the Class Period, Vestis' Customers Sought Contract Deviations and Reduced Their Order Volumes to Contractual Minimums, Prompting Policy Responses by Defendant Scott That Enflamed Customer Relations Further........................................................ 49

iii.Vestis' Customers Seek to Terminate Their Contracts and Pursue Buyouts in Response to Rampant Service Issues ................................................................... 51

6.  Defendants and Senior Leadership Knew about Severe Production Issues Which Caused Delayed Deliveries to Customers, Low Customer Satisfaction, and Customer Retention and Sales Execution That Underperformed the Company's Publicly Disseminated Projections ............................................................................................. 53

i.  Defendant Scott and Senior Leadership Regularly Reviewed Production Data ... 53

ii. Defendant Scott and Senior Leadership Regularly Reviewed Sales, Retention, and Customer Satisfaction Data, Which Scott Presented during Town Hall Meetings ...................................................................................... 55

7.  Vestis Antagonized Customers Even Further by Instructing Employees to Willfully Deceive Customers About Contract Terms .................................................. 57

E.  During the Class Period, Vestis' Revenue and Adjusted EBITDA Plummet Due to Persistent Customer Service Issues and Soured Customer Relations .............................. 60

VI.  DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS .......................................................................................................... 63

VII.  THE TRUTH IS REVEALED ........................................................................................ 69

VIII.  ADDITIONAL SCIENTER ALLEGATIONS ............................................................ 77

A.  The Individual Defendants Admitted Reviewing and Discussing Sales, Customer Service and Satisfaction, Operations, and Productivity, and the Admissions Were Corroborated by CWs ...................................................................................................... 77

1.  Defendant Scott Conducted Customer Service Assessments and Met with Territory Managers to Discuss Customer Service Issues ............................................. 77

2.  Defendant Scott Touted Her Relationships with Customers and Personal Involvement with Vestis' Sales Team ......................................................................... 78

3.  Defendants Admittedly Monitored and Discussed Customer Service Data, Which CWs Confirmed, Highlighting Their Deep Understanding of Customer Dissatisfaction .............................................................................................................. 80

4.  Throughout the Class Period Defendant Scott Led Monthly Town Halls to Review Sales, Retention, and Customer Satisfaction Data ......................................... 84

B.  Senior Leadership Regularly Discussed Information in Meetings and Regular Reports That was Readily Accessible to and/or Reviewed by the Individual Defendants ........... 85

C.  CWs Confirmed That Defendant Scott and Senior Leadership Personally Visted and Observed Vestis' Underperforming Facilities ................................................................. 90

D.  Defendants Frequently, and in Great Detail, Discussed Vestis' Purported Service Improvements, Customer Experience, Retention and Sales Evidencing Their Knowledge of the Same ................................................................................................... 91

E.   Defendants' False and Misleading Statements Were Made on the Heels of Service Issue Disclosures Which Demonstrated Defendants' Awareness of Those Issues and Their Importance to Investors ................................................................................................ 96

F.   Defendants' Changes to Contract Deviation and Credit Policies Support a Strong Inference That Defendants Knew the Severity of Customer Service and Relations Issues ................................................................................................................ 96

G.   Suspicious Class Period Executive Departures Support a Strong Inference That Defendants Knew Severity of Customer Service and Relations Issues .......................... 97

H.   The Core Operations Doctrine Further Supports Scienter ................................................. 99

   1.   Defendants' Misstatements Concerned Vestis' Core Revenue Source and Operations 99

   2.   Defendants' Misstatements Concerned Vestis' Strategic Plan for Its Core Operations ............................................................................................................... 101

IX.   LOSS CAUSATION ............................................................................................................ 103

X.   CLASS ACTION ALLEGATIONS ...................................................................................... 109

XI.   PRESUMPTION OF RELIANCE ....................................................................................... 111

XII.   NO STATUTORY SAFE HARBOR .................................................................................... 113

XIII.   CLAIMS FOR RELIEF ........................................................................................................ 114

XIV.   PRAYER FOR RELIEF ........................................................................................................ 118

XV.   JURY DEMAND .................................................................................................................. 119

1.      Lead Plaintiff Board of Trustees of the Police Officers' Retirement Plan and Trust Fund for the City of Miramar ("Plaintiff"), by and through its undersigned attorneys, brings this class action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), individually and on behalf of all persons and entities that purchased or otherwise acquired Vestis Corporation ("Vestis" or the "Company") securities between May 2, 2024 and May 6, 2025, inclusive, and were damaged thereby (the "Class Period").

2.      Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Vestis with the SEC; (b) review and analysis of press releases and media reports issued by and disseminated by Vestis; (c) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning Vestis and the industry in which it operates; (d) review of other publicly available information concerning Vestis; and (e) interviews with former employees of the Company.

3.      Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION[1]

4.    Plaintiff brings this securities fraud class action alleging that, throughout the Class Period, Vestis and its former Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") knowingly or severely recklessly made material misrepresentations to investors concerning the Company's ability to fulfill on-time, complete, and quality product orders to customers, and the financial performance that was dependent on such deliveries.

5.    Vestis provides workplace supplies such as uniforms, floor mats, linens, etc., for corporate clients in the U.S. and Canada ranging from large national chains like the Cheesecake Factory to Small and Medium Enterprises or Businesses ("SMEs" or "SMBs") as compactly scaled as single-location mom-and-pop shops (*e.g.*, a local auto garage or medical office). The Company's core "rental" business involves renting products to customers and providing recurring service to pick up, launder, and provide clean replacements—typically, once a week.

6.    On May 2, 2024—the first day of the Class Period, and less than one year into Vestis' independent corporate existence—Defendants announced that the Company's customer service with regard to an "isolated" set of issues, including on-time and complete deliveries, had caused the Company to halt planned customer price increases and deeply cut guidance targets for fiscal year 2024. Investors and analysts were incensed, and not only would they demand frequent updates from that point on regarding Vestis' service performance, they were also committed to flyspecking every disclosure Defendants would make about it. For example, at the beginning of the Class Period an analyst from Wolfe Research, a prominent financial advisory, stated "investors likely will require ideal execution from mgmt in the periods ahead to regain standing" and Barclays

---

[1] Unless otherwise noted, all emphasis in quotations is added and all internal citations and quotation marks are omitted.

issued a report warning that Vestis was trending from a "show me" state toward "lost me."

7.      Accordingly, the Class Period dawned at the most pivotal moment in Vestis' history for Defendants to demonstrate proof of concept for the Company's business model. The Individual Defendants—Kimberly T. Scott (former CEO) ("Scott") and Ricky T. Dillon (former CFO) ("Dillon")—knew it. Indeed, during a May 2, 2024 earnings call presented jointly by Scott and Dillon, Scott assured investors that "we have been evaluating the lost business and [are] really digging in to understand the root causes" and that such investigation "is about going really deep into the bowels of the business and understanding what levers we can pull to make Vestis even better, and that's what we're doing." Likewise, Dillon admitted "we've spent the time analyzing the reason for [customer] quits and the magnitude of the carryover losses[.]"

8.      Knowing the market would punish any unfavorable news, Defendants spent the Class Period concealing the truth by falsely and misleadingly extolling the Company's purported gains in service performance and customer experience. For instance, Scott made numerous patently false claims, including, among many others:

- that "**<u>retention is moving back in the right direction</u>**";

- that "**<u>we have made great progress in terms of … improving our service levels</u>**";

- that Defendants were "**<u>very pleased with the progress that we're making around efficient operations</u>**";

- that "[**<u>w]e continue to drive efficiencies across our operations, and we remain highly focused on elevating our customers' experience</u>**";

- that in terms of customer service "**<u>across the system, the whole system is rising and the level of play is getting stronger. So I would just say we're going to continuously</u>**

**improve across the board, and we're doing that**";

- that "**overall, we are seeing continued improvement in the customer experience, and we can see that daily in the reduction of service requests related to these key focus areas**" of "on-time delivery" and product "shortages";

- that as to customer service "**[w]e are definitely seeing that, that body of work is making a difference, and we are seeing improvements in service requests and our customers are responding very positively to the work that we are doing to take great care of them. So I would point to that as the key reason around why our customers are staying**";

- and that "**we are actually seeing a step change in improvement related to shortages.**"

9.      In addition, every quarterly report filed with the SEC on behalf of Vestis, and signed by Defendants Scott and Dillon, falsely represented that "**[t]here have been no material changes**" to the Company's previously issued risk factors in addition to containing purported risk disclosures that speculatively cautioned "**actual results may differ materially**" from reality if, *inter alia*, customers canceled or reduced service.

10.      However, throughout the Class Period, customer service and experience never improved at all. According to Confidential Witnesses ("CWs"), who are former employees of Vestis, the Company's inefficient, outdated, and under-resourced production facilities resulted in customer orders being delivered chronically late, missing product, or fulfilled with soiled or substandard quality product.

11.      For example, CW2 estimated half of the equipment in Vestis' Chicago plant (the third largest in the Company) was down at any given time throughout the Class Period, other

equipment "barely ran," and still others routinely caught fire and halted production across an entire facility. Likewise, CW4, recalled that throughout CW4's Company Region there was "outdated machinery," some 30 or 45 years old, that caused "much" of the Company's productivity issues. And the plant productivity shortfalls were enormous. According to CW2, ironing efficiency in the Chicago plan was "consistently at 70 to 80%" of target which "absolutely" caused missed deliveries. Further, the Chicago area plant "was very capable of doing 800,000 to a million pounds a week if it was maintained correctly," but that "we were doing somewhere around 600,000 if we were lucky." In other words, throughout the Class Period, Vestis' Chicago production output was *always 25% behind schedule*.

12.     Another cause of the Company's service problems was that Vestis had implemented cost control measures designed to limit the amount of new products injected into the Company's workstream, without considering the amount of product that customers needed. Consequently, throughout the Class Period, production facilities were unable to fulfill customer orders due to a lack of product. Instead, Vestis management sought to triangulate customers most in need of service and "short" other customers (*i.e.*, not provide the amount of product agreed to). CW1 described shortages as a necessity "every week" because "the only way you could operate was cutting. *You're robbing from Peter to pay Paul every day*." As a result, beginning before the Class Period began, and persisting consistently until May 2025, the Company received "constant complaints" from customers that "there weren't enough mats, not enough aprons, towels, and just a constant lack of product."

13.     In addition to missing orders and insufficient product, CWs confirmed that, throughout the Class Period, the Company's chaotic workstreams affected customers in other

ways. Product quality was one—with CWs confirming that Vestis received regular complaints of unclean products containing stains, spots, holes, "metal fragments," or other deficiencies that resulted in products being improperly packaged to meet health and safety standards. New customer onboarding (referred to as "installation") was another—resulting in delayed service, and therefore, attendant revenue loss. Whereas the industry standard time for completed installations was twenty to thirty days (depending on the type of service requested), CWs confirmed that Vestis was hovering around 45 days on average, and sometimes "over six months," meaning weeks or months of missed service for every customer and damage to the customer relationship.

14.     In fact, Vestis got off to a rocky start with its customers from the very beginning, especially with SMEs who were frequently less sophisticated bargaining partners. According to CW5, and corroborated by Defendant Scott herself, the Company required new sales personnel to attend corporate training at the Company's Roswell, Georgia headquarters. During training CW5 stated that the Company's Senior Vice President of Sales, Peter Rego, pressured salespersons to sign customers up for service agreements with up to five-year terms while telling the customers that their service agreement was "month-to-month" and customers could "cancel whenever" they wanted, which was a "***complete lie***." CW6 heard the same from Rego during a Company "rally call" after his arrival in 2024. Rego told trainees "don't worry about the term" because Vestis has lawyers and "a legal way to justify it." The Company's hardball tactics were not just dishonest, but also costly. CW1 stated that "tons of customers" would tell CW1 "I'm not renewing with you guys once my contract's up" and that "they all wanted to quit."

15.     As a result of the endless operational failures and shameful client outreach, throughout the Class Period the Company was left with thoroughly dissatisfied customers who:

demanded credits for missed service; reduced service levels to the contractual minimums; sought contract deviations to obtain more favorable terms or fewer obligations; negotiated to buy out of their contract; or canceled service altogether. The combined effect wreaked havoc on Vestis' financials. ***And Defendants knew it***.

16.     Indeed, mirroring the Individual Defendants' statements at the beginning of the Class Period, Scott, speaking for herself and Dillon, would continue to admit that "we look ***every day*** at leading indicators around service-related requests[,]" that "we manage service requests on a very tactical and daily basis" and that Defendants were "very diligent about measuring the performance with existing customers, understanding what's happening with teammates and wearers that are using our product with those customers."

17.     CWs corroborated Defendants' admittedly detailed review and analysis of the Company's operational performance metrics. For instance, CW2 and CW4 confirmed that weekly plant production data was stored in the Company's databases and that both witnesses were informed by their managers that Scott was reviewing the data. In fact, CW2 verified that he/she actually saw in the Tableau software system that Scott had reviewed plant data on multiple occasions. Likewise, CW3 confirmed that an "executive-level dashboard" available to Scott and Dillon showed new customer installation delay averages. As to meetings, CW1 explained that Scott attended a "roundtable" meeting in late 2023 or early 2024 where Territory Managers across the entire Company explained to Scott the numerous problems affecting customer service, including the product shortages, low morale among Territory Managers, and "not having what we need to run our areas every day." Additionally, CW4 confirmed that beginning before the Class Period and throughout CW4's tenure, Scott led monthly virtually-held Town Hall meetings,

attended by senior leadership and managers. The meetings were accompanied by slide presentations containing Company metrics and financial performance. Consistently during Town Halls before the Class Period and throughout CW4's tenure, customer satisfaction metrics fell short of the Company's targets.

18.    CWs also confirmed Defendant Scott's in-depth review of the Company's financial performance. According to CW3, Vestis convened monthly or quarterly Enterprise Architecture meetings, which were frequently attended by Scott's Executive Assistant Jessica Bernantz, wherein customer credits were an issue "all the time" and it was an ongoing topic of discussion and "end-to-end install timing" were "regularly discussed." Moreover, CW4 confirmed that, during the October and November 2024 Town Halls, Scott reported that Vestis was missing its targets and **not hitting the sales and customer retention numbers promised to investors** by "**significant percentages**[,]" and investors were not happy with the company.

19.    Astonishingly, in stark contrast to the information Defendants learned in Company reports and during meetings like the ones described above (and many others described, *infra.*, that were attended by the Company's most senior leadership below the C-Suite), Defendants even falsely assured investors as late as November 2024 and January 2025 that the Company's financial outlooks somehow *benefitted* from the prevailing dismal customer service levels. For instance, on November 21, 2024, Scott attributed the company's projected revenue and adjusted EBITDA growth to "**the commercial momentum that is building across Vestis, the progress we are making executing against our efficient operations initiatives, and the way our organization has embraced our mission to deliver a best-in-class customer experience**" and on January 31, 2025—the same day Vestis announced Dillon was leaving the Company, yet while concealing that

he had been "terminated"—Scott claimed that Defendants expected "**new volume growth will exceed lost business driven by field sales productivity**[.]"

20.     Vestis revealed the truth after market close on May 6, 2025, and before the market opened on May 7, 2025, by announcing, among other disclosures, its 2Q2025 results and updated financial guidance—including a complete withdrawal of full year guidance for fiscal 2025, which was replaced by disappointing quarterly guidance for 3Q2025. Specifically, the Company disclosed: that second quarter revenue decreased by $40.1 million year-over-year "primarily due to a $17.5 million decline from lost business in excess of new business[;]" that second quarter adjusted EBITDA had decreased year-over-year and that the "main reason for the decrease was lower adds over stops," reflecting the change in order volumes from existing customers; that the Company had taken a "$15.0 million one-time adjustment for bad debt expense" related to sums owed from customers who had canceled service and that Vestis now had changed its views as to the collectability of those sums; that the Company had spent $30 million in 2Q2025 working capital as an "investment in inventory to support new customer installations as well as improve our ability to serve existing customers more effectively[;]" that the Company's capital expenditures were exploding ($14 million in 2Q2025 and $60 million for the remainder of fiscal 2025) to invest in "facility improvement[;]" and that Scott and Dillon, whose departures had previously been announced earlier in 2025 but under undisclosed circumstances, had in fact been terminated.

21.     On this news, Vestis' common stock price fell approximately **_38%_** in a single trading day, declining $3.27 per share from a closing price of $8.71 per share on May 6, 2025 to $5.44 per share on May 7, 2025 on unusually heavy trading volume.

22.     Analysts and investors reacted immediately, evidencing their disbelief. For instance, Baird Equity Research issued a report cutting its price target for the Company by more than half "given the high level of uncertainty and management turnover[,]" expressing that "[e]xpectations were low following CEO firing, with guidance cut widely expected, but VSTS' F2Q25 results still managed to negatively surprise, probably by a lot." Wolfe Research wrote that the "company's execution failures continue to persist leading to significant loss of credibility" and that "we believe the company's churn is reflective of deeper underlying service operations as opposed to macro impacts as peers have recently grown organic revenue presumably at VSTS's expense." Barclays, following up on its report from a year earlier, issued a report on May 8, 2025 titled "***From 'lost me' to 'at a loss for words***[,]'" and succinctly stated that "whatever little credibility VSTS had worked to restore is now gone."

23.     Defendants' fraudulent and misleading statements served to artificially inflate the price of Vestis' securities throughout the Class Period, causing massive investor losses when the price of those securities precipitously declined as the truth was revealed. Plaintiff hereby seeks damages individually and on behalf of the Class.

## II.    JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     This Court has jurisdiction over each Defendant named herein because each

Defendant has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa), as Vestis' stock is publicly listed and trades within this Judicial District.

28.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephonic and digital communications, and the facilities of a national securities exchange.

### III.     PARTIES

29.     Lead Plaintiff Board of Trustees of the Police Officers' Retirement Plan and Trust Fund for the City of Miramar purchased Vestis common stock during the Class Period, as set forth in its previously-filed certification, incorporated by reference herein (ECF No. 19-1), and suffered damages as set forth herein.

30.     Defendant Vestis Corporation is a Delaware corporation with principal executive offices located at 1035 Alpharetta Street, Suite 2100, Roswell, Georgia. Vestis' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol VSTS.

31.     Defendant Kimberly T. Scott served as CEO, President, and Director of Vestis from September 30, 2023, until March 18, 2025. On March 19, 2025, Vestis announced Scott would "leave her positions with the Company" effective the day prior and that Phillip Holloman, Chairman of the Board of Directors (the "Board"), would serve as Interim Executive Chairman and President and CEO effective immediately. On May 7, 2025, Vestis filed a Separation

11

Agreement and Waiver and Release (the "Scott Separation Agreement"), entered into with Defendant Scott, with the SEC as an exhibit to the Company's quarterly report for the period ending March 28, 2025. The Scott Separation Agreement, which entitles Vestis to a release of claims, states that "the Company notified [Scott] that, effective as of March 18, 2025 . . . her employment with the Company, including as President and Chief Executive Officer, would be terminated in all respects without 'Cause' . . . ."

32.     Defendant Ricky T. Dillon served as Executive Vice President and CFO of Vestis from September 30, 2023 until February 14, 2025. On January 31, 2025, Vestis announced that Dillon was "leaving the Company [on February 14, 2025] as part of a transition of the Chief Financial Officer role." Kelly Janzen replaced Dillon as Executive Vice President and CFO. On May 7, 2025, Vestis filed a Separation Agreement and Waiver and Release (the "Dillon Separation Agreement"), entered into with Defendant Dillon, with the SEC as an exhibit to the Company's quarterly report for the period ending March 28, 2025. The Dillon Separation Agreement, which entitles Vestis to a release of claims, states that "the Company notified [Dillon] that, effective as of February 14, 2025 . . . his employment with the Company, including as Executive Vice President and Chief Financial Officer, would be terminated in all respects without 'Cause' . . . ."

33.     Defendants Scott and Dillon are referred to herein as the "Individual Defendants." Defendants Vestis, Scott, and Dillon are referred to herein as the "Defendants."

## IV.    RELEVANT NON-PARTIES

34.     Phillip Holloman served as Vestis' Chairman of the Board throughout the Class Period. After Defendant Scott's termination, Holloman also served as interim Executive Chairman,

President, and CEO from March 18, 2025 until June 2, 2025, when Jim Barber was appointed as Vestis' CEO, President, and as a Board member.

35.    Peter Rego has served as Vestis' Senior Vice President of Sales since July 23, 2024. According to a July 23, 2024 Vestis Press Release, titled "Vestis Announces Key Operations and Sales Leadership Appointments[,]" Rego reported "directly to CEO Kim Scott" during the Class Period.

36.    Kelly Janzen has served as Vestis' CFO since February 14, 2025 when she assumed the position after Defendant Dillon's termination.

37.    Aramark Corporation ("Aramark") is the former-parent company of Vestis which, during such period, operated as an Aramark business segment called Aramark Uniform Services. Vestis became a standalone company after Aramark spun it off in a transaction that closed on September 30, 2023. As a result, the Company's shares began publicly trading on the NYSE on October 2, 2023.[2]

38.    CW1 was employed by Aramark and then Vestis as Territory Manager for the Southeast United States from June 2021 through May 2025. CW1 reported to General Manager ("GM") William Turner, who reported to Vice President ("VP") of the Southeast Region Paul Schmid, who reported to Scott. The Southeast Territory that CW1 managed included customers within a 250-mile radius of Thomasville, Georgia. As a Territory Manager, CW1 managed various

---

[2] Vestis' fiscal year does not correspond to the calendar year, but rather ends on the Friday nearest to September 30th. *See* Vestis, *FAQ*, https://ir.vestis.com/company-information/faq (last visited Oct. 24, 2025). Consequently, the Company's fiscal quarters containing and surrounding the Class Period consisted of: (i) the second quarter of 2024, consisting of the three months ended March 29, 2024; (ii) the third quarter of 2024, consisting of the three months ended June 28, 2024; (iii) the fourth quarter of 2024, consisting of the three months ended September 27, 2024; (iv) the first quarter of 2025, consisting of the three months ended December 27, 2024; and (v) the second quarter of 2025, consisting of the three months ended March 28, 2025.

aspects of Vestis' operations, including overseeing routes, route service representatives ("RSRs"), customer complaints, and customer retention within CW1's territory.

39.     CW1's responsibilities also included training RSRs. Within the territory, CW1 was responsible for running day-to-day operations at a depot, which is a satellite facility where products are delivered to and stored for distribution to customers within the depot's radius and where dirty products from those same customers are brought before being transported to a market center. Market centers include a main laundry plant specific to that region as well as satellite plants, distribution centers, manufacturing plants, a group of routes serviced by RSRs, and a sales team. CW1 explained that Vestis' market centers were "the main hub" where the General Manager for each Territory was situated and the production plant was where Vestis personnel "do all the washing and sorting of the clothes" within the Territory. CW1 explained that the depot where CW1 worked mostly serviced Vestis' rental customers, providing them with all of Vestis' product offerings, including uniforms, towels, aprons, bathroom supplies, and first aid.

40.     CW2 was employed by Vestis as a General Manager Designate from May 2024 through July 2024 and as a General Manager of Production at a production center, also referred to as a plant, outside of Chicago, Illinois from July 2024 through February 2025. CW2 reported to Regional Vice President Nanci Hunsinger, who initially reported to Senior Director of Plant Operations Kevin Sanders and CEO Kim Scott. Upon Bill Seward joining Vestis as Chief Operating Officer on September 1, 2024, Hunsinger reported to Seward, who reported to Scott.

41.     CW2's plant was the third largest in Vestis' network, behind the Riverside, California facility and the New Jersey facility, which were the largest and second largest, respectively. According to CW2, the Chicago plant supplied product for three market centers:

Chicago (Central), Arlington Heights, (North) and Mokena (South). CW2 stated that the plant served many rental customers in the healthcare and food service industries (*i.e.*, hospitals and restaurants). CW2 managed the Chicago plant's entire operations, including the 80 to 100 employees working there. CW2's role was senior to the plant manager. According to CW2, the plant also had a separate General Manager of Sales equal in rank to CW2, but who was responsible for sales rather than operations.

42.    CW3 started at Aramark in the fourth calendar quarter of 2021 on the Business Transformation team and, by the beginning of Class Period, CW3 had transitioned to Vestis' Enterprise Architecture team where CW3 remained until CW3's departure from Vestis in the fourth calendar quarter of 2024. CW3 reported to the Vice President of Enterprise Architecture. CW3 stated that the Business Transformation led the rollout of the ABS route accounting system at Aramark. Upon finishing the ABS implementation, CW3 recounted the Business Transformation team was folded into Enterprise Architecture and focused on project implementation. CW3 stated that Enterprise Architecture projects ranged from supply chain activities, to customer service and plant operations. CW3 explained the Enterprise Architecture team "took the strategic vision of the company" and the projects that were supportive of those strategic initiatives, and implemented them.

43.    CW4 was the Plant Manager of the Odessa, Texas production center from January 2022 through December 2024. CW4 reported to General Manager Clint Rodgers and a District Operations Manager. CW4 stated that Rodgers reported to the Regional Manager. CW4 oversaw 42 production employees and was responsible for "[a]nything that happened inside the plant." CW4 stated that the Odessa plant had 17 routes, each staffed by an RSR.

44.     CW4 recounted that CW4's main task was to keep the production line moving. CW4 stated that "when the dirty product comes back from the RSRs, it gets unloaded. We sort through that. We wash it. We process. And then we turn it around, and then we load it for customers for the following day."

45.     CW5 was employed by Vestis as an Account Executive in the Company's Indianapolis, Indiana office from late January 2025 through June 2025. CW5 reported to Sales Manager Tyler Grissom, who reported to Director of Sales Alexandria Karpin, who reported to Senior Vice President of Sales, Peter Rego, who reported to CEO, Kimberly Scott. As an Account Executive, CW5 was in a sales-facing role and was responsible for generating new rental accounts (meaning customers looking to rent products owned and cleaned by Vestis), primarily consisting of SMEs, within CW5's sales territory.

46.     CW6 was employed by Aramark and then Vestis as an Account Executive from March 2023 until March 2024 and as a Regional Sales Executive in the Company's Buffalo, New York office from March 2024 until mid-August 2025. CW6 reported to Regional Sales Manager Mark Wahl, who reported to a Regional Sales Manager for the Northeast, who initially reported to Scott. Upon Rego becoming Vestis' Senior Vice President of Sales on July 23, 2024, the Regional Sales Manager for the Northeast reported to Rego, who reported to Scott. As a Regional Sales Executive, CW6 was responsible for developing business-to-business direct-sales and rental sales for larger-sized accounts in a region that included Buffalo, Rochester, and an area in Pennsylvania.

V.    SUBSTANTIVE ALLEGATIONS

   A.  **Vestis Is a North American Uniform and Workplace Supplies Company Whose Core Business Is Recurring Rentals**

47.    Vestis' core business is referred to as "recurring rentals" meaning the Company rents its products to customers and services them on a recurring basis (typically weekly). To service its over 300,000 customer locations across the United States and Canada, Vestis sources and delivers uniforms, floor mats, linens, first aid, and restroom and safety supplies, picks up dirty products, and launders, sanitizes, repairs, and replaces those products.

48.    Throughout the Class Period, Vestis' recurring rentals comprised the overwhelming majority of the Company's total revenue. For example, according to the Company's financial report for the fourth quarter and full year ended September 27, 2024, which was filed with the SEC on November 22, 2024 on Form 10-K (the "FY2024 Form 10-K"), Vestis' recurring rentals constituted over 94% of the Company's total revenue. Vestis' remaining revenue was derived from direct sales of customized uniforms to customers.

   **1.  Vestis' Customers and Operations**

49.    Vestis' customers span several industries, including manufacturing, hospitality, retail, food processing, pharmaceuticals, healthcare and automotive, and consist of SMEs and national franchises/large corporations. The vast majority of Vestis' customers consist of SMEs. For instance, during the Company's first Analyst Day presentation ("Analyst Day") on September 13, 2023, Defendant Scott explained that "84% of [Vestis' customers] are small-to-medium enterprise customers, and the remaining 16% of them are national accounts."

50.    Vestis markets and sells its services to its customers through multiple channels including its sales team RSRs, telemarketing sales channels, territory managers and digital

platforms. After the Company secures a new customer contract, then the new customer installation process begins.

51.    According to CW3, a salesperson would sign a contract and then pass a folder of information regarding the new customer to the New Business Install Manager ("NBIM"). CW3 stated that the NBIM visited the customer to perform sizing and input data, including shirt and pant sizes and quantities of mats or napkins, into Salesforce.

52.    Upon NBIM approval of the order, CW3 recalled that the order proceeded to the stockroom manager at the respective market center who managed garments at the plant and would "do some processes in ABS." CW3 stated that stockroom managers were "responsible for approving orders" and those orders were sent electronically to the distribution centers through ABS once the purchase order was approved.

53.    According to CW3, the distribution center then processed the garments and sent them back to stockroom manager at the plant who would unpack the boxes, hang the garments, check them over, and prepare them for installation, meaning delivery to the new customer. CW3 recalled that, depending "on the size and type of account," the route driver, salesperson, or NBIM would perform the installation.

54.    For new rental customers who have completed installation and for existing rental customers, Vestis provides services on a recurring basis, which is typically performed weekly, and includes: (i) delivering clean uniforms; (ii) picking up worn uniforms for inspection, cleaning and repair or replacement; (iii) picking up used and soiled floor mats, towels and linens and replacing them with clean products; and (iv) restocking restroom supplies, first-aid supplies and safety products as needed.

### 2. Vestis Relies on Multiple Software Systems to Track the Company's Operations

55.     To track and monitor customer satisfaction, production, and sales data, Vestis employed specialized software systems, including, *inter alia*, Salesforce (a customer relationship management ("CRM") software), ABS (a route accounting tool), Microsoft Power BI and Tableau (two business intelligence platforms), Spindle (utilized in commercial laundry plants), and Oracle (enterprise resource planning ("ERP") software ).

56.     Salesforce is a CRM software that provides customer contact management, lead-tracking, and real-time sales reports, such as sales team performance and sales forecasts.[3] In CW5's role, CW5 had access to Salesforce, which included the Company's sales leads, sales metrics, and service agreement terms with its customers. Salesforce also included customers' addresses, contact information, "decision makers," and Account Executive notes on customer interactions. According to CW3, Salesforce was used to track customer prospecting, and once a contract was signed, the customer account would also be set up in Oracle and ABS.

57.     At Vestis' Analyst Day, Scott stated that ABS was the Company's "operating system" and further explained that it provided a "standardized common platform for all of our facilities to operate off of[.]" Scott had previously described ABS, during Aramark's December 9, 2021 Investor Day, as "one place to house all of our data and information about our customers to see the movement of our routes so that we can understand how efficient we're being[.]" Scott also noted, during the Analyst Day, that ABS enabled RSRs to have handhelds to digitally "[a]dd a new customer wear, add a new product, look up information for the customer" while on the route.

---

[3] Salesforce, *8 Best Sales Software for 2025*, https://www.salesforce.com/sales/software/ (last visited Oct. 24, 2025).

58.     CW3 explained that ABS is the "the heartbeat of the laundry operation" and was fully implemented across Vestis' production facilities by May 2024. According to CW3, ABS contained a variety of operations data, including customer records, the products they received, delivery schedules, invoices, and charges, although Oracle, an ERP system with financial accounting and reporting capabilities,[4] was the "golden record" for invoices. CW3 recalled that Vestis employees also entered price increases and credits in ABS. CW3 stated that ABS also contained reason codes to capture customer requests, including size changes, defective items, or replacements.

59.     CW3 stated ABS reports were used for daily operations and that the ABS data "certainly was part of the data warehouse where those more executive level dashboards and things would have been created."

60.     Vestis also used Spindle, a platform that allows for data collection automatically from plant equipment and through manual inputs, visual productivity displays based on real-time data, and real-time alerts to identify opportunities for plant floor improvements, to capture its plant operations.[5]

61.     CW4, who had access to Spindle as a Plant Manager, confirmed that it was used to track plant efficiency and "tells you what's happening right now." CW2, who also had access to Spindle as a General Manager, stated that Spindle was a phone application that "recorded all the metrics for the plant," including pounds processed per hour, the number of napkins through an ironer, and the number of slings of dirty laundry sent into the air. According to CW2, "most of the

---

[4] Oracle, *Oracle Enterprise Resource Planning (ERP)*, https://www.oracle.com/erp/#rc30p1 (last visited Oct. 24, 2025).
[5] Spindle, *Spindle for Industrial*, https://www.spindlelive.com/industrial-laundry (last visited Oct. 24, 2025).

data" input into Spindle was automated, including wash floor and soil data, because it tracked automated processes. CW2 recalled that other tasks performed manually were logged manually accordingly, stating that "if I bagged up 25 shop towels or 50, I would then hit a button, and it would record my productivity."

62.    CW2 stated that Spindle also tracked individual worker metrics, including productivity, through an app on the employee's phone. CW2 provided an example, stating that Spindle would display an error if the worker "was supposed to be on an ironer," but still "showed up in soil or the wash floor." CW2 also explained that Spindle would flag if a worker was at 60% productivity, then the supervisors were required to coach that employee, which was also logged in Spindle.

63.    CW2 described that Spindle allowed plant management to perform regular checks of worker productivity. CW2 stated that "every two hours, every plant has a tour" and that Spindle would show "how many pounds you did." CW2 added that "every plant has an identical board" which contained employees' real time "metrics on it" and permitted personnel in the plant to "see where you're at." According to CW2, every two hours, teams were expected to respond to the data and "understand why you were down, why you're up," then to "come up with countermeasures if you were down."

64.    Vestis also used Tableau to track and report metrics related to plant operations, among other metrics. Tableau is a visual analytics platform that connects data and produces visualizations, like interactive dashboards, charts, and reports to track and analyze metrics.[6] CW2,

---

[6] Tableau, *Explore the Tableau Product Portfolio*, https://www.tableau.com/products/tableau (last visited Oct. 24, 2025).

who had access to the software as a General Manager, stated Tableau would "give you a wrap up" of all the production metrics, including a breakdown of data "by day" and "by month" for items on the wash floor. CW2 recalled that Tableau had reports covering different areas, including ironing efficiency, wash floor efficiency, and bulk fold efficiency. CW2 added that Vestis also used Tableau for scorecards used by C-suite executives.

65.     Corroborating CW2, CW4 stated that Tableau was also used to track plant efficiency and explained that it "tells you what happened yesterday." CW4 stated that Tableau was central to how plant performance was tracked and discussed, and was a "key component" in providing the efficiency data that was reported during the weekly regional calls.

66.     Vestis also used Microsoft Power Business Intelligence ("BI"), another business analytics platform that aggregates data sources to create interactive reports, visuals, and dashboards,[7] to create executive dashboards that provided insight into install times and other metrics. For instance, CW3 confirmed that the "C Suite" (which includes Scott and Dillon) had access to "an executive-level dashboard" built into Microsoft Power BI, which CW3 personally accessed a few times, that included "average install time" (representing the number of days to complete a new customer installation for garments and allied installations (i.e., non-garment products)) as a metric that was viewable on the executive dashboard.

---

[7] Microsoft, *Product Overview*, https://www.microsoft.com/en-us/power-platform/products/power-bi (last visited Oct. 24, 2025).

**B. Leading Up to the Class Period, Vestis Emphasized Its Strategic Growth Plan Which Contemplated Superior Customer Service and Rigorous Executive Oversight**

67.     Prior to the Class Period, during Vestis' Analyst Day, Defendants introduced their strategic plan to accelerate growth at Vestis. The strategic plan sought to provide: (i) high quality revenue growth, (ii) efficient operations, (iii) disciplined capital allocation, and (iv) a performance-driven culture.

68.     The high-quality growth component aimed to retain customers by providing them with seamless service, which Scott described during the Analyst Day as "show up on time every week, deliver the products and services that you provide promise to your customers and do that with consistency and excellence." To purportedly facilitate this, Vestis relied on data analytics to "really trend customer behaviors and understand what's happening with that customer so that we can provide excellent service to them."

69.     The high-quality growth component also contemplated that Vestis' RSRs would cross-sell the Company's products to its existing customers to increase revenue. According to Scott, cross-selling represented a "massive opportunity" for the Company because, at that time, Vestis was only providing 30-40% of services to its existing customers. Indeed, Scott explained during the Analyst Day that "if we were to add one product to every customer that we have, just using our average value of a product, it would be worth $900 million in revenue."

70.     Another component of the strategic plan was efficient operations. Vestis' operations included significant cost inputs, including labor, merchandise in service costs, plant operating costs and service-related costs. Due to these costs, Vestis purportedly sought to instill a continuous improvement mindset in its employees by instituting disciplined, financial metrics and

reporting, key performance indicator monitoring and strengthening its leadership in key functional areas such as supply chain, logistics and plant operations.

71.     One component of Vestis' efficient operations strategy concerned managing costs through the Company's merchandising. Through this initiative, Vestis aimed to reuse garments and products and reduce the issuance of new products. Traditionally, when Vestis acquired new customers, the Company sourced them new garments. Vestis would then amortize those garments over time. Under the efficient operations strategic plan component, however, the Company planned to provide used, laundered garments in instances where, for example, one of the customer's employees leaves and the new employee (who wears the same size) joins rather than providing a new garment. During the Analyst Day, Scott described this process as educating Vestis' stockroom employees about garments that could be reused, consolidating stockrooms, "very closely" monitoring "used fill rate" (*i.e.*, the rate at which Vestis uses used garments) and automating Vestis' inventory system so that Defendants could "see every product and every facility at any given time so that we know and have access to these garments, and we can effectively reuse them."

72.     The Company's strategic plan also involved creating a performance-driven culture through which Vestis planned to make data-informed decisions and implement performance measurements and incentives aligned with the Company's strategic objectives. At the Analyst Day, Scott described this initiative as mobilizing Vestis' employees to take great care of its customers, cross-sell its base, and running efficient routes by "bringing a databased approach to" Vestis by focusing on key performance indicators ("KPIs") and leading indicators.

73.     One such leading indicator was customer retention, which Vestis defines as "lost annualized recurring revenue for the period reported divided by total company annualized recurring revenue for the trailing 52 weeks." According to Vestis' FY2024 Form 10-K, customer retention was "a leading indicator" of the Company's financial and operational performance because "the financial impact from the lost business will be realized over the 12 months after the billings cease for the lost customer." In line with this, Vestis considered lost business and new business to be KPIs. During the Class Period, Vestis defined "lost business" as net revenue impact from customers who terminated their relationship with Vestis whereas the Company defined "new business" as "volume growth" for both "new customers and expanding our existing customer penetration through cross-selling[.]"

> **C.   Prior to the Class Period, Mounting Lost Business Due to Customer Service Issues Attracts Immense Investor and Analyst Scrutiny Prompting Defendants to Personally Review Operational Shortcomings and Assure the Market That Corrective Measures Were Already Underway**

74.     Before the Class Period, Vestis experienced a torrent of customer losses driven by disastrous service problems. For instance, during the Company's earnings call for the first fiscal quarter of 2024 on February 7, 2024 ("1Q2024 Earnings Call"), Scott disclosed that Vestis lost a large national Clean Room business account in 2023 for undisclosed but nonstrategic and "regrettable" reasons. Vestis also lost at least two major national accounts during FY2023. During the 1Q2024 Earnings Call, Scott also disclosed that Vestis was losing SMEs due to a purported "uptick in business closures." This increase in customer losses served as a catalyst for the Company's deep-dive into the underlying reasons for such losses. For instance, during the 1Q2024 Earnings Call, Scott explained that "[s]o when you look at what is happening around business

closures, particularly with small to medium enterprise, ***we're going pretty deep and granular to understand what are those patterns and trends around why customers leave***."

75.    The results of this deep-dive purportedly uncovered that customer losses were driven by pricing fatigue and, according to Defendants, a narrow subset of service issues associated with "isolated reason codes" related to "very specific delivery matters" including "on-time delivery and stopping shortages and delivering full loads to customers." Defendants reported such findings on the first day of the Class Period during the Company's for the second fiscal quarter of 2024 on May 2, 2024 ("2Q2024 Earnings Call").

76.    These customer losses and customer repudiations of price increases devastated the Company's financials. For instance, though Scott affirmed Defendants' "confiden[ce] in [Vestis'] ability to deliver on our full year financial outlook" in a press release filed with the SEC on Form 8-K on February 7, 2024 ("1Q2024 Press Release"), just one quarter later Defendants slashed FY2024 guidance from "deliver[ing] revenue growth in the range of 4.0 to 4.5%" and an adjusted EBITDA margin of approximately 14.3% to "revenue growth in the range of (1)% to 0%" and an adjusted EBITDA margin "between 12.0% and 12.4%."

77.    Nevertheless, during the 2Q2024 Earnings Call, Scott assured investors that the service shortfalls Defendants had identified represented an "underlying opportunity" for improvement that the Company had known about "for some time[.]"  Scott likewise assured that she, ***personally***, had "very deeply" evaluated the "root causes [of customer losses] at the grassroots level down to [Vestis'] market center" and confirmed that Vestis had already isolated the specific challenges causing the service issues and opportunities to enhance those processes. As a result, the Company had already "been addressing" those issues as a means to improve customer retention.

78.    Research analysts were shocked by the disclosures. For instance, a Jefferies report issued on May 3, 2024 noted that it was "the first time customer retention and service issues were made apparent publicly." That same report emphasized that analysts were particularly troubled by management withholding information regarding customer retention, stating in relevant part:

> More troubling, mgmt never fully disclosed the fall off in retention on recurring revenue it started experiencing 2H23 or the true magnitude of customer losses to be expected and overcome in FY24 (we had modeled ~MSD % customer losses, not 9%+). ***For a newly public company, there is now a significant mgmt credibility issue and the tone yesterday lacked a mea culpa, in our opinion.*** [Emphasis in original].

79.    A Wolfe Research report published on May 3, 2024 also expressed concern about the newly revealed service issues and noted that investors would be homed in on the Company's execution moving forward, stating in relevant part:

> Given that mgmt provided its original FY24 guidance last quarter, we were surprised by the sudden cut. Previously, mgmt cited additional pricing opportunities in the back half, however, the team shifted to moderate pricing action over the fiscal year. Moreover, mgmt noted incremental service shortfalls (i.e. late deliveries, missing truck loads, etc.) that were brought up via customer feedback. ***We note that these service shortfalls were not discussed during the Company's previous analyst day nor are part of the ongoing optimization efforts.*** With this, we factor in additional caution on Vestis' previously communicated strategic review to enhance margin and produce MSD organic growth. ***Following the guide cut, investors likely will require ideal execution from mgmt in the periods ahead to regain standing.***
>
> Post Print Adjustments. ***We are concerned over future retention due to unforeseen service-related issues.***

80.    Likewise, on May 2, 2024, Barclays issued a report concerning Vestis titled "***Moving from 'show me' to 'lost me'***" and stated that "after today's [disclosures], the Vestis story takes a significant hit and pricing the equity becomes very hard . . . ."

81.    Accordingly, the beginning of the Class Period constituted one of the most pivotal

27

inflection points in Vestis' short corporate history, particularly with respect to some of the most essential aspects of the Company's business—customer service and retention. Investors were already fatigued with service issues and analysts had put Defendants on notice that they would eagerly scrutinize any new information concerning the Company's operations. Defendants' assurances of "deep and granular" investigations, as well as purported corrective actions undertaken, demonstrate they understood as much.

### D. Despite Defendants' Assurances, Vestis' Customer Service Issues Were Far More Severe Than Disclosed and Persisted Throughout the Class Period

82.    Contrary to Defendants' assurances that service issues were a thing of the past, CWs confirm that Vestis had pervasive customer service problems throughout the Class Period. For instance, contradicting Defendants' purported focus and improvement in "merchandise management" and "efficient operations," Vestis had severe inventory issues that included product shortages and poor-quality products. Vestis was also unable to adequately service accounts due to outdated facilities—which contributed to Vestis' inability to timely process products and to delayed customer installations and deliveries. Vestis' new customer installations were also delayed as a result of operating inefficiencies and product shortages

83.    As a result, customers were frequently dissatisfied with the Company's service. Moreover, the Company exacerbated its souring customers' relationships through hardball procedural obstacles to contractual relief, and even by instructing employees to deceive customers about their contracts. As a result of these issues, customers sought credits, reduced order volumes, canceled service, and pursued contract deviations and buyouts, all of which decimated Vestis' financial performance.

1. **Vestis' Extensive Customer Service and Inventory Issues Persist Throughout the Class Period Resulting in Company-Wide Customer Dissatisfaction**

84. Customers' orders were frequently shorted products or fulfilled with poor quality products as a result of Vestis' rampant inventory issues, resulting in widespread customer dissatisfaction and complaints.

i. **Vestis Regularly Provided Customers with Less Product Than Ordered Due to Insufficient Inventory**

85. Vestis regularly "shorted" its customers' orders due to the Company's inventory backlogs. For instance, according to CW1, consistently throughout CW1's tenure at the Company, Vestis received "constant complaints" from customers about product shortages. CW1 recalled that shortages worsened after Vestis spun off of Aramark in 2023 and became an independent company. CW1 confirmed that Vestis' product shortages consistently persisted until CW1 left the Company in May 2025.

86. CW1 stated that "there weren't enough mats, not enough aprons, towels, and just a constant lack of product." CW1 explained that customers were "going to get shorted every week," stating that they might give Vestis five pants and five shirts one week, but only receive "three and four back the next week." CW1 added that during CW1's employment, customers never received "100% service" from Vestis. Accordingly, Vestis was not completely fulfilling its customers' orders by providing them with each of the products in their order on a consistent basis.

87. CW1 explained that while the Jacksonville market center was in a bad spot with product shortages, the shortages were Company-wide. CW1 stated that "everybody's short product." CW1 added that, based on conversations with other Territory Managers in Indiana and

Wisconsin, the "same shortages" were "everywhere." CW5, based in Indiana, corroborated that a mechanic customer complained to CW5 regarding missing products.

88.     Corroborating CW1 and CW5, CW6 stated that after the spin-off product shortages were constant and happened "all the time." CW6 had frequent conversations with the Buffalo sales management team who told CW6, "we're not getting the product here. So how are we going to deliver to them if we're not getting the product?" CW6 stated product shortages were the Company's "biggest problem" concerning customer service. Indeed, CW6 explained that, as a result of product shortages, deliveries were repeatedly delayed or missed altogether. CW6 confirmed that before the Class Period and continuing until CW6 departed Vestis, customers personally complained to CW6 regarding product shortages "every week" and complained regarding missed deliveries "several times a month."

89.     CW1 recalled that all Territory Managers participated in a roundtable meeting in either late 2023 or early 2024 with Defendant Scott where each Territory Manager informed her regarding the numerous service problems in their respective Territories. CW1 recounted that, during the roundtable, Defendant Scott was specifically informed about the shortages, low morale among Territory Managers, and "not having what we need to run our areas every day." But, according to CW1, the meeting did not lead to improvements. Instead, CW1 stated that "everything always seemed to get worse. It would never get better. It'd only get worse." Corroborating CW1, CW6 recalled that customer service issues were serious and widespread from the beginning of CW6's tenure—it was "the worst company service-oriented" in CW6's thirty-year sales career. CW6 stated "it was downhill from the very beginning" and "nothing improved."

90.    CWs also recounted inconsistent and chaotic practices across territories to deal with product shortages, including reshuffling customer orders.

91.    For example, CW1 explained that product shortages resulted from back orders because Vestis was "so far behind on product." CW1 stated that General Managers had to get special approval "from up top" to purchase more product than they were allotted in the Company's budget limits for new product. CW1 was told new product was coming, but he would "never see it" and "even when they did inject new stuff, it didn't make a difference, because we're just so far behind." CW1 told GM Turner about the shortages, who communicated it to his superiors, and CW1 received "some new products, here or there, but not enough."

92.    Given Vestis' cost control measures that limited new product purchases, some new orders were fulfilled with previously used items while other orders were intentionally delayed and shorted products to permit another customer's order to be filled.

93.    For instance, CW1 recounted that new customer accounts were supposed to receive fresh items, but that was not always the case. Moreover, CW1 described how General Managers and Merchandise Control Managers ("MCMs") would also sometimes "hold orders." CW1 explained that the purpose of holding orders was cost control and that each route had a "piece budget," meaning an allotted amount of new product that Vestis would order to replenish and replace inventory. GMs and MCMs constantly monitored the piece budget to ensure it was not exceeded. CW1 explained if the budget was close to being exceeded, the GM and MCM would step in. According to CW2, MCMs used piece budgets to manage product injections.

94.    According to CW1, the MCM would "go through the orders every morning, and they would decide what order would get pushed through and which orders would be held and

31

which orders would be kicked back." Indeed, CW1 recalled entering orders into ABS "right in front of the customer," but that "orders would just disappear out of the system." CW1 explained this was because MCMs had removed the orders and would hold them until a later point when it could be put through to comply with the piece budget. According to CW1, as a result of these piece budgets, "at some point, the GM would just cut off our order altogether for a week."

95.     CW1 noted that shortages were constant. CW1 described shortages as a necessity because "the only way you could operate was cutting. You're robbing from Peter to pay Paul every day." CW1 added that customers had to be rotated and managers juggled supplies to cover immediate needs. Indeed, CW1 would give one customer "100% this week" but CW1 would have to short that same customer during the next week because CW1 had to give another customer 100%. CW1 reiterated that the shortages resulted in "borrowing from tomorrow to pay for today."

96.     Indeed, CW1 stated "I don't think I've ever had a 100% load" meaning CW1 never had an instance where each one of the trucks on CW1's seven routes had a 100% of the product necessary to fill each order. Accordingly, Vestis was not fulfilling its customers' orders accurately on a consistent basis.

97.     CW6 corroborated CW1, stating that the service team often had to manage shortages with a "bait and switch" meaning that Vestis personnel would "have to steal" product intended for one customer to cover deliveries for another, usually larger customer.  CW6 confirmed that Vestis had to "triage[]" which customers received products because of the product shortages. As a result, according to CW6, certain accounts were prioritized while others were neglected. CW6 confirmed that the neglect came from the top down. Indeed, CW6 stated that service managers,

who CW6 spoke with "every week,"  repeatedly told higher-ups that the service managers needed more product but "they didn't send it."

### ii.    Vestis Frequently Delivered Poor Quality Products to Its Customers

98.    CWs confirmed that significant product quality issues resulted from Vestis' own reuse initiative and spanned all manner of customers and industries.

99.    For instance, CW1 explained that GMs preferred to reuse existing stock rather than order new uniforms, which was a major expense for Vestis. According to CW1, the Company varied inventory grading, meaning Vestis permitted lowered grading when uniform supply was low. When lower-grading was permitted, CW1 recalled that Vestis would "take something that probably shouldn't have been taken and try to deliver to customers." CW1 added that, after receiving poor quality uniforms, "I have to reorder it because it would look like garbage" causing the new customer's installation to be delayed. CW1 explained that it could take up to six weeks to get customers their uniforms. CW1 added that this resulted in angry customers. CW1 recalled that customers documented the delays and reported to CW1 that the delays were "ridiculous" while some canceled their orders entirely.

100.    When CW5 asked customers for feedback, they mentioned product quality issues, including that uniforms were not being cleaned. CW5 also participated in several ride-alongs with Vestis' RSRs who delivered items and serviced customers. RSRs told CW5 that drivers had to inform customers that Vestis' products were not clean.

101.    CW2 recounted that customers regularly complained about poor quality, including Chicago restaurants commonly receiving white linens with stains, mold spots, and holes, as well

as hospitals who complained about receiving uniforms with holes and items that were improperly

packaged to meet health and safety standards.

102.    CW6 confirmed that Vestis' product quality issues were constant and that customers

regularly called CW6 to complain about the quality. CW6 recalled that Vestis would deliver shop towels

with "holes" and "metal fragments in them," and uncleaned mats that were dirty and smelled. CW6

explained that Vestis also often returned the wrong-sized garments or stained garments to customers, and

the Company failed to fix the issues. CW6 explained that these were not occasional, isolated incidents but

instead, customers personally complained to CW6 multiple times a week regarding quality issues during

the Class Period.

### 2.    Vestis' Outdated Facilities Cause Massive Delays in Customer Service

103.    Vestis' facilities were unable to timely process the Company's product throughout

the Class Period because the Company neglected to make necessary improvements such as

investing in new equipment and repairing existing equipment. Moreover, because of the

Company's severe backlog of unprocessed products, Vestis' facilities had frequent fires that

contributed to delays. As a result of these problems, customers often experienced significant delays

in receiving their orders. Indeed, when asked why Vestis was experiencing service issues, CW5

explained that the facilities were outdated, dirty, and like a "sweat shop."

104.    For instance, CW2 explained that the Chicago's plant was subject to "years upon

years of neglect," including "well before I got there based on what I saw." CW2 estimated that

half of the plant's equipment was down at any given time. CW2 recalled Vestis failed to invest in

new equipment "even when problems were raised to leadership." CW2 stated that only one of the

four "pony" washers, which were smaller in size than the Company's bulk washing machines, and

which were used for expedited orders and sensitive products like gloves, worked. During CW2's tenure, the Chicago plant's pony washer "barely ran."

105.    CW4 corroborated that plants had outdated equipment. Indeed, according to CW4, "much" of the productivity issues were due to "outdated machinery." CW4 stated that "there's equipment in some of these plants that's older than I am." For example, CW4 stated that "this ironer that's 45 years old, and it goes down constantly. And now you can't process napkins and such, and now you can't fulfill your customers' needs."

106.    CWs also recalled a cumbersome process to request new or replacement equipment. CW2 recounted requesting replacements "for months," but nothing happened. CW2 explained that Vestis resisted and slow-rolled even modest investments in equipment. CW2 recounted that General Managers had "little control over capital spending" and could not formally request new equipment. CW2 stated that the CapEx group, consisting of Directors of Technical Services or Engineering, handled the requests directly.

107.    Corroborating CW2, CW4 recalled that plant managers constantly raised outdated equipment as a problem. CW4 stated that "we would bring up when a machine failed because of how old it is," but "trying to get new equipment is like pulling teeth." CW4 added that "once they get bent to that point, you're spending more money on maintenance than you are than you would be if you replaced it." For example, CW4 recounted that "before I left, we got a brand new washer, and all the other ones are like 30 years old. So we have one brand new washer and then four that are 30 years old."

108.    CW2 also recounted that fires, spanning smoldering fires to full flames, happened monthly during the summer from May or June until October of 2024. CW2 estimated that there

were four to six fires at the plant during CW2's tenure and stated that "the amount we had was pretty excessive." Indeed, CW2 expressed surprise that "the place hasn't burned down."

109.    CW2 explained that laundry operations were inherently dangerous due to flammable materials, including greasy towels from restaurants "spontaneously" combusting and smoldering if left, in a soiled state, hanging or in dryers too long. CW2 recalled an example where a "redry" step wasn't followed, a dryer caught on fire, and flames spread into the rafters where lint buildup ignited. CW2 stated that some fires required the fire department.

110.    CW2 also recalled a "faulty dryer," identified as dryer seven, which had "multiple fires," with the last one occurring in late 2024. CW2 stated that Vestis required dryers to be put out of service "until you had some controls in place," which included finding a root cause and directors and engineers approving restarting. CW2 added that "dryer seven was down for months until we figured out what was wrong and before they approved it to go back online."

111.    CW2 provided the following images depicting the Chicago Fire Department's response to the fire in dryer seven that occurred on October 21, 2024:

**Figure 1**                                    **Figure 2**




112.    CW2 recalled other Vestis plants having fires. CW2 attended training at the Riverside, California and stated "I remember in the parking lot, there was a big black mark," and "they said, oh yeah, that's where we had a big fire a couple months ago where a trailer burned down to the ground."

113.    Further, CW2 added that the plant often ran out of space in the air because "bulk fold and ironing was backed up," noting that bulk fold could be delayed "by a day or two." CW2 stated that "it wasn't like one bag would set the wash floor back. It would accumulate for a while." And CW2 stated that "if you are washing it and then your irons can't keep up, it sits in the air waiting in a buffer area." CW2 added that "if you're not washing it, it sits in dirty state." Thus, CW2 recounted that the plant inefficiencies created constant problems and that "every day" of

CW2's tenure "was a different challenge in that facility."

114.    As a result of the delays, CW2 recalled dirty items "often sat outside" because the plant could not keep up with demand and that that soiled product left outside in the sun would sometimes be thrown away because "you couldn't resalvage it through the wash process." CW2 provided the following images taken during the summer of 2024 depicting severe backlogs of soiled products that amassed outside the Chicago plant waiting to be processed:

**Figure 3**                                        **Figure 4**

    

**Figure 5**



115.    As a result of out-of-service and outdated equipment, CW2 recounted consistent plant inefficiencies leading to a significant productivity gap in Chicago. According to CW2, ironing "was always behind" during CW2's tenure with ironing efficiency "consistently at 70 to 80%." CW2 stated that late ironing "absolutely" caused missed deliveries. CW2 added that the wash floor "was always behind."

116.    CW2 recalled that the Chicago wash floor "was very capable of doing 800,000 to a million pounds a week if it was maintained correctly," but that "we were doing somewhere around 600,000 if we were lucky." In other words, throughout the Class Period, Vestis' Chicago production output was ***always 25% behind schedule***. Indeed, CW2 confirmed that the Chicago plant's washing pace and poundage processing was consistent throughout CW2's tenure.

117.    Senior leadership personally visited Vestis facilities, including witnessing a severe production backlog. For instance, CW2 stated Regional Vice President Nanci Hunsinger visited the Chicago facility about once every week or every other week, including during the summer of 2024. Additionally, CW2 stated that VP of Field Operations Paul Schmid visited the Chicago facility around the holiday rush of Mother's Day or Memorial Day in 2024 and saw the materials

piled up in the more than 100 carts outside. CW2 recounted that Schmid's response was, "holy shit . . . everybody, I want them in the conference room in forty-five minutes. I didn't realize it was this bad." CW2 told Schmid there was "no way I can get through this" and emphasized to Schmid that "we're not a mom-and-pop shop, Paul. I think we need every available washer in our network processing material."

118.    CW2 recalled that productivity issues went beyond the central Chicago plant. CW2 led daily sales calls with the each of the three market centers under CW2's management, both in the morning and the evening. CW2 provided an example of the call, stating that "I would talk to South and listen to their shortages, any issues they had" and then provide updates on trailers moving between centers and what was behind schedule. CW2 recounted that all three market centers were behind schedule every day. According to CW2, Chicago "always lagged" and the Rockford, Illinois plant also had problems, including a "dip in productivity" because of "older equipment that obviously needed some TLC." Moreover, according to CW2, the market center in the North was even further behind schedule.

### 3.    Vestis Regularly Received Customer Complaints and Service Requests Given the Company's Recurrent Service Issues

119.    CWs recalled that Vestis' consistent product shortages and order accuracy issues infuriated customers, driving them to raise complaints and seek relief through Vestis' arduous complaint procedure.

120.    For instance, CW1 stated that customers complained to CW1 "every day" and were unhappy. According to CW1, customers would convey their dissatisfaction with Vestis' service because the Company could not "hold up" its "end of the bargain." CW1 confirmed that the

majority of the service requests were for product shortages and missing items. CW6 corroborated CW1, stating that customers constantly complained about product shortages and missed deliveries.

121.    Similarly, CW2 recalled spending "much of the summer" during 2024 on a delivery truck, which allowed CW2 to talk with customers to "understand their struggles" and try "to fix those issues for them." During this time, CW2 observed customers regularly complaining about receiving poor quality products.

122.    CW2 also recalled "frequent complaints" about mats, particularly in the winter, and that "we never had enough mats." Corroborating CW2, CW1 stated "sometimes we barely received any mats at all." CW2 raised the issue to his Regional Vice President, Hunsinger, in early summer 2024, but there still continued to be a shortage of mats. CW2 recounted that customers called angrily asking about the mats and that Vestis would sometimes leave mats in parking lots and then discard them because they could not be processed.

123.    CW1 explained that managing RSRs was difficult because loads were always short, leading to constant customer complaints. CW1 added that RSRs had to face customers without enough product and "it was just a constant battle." CW5 corroborated that RSRs were not positioned for success. During CW5's ride-alongs, the RSRs told CW5 that they could not do their job because of Vestis' poor service. RSRs recounted to CW5 that they regularly told customers their deliveries were missing uniforms, that they forgot mats, and that they would bring the items in the future. CW6 also corroborated CW1 and CW5 stating, as a result of the product shortages, constant customer complaints, and the service teams' need to "bait and switch" customer orders, "it was horrible what those guys had to go through."

124.    CW1 explained that the RSR position was demanding, including customers yelling at RSRs for shortages. As a result, RSRs—faced with irate customers or product shortages—did not try to cross-sell new products to Vestis' existing customers. For instance, CW1 explained that sales metrics existed for RSRs, but were not being met due to drivers resisting sales because of product shortages.

125.    According to CW4, customer complaints were handled in ABS, which ran on the handheld devices carried by RSRs. CW4 recalled that customers could file complaints directly through the Company's website "and it would send an email to the service team, and they would all get it." CW2 stated that responsibility for responding to customer complaints went first to the Territory Manager or RSR. According to CW2, if the issue escalated, then the General Manager of Sales would go meet with the customer.

126.    As a Territory Manager, CW1 was responsible for handling customer complaints in CW1's territory. CW1 had access to Vestis' facility operating system, ABS. CW1 had access to Microsoft Power BI, which also tracked customer service requests, including reason codes and whether the request had been resolved.

127.    CW1 explained that customers had to submit a formal service request to remedy their service issues. According to CW1, customers were required to submit a certified letter to comply with the satisfaction policy in the contract. CW1 stated that "if they would submit a service request and complain, that's the way that they would be able to get that product." CW1 added that if a service request was not submitted, it would "get pushed to the side."

128.    CW1 confirmed that senior leadership could see the complaints and explained that "every manager had access" to see the complaints. CW1 added that certain requests were marked

"Office of the President" or "OOP," which referred to Defendant Scott's Office. According to CW1, a daily email tracked service requests, including those identified as "Office of the President."

129.    CW1 recalled that, beginning before the Class Period, the Company's policy was that if a service request was not closed by the end of day, it was escalated to a VP. If still no one had responded within around 36 to 48 hours, CW1 explained that the service request "would make its way up to Kim Scott."

### 4.    Vestis' Installation Process Inefficiencies Delay New Customer Sales, Which Defendants Knew from Dashboards and Meetings

130.    CWs confirmed that Vestis' new customer order fulfillment timeline regularly exceeded industry standards, meaning customers often waited weeks to receive their first orders and for Vestis to begin servicing them.

131.    For instance, according to CW3, throughout their tenure, Vestis' install times exceeded the 20-day and 30-day industry standards, stating "on a very regular basis, the actual install was in excess of that." CW3 stated that, based on more than twenty years working in the industry, CW3 was familiar with the industry benchmark or standard for install times – which was 20 days for non-garments, like mats and napkins, and 30 days for uniforms or garments. CW3 recalled that the install time "would kind of ebb and flow," but around 45 days was the average and "60 days was probably true for some customers." CW3 stated that "certainly, I heard of complaints and things taking too long."

132.    According to CW3, install time delays resulted from the several handoffs required to process the installation. CW3 recalled that "there was a pretty decent gap between the time when the contract was signed and when the salesperson would hand that folder off" to the NBIM. CW3

added that, due to incomplete information, the install team sometimes had to go back to sales for emblems or product codes. CW3 also recounted that the stockroom approval and release of orders to the distribution center often took "two or three days or more" when it "should have been done in a day."

133.    CW3 recalled that emblems, or the customer's logo and employee name patch, were also a source of delays. According to CW3, part of the sales process included customer approval of a mock-up of the emblem before the order could move forward. CW3 also stated that market centers had a "manual process" to order emblems and send them to the distribution centers, which "had to wait days for the emblems to arrive" even though the distribution centers had the product.

134.    CW3 explained that complaints were common and that CW3 "certainly" heard of complaints and things taking too long, leaving customers "dissatisfied."

135.    Corroborating CW3, CW6 stated that installation delays were another major service issue. CW6 stated that new installations should take two to four weeks but confirmed that, during the Class Period, the average timeframe was approximately 45 days. CW6 noted that "sometimes it went beyond that" with some installs taking "over six months." CW6 further stated that small accounts experienced long waits for their uniforms. CW6 recalled an instance where a small auto garage needed uniforms, and it took months to get them delivered to the customer.

136.    Even after installation was finally complete, customers often reported quality and fulfillments issues. For instance, CW6 recalled that customers would call CW6 "within a day after installation" to report problems.

137.    CW3 stated that executives had visibility into install delays because it was a metric included in Vestis' Power BI "executive-level dashboard." As a result, CW3 "could not imagine

any planet that installs weren't a frequent topic of conversation" among the Company's executive officers because Company leadership, including Defendant Scott had dispatched "all the salespeople" out into the field "and their focus was on installing new business, there's no way they could have just been oblivious."

138. Corroborating Defendants' access to Vestis' chronically delayed install rates, CW3 attended monthly or quarterly Enterprise Architecture meetings and Scott's Executive Assistant Jessica Bernantz was "frequently on that call." CW3 recalled that problems regarding issuing too many customer credits, as well as the Company's excessive "end-to-end install timing," were "regularly discussed" during the Enterprise Architecture meetings.

### 5. Vestis' Severely Dissatisfied Customers Seek Credits, Lower Order Volumes, and Pursue Contract Deviations and Buyouts in Response to Pervasive Service Issues

139. Because Vestis consistently delivered insufficient product quantities (often nothing at all), inaccurate orders, and poor-quality merchandise, multiple CWs recounted that customers sought credits, reduced order volumes, and pursued contract deviations and buyouts. As with Vestis' complaint procedures, the Company utilized burdensome processes for customers to seek relief from their service contracts. Adding insult to injury, Vestis ruthlessly pursued contractual enforcement provisions against SMEs to deter its customers from cancelling service, creating a vicious cycle that exacerbated customer dissatisfaction and contributed to Vestis' customer losses consistently outpacing new customers.

i.  **Vestis Implements a Strict Procedure in Response to Increased Customer Credits That Exacerbates Customers' Negative Experience with the Company**

140.    Vestis' RSRs and Territory Managers used, and customers requested, credits to compensate customers for service failings. For instance, according to CW1, customers attempted to request credits due to product shortages. CW1 explained that if Vestis could not deliver enough towels or mats one week, then a customer could request a credit on their contract. Corroborating CW1, CW2 explained customers could ask RSRs to write them a credit, such that "if a restaurant ordered 100 towels but only received 50, the driver had two options: deliver the rest later using a jumper or territory manager, or issue a credit if the items would never arrive."

141.    CW2 stated that Vestis issued credits often and "it was talked about quite often." CW3 corroborated this stating that credits were an issue that were discussed "all the time" including throughout CW3's tenure in 2024. In fact, CW3 stated that credits were a frequent topic of discussion during the monthly or quarterly Enterprise Architecture meetings attended by Defendant Scott's Executive Assistant throughout "at least the last year of two" of CW3's employment (*i.e.*, "at least" throughout 2024). As a result, CW3 confirmed that Company-wide, "handwritten credits by the RSRs and the service organization was always a focus," because the amount of credits written was considered too high.

142.    CW4 confirmed that customer complaints, credits, and cancellations were handled through the plant's main office. CW4 explained that Territory Managers and Service Managers entered requests for credits into ABS and the General Manger was responsible for approving them.

143.    Corroborating CW4, CW2 explained that the respective General Manager of Sales approved credits written by RSRs, except that CW2 approved credits when the South market center

did not have a General Manager of Sales. CW2 stated "it was eye opening on how many credits were being issued." CW2 explained that the credits issued to SMEs may have been small individually, but that they added up on a Territory-wide (and therefore Company-wide) basis. Specifically, CW2 stated RSRs "think, oh, it's a $3 credit," but "the problem is you issued a 100 of them today" and "collectively, they add up."

144.    CWs confirmed customer complaints and credits were frequently discussed during weekly calls. Indeed, CW2 attended a "state of business" call every Wednesday, led by Hunsinger, which CW2 stated "was a 95% sales call and a 5% operations call." According to CW2, leadership flagged national accounts, like the Cheesecake Factory, and "they would bring it up and say, hey, the plants need to start watching Cheesecake Factory. Sales, please go give them some love."

145.    CW2 stated that customer problems also triggered APB, or "all-points bulletin," calls initiated by the General Manager of Sales. CW2 recalled that "if somebody was complaining they weren't getting all their rugs or napkins or uniforms, and the general manager deemed it needed an APB call, you would have this call." CW2 stated that the Regional Vice President would also be on most of the calls.

146.    According to CW2, APB calls occurred frequently—"once a week, twice a week"—in Chicago given the issues. CW2 stated that the General Manager of Sales would schedule a call if there were "repetitive issues," it involved a larger account, or there was "a threat to cancel service." CW2 added that credits were a problem "all the time" and a constant topic on both APB calls and State of the Business calls.

147.    CW1 stated that Vestis wanted Territory Managers "to do whatever we could to where we did not have to issue a credit" and credits were considered "the last-ditch effort." Indeed,

CW1 recalled participating in call with General Manger Turner where CW1 learned that Scott was discouraging credits from being issued. As a result, CW1 recalled that starting around October or November 2024 the credit policy changed under Scott, who thought too many credits were being issued, so that Territory Managers could no longer approve credits themselves.

148.    CW1 recounted that Scott's changes resulted in Territory Managers having to submit credit requests in Express Desk with "detailed explanations." CW1 explained that Express Desk, which to CW1 had access as a Territory Manager, tracked customer credits (meaning dollar amounts credited toward customer accounts), including detailed explanations of why customers requested the credit and the Territory Manager's justification for granting the credit.

149.    CW1 recalled that the credit approval chain included GMs, the credit review team, and then the COO or Scott. CW1 added that GMs often had to get VPs involved to prevent the credit request from getting "kicked back" and it could take "a week before you could actually get a credit approved." CW1 confirmed that this process applied to all credits, except for national accounts which were billed based on usage. CW1 added that national accounts, such as Cracker Barrel and Texas Roadhouse, could receive credit on the spot.

150.    According to CW1, although executive management claimed that Territory Managers "were giving too many credits," those credits were warranted due to constant service failures. CW1 stated "so many" credits were issued "because we were just short product, we had to figure out how to keep customers happy."

151.    According to CW1, credit approval was based on management's judgement and whether "they thought it was something that was worth it or not." CW1 explained that management had even come up with nomenclature for customers who were more likely to get credits

approved—Accounts In Jeopardy, or "AIJ." CW1 added that Accounts In Jeopardy were accounts either "about to come up on a renewal" or "have issues and threatening to quit."

152.    CW4 and CW6 corroborated the existence of the AIJ Meetings, and CW4 explained that there was a dedicated process for at-risk customers. CW6 stated that AIJ meetings were attended by the General Manager and the service team. Corroborating CW6, CW4 confirmed that General Manager Rodgers led weekly AIJ meetings, which included the Service Manager Junior Lopez and Territory Managers Matt Holguin and Jeffrey Malcolmb. CW4 added that "there were some corporate personnel on there as well, some higher ups." While CW4 did not attend, CW4's Service Manager Junior Lopez, who CW4 had a good relationship with and would often discuss work with, recounted being asked during those meetings: "Okay, you lost x number of customers. Why? What happened? What led to us losing these customers? What could we have done to retain these customers?" CW4 further understood that during the AIJ meetings specific accounts would be discussed and "if it's Accounts in Jeopardy account, they would review those and see how do we keep this customer? Why does this customer want to leave?" CW4 confirmed that Scott received customer attrition data because the plant data gathered in connection with the AIJ Meetings was sent to Regional Managers, who compiled that data into reports, and then forwarded the reports to Scott. CW4 confirmed that "they 100% gave that information to her."

    ii.    **Throughout the Class Period, Vestis' Customers Sought Contract Deviations and Reduced Their Order Volumes to Contractual Minimums, Prompting Policy Responses by Defendant Scott That Enflamed Customer Relations Further**

153.    Vestis had strict procedures to attempt to prevent customers from cancelling their contracts with the Company. Rather than navigate these processes, some dissatisfied customers

responded to the Company's pervasive service issues by lowering their order volumes to the minimum invoice amounts permitted under their contracts, while others sought contract deviations.

154.    In line with this, CW1 explained that customers could cancel individual orders, but remained under contract with Vestis. As a result, though some dissatisfied customers remained in their contracts, they sought alternative means to reduce the services that they received from Vestis and accordingly, how much they ultimately paid the Company. For instance, CW1 explained that customers could lower product volume, but only to "75% of the original contract before it hits an invoice minimum." CW1 stated that the invoice minimum was based on the customer's first invoice, which was not a "normal invoice" because it included one-time prep and emblem charges.

155.    Customers could also seek contract deviations, including changing the invoice minimums, but Scott tightly controlled the process. CW1 stated that Scott personally oversaw contract deviations beginning around late 2023 or early 2024 and continuing throughout CW1's employment. CW1 explained that, at such time Scott's approval was required for any change, including increasing or removing invoice minimums and cutting bills for renewal. CW1 added that even small price rollbacks required Scott's approval and that the only deviations that Territory Managers could make were contract renewals at the same price level or higher.

156.    CW1 stated that customers were unhappy with the deviations process. CW1 confirmed that the strict deviation process caused customers to leave. CW1 added, one customer left when deviations were frozen, others sent letters, and others would lower the invoice as much as they could and ride out the contract. CW1 confirmed that customers could lower the order by 75% because of the invoice minimum threshold.

157.    Given the strict deviation policy, CW1 estimated that about 10%-20% of customers in CW1's territory reduced volume to the invoice minimum. For example, CW1 recalled that customers would reduce quantity to just one item in a category like uniforms to minimize the customer's bill. CW1 explained that these volume reductions had a "significant" effect on Vestis' revenue and reputation.

### iii.    Vestis' Customers Seek to Terminate Their Contracts and Pursue Buyouts in Response to Rampant Service Issues

158.    Beyond reducing order volumes, some Vestis customers during the Class Period exited their contracts altogether. According to CW1, cancelling a contract was "not an easy process." Instead, CW1 described the process as "slow and difficult." Customers had to send a certified letter and then Vestis had 30 days to begin fixing the problem. CW1 added that a customer could quit "if nothing got fixed" but reiterated that "it was not an easy process." CW1 recalled that, instead of customers attempting to cancel the contract, a "majority of the time, they would just try to agree upon a buyout." CW1 added: "the customer gets so fed up that they're just willing to eat that cost to be done."

159.    CW1 recalled that the buyout amount varied, with some customers paying 25%-50% of the remaining balance or others paying liquidated damages. Between the balance and liquidated damages, Vestis would identify the greatest amount and "just negotiate from there."

160.    According to CW1, a buyout occurred for one of CW1's largest customers in 2024. CW1 explained that FPL Food, a meat processor for Walmart, canceled the coat portion of the contract which ran "$13,000 to $15,000 a week." CW1 added that FPL food told CW1 that they were going to cancel the remaining contract, which related to restroom supplies, first aid, and mats, when it expired "because they weren't happy with everything."

161.    CW1 had visibility into customer retention in CW1's territory. According to CW1, throughout CW1's tenure customer retention "was always going down" and it "always seemed like we were losing more than we were gaining." CW1 stated that customer retention numbers were negative, and the losses outweighed the gains. CW1 added that the only gains were "small customers that were $25 or $50 a week" and that CW1's territory was "in a big hole" and "all of the large customers were just quitting."

162.    CW2 corroborated CW1 that contracts were difficult to escape. CW2 stated that customers sent formal complaints to the General Manager of Sales's mailbox anyway. CW2 recalled that customer cancellation requests were frequent. CW2 added that the General Manager of Sales came into CW2's office daily and slapped down a certified letter, saying "another one requests to leave." CW2 recalled Vestis tried to save some larger accounts, but CW2 estimated there were "at least three cancellations a week" during CW2's tenure. CW2 remembered losing a large account, a breakfast diner chain with multiple locations, just before CW2 left.

163.    CW2 stated that, when a customer sent a certified letter, it was "usually too late to repair the relationship" and "many" letters ended up with legal. CW2 recounted that a sales General Manager would sometimes dispute a complaint.

164.    Corroborating CW1 and C2, CW6 confirmed that customers were required to send "a certified letter" to the general manager to cancel their contracts. CW6 also confirmed that, throughout CW6's tenure, customers from "all over the place" were canceling "every week" because "service was so poor" as a result of the product shortages and poor product quality. CW6 explained that the Company's supply issues directly led to customer cancellations, and even though "a lot of customers" gave Vestis "a chance to rectify" the issues, the Company "just didn't

make it good." Highlighting the point, CW6 confirmed that the Company's service reputation was so poor that new sales prospects "wouldn't even come on board because they heard the nightmares." Indeed, "a lot" of potential sales leads that CW6 pursued during CW6's tenure would state that "we don't want to go with you" as soon as they heard that CW6 was from Vestis because of the "poor service."

> **6. Defendants and Senior Leadership Knew about Severe Production Issues Which Caused Delayed Deliveries to Customers, Low Customer Satisfaction, and Customer Retention and Sales Execution That Underperformed the Company's Publicly Disseminated Projections**

> **i. Defendant Scott and Senior Leadership Regularly Reviewed Production Data**

165.    CWs confirmed that Vestis held weekly calls to discuss operations across all of the Company's regions to discuss plant operations and efficiency based on data compiled from Tableau. CWs also confirmed that Defendant Scott accessed Tableau and received weekly productivity reports reflecting the data discussed during the calls, which was compiled and sent to Scott by the District Operations Manager.

166.    CW2 recounted that each region held a "region wrap up" call every Monday at 1:30 pm or 2 pm CT that was "mostly for operations." CW2 stated that each region's Regional Director of Operations and Regional Vice President would attend the call and "kind of tag team you."

167.    CW2 prepared a slide deck for CW's plant to use in the Monday meetings. CW2 recalled that "every Monday morning, I would pull up my individual sheets so I was able to talk to them." CW2 stated that leadership also had a deck and they would "project it to everybody" on Microsoft Teams. CW2 stated that according to Regional Vice President Hunsinger, Scott "wanted everyone to be standardized because she couldn't understand the format of the East Coast to the

West Coast" and so "we standardized it so every region was the same." CW2 recounted that the standardization occurred sometime between June and August 2024 and then the slide deck was "usually the same format."

168.    CW2 stated that executive management, and Defendant Scott specifically, had "full visibility into plant operations" both "daily and weekly." According to CW2, you could see who was in Tableau and "no less than two, no more than four times Kim Scott's name would be in there." CW2 confirmed that, when you clicked on a report, the system "would tell you the last person that was in there" and "you'd look to the right, and it would say last viewed by Kimberly Scott." CW2 recounted that one type of metric Scott looked at was the ironing efficiency and that her review was "used as a kind of threat." CW2 elaborated that, in weekly Monday meetings, Hunsinger used Scott's oversight in Tableau to push performance: "They would broadcast it and be like, *'Look, guys. See? Kim Scott's even looking at it. You guys got to get better.'*"

169.    Similar to CW2, CW4 prepared a weekly productivity report that "ranged from overall efficiency of the plant and then individual department efficiencies." CW4 explained that Tableau was central to how plant performance was tracked and discussed, and was a "key component" in providing the efficiency data that was reported during the weekly regional calls. CW4 stated that the reports addressed whether all the soil was washed, whether everything was processed that day, what was load percentage, and whether customers were receiving items and having their needs met.

170.    CW4 recounted that the weekly productivity reports were moved into a shared drive on Microsoft SharePoint and that, generally, anyone with a company email address "could go in there and look at it at any time." CW4 stated that, each week, plant managers updated their numbers

in the spreadsheet. According to CW4, during 2024, plant productivity varied widely across CW4's region. CW4 stated that some of the plants in the region "suffered really bad."

171.    CW4 attended weekly calls with the other plants in CW4's region to review the weekly production reports and "we would all have to speak to our numbers." CW4 recalled that General Manager Rodgers normally joined those calls.

172.    CW4 also sent the weekly productivity report to the District Operations Manager, who compiled data from multiple plants into a regional spreadsheet. CW4 confirmed that Scott received the productivity reports because the District Operations Manager would "compile all of that, and then he would send that up to Kim Scott." CW4 recalled the District Operations Manager "made it very clear" that "'hey, Kim Scott is looking at these numbers. She wants to see improvement.'"

> **ii.    Defendant Scott and Senior Leadership Regularly Reviewed Sales, Retention, and Customer Satisfaction Data, Which Scott Presented during Town Hall Meetings**

173.    Defendant Scott led Town Hall meetings throughout the Class Period where she would present sales, retention, and customer satisfaction data to, *inter alia*, senior leadership and managers. Scott necessarily reviewed the underlying data to prepare for such Town Halls.

174.    For instance, according to CW4, throughout CW4's tenure, Kim Scott led monthly virtual Town Halls held on Microsoft Teams which were attended mostly by managers and more senior leadership. CW4 began attending these Town Halls around the time Vestis spun off from Aramark, near the end of 2023, and continued throughout CW4 tenure.

175.    CW4 confirmed that Defendant Scott led the monthly Town Halls "99% of the time." CW4 estimated that "anywhere from three to 500 people" attended Town Halls given that

Vestis invited multiple managers per site from the Company's approximately 130 plants nationwide.

176.    CW4 recounted that during the Town Halls Scott would present specific sales and customer retention figures "by region" and "the overall numbers for the company as a whole." CW4 added that the sales metrics presented compared quarterly and yearly results against company targets. CW4 stated that Scott presented slides with company metrics and financial performance, including data from sales reports and customer satisfaction surveys. CW4 added that "all of it had documentation behind it." CW4 believed Vestis may have used Salesforce to generate the data for the slides. CW4 recalled that the reports showed "here's where we're at for the quarter. Here's where we're at for the year. Here's where we need to be. Here's what we promised our investors."

177.    CW4 recalled that, by late 2024, the tone of the monthly Town Halls was not positive. For instance, CW4 recalled, during the October and November 2024 Town Halls, Scott reported that Vestis was missing its targets and not hitting the sales and customer retention numbers promised to investors, and investors were not happy with the company. CW4 added that, during the October and November 2024 town halls, Scott stated "here's the number we promised our investors. Here's where we're projected to be. We're not going to meet that." CW4 stated that Scott "made it sound like the plants were failing" and that the Company's actual sales and customer retention results discussed during these October and November 2024 meetings each deviated from their targets by a "***significant percentage***." According to CW4, the sales and retention figure shortfalls were significant enough for Scott to comment on them.

178.    CW4 stated that Scott also "absolutely" tracked customer satisfaction because during the Town Halls, she also presented specific customer satisfaction metrics, measured on a

1-10 scale with scores of 8 or more representing that customers were satisfied. CW4 recounted that the satisfaction score "was dependent on however many customers rated you at an eight or above." CW4 added that the Company's goal was for plants to receive approximately two-thirds of customers rating between eight and ten. CW4 stated that it's "really not great" that "some 30 odd percent of your customers don't like you enough to give you an eight or a ten."

179.    CW4 stated that, consistently at Town Halls throughout 2024, Scott told managers that Vestis as a whole was falling short of the approximately two-thirds benchmark. CW4 confirmed that, from the time of the spin-off through the end of CW4's tenure, satisfaction scores remained steady and there was never "a significant jump in customer satisfaction." According to CW4, customer retention was not a priority for Vestis until the back half of 2024. CW4 stated that the Company "didn't really focus on customer retention a whole lot until it was too late." CW4 explained that Vestis' approach was "oh we lost this customer, go get another." CW4 recalled that customer retention gained attention in the back half of 2024 when financial results were impacted. During that time, CW4 recounted Scott framed customer retention in terms of shortfalls and as another target Vestis was missing.

### 7.    Vestis Antagonized Customers Even Further by Instructing Employees to Willfully Deceive Customers About Contract Terms

180.    During the Class Period, Vestis' executive management pressured sales personnel to deceive customers, particularly SMEs with less sophisticated bargaining teams or experience with commercial transactions. These tactics ranged from indoctrinating sales teams during orientation to never refer the contracts as such (but rather as mere "service agreements" that were something less), to outright lying to sales leads (prospective customers) that they would be permitted to end services whenever they desired, to knowingly locking new customers into

contractual arrangements (with byzantine cancellation processes) for years-long terms to which the customers did not agree. Vestis' dealings with its customers made them irate—particularly for the large number of customers who experienced service issues and sought to end their relationship with the Company.

181.    For example, CW5 described how all of the Company's client relationships commenced with a service term (either 1 year, 3 year, or 5 year) that was governed by a form Service Agreement. However, according to CW5, Vestis executives knew most SMB customers were not interested in entering long term "contracts" with a cleaning service provider and were unreceptive to sales pitches when the term "contract" was used. Accordingly, during the corporate training Senior Vice President of Sales Rego instructed Account Executives to never use the term "contract" with customers and, instead, use the more jargon-laden phrase "service agreement."

182.    According to CW5, Rego and other Vestis sales managers corrected Account Executives "every time" they used "contract" instead of "service agreement." Indeed, CW5 confirmed that, throughout CW5's tenure, management instructed sales personnel that if customers or potential customers asked whether they were required to enter a contract with Vestis, that the salespersons should "flat out lie" and state, "oh no, it is a service agreement."

183.    Corroborating CW5, CW6 recalled participating in a companywide "rally call" with Rego and all of Vestis' salespeople that occurred within a couple of months of Rego joining the Company during which Rego instructed the salespeople not to bring up contracts and "just have them sign the paperwork." Specifically, CW6 stated "we were told by Pete Rego that when you go see a customer, do not talk contracts," that the preferred terminology was "service agreement," and "if they don't ask about it, don't talk about it. Do not bring it up," but rather, "just

have them sign the paperwork." According to CW6, as a result of this practice, customers started "service with us not knowing they even signed a contract."

184.    Vestis' deceptive practice of referring to service agreements was instilled in its the Company's salespersons along with other such practices during the Company's mandatory sales personnel training. For instance, CW5 confirmed that during the Class Period all new sales personnel were required to attend training at Vestis' corporate headquarters in Roswell, Georgia, typically beginning five weeks after an employee's start date. CW5 attended such training and observed that Vestis' training instructed employees to engage in various unethical behavior at the expense of customers.

185.    According to CW5, during training, Rego also pressured Account Executives to sign customers up for service agreements with five-year terms while telling the customers their service agreement was "month-to-month" and customers could "cancel whenever" they wanted. CW5 stated that this was a "complete lie." Nevertheless, CW5 explained that Account Executives were directed to lie to customers if they asked questions about whether the agreement was a contract and if it was cancelable. Specifically, CW5 stated that Account Executives were supposed to tell customers that the contract was a "service agreement," they could cancel whenever, and that after the customer entered the service agreement, they would unknowingly have entered a five-year term contract. CW5 recounted that, during training, Rego told CW5 and other sales trainees "don't worry about the term" because Vestis has lawyers and "a legal way to justify it."

186.    During the training, CW5 recalled that Account Executives were told to memorize a "script" to use when speaking to prospective customers on the phone. CW5 explained that Vestis' training also involved roleplaying how to overcome customer objections. CW5 stated that the

"whole point" of the script and roleplaying were to "deceive the customer into thinking they were safe with us."

187.    CW6 corroborated CW5, stating that Rego instructed salespeople to tell customers they could cancel their contracts at any time, even though that was "not true at all." CW6 added that Vestis trained its salespeople to disguise five-year contracts as short commitments and to "spin" the agreements in a way that misled customers about the true length. Specifically, CW6 recalled being instructed to "tell them it's a sixty-day agreement or it's a thirty-day agreement over a period of five years." As a result, according to CW6, the customers thought "it's only a thirty-day agreement—it's month to month." CW6 stated Vestis' misleading practices resulted in some customers cancelling their contracts after discovering they had been misled during the sales process telling Vestis "do not deliver to me anymore. I don't care. Take me to court."

188.    CW1 explained that contracts automatically rolled over for the original term, unless customers sent a letter 60 days prior to the cancellation date. CW1 stated that automatic rollover happened "a lot" and trapped many customers.

189.    CW1 added that the majority of customers were waiting for their contracts to expire. CW1 stated that "tons of customers" would tell CW1 "I'm not renewing with you guys once my contract's up." CW1 stated that "the majority of the time, the customers were not happy" and that "they all wanted to quit."

### E.  During the Class Period, Vestis' Revenue and Adjusted EBITDA Plummet Due to Persistent Customer Service Issues and Soured Customer Relations

190.    Contrary to Defendants' assurances during the Class Period that that Company's execution against its strategic plan would produce growth, the exact opposite happened.

191.    For instance, as depicted below in Figure 6, Vestis' revenue decreased by about 5.7% between 2Q2024 and 2Q2025. The decrease was largely driven by a decrease in uniform revenue during the same period of around 11.4%.

**Figure 6**



192.    According to Scott, during the Class Period, Vestis had "the strongest" national account pipeline during her tenure and customer retention was improving, which should have generated more revenue. In reality, lost business always outpaced new business. For example, on May 6, 2025, in a slide presentation on their Investor Relations webpages (the "2Q2025 Earnings Presentation"), Vestis disclosed net new business of -$3,200,000 in 2Q2025. As illustrated below in Figure 7, on January 31, 2025, in a slide presentation on their Investor Relations webpages (the "1Q2025 Earnings Presentation"), Vestis disclosed that lost business similarly outpaced new business throughout the remainder of the Class Period:

**Figure 7**



193.    As depicted below in Figure 8, Vestis' Adjusted EBITDA also decreased by around

45.4% between 2Q2024 and 2Q2025:[8]

---

[8] On May 6, 2025, Vestis filed a press release with the SEC on Form 8-K announcing financial and operational results for the Company's fiscal 2Q2025 ("2Q2025 Press Release"). In the 2Q2025 Press Release, Vestis disclosed a "one-time" $15 million bad debt expense. Without the bad debt expense, Vestis' 2Q2025 Adjusted EBITDA was $62,618, resulting in an over 28.1% decline in Adjusted EBITDA between 2Q2024 and 2Q2025.

**Figure 8**



194.     Therefore, despite Scott's assurances that Vestis' strategic plan would increase the Company's revenue and profitability, both decreased during the Class Period due to persistent customer service issues and soured customer relations.

## VI.    DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS

195.     Throughout the Class Period, Vestis had pervasive inventory and customer service issues, including product shortages, delayed or missed deliveries, poor-quality products, and delayed new customer installations, all of which were compounded by the Company's outdated facilities. The Company's deceptive contracting processes soured customer relations further. As a result, customers were frequently dissatisfied with the Company's service and sought credits, contract deviations, lowered invoices to minimum orders, and pursued buyouts and cancellations.

196.     Plaintiff asserts that all alleged false and misleading statements, or statements omitting material facts so as not to mislead, made by Defendants are contained in the chart within

**Exhibit A**, hereto, which is expressly and fully incorporated by reference into this paragraph. Statements that are alleged to be false and misleading in **Exhibit A** and as referenced herein are bold and underlined (**<u>example</u>**). The remaining statements are provided for context. Statements that are alleged to be false and misleading in **Exhibit A** and as referenced herein were made by the Defendants in:

- Vestis' press release reporting second fiscal quarter 2024 results and full-year outlook updates filed with the SEC on Form 8-K ("2Q2024 Press Release") and the 2Q2024 Earnings Call that was filed and convened, respectively, on May 2, 2024.

- The report on the Company's financial and operational results for its second fiscal quarter ended March 24, 2024 filed with the SEC on Form 10-Q ("2Q2024 Form 10-Q") on May 8, 2024.

- Vestis' earnings call reporting financial and operational results for the third fiscal quarter of 2024 ("3Q2024 Earnings Call") and the report on the Company's financial and operational results for its third fiscal quarter ended June 28, 2024 filed with the SEC on Form 10-Q ("3Q2024 Form 10-Q") convened and filed, respectively, on August 7, 2024.

- Vestis' press release reporting fourth fiscal quarter and full-year 2024 results filed with the SEC on Form 8-K ("FY2024 Press Release") and Vestis' earnings call reporting financial and operational results for the fourth fiscal quarter and full year of 2024 ("FY2024 Earnings Call") filed and convened, respectively, on November 21, 2024.

- The FY2024 Form 10-K filed with the SEC on November 22, 2024.

- Vestis' press release reporting first fiscal quarter 2025 results filed with the SEC on Form 8-K ("1Q2025 Press Release") and Vestis' earnings call reporting financial and

operational results for the first fiscal quarter of 2025 ("1Q2025 Earnings Call") filed and convened, respectively, on January 31, 2025.

- The report on the Company's financial and operational results for its first fiscal quarter ended December 27, 2024 filed with the SEC on Form 10-Q ("1Q2025 Form 10-Q") on February 5, 2025.

197.     Throughout the Class Period, analysts relied on Defendants' statements, frequently citing commentary around customer service initiatives and progress. As a result, analysts and investors maintained inflated ratings and expectations for Vestis.

198.     For example, Jefferies issued a report on August 7, 2024, titled "3Q24: Assembling the Right Team and Strategy - Good Quarter & Reiterated Guide[,]" reiterating its "Buy" rating and stating: "we think the company now has the right mgmt team in place to execute on their strategic and operational plan which should enable them to return to at least LSD% organic growth and drive margin expansion." In a section titled, "A Step in the Right Direction, Rebuilding Credibility One Qtr at a Time[,]" the Jefferies report emphasized that the Company's improving customer retention and customer service were key to rebuilding credibility, stating in relevant part:

> After a very tough F2Q print and lowered FY guide, VSTS shares have been largely in the penalty box as investors questioned whether: (1) the new guidance was conservative enough; (2) the company could actually de-lever to below 4x; and (3) *did the mgmt. team have the right strategy and people in place to stop customer losses, improve service and drive a more efficient business model* (i.e. can they drive LSD-MSD% organic growth and see margin expansion closer to peers). We view the F3Q results as a nice step in the right direction in regaining management credibility. Specifically, the 3Q beat, reiterated outlook (slightly better margins), and prudent actions to de-lever to 3.3x were exactly what the company needed to deliver. In our view, the path forward for VSTS will be more about hitting singles than home runs, *but what we found most encouraging from today's print was that customer retention/losses didn't deteriorate*, restructuring actions were enacted, and ***most importantly, major changes to the organization structure were implemented***. On the latter, a new COO, who in simplistic terms is focused on

improving customer service (helps keep retention under control), and a new head of sales (from CTAS) who owns the task of driving new business wins, is exactly the change we needed to see.

199.    Similarly, a J.P. Morgan report published on August 8, 2024, remarked on Defendants' commitment to addressing Vestis' service and customer retention challenges, and on their "transparent 'no surprises'" discussion of operations and financials, stating in relevant part:

Recall that our estimates for 2HF24 were reset materially lower across the P&L following 2QF24 (March) results that revealed the firm's service, sales, and customer retention challenges were more pronounced than we had previously appreciated []. Indeed, before diving into its results, Vestis leadership sought to convey three key messages on the firm's earnings call: 1) "our business is stable;" 2) *the team appreciates "the importance of external communication, consistently delivering against our commitments, and establishing our credibility*;" and 3) *the firm is well-positioned to deliver sales/operations improvements via both new leadership and a streamlined organizational structure*.

. . .

Vestis' performance was somewhat better than expected in 3QF24, and *we appreciated that management took a refreshingly transparent "no surprises" approach to discussing the business and its outlook*. Looking further ahead, management did sound confident that 2HF24's results "will be the new base for our business from which we will growth."

200.    As the Class Period progressed, analysts continued to remark on the Company's execution on strategic initiatives and improvements to service. For instance, in a Jefferies report published on November 21, 2024, titled "4Q24: Making the Right Changes; FY25 Setup Is Attractive And Takeout Possible[,]" the analyst reiterated its "Buy" rating, stating that "the outlook looks attractive as they execute on their initiatives[.]" The report also explicitly connected Defendants' statements, including "plans to operate the company more efficiently and improve the customer experience," to rising share prices, stating in relevant part:

***Shares React Positively To Guidance And Commentary***. Shares ended the day up ~13% given the company's outlook for FY25 and commentary about the

company's strategies going forward. ***Our sense is mgmt did a good job providing insight on their*** 1) sales strategy, 2) ***plans to operate the company more efficiently and improve the customer experience***, 3) cost take out initiatives, and 4) intentions on reducing leverage to their targeted range of 1.5x-2x net debt to EBITDA. That said, we don't think much focus was placed on the quarter though the company missed revenue by ~1% at $684mm vs street at $693mm but beat on EBITDA by 4% at $80.5mm vs street at $77mm. All in, we think the focus on the call was around the outlook mgmt provided, highlighting their expectations for operations to improve in FY25.

201.    Likewise, in a report published on January 31, 2025, Wolfe Research maintained its "Outperform" rating and highlighted management's "optimistic outlook" for the remainder of FY2025, stating in relevant part: "mgt. expressed an optimistic outlook for the remainder of FY2025 driven by expected pricing actions in 2H, a strong national account pipeline, and expectations that new volume wins to outweigh losses as they exit 2Q." The January 31, 2025 Wolf Research report also emphasized Defendants' customer service updates, stating in relevant part:

Customer retention of 92.9% was up roughly 280 bps sequentially and up 30 bps y/y. ***Mgt. stated its ongoing efforts around improving its customer experience for on-time delivery and balanced approach to pricing have led to its sequential retention rate increase***. Additionally, service costs and SG&A were down -3% y/y which mgt. stated reflects the company's continued efforts to optimize its logistics network, as well as generating savings from plant efficiencies such as driving merchandise reuse efficiencies, which used fill ratio was up 10% y/y to a record high.

202.    Analysts continued to rely on Defendants' commentary about ostensible customer service improvements up until the last moments before the truth was revealed in 2Q2025.

203.    For example, Jefferies published a report on February 2, 2025 reiterating its "Buy" rating and emphasizing Defendants' commentary around customer service improvements, stating in relevant part:

Retention for the company ticked up 30bps YoY in the quarter driven by improvement in service levels. Specifically, mgmt believes their customer delivery notification and ***customer service team has improved service levels for clients, ensuring that deliveries are on time. Further, the company noted that on-time delivery and shortages were common service requests they received from clients but given the focus here, these requests have declined***. All in, we expect retention to improve throughout the year as they benefit from these improvements.

204.    Likewise, Baird Equity Research published a report on February 2, 2025, stating stated that "[c]ustomer service KPIs appear to be improving as well with management citing fewer service requests for deliver delays and shortages." The following day, J.P. Morgan published a report, titled "1QF25 Results In-Line; Turnaround Progressing Well but Takeout Threads Appear to Have Frayed[,]" highlighting Defendants' confidence in Vestis' "ongoing transformation" and noting its import to the analyst's view looking forward, stating in relevant part:

> Looking ahead, ***management sounded confident in the firm's ongoing transformation and inflection towards positive y/y growth. In particular, CEO Kim Scott noted progress on each of "three legs of the stool" for driving growth: national account sales, SME/field sales, and retention/service***. On national accounts, CEO Scott described the firm's pipeline as "the strongest it's been since I joined Vestis" (in late 2021). Notable wins included a "significant lane expansion" with a large restaurant customer that will "more than triple" recurring revenues, plus "a number" of customer adds in each the healthcare and industrial verticals. On SME/ field sales, management highlighted recent progress under new leadership (SVP of Sales Pete Rego joined in July 2024) has resulted in rising productivity (i.e., revenue per salesperson) and the firm recently began rebuilding sales headcount. On retention/service, management pointed to an improving customer experience, measured by fewer service requests tied to each order shortages/late deliveries. **In our view, stronger (sustained) service levels should lead to better retention, pricing power, and cross-selling capability at Vestis. [Non-Italicized emphasis in original]**

205.    Accordingly, throughout the Class Period, Defendants' materially false and misleading statements altered the total mix of information in the market and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

## VII.    THE TRUTH IS REVEALED

206.    On May 6, 2025, after the market closed, Vestis filed the 2Q2025 Press Release, including revenue that had declined "primarily" due to "lost business in excess of new business," contrary to Scott's assurances just the prior quarter, as well as a $15 million "bad debt" expense. Within the 2Q2025 Press Release, Holloman was quoted as being "disappointed with our second quarter results[.]" Specifically, the 2Q2025 Press Release stated in relevant part:

> **Second Quarter 2025 Financial Performance**
>
> Second quarter fiscal 2025 revenue totaled $665.2 million, a decrease of $40.1 million year over year, and the company generated an operating loss of $8.6 million during the period, a decrease of $51.6 million when compared with operating income in the second quarter of 2024. ***The decline in revenue was primarily due to a $17.5 million decline from lost business in excess of new business***, a $5.8 million decline in revenue related to existing customers, and a $6.8 million decrease in direct sales primarily driven by the loss of a national account customer. In addition, the second quarter of fiscal 2024 included approximately $5.0 million of revenue from one-time customer exit billings that did not repeat in fiscal 2025. Cost of services decreased $14.4 million year over year, as a result of lower volume.
>
> ***
>
> Adjusted EBITDA was $47.6 million for the second quarter of 2025 and excluding ***a $15.0 million one-time adjustment for bad debt expense*** was $62.6 million or 9.4% of revenue as compared to $87.2 million, or 12.4% of revenue in the second quarter of 2024.

207.    Vestis disclosed in its contemporaneously-filed SEC quarterly report on Form 10-Q (the "2Q2025 10-Q") that the $15.0 million bad debt expense was an "adjustment to the allowance for credit losses during the three and six months ended March 28, 2025 based on ***updated estimates of collectability*** and to ensure the adequacy of the allowance for credit losses." In other words, Vestis now estimated it would collect significantly less from customers, who, due

to ceaseless customer service issues, including product shortages, poor quality products, and install times, would refuse to pay.

208.    As a result of these operating challenges, the 2Q2025 Press Release further disclosed that Vestis was ***withdrawing*** its previously-issued full-year fiscal 2025 financial guidance altogether—indicating that operations were so turbulent the Company was unable to provide investors with forecasts in the manner it had historically. Instead, Vestis could only issue revenue and adjusted EBITDA guidance for the third quarter 2025 ("3Q2025"), stating, in pertinent part:

### Revised Outlook and Third Quarter Guidance

The Company expects fiscal third quarter 2025 revenue to be in the range of $674 million to $682 million and fiscal third quarter 2025 Adjusted EBITDA to be at least $63 million. In shifting to quarterly guidance, the Company is not providing full-year guidance for fiscal 2025.

209.    On May 6, 2025, Vestis also published the 2Q2025 Earnings Presentation to inform discussion during the 2Q2025 Earnings Call. On May 7, 2025, before market open, Vestis held an earnings call to discuss the Company's 2Q2025 financial and operational results (the "2Q2025 Earnings Call") presented by Holloman and Janzen.

210.    The 2Q2025 Earnings Presentation and the 2Q2025 Earnings Call corrected the misimpression from Defendants' previous statements—including Defendant Scott's assertions that Vestis was taking "clear, deliberate actions" to address service issues such as "on-time delivery[,]" "stopping shortages[,] and delivering full loads" such that customers were having a great experience, remaining with the Company and even increasing orders through cross-selling. Instead, Vestis' disclosures evidenced that Vestis' customers were lowering order volumes,

receiving sizeable credits due to woefully inadequate service, and ending services altogether, which made achieving the Company's full-year forecasts unreasonable.

211.    The 2Q2025 Earnings Presentation included the following slide (Figure 9) which demonstrated that lost business outpaced growth from new customers and existing customers lowered their order volumes.

**Figure 9**



212.    In the 2Q2025 Earnings Presentation, Vestis' discussion of "Rental decline" from "weaker existing customer volume" in "January" 2025 starkly contrasted with Defendants' prior statements, including those made in *February* 2025 in the 1Q2025 Form 10-Q speculating that Vestis "**may**" suffer a "**failure to retain current customers**" and "**renew existing customer contracts**[.]"

213.    On the 2Q2025 Earnings Call, in prepared remarks, Holloman discussed "specifically what changed between Q1 and Q2 and why [Vestis] did not deliver the revenue growth that [the Company] expected this quarter." Contrary to Defendants' Class Period claims on the 1Q2025 Earnings Call that they expected "**new volume wins to outweigh losses**" in 2Q2025, Holloman admitted that Vestis' disappointment revenue was "a significant difference from the growth we implied in our guidance[,]" stating in relevant part:

> *Second quarter revenue was $665 million, which declined approximately $18 million from Q1 or 2.7%, a significant difference from the growth we implied in our guidance*. Excluding a $15 million onetime bad debt adjustment that Kelly will discuss, adjusted EBITDA was $63 million or 9.4% of revenue, a 250- basis point reduction compared to Q1. This decrease in margin from our lower revenue demonstrates the operating leverage inherent in our relatively fixed cost structure, which in times of revenue growth is beneficial.
>
> During the quarter, $7 million of decline was related to direct sales and $11 million of the decline was from our rental business, which we had expected to grow given the previous trends. While this was partially driven by lost business and excess of new business, *the main reason for the decrease was lower adds over stops, which is how we describe volume changes with our existing customers*.

214.    In discussing the Company's efforts to "improve revenue," Holloman also commented on customer credits. Specifically, Holloman disclosed that customer service would need to improve so that the Company could decrease costly credits going forward, stating in relevant part:

> [W]e have taken meaningful actions to further improve revenue, including *focusing on decreasing the number of credits being issued to our customers. We have done this by improving specific customer service issues, such as product shortages and cleaning qualit*y and have seen a positive impact from these actions on our revenue run rate in a relatively short time frame.

215.    Holloman's disclosure that Vestis' revenue was impacted by the number of credits being issued due to ongoing service issues, including product shortages and cleaning quality,

corrected Defendants' prior statements, such as those suggesting that Vestis was "**delivering an outstanding customer experience**[,]" "**reducing [] service requests related to … on-time delivery and [product] shortages**[,]" and "**seeing the level of performance rise across the system**" and "**the fruits of our labor around improving the customer experience**."

216.     During the 2Q2025 Earnings Call, Holloman reiterated Vestis' disappointment in the financial results and acknowledged that the Company failed to achieve new business in excess of lost business as previously represented. Holloman also clearly understood that Vestis' service performance to date was insufficient given the Company's admitted disappointment and resolve to "do better through serving our customers," stating in relevant part:

> ***Let me be clear, we are disappointed with our second quarter performance.*** It does not represent our long-term potential in the attractive uniform and workplace supplies market. ***We can and we will do better through serving our customers***, executing our strategic priorities and delivering for our shareholders.

217.     During the 2Q2025 Earnings Call, Holloman also reinforced Vestis' focus on "improving customer service and operational effectiveness" and addressing such issues with an urgent customer-centric approach. In doing so, Holloman corrected Defendants' prior misstatements representing that customer service had meaningfully improved such that Vestis was seeing an increase in revenue related to customer cross-selling, stating in relevant part:

> We are moving with a sense of urgency to drive a customer-centric mindset across all levels of the organization. ***I am particularly focused on positioning our route sales representatives for success***. These teammates play a critical role as the face of Vestis to our customers. This includes enabling field service teams to deliver best-in-class service from the start with enhanced ability to solve customer issues in real time. It also means ensuring our teams can support our customers' needs by delivering high-quality products on time and in full.

218.     During the 2Q2025 Earnings Call, Janzen acknowledged that Vestis' "revenue was negatively impacted by volume-related credits issued to customers to address service concerns."

Janzen also disclosed that the Company's operating cash flow was impacted by an enormous investment in inventory to purportedly "support new customer installations[,]" in stark contrast to Defendants' prior statements representing they had positioned Vestis with "**the right inventories in our distribution centers and operating facilities to support growth**[:]"

> During the quarter, we generated $7 million of operating cash flow. However, free cash flow was $7 million negative, reflecting lower profit and higher working capital. ***The increase in working capital was primarily due to $30 million of investment in inventory to support new customer installations as well as improve our ability to serve existing customers more effectively***. This investment included $6 million of purchases we bought in anticipation of tariffs. Given current inventory levels, we do not anticipate the need to continue making significant investments over the remainder of the fiscal year.

219.    Similarly, Janzen disclosed the Company's forthcoming capital expenditures during her prepared remarks, explaining that "[d]uring the quarter, we spent approximately $14 million in capital expenditures. And for the year, we expect total capital investment to be around $60 million, the majority of which is related to market center facility improvement."

220.    During the question-and-answer portion of the 2Q2025 Earnings Call, Holloman admitted that Vestis needed to curb cost reduction efforts which were at the expense of "better service" for customers, stating in relevant part:

> [W]e are continuing with our efforts around plant consolidations and better utilizing of our assets and facilities and being more efficient. So we continue that work. At the same time, we did a lot of work -- ***a lot of work was done, I should say, in the past year on cost reduction. And I'm at the point now, Andy, and I believe we're at the point where we need to settle down and really look at making absolutely sure that we are investing where we need to, to help retain customers and provide better service. So it's a fine balance there***, but we need to make absolutely sure that we're able to service our customers in a very robust, solid customer-centric kind of a focus.

221.    Holloman's disclosure contradicted Defendants' prior misstatements that Vestis had successfully deployed its efficient operation initiative, which included cost control measures such as the re-use garment initiative, while also "**building a customer-centric culture with a keen recognition of the importance of delivering an outstanding customer experience**[.]"

222.    Analysts attending the 2Q2025 Earnings Call demanded further clarity around Vestis' customer service issues given the Company's prior representations regarding improvements. For instance, a Stifel, Nicolaus & Company analyst asked Holloman "as to what really has to be done here to fix some of those things." In response, Holloman dodged the question, focusing only on Vestis' actions post-Scott's termination, stating in relevant part:

> In the service area, *we are now and what we've done over the last few weeks*, we are better organized and providing the right resources to implement both the improvements that need to be made in the plant and the improvements that we need to make in service, making sure that we have some resources that are focused on that, helping to implement and execute those improvements in the locations. And so that's a part of why I see it improving. Also, we've been talking a lot about culture and being focused on the customer and being customer-centric and making absolutely sure that we're doing that.

> The other part of it is what I often say, and I think I said it in my remarks, is that we need to be always working towards positioning our RSRs for success because they are, of course, the face of the company, and they have the relationships with the customer. And we need to make absolutely sure that they have the products with complete loads that they need to fully service the customer. And we're doing training in that area and really focused on how we can best make our RSRs successful. And so that gives me more confidence.

> And I understand your point around we've been working on these things. *I would say we now have a renewed focus on making absolutely sure that we're getting these things implemented*.

223.    Holloman also reiterated that the Company was *now* starting to talk about the credits related to poor service, stating in relevant part: "And as you noticed, we have started to talk

about credits, the amount of credits that we issue. And the real opportunity there is to fix the performance issues that cause credits to happen, and that's where we're focused."

224.    Analysts also pressed Vestis on the Company's revenue decline during the quarter. For instance, a Goldman Sachs analyst asked for clarity "on what could have caused year-over-year revenue declines" and "how much of it was due to internal issues versus evolving competitive dynamics versus macro considerations[.]" In response, Janzen confirmed that Vestis' financial results were solely due to lost customers, lower volume, and service issues, stating in relevant part:

> So for ***the year-over-year revenue decline is driven by a number of things. One is we did have the lost business that did exceed the new business***. Obviously, we're narrowing that gap, but ***certainly year-over-year, that was a fairly significant factor***. ***We also did have the adjustment -- the lower volume with existing customers. I think it's a very similar conversation as it relates to some of the service discussions that Phillip had -- service items that Phillip had, some of the credits*** and as well as potentially some of those changes in inventory demand depending on some of our mix of customers.
>
> We also had a reduction in direct sales related to the loss of that large national account we had talked about, and that had a relatively significant impact on the year-over-year. And then last year, we had some unusual positive exit billings for a couple of our customers that did not repeat this year.
>
> So those were the larger items that caused the year-over-year. ***I'd say we are not attributing really any of that to a macro environment change that's happened from last year to this year***.

225.    On this news, Vestis' common stock price fell approximately ***38%*** in a single trading day, declining $3.27 per share from a closing price of $8.71 per share on May 6, 2025 to $5.44 per share on May 7, 2025 on unusually heavy trading volume of over 14 million shares, as compared to the previous day of nearly 3 million shares.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

226.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true facts regarding Vestis, and their control over and/or receipt and/or modification of Vestis' allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

### A. The Individual Defendants Admitted Reviewing and Discussing Sales, Customer Service and Satisfaction, Operations, and Productivity, and the Admissions Were Corroborated by CWs

#### 1. Defendant Scott Conducted Customer Service Assessments and Met with Territory Managers to Discuss Customer Service Issues

227.    Prior to and during the Class Period, Defendants conducted assessments at all levels of the Company—all the way to the RSRs—as a part of their initiatives to purportedly enhance customer experience. For instance, during the 2Q2024 Earnings Call, Scott presented jointly with Defendant Dillon and speaking on behalf of "we"—*i.e.*, both Individual Defendants—affirmed that they were conducting customer satisfaction and leadership assessments throughout the Company and "all the way to our route service representatives[,]" stating in relevant part:

> ***We are conducting assessments all the way to our route service representatives*** in the field to identify, improve and retrain on specific procedures that can enhance our customers' experience and garner loyalty. We will also be creating a new leadership role on our team that will be accountable for service across the company.

228. CW1 corroborated that Scott was personally meeting with Territory Managers on customer issues, including a "roundtable meeting" in late 2023 or early 2024, attended by Territory Managers from around the country. During the meeting Scott was personally informed of the numerous problems relayed by the many Territory Managers, including the product shortages, low morale among Territory Managers, and "not having what we need to run our areas every day."

229. Accordingly, based on their customer experience assessments and Scott's meetings with Territory Managers, Defendants knew or recklessly disregarded that customers remained dissatisfied, Vestis had not resolved underlying customer service issues, and in fact, were driving customers to reduce orders and cancel their contracts.

### 2. Defendant Scott Touted Her Relationships with Customers and Personal Involvement with Vestis' Sales Team

230. Defendant Scott emphasized spending considerable time with Vestis' sales team and monitoring the Company's sales team's and RSRs' sales performance, all of which supports an inference that she knew about the Company's deceptive sales practices and RSRs reluctance to engage in cross-selling due given the Company's service issues.

231. For instance, during the 2Q2024 Earnings Call, Scott emphasized the amount of time that she spent with the Company's sales teams and her involvement in assessing their training and practices, stating in relevant part: "*I have spent significant time over the past few months assessing our sales team, structure and talent as well as our processes* from teammate training and onboarding to collateral and go-to-market strategies for our various product lines."

232. During that same call, Scott spoke on behalf of "we"—*i.e.*, she and Dillon, the other Company presenter on the call—and also highlighted a new, twice-daily process implemented to measure RSR cross-selling performance:

***We've instituted a twice daily process to manage and measure route sales,*** and I'm very pleased with the results we are seeing here. ***We've also seen demonstrated performance from teammates at the levels required*** to achieve the long-term growth rates in our strategic plan. Our focus is now centered around supporting all of our RSRs in achieving and maintaining these levels of performance.

233.    Scott also expressed control over three "levers," "dials," or "knobs," to drive Vestis' revenue growth. During the 4Q2024 Earnings Call, in response to an analyst question about the size of Vestis' sales force and the timing of revenue growth, Scott described increasing productivity per head of existing salespeople, setting salespeople up for success to reduce turnover, and adding new salespeople. In relevant part, Scott (again speaking collectively for "we," including Dillon) stated that "what we're doing is ***closely monitoring the productivity levels*** that we're getting from existing teammates, and ***we will turn the dial*** for adding new teammates as we see the need to replenish the team." Scott added that:

Now we have that leadership, and we will add heads as needed to replenish the team while we monitor the productivity per head, because ***we're going to turn all 3 of those dials***. What's happening with turnover, what's happening with revenue per teammate and then what is happening with new sales adds. And so as we move through the year, ***we'll turn those dials appropriately***.

234.    Scott repeated her control over the three "knobs" to drive revenue growth during the 1Q2025 Earnings Call—which, again, she jointly presented with Dillon—stating in relevant part:

But when you think about what should the size of the team be, ***it really depends on 3 knobs***. It depends on what type of turnover you're seeing. It depends on what type of productivity you're seeing and then how fast are you hiring them and how productive are they. ***So we're going to just keep dialing those knobs and turning those knobs*** until we get the right formula, but we are going to add teammates to that team.

235.    During the same earnings call, Scott again highlighted Defendants' personal involvement in training Vestis' sales team and RSRs. For example, when an analyst asked for more

details on price absorption by customers, Scott responded that "*[w]e've also spent time with our frontline teammates* training them and helping them have those conversations with customers and understand how to discuss and explain pricing tactics." Scott also touted the Company's sales training during that same earnings call, stating in relevant part:

> And so we feel outstanding that we are now onboarding teammates through what I would call somewhat of a sales boot camp. *We're literally bringing them here into the teammate support center here at the corporate headquarters where I sit and we're training those teammates* one by one individually and in groups as they come into our team.

236.    The foregoing statements demonstrate that the Individual Defendants were deeply engaged with Vestis' customers and sales team. Scott admitted that they regularly spent time with Vestis' sales team, monitoring sales from the sales team and RSRs, adjusting levers, dials, or knobs to achieve growth, and helping train the Company's sales team. The Individual Defendants' extensive personal involvement with Vestis' customers and sales team supports the inference that they knew or recklessly disregarded that the Company's revenue forecasts were undergirded by illusory sales metrics, that RSRs were not cross-selling customers due to sustained service issues, and that the Company's deceitful sales tactics were driving customers to reduce their volumes and end their contracts with the Company altogether.

### 3. Defendants Admittedly Monitored and Discussed Customer Service Data, Which CWs Confirmed, Highlighting Their Deep Understanding of Customer Dissatisfaction

237.    During the Class Period, Defendants regularly touted how closely they monitored customer satisfaction data and the granularity of their review. For example, during the 2Q2024 Earnings Call, Defendants Scott and Dillon assured investors that they were closely reviewing metrics concerning customer experience, service, and retention. For instance, Scott emphasized:

So as *we have been* evaluating the lost business and *really digging in to understand the root causes of that lost business*, it's led us back to service efficacy. So *as we look at the causes* for customer quits and the feedback that we're receiving from them, we're finding very specific areas we can action around.

238.    Scott similarly assured that she personally reviewed such metrics during the call, stating in relevant part:

These challenges have been in our business for quite some time, and *I've dug in quite deeply into these root causes of quits to really understand how do you get to the root of this and improve customer retention. And so you've got to go really deep and far to get to the right answer. And so as I've explored this and listen to customer feedback*, it's just really clear that we are not tight on our processes as it relates to disciplined loading of trucks, delivering on time, delivering full loads.

239.    Recognizing that these issues were important to investors, Scott also emphasized the granularity of Defendants' review, stating in relevant part: "we've spent a lot of time over the last few months *very aggressively digging into reason codes* related to the customer experience." Likewise, Scott highlighted that the Company had "*great visibility*" into why customers were choosing to leave Vestis, had completed "diagnostic around those that are leaving[,]" and again emphasized her personal involvement: "*I've dug into quite deeply around why are customers choosing to leave Vestis*." Scott likewise described the levels of the Company that she had been immersing herself in, stating in relevant part:

But I can also tell you that *I have gone incredibly deep into this business* over the last 6 months since we have spun out and particularly over the last few months since our COO left the company, and *I have gone very deeply into evaluating these root causes at the grassroots level down to our market center*. And I'm just finding great opportunity to continue to improve. *So I think this is about going really deep into the bowels of the business and understanding what levers we can pull to make Vestis even better*, and that's what we're doing.

240.    Dillon echoed Scott during the 2Q2024 Earnings Call, affirming that they reviewed customer data concerning customer experience, service, and retention, stating: "*as we've spent the*

*time analyzing the reason for quits and the magnitude of the carryover losses*, we made the determination that we would deliberately moderate the pricing to focus on retention and customer efficacy."

241.    As a result of Defendants' efforts to "really dig[] in[,]" Scott also confirmed that data revealed that Vestis was responsible for its customers' cancellations, stating in relevant part: "[b]ased on reason codes cited by our customers when they cancel service with us, *we know* that more than 70% of cancellations are due to causes that are within our control."

242.    Defendants continued to affirm their close reviews of market center performance during the Class Period. For instance, during the 3Q2024 Earnings Call, Scott reaffirmed Defendants tracked customer retention rates down to the market center in response to an analyst's question about such rates, "[w]hen we look at the future opportunity, we have market centers today. *We have locations today that are performing well above the 95% mark*."

243.    Defendants also continued to reiterate that they were tracking customer service requests and reason codes daily. For example, during the 1Q2025 Earnings Call, Scott replied to an analyst's question about service issue reduction by affirming Defendants' daily monitoring efforts:

> *But we look every day at leading indicators around service-related requests*. So as a customer calls in with a service need of some sort, we call those SRs, and *we manage service requests on a very tactical and daily basis*. And those service requests have very specific reason codes attached to them. And those reason codes help us generate Pareto bars and understand what are the key drivers of customer service requests.

244.    During that same call, Scott emphasized that Defendants were "very diligent about measuring the performance with existing customers, understanding what's happening with

teammates and wearers that are using our product with those customers," and she reinforced that they were "not seeing any significant shifts there."

245. Corroborating Scott's own admitted monitoring of the customer service issues, CWs also recalled that certain customer service requests and customer attrition reports were escalated directly to Scott. For example, CW1 confirmed that senior leadership could see the complaints and explained that "every manager had access" to see the complaints. CW1 added that certain requests were marked "Office of the President" or "OOP," which refers to Defendant Scott's Office. According to CW1, a daily email tracked service requests, including those identified as "Office of the President."

246. CW1 also recalled that, if a service request was not closed by the end of day, it was escalated to a VP. If still no one had responded within around 36 to 48 hours, CW1 explained that the service request "would make its way up to Kim Scott." CW4 also confirmed that Scott received customer attrition data from Regional Managers.

247. Moreover, as multiple CWs recounted, customer satisfaction, retention, and sales data were readily available to Defendants via Vestis' specialized software systems, including, *inter alia*, Salesforce, ABS, Microsoft Power BI, Tableau, Spindle, and Oracle.

248. The foregoing demonstrates that the Individual Defendants regularly accessed and monitored data related to customer satisfaction, retention, and customer service issues. Moreover, Defendants repeated reference to specific reason codes, market centers, customer service requests,

and Pareto bars evidence that Defendants were exercising a granular level of oversight.[9] Accordingly, Defendants' detailed and ongoing monitoring strongly supports the inference that throughout the Class Period, Defendants knew or recklessly disregarded that customers remained dissatisfied, Vestis had not resolved underlying customer service issues, and in fact, was driving customers to reduce orders and cancel their contracts, which led to a significant decline in the Company's revenues.

### 4. Throughout the Class Period Defendant Scott Led Monthly Town Halls to Review Sales, Retention, and Customer Satisfaction Data

249.    CW4 confirmed that beginning before the Class Period and throughout CW4's tenure, Scott led monthly virtually-held Town Hall meetings, attended by senior leadership and managers. During the Town Halls, according to CW4, Scott presented slides with customer satisfaction surveys and company metrics and financial performance, including data from sales reports such as gross sales figures and customer retention "by region[,]" "the overall numbers for the company as a whole[,]" and metrics presented compared quarterly and yearly results against company targets.

250.    CW4 also recalled that, during the October and November 2024 Town Halls, Scott reported that Vestis was missing its targets and not hitting the sales and customer retention numbers promised to investors by "***significant percentages***," and investors were not happy with

---

[9] A Pareto chart is a tool to visualize the root causes of particular issues. Pareto bar charts contain both columns sorted in descending order, representing various categories of information, and a line representing the cumulative total percentage. Pareto charts highlight the biggest factors in a data set, and are considered one of the seven basic tools of quality control as it's easy to see the most common problems or issues. *See Microsoft*, Create a Pareto chart, https://support.microsoft.com/en-us/office/create-a-pareto-chart-a1512496-6dba-4743-9ab1-df5012972856 (last visited Oct. 24, 2025).

the company. CW4 further recalled that Scott paid particular attention to customer retention during Town Halls in the back half of 2024, framing the issue in terms of "shortfalls."

251.    CW4 further confirmed that Scott also "absolutely" tracked customer satisfaction because during the Town Halls from the time of the spin-off through the end of CW4's tenure, she also presented specific customer satisfaction metrics reflecting that Vestis as a whole was falling short of its benchmark.

252.    By leading monthly Town Halls and presenting detailed sales, retention, and customer satisfaction data, Defendants knew or recklessly disregarded that customer service issues remained unresolved and customers dissatisfied, driving customers to reduce orders and cancel their contracts, leading to a significant decline in the Company's revenues.

**B.    Senior Leadership Regularly Discussed Information in Meetings and Regular Reports That was Readily Accessible to and/or Reviewed by the Individual Defendants**

253.    Throughout the Class Period, the Company's senior leadership attended regularly occurring meetings, or on an as-needed basis, and reviewed accompanying reports and data to investigate and discuss Vestis' customer service issues, including product shortages, poor quality products, install times, and credits.

**State of the Business Calls**

254.    CW2 confirmed that a "state of business" call led by Regional Vice President Hunsinger was held every Wednesday. The meeting "was a 95% sales call and a 5% operations call" and during these calls, customer accounts in need of improved sales would be brought to attention. For example, when the Company's Cheesecake Factory account was negatively affected,

leadership "would bring it up and say, hey, the plants need to start watching Cheesecake Factory. Sales, please go give them some love."

**All-Points Bulletin Calls**

255.     Vestis' General Managers of Sales used "APB" calls to review accounts that were having service issues, with most calls attended by an RVP. CW2 explained that "if somebody was complaining they weren't getting all their rugs or napkins or uniforms, and the general manager deemed it needed an APB call, you would have this call."

256.     According to CW2, APB calls in the Chicago territory occurred frequently—"once a week, twice a week." CW2 stated that the General Manager of Sales would schedule a call if: there were "repetitive issues;" it involved a larger account; or there was "a threat to cancel service." CW2 explained that, during the APB calls, participants would discuss the customer's weekly sales, account age, and what the issues were. On these calls, CW2, participants also discussed "what was potentially at stake, what could we lose, and what can we do to correct it."

**Accounts In Jeopardy Meetings**

257.     Vestis' General Managers held AIJ meetings with RSRs and Territory Managers to discuss accounts that were in "jeopardy" due to customer service issues, and flowed that customer attrition information up to Scott via reports.

258.     For instance, CW4 confirmed that General Manager Rodgers led weekly AIJ meetings, which included the Service Manager Junior Lopez and Territory Managers Matt Holguin and Jeffrey Malcolmb as well as "some corporate personnel" and "some higher ups." While CW4 did not attend, CW4's Service Manager Junior Lopez told CW4 what he was asked during those meetings, specifically: "Okay, you lost x number of customers. Why? What happened? What led

to us losing these customers? What could we have done to retain these customers?" CW4 further understood that during the AIJ meetings specific accounts would be discussed and "if it's Accounts in Jeopardy account, they would review those and see how do we keep this customer? Why does this customer want to leave?"

259.    CW4 also confirmed that Scott received customer attrition data because the plant data gathered in connection with the AIJ Meetings was sent to Regional Managers, who compiled that data into reports, and then forwarded the reports to Scott. CW4 confirmed that "they 100% gave that information to her."

**Weekly Regional Plant Efficiency Meetings and Internal Production Reports**

260.    Vestis held regularly occurring meetings to discuss plant operations and efficiencies ("Weekly Regional Plant Efficiency Meetings"), and the information from those meetings was elevated to Defendant Scott and other senior leadership also regularly reviewed production data.

261.    For instance, CW2 recalled attending recurring Microsoft Teams meetings on Mondays along with the Regional Director of Operations and Regional Vice President. The meetings consisted of a "region wrap up" and its purpose was "mostly for operations." During the meetings leadership projected a presentation slide deck to everybody on the call and individual participants, including CW2, would be responsible for presenting their plant's data.

262.    Defendant Scott also reviewed the data that was presented during these Weekly Regional Plant Efficiency Meetings as evidenced by her request to change its presentation to a standardized format. For instance, CW2 stated that the decks were not consistent at first but, according to Hunsinger, Scott "wanted everyone to be standardized because she couldn't

understand the format of the East Coast to the West Coast" and so "we standardized it so every region were the same." CW2 recounted that the standardization occurred sometime between June and August 2024 and then the slide deck was "usually the same format."

263.    CW2 further stated that management had "full visibility into plant operations" both "daily and weekly." According to CW2, you could see who was in Tableau and "no less than two, no more than four times" you could see "Kim Scott's name would be in there." CW2 confirmed that, when you clicked on a report, the system "would tell you the last person that was in there" and "you'd look to the right, and it would say last viewed by Kimberly Scott." CW2 recounted that one type of metric Scott looked at was the ironing efficiency and that her review was "used as a kind of threat." CW2 elaborated that, in the weekly Monday meetings, Hunsinger used Scott's oversight in Tableau to push performance: "They would broadcast it and be like, *'Look, guys. See? Kim Scott's even looking at it. You guys got to get better.'*"

264.    CW4 also attended weekly calls with the other plants in CW4's region to review each plant's weekly production report and "we would all have to speak to our numbers." CW4 recalled that General Manager Rodgers normally joined those calls. CW4 recounted that the weekly productivity reports were moved into a shared drive on Microsoft SharePoint and that, generally, anyone with a company email address "could go in there and look at it at any time."

265.    CW4 sent the weekly productivity report to the District Operations Manager, who compiled data from multiple plants into a regional spreadsheet. CW4 confirmed that Scott received the productivity reports because the District Operations Manager would "compile all of that, and then he would send that up to Kim Scott." CW4 recalled that the District Operations Manager

"made it very clear" that "'hey, Kim Scott is looking at these numbers. She wants to see improvement.'"

266.    CW4 also corroborated CW2 that Defendants had access to, and senior leadership personally reviewed, detailed production data. CW4 explained that Tableau was central to how plant performance was tracked and discussed and was a "key component" in providing the efficiency data that was reported during the weekly regional calls. CW4 stated that the reports addressed whether all the soil was washed, whether everything was processed that day, what was load percentage, and whether customers were receiving items and having their needs met.

**Enterprise Architecture Meetings**

267.    Vestis' Enterprise Architecture group also held regularly scheduled meetings where customer credits and installations were frequently a topic of discussion. For instance, CW3 attended monthly or quarterly Enterprise Architecture meetings throughout "at least the last year of two" of CW3's employment (*i.e.*, "at least" throughout 2024), which were frequently attended by Scott's Executive Assistant Jessica Bernantz, wherein credits and "end-to-end install timing" were "regularly discussed." According to CW3, "handwritten credits by the RSRs and the service organization was always a focus" and there was "pretty much always something going on with credits." CW3 confirmed that credits were an issue "all the time" and it was an ongoing topic of discussion.

268.    CW3 stated that executives had visibility into install delays, which exceeded the 20-day and 30-day industry standards "on a very regular basis," because it was a metric included in Vestis' Power BI "executive-level dashboard." As a result, CW3 "could not imagine any planet that installs weren't a frequent topic of conversation" among the Company's executive officers

because Company leadership, including Defendant Scott had dispatched "all the salespeople" out into the field "and their focus was on installing new business, there's no way they could have just been oblivious."

269.    In sum, throughout the Class Period, the Company had designed and implemented comprehensive reporting chains to funnel information and data concerning sales, retention, installations, customer satisfaction, credits, and customer service issues upward toward senior leadership, including Defendant Scott. Accordingly, the Individual Defendants knew or recklessly disregarded that customers remained dissatisfied, Vestis had not resolved underlying customer service issues, and in fact, were driving customers to reduce orders, seek credits, and cancel their contracts, leading to a significant decline in the Company's revenues.

### C. CWs Confirmed That Defendant Scott and Senior Leadership Personally Visted and Observed Vestis' Underperforming Facilities

270.    During the Class Period, Defendant Scott and other senior leadership visited Vestis facilities, observing shortages and purported responses thereto as well as production delays stemming from neglected facilities and staffing shortages.

271.    For instance, during the 3Q2024 Earnings Call, Scott described personally visiting Vestis' Greenville, South Carolina facility and observing shortages and employees' efforts to manage them, stating in relevant part:

> We also have developed a very robust SOP, standard operating procedure related to how to manage shortages, if there is an inventory challenge in a facility or we're falling short for some reason on product. We have found some best-in-class behaviors at our -- in fact, at our Greenville, South Carolina facility. ***We spent a couple of days, myself, spent a couple of days on the ground with them in Greenville mapping out their process of how they manage shortages***.

272.     Senior leadership also personally visited Vestis facilities, including witnessing a severe production backlog. For instance, CW2 stated Regional Vice President Nanci Hunsinger visited the Chicago facility about once every week or every other week, including during the summer of 2024. Additionally, CW2 stated that VP of Field Operations Paul Schmid visited the Chicago facility around the holiday rush of Mother's Day or Memorial Day in 2024 and saw the materials piled up in the more than 100 carts outside.

273.     As a result of Defendant Scott's and other senior leadership's personal visits to Vestis' facilities, Defendants knew or recklessly disregarded that the Company's facilities required considerable investment to inject new equipment, repair existing equipment, and alleviate the severe backlog of unprocessed products that contributed to fulfillment delays and customer dissatisfaction.

**D. Defendants Frequently, and in Great Detail, Discussed Vestis' Purported Service Improvements, Customer Experience, Retention and Sales Evidencing Their Knowledge of the Same**

274.     Throughout the Class Period, during earnings calls, analysts regularly asked Defendants pointed questions concerning the Company's customer service. Defendants did not demur or claim ignorance of these matters. Rather, the Individual Defendants repeatedly provided detailed answers to these questions, indicating their personal knowledge and understanding of the subjects.

275.     Some of the Individual Defendants' numerous, detailed statements given during prepared remarks and in response to analysts' questions on such issues include, but are not limited to, the following:

91

**2Q2024 Earnings Call**

**Shlomo H. Rosenbaum**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Kim, could you explain to us what the service gaps are just from a practical perspective that are resulting in the decision to moderate the pricing? It sounds like it -- this is a change that happened inter quarter, something's like -- something was discovered that you didn't necessarily see beforehand and significant enough that you feel that you need to make a change in the plans of pricing. Can you just give us some idea of what these service gaps are, how widespread they are? And how long do you think it's going to take to fix them?

**Kimberly T. Scott**
*President, CEO & Director*

…We also see opportunities around things like shortages, that are ***making sure that we have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer***. So those are opportunities around the perfect truck and loading processes, and ***we've got folks out in the field now working through programs to address those things***.

So we feel very confident that we've isolated these challenges and opportunities, **and we have very clear, deliberate actions around specific things like on-time delivery and stopping shortages and delivering full loads to customers**. The great news is that our culture is in a great place as it relates to wanting to do a great job for the customer and **our teammates are serving our customers really well as it relates to the relationship and the experience**."

**3Q2024 Earnings Call**

**Timothy Michael Mulrooney**
*William Blair & Company L.L.C., Research Division*

Okay. And just 1 more from me. I know service efficacy is a real focus area right now to help strengthen those retention rates. Curious how the general effort to improve on-time delivery has gone over the last few months with those telematics in place and efforts to improve on like loading processes and load shortages. Have you seen any material change in those key KPIs yet to improve service levels? Or is it too early at this point?

**Kimberly T. Scott**
*President, CEO & Director*

Yes. **So we've done a lot of work around this**. It's too early to start talking about step change in metrics yet because we've just been working diligently on implementing these new processes over the last quarter, but **we're making great progress**.

…

*We also have developed a very robust SOP, standard operating procedure related to how to manage shortages*, if there is an inventory challenge in a facility or we're falling short for some reason on product. *We have found some best-in-class behaviors at our -- in fact, at our Greenville, South Carolina facility*. We spent a couple of days, myself, spent a couple of days on the ground with them in Greenville mapping out their process of how they manage shortages. And we've actually taken that best practice, put it into the standard operating procedure. And we'll be standardizing that across our whole network so that everyone is responding with urgency and in the same way to address any type of product shortage that we might have.

Lastly and most importantly though, we've moved the leadership of this responsibility under our logistics leader, who you just heard me mentioned is having really great success with the initiatives he's driving on optimization, and he's now taken ownership for all of what we call tactical inventory.

**So ensuring all the plants have enough buffer stock and that we're ordering on time and we're delivering on time and that, that product is available for customers**. And he's bringing a whole another level of sophistication and metrics and data-based execution to this area of shortages and on-time delivery. So early days on the metrics but we feel outstanding about the progress we've made since we spoke with you last quarter in terms of mobilizing around these opportunities.

### 4Q2024 Earnings Call

**Shlomo H. Rosenbaum**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Okay. And then can you just give us a little bit more detail in progress that you're seeing in some of the things that were challenged. You listed 3 things before last quarter or 2, new wins not ramping as expected. You had service quality issues. And then deliberately moderated pricing. We talked a little bit about pricing here. But are you seeing improvements in new wins and kind of ramping the way that more the way that you'd expect? And can you quantify any improvements there in kind of the service quality issues.

**Kimberly T. Scott**
*President, CEO & Director*

…And then lastly, ***we called out shortages, making sure every piece of product got on the truck and delivered to the customer as needed. And we also have now been testing a new procedure for our facilities to follow***. In our pilot locations, we've seen a 50% improvement in reducing shortages just in the pilot locations. So that will be rolled out over the course of the year as well. So all in, I can tell you that great things are happening here at Vestis for our customers, and we've got leadership and processes to underpin that. So I feel really good about where we are.

**1Q2025 Earnings Call**

**Andrew Charles Steinerman**
*JPMorgan Chase & Co, Research Division*

***Kim, could you comment on the direction of the NPS scores?***[10] I remember the last time you commented on them with this group, you said they were at 12-month highs. That was a couple of quarters ago. Could you just remind us how often these scores are measured at a company level? And then give us some qualitative comments. ***Has there been a reduction of service issues and how that was achieved?***

**Kimberly T. Scott**
*President, CEO & Director*

Yes. Great question. So we really look at NPS at the most macro level on an annual basis. So we'll come back to that and talk about that annually. But we look every day at leading indicators around service related requests. So as a customer calls in with a service need of some sort, we call those SRs, and we manage service requests on a very tactical and daily basis. And those service requests have very specific reason codes attached to them. And those reason codes help us generate Pareto bars and understand what are the key drivers of customer service requests.

You might recall in the past, I spoke about those, and I specifically called out on-time delivery and shortages as being key opportunities to improve the customer experience and to reduce those service requests. <u>**And I'm really proud to say that we are reducing those service requests related to those key Pareto bars in those key areas around on-time delivery and around shortages. So overall, we are**</u>

---

[10] "NPS scores" refers to National Promoter Score, which is "a customer experience metric that captures how likely a customer is to recommend your products, services, or brand." Salesforce, *What Is Net Promoter Score (NPS)? A Complete Guide*, https://www.salesforce.com/service/customer-service-incident-management/net-promoter-score/#1 (last accessed Oct. 24, 2025).

**seeing continued improvement in the customer experience, and we can see that daily in the reduction of service requests related to these key focus areas**.

And also, I will add some more color around that, Andrew, is **we're seeing great success cross-selling our existing customers multiple products and services. And that is also a great indicator that our customers are having a good experience because they're choosing to buy more from Vestis**.

### 1Q2025 Earnings Call

**Harold Antor**
*Jefferies LLC, Research Division*

…So I guess just on the retention front, I know you saw an improvement in the quarter. I guess could you talk about the factors that's contributing to that improvement? And then how should we think about the retention through -- improvement through the rest of the year? And I guess, what are you underwriting for retention for the fiscal year?

…

**Kimberly T. Scott**
*President, CEO & Director*

So I'll point you back to all of the efforts that we really undertook really in the second quarter of last year, shifting the team to focus very aggressively on enhancing the customer experience. **And so we have been hyper focused as a team on really driving a delightful experience for our customers from on-time performance to rolling out standard operating procedures to improve shortages and to make sure our customers get everything they want the first time that it's delivered and really shifting our team's focus around delighting the customer**.

**We are definitely seeing that, that body of work is making a difference, and we are seeing improvements in service requests and our customers are responding very positively to the work that we are doing to take great care of them. So I would point to that as the key reason around why our customers are staying**.

276.    Defendants' numerous, detailed discussions with analysts and investors regarding Vestis' customer service and purported improvements are probative of Defendants' knowledge of those subjects and support a strong inference of scienter.

95

### E. Defendants' False and Misleading Statements Were Made on the Heels of Service Issue Disclosures Which Demonstrated Defendants' Awareness of Those Issues and Their Importance to Investors

277.    Defendants were no strangers to customer service issues, having experienced massive customer losses immediately before the Class Period. Therefore, Defendants keenly understood that, throughout the Class Period, investors would be eager for any news or update regarding customer service issues and that such updates would be heavily scrutinized. This would have been obvious to Defendants given: (i) the importance of customer satisfaction to Vestis' core rental business, which is reliant on regular customer service (typically weekly) and which generates countless customer interactions that serve as the basis of the Company's existing and future revenue; and (ii) analysts excoriated the Individual Defendants during 2Q2024 Earnings Call (and in their contemporaneous reports), and constantly inquired about customer service issues throughout the Class Period.

278.    Indeed, the Individual Defendants made statements to analysts throughout the Class Period insisting that they were managing the Company's customer service for the intended purpose of mollifying and allaying concerns. As such, Defendants were on high alert, and deeply knowledgeable of the importance of monitoring and identifying customer service issues, or were severely reckless in disregarding them.

### F. Defendants' Changes to Contract Deviation and Credit Policies Support a Strong Inference That Defendants Knew the Severity of Customer Service and Relations Issues

279.    Defendants' scienter is further evidenced by their changes to policies during the Class Period. Indeed, Defendant Scott exerted tight control over Vestis' contract deviation and

credit policies, modifying both policies to ensure more executive visibility and restrict contract deviations and credits.

280.    For instance, CW1 stated that Scott personally oversaw contract deviations beginning around late 2023 or early 2024 and continuing throughout CW1's employment. CW1 explained that Scott's approval was required for any change, including increasing or removing invoice minimums and cutting bills for renewal. CW1 added that even small price rollbacks required Scott's approval and that the only deviations that Territory Managers could make were contract renewals at the same price level or higher.

281.    CW1 also recalled Scott discouraging credits from being issued. As a result, CW1 recalled that starting around October or November 2024 the credit policy changed under Scott, who thought too many credits were being issued, so that Territory Managers could no longer approve credits themselves. CW1 recounted that Scott's changes resulted in Territory Managers having to submit credit requests in Express Desk with "detailed explanations." CW1 recalled that the credit approval chain included GMs, the credit review team, and then the COO or Scott.

282.    Defendants enacting more restrictive and executive intensive contract deviation and credit policies supports the inference that Vestis and its executive leadership knew that, due to pervasive product shortages, poor-quality products, as well as delayed customer installations and deliveries, customers frequently sought relief via contract deviations and credits.

### G. Suspicious Class Period Executive Departures Support a Strong Inference That Defendants Knew Severity of Customer Service and Relations Issues

283.    Within months of each other, several Vestis C-suite executives, ***including both Individual Defendants***, suspiciously departed during the Class Period. The significant number of

executive departures in such a short period and that they occurred at suspicious times and/or under suspicious circumstances, often without explanation, supports a strong inference of Defendants' knowledge, recklessness and/or scienter with respect to the customer service and relations issues facing Vestis.

284.    On January 31, 2025, five days before the Company would continue making misstatements in the 1Q2025 Form 10-Q and less than three years after Defendant Dillon was announced as the CFO of Vestis, the Company issued the 1Q2025 Press Release announcing Dillon's departure effective February 14, 2025. The press release downplayed the basis for Dillon's departure as merely a function of a CFO transition; however, on May 7, 2025, Vestis filed the Dillon Separation Agreement which revealed that Dillon's employment was "terminated."

285.    In March 2025, within two weeks of each other, two more C-suite executives left Vestis without explanation. On March 4, 2025, Vestis filed a press release with the SEC on Form 8-K announcing that Chief Accounting Officer Bryan Johnson resigned, effective March 10, 2025.

286.    Then, on March 19, 2025, less than three years after Defendant Scott was announced as the CEO of Vestis, the Company filed a press release with the SEC on Form 8-K announcing that Scott would "leave her positions with the Company" effective the day prior and that Holloman would serve as Interim Executive Chairman and President and Chief Executive Officer effective immediately. As with Dillon, the Company also downplayed the basis for Ms. Scott's departure, claiming that it was merely "the right time for this transition[.]" However, on May 7, 2025, Vestis filed the Scott Separation Agreement revealing that she too was "terminated."

287.    These Class Period C-suite departures occurred mere months before Vestis disclosed the Company's disappointing 2Q2025 revenue and EBITDA and the withdrawal of

Vestis' full-year guidance, which stemmed from ongoing, unresolved service issues that drove customers to lower order volumes, seek sizeable credits, and cancel services with the Company altogether. The suspicious timing of Vestis' personnel changes, including abrupt terminations of both Defendants Dillon and Scott during the Class Period, supports a strong inference of scienter.

### H. The Core Operations Doctrine Further Supports Scienter

#### 1. Defendants' Misstatements Concerned Vestis' Core Revenue Source and Operations

288.     Vestis' core business is its recurring rentals. Throughout the Class Period, Vestis' recurring rentals consistently comprised nearly all of the Company's total revenue. The table below indicates Vestis' quarterly disclosures on the Company's total revenue breakdown between recurring rentals and direct sales during the Class Period:

|  | 2Q2024 | 3Q2024 | FY2024 | 1Q2025 | 2Q2025 |
|---|---|---|---|---|---|
| **Recurring Rental** | 94% | 93% | 94% | 94% | 94% |
| **Direct Sale** | 6% | 7% | 6% | 6% | 6% |

289.     Moreover, before and during the Class Period, Defendants emphasized the importance and benefits of Vestis' recurring rental business.

290.     At the Analyst Day, Defendant Scott stated she "love[d]" Vestis' recurring revenue model and added that "many of you understand how attractive recurring revenue models are, and 92% of our volume in FY'22 was recurring revenue, which is also highly attractive."

291.     Defendant Dillon continued to tout the "beaut[y]" and "high degree of visibility" of the Company's recurring rental business stating, in relevant part, that:

> So this business, strong cash flow generation, and that's what we love about the model. It generates strong and stable cash flows. When you look at our operating cash flow, 2021 and '22, very stable despite the cyclicality of not cyclicality, but

despite the COVID environment that we were living in, we were able to kind of hold our cash flow generation on over that period, and that's just reflective of the model. ***It's one of the beauties of the recurring revenue weekly model. It's a very short conversion cycle for us, and it provides a high degree of visibility and predictability from a cash perspective***.

292.    During the 2Q2024 Earnings Call, Scott highlighted Individual Defendants' focus on improving Vestis' recurring rental business, stating, in relevant part, that:

We talked a lot about sales today, and we are undoubtedly focused on accelerating revenue growth through addressing sales productivity. ***Customer retention is one of the single most important levers in our recurring revenue model and critical to our strategy to strengthen the base***, capture share of wallet through cross-selling, to leverage idle capacity and fixed assets and enhance customer lifetime value.

293.    Scott continued to highlight Vestis' recurring rental business and actions taken to "protect our recurring revenue base" during the 3Q2024 Earnings Call, stating, in relevant part, that "[i]n fiscal '24, we have seen a 210 basis point improvement in retention on a year-to-date basis versus fiscal '23. This is good validation that our decision to moderate pricing was the right decision to protect our recurring revenue base for the long term."

294.    In addition to Individual Defendants' own statements demonstrating an acute focus on Vestis' recurring rental business, the staggering financial impact of the Company's operational failures further bolsters an inference that the mispresented information was readily apparent to Defendants. Indeed, comparing 2Q2025 to 2Q2024 the Company's persistent customer service issues with regard to its recurring rental business caused an around ***11.4%*** decline in uniform revenue, and comparing the first half of 2025 to the first half of 2024, Vestis saw an astonishing ***$117.1 million*** or an about ***91.8%*** decrease in net cash provided by operating activities.

295.    Moreover, as senior officers and/or directors of Vestis with continuous access to customer service data, it strains credulity to suggest that Defendants were unaware of the negative

impact of persistent customer service and relations issues when those issues affected the recurring rental business, constituting over 90% of Vestis' revenue, and caused such a substantial loss of revenue. In the alternative, they acted with reckless disregard for the truth when they failed to ascertain and disclose the readily available facts regarding the continued pervasive customer service issues affecting Vestis' core recurring rental business.

**2. Defendants' Misstatements Concerned Vestis' Strategic Plan for Its Core Operations**

296. Throughout the Class Period, Defendants' materially false and misleading statements concerned updates to investors on the Company's progress purportedly achieving its strategic initiatives and improving customer service (most of which were aimed at improving the Company's core recurring rentals business). These statements also illustrated Defendants paid close attention to customer satisfaction, inventory management, and revenue forecasts.

297. For example, during the 2Q2024 Earnings Call, Defendant Scott highlighted the strategic plan scorecard, stating, in relevant part "[n]ow let's shift to our strategic plan. We remain confident in our strategic plan, and we will continue to advance it. On Slide 7 (Figure 10), this scorecard depicts our rating of how we are doing against several key initiatives.".

**Figure 10**



298. Indeed, in every quarterly investor presentation during the Class Period, Vestis disclosed a strategic plan "scorecard." For example, the 3Q2024 investor presentation included the following slide (Figure 11):

**Figure 11**



299.    Throughout the Class Period, the scorecard slides updated investors, in relevant part, on sales productivity, cross-selling performance, inventory management, and employee turnover, demonstrating that Defendants closely tracked customer satisfaction, inventory management, and revenue forecasts.

300.    It is absurd to suggest that Defendants were unaware of the negative impact of persistent customer service and relations issues when those issues were directly related to the Company's strategic initiatives to purportedly improve the same, particularly given Defendants frequent updates on the same.

## IX.    LOSS CAUSATION

301.    During the Class Period, as detailed herein, Defendants materially misled the investing public, thereby inflating the price of Vestis' securities and/or maintaining the artificial inflation in Vestis' securities, by publicly issuing materially false and/or misleading statements

and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about the Vestis' business, operations, and prospects as alleged herein.

302.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements concerning the Company's business prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

303.    Defendants' statements were materially and objectively misleading when made, as set forth *supra*, and had the cause and effect of creating in the market an unrealistically positive assessment of the Company's services, customer relationships, strategic initiatives, and facilities, thus causing Vestis' securities to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made or endorsed by Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing Vestis' stock at artificially inflated prices, thus causing the damages complained of herein.

304.    Beginning after market close on May 6, 2025, Defendants issued a set of corrective disclosures contained within the: (i) May 6, 2025 2Q2025 Press Release; (ii) May 6, 2025 2Q2025 Presentation; (iii) the May 7, 2025 2Q2025 Form 10-Q; and (iv) May 7, 2025 2Q2025 Earnings

Call. This set of corrective disclosures revealed, *inter alia*, that, contrary to Defendants' representations, (i) Vestis' service issues were not isolated to a narrow subset of issues and were not improving; (ii) Vestis performed disastrously on customer service and client experience, and as such, lost massive sales volumes; (iii) RSR cross-selling was severely hampered by the Company's pervasive inventory and customer service issues; (iii) the Company did not have the right inventory balances given the Company needed to inject $30 million into inventory; (iv) the Company's facilities were in need of extensive investment to the tune of $60 million; (v) lost business was not stabilizing; and (vi) the Company did not return growth in FY'25 nor did customer wins outpace losses.

305.     On May 7, 2025, in response to Defendants' corrective disclosures, the price of Vestis' common stock fell sharply, declining $3.27 per share (*i.e.*, approximately 38%) on unusually heavy trading volume, declining from a closing price of $8.71 per share on May 6, 2025 to $5.44 per share on May 7, 2025, thereby removing the artificial inflation caused and/or maintained by Defendants' false and misleading statements and causing economic loss to investors who had purchased Vestis' securities during the Class Period.

306.     Analysts were caught by complete surprise by Defendants' disclosures and reacted swiftly and negatively. For instance, on May 6, 2025, Baird Equity Research issues a report titled, "Not Good[,]" wherein the analyst cut its expectation for Vestis' stock price from ***$13 to $6*** "given the high level of uncertainty and management turnover." The report also expressed astonishment at the magnitude of Vestis' guidance reduction, stating in relevant part:

> Incrementally negative, another huge reduction to estimates. ***Expectations were low*** following CEO firing, with guidance cut widely expected, ***but VSTS' F2Q25 results still managed to negatively surprise, probably by a lot***. We advise to let the

dust settle and build a more complete understanding of what's happening and where earnings power/FCF should be[.]

307.    The May 6, 2025 Baird report discussed the Company's financial misses and the $15 million impact to the Company's bad debt reserve to account for collectability risks from SMEs, stating in relevant part:

> Revenue degraded QOQ. Revenue declined -3% QOQ and -6% YOY (last quarter was -4.8%) and was $665M vs the $690M consensus (a 3.6% shortfall). VSTS makes the case that most of the QOQ reduction is seasonal, both in rental volumes and its large direct sales business, with retention stabilizing. Investors likely remain skeptical, but the explanation has some merit. ***Still, lost business was a 300 bps YOY headwind, and Add/Stops were another 90 bps YOY growth headwind***. Softer damaged garment fees explains the balance of the delta.

> Margins suffer under deleveraging. Adjusted EBITDA was $47.6M (or $62.6M after adding back a $15M bad debt reserve) compared to the $83M, consensus ***a whopping 25% miss***. Adjusted margins were 9.4% vs the 12.0% consensus or 260 bps light and down 300 bps YOY. Adjusted EPS loss was -$0.05 against $0.14 consensus. Importantly, adjusted results exclude executive transition costs from the former CEO/CFO. Other than revenue deleveraging, disclosure on EBITDA decline was limited.

> . . .

> Adjusted EBITDA even bigger miss. Adjusted EBITDA was $47.6M, a 42.6% short of estimates ($83M). Even adjusting for an unexpected $15M bad debt write-down, Adjusted EBITDA still fell short at $62.6M. Adjusted EBITDA margins of 7.2% contracted 520 bps YOY. ***Against, excluding $15M adjustment for bad debt expense stemming from aging receivables from smaller "mom-and pop" stores*** still came in at 9.4%. Adjusted EPS was -$0.05 versus the $0.14 consensus.

308.    The report likewise noted that Vestis' decision to increase inventory with a $30 million investment impacted the Company's cash flow, stating in relevant part:

> FCF burn on pre-tariff inventory investment; FCF generation potential uncertainty high. ***CFO [cash flows from operating activities] was light at just $6.6M vs $76M largely due to a $30M increase in inventory during the quarter***. Management suggests CFO of ~$40M/quarter against annual CAPEX of ~$60M per year "seems about right," though we're not overly confident and are modeling well below previous "50% Adjusted EBITDA" conversion target (about half that).

309.    Analysts from Wolfe Research likewise expressed disappointment with Vestis' 2Q2025 results and guidance. On May 7, 2025, in a report titled, "Disappointing 2Q results with New CEO Appointment[,]" wherein the analysts lowered Vestis' price target from $18 to $9. In the report, Wolfe analysts discussed Vestis' "significant[] miss" for revenue and EBITDA, stating in relevant part:

> 2Q Summary: Results significantly missed estimates for revenue and EBITDA. Revenue was $665M (vs. cons. $693M), down from $705M (-6%) y/y. Adj. EBITDA was $48M (vs. cons. $83M), down (-45%) from $87M y/y. **Lost business in excess of new customers continues to be a major headwind consistent with prior quarters.** With this, mgt. withdrew its prior FY25 guidance with revenue of $2.80-2.83B and Adj. EBITDA of $345-360M and provided 3Q guidance with revenue of $674-682M and Adj. EBITDA of at least $63M. Cost headwinds include one-time $15M bad debt expense and $10M in severance costs.

310.    In a section titled, "Where Do We Go From Here[,]" the Wolfe report evidenced that the market had lost the ability to trust and credit Defendants public statements. Specifically, Wolfe noted that Vestis had previously represented that "they were reaching an inflection point on lost business and expected volumes from new growth to exceed its churn. However, company's execution failures continue to persist *leading to significant loss of credibility*." The May 7, 2025 Wolfe report added: "[m]oreover, *we believe the company's churn is reflective of deeper underlying service operations* as opposed to macro impacts as peers have recently grown organic revenue presumably at VSTS's expense."

311.    In a May 8, 2025 report titled, "***From 'lost me' to 'at a loss for words***[,]'" Barclays' analysts likewise remarked on Vestis' lack of credibility, stating in relevant part:

> We were simply [] at a loss for words processing VSTS's 2Q'25 print and announcement.  And this is about a year after the company had us Moving from 'show me' to 'lost me.'* ***So, whatever little credibility VSTS had worked to restore is now gone.*** New CEO has his work cut out for himself.

*See Moving from 'show me' to 'lost me' last year, when VSTS lowered their FY24 guided top line growth from 4%-4.5% to declining (-1)% to 0% (with Adj. EBITDA margins falling from 14.3% to 12.0%-12.4%); driving the stock down -45% (vs. SPX that day +0.9%). Suffice to say this had us feeling a sense of déjà vu - with VSTS trading down -37.5% vs SPX ~ flat. In both instances, ***communication proved poor, forecasting clearly inadequate, and the root cause/issues (service, culture) remain and management has so far been unable to rectify them***. Last year, we said [] that the story takes a significant hit and pricing the equity becomes very hard, with only FCF generation supporting any deep value investment case; but now VSTS is not even comfortable guiding to FCF!

As such we stay UW and reiterate our view that CTAS is the only real choice (OW) in Uniforms (4/4/25). ***VSTS clearly has fundamental customer service issues and is in desperate need of a cultural transformation*** – which is going to be hard to come by, and if it does, take a long long time (i.e. near term potential value trap). We lower our PT to $5[.]

312.    As a result of their purchases of Vestis' securities during the Class Period at artificially inflated prices, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price declines in Vestis' securities, the statements in the Company's corrective disclosures, and the market's reaction negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to the Companies that were unrelated to Defendants' fraudulent conduct. This is supported by the stock chart in Figure 12, below, which demonstrates the clear divergence in the performance[11]:

---

[11] Vestis identified "Cintas Corporation and UniFirst Corporation" as notable competitors of size in its financial report for the fourth quarter and full year ended September 29, 2023, which was filed with the SEC on December 21, 2023 on Form 10-K (the "FY2023 Form 10-K"), and in the FY2024 Form 10-K.

**Figure 12**



## X.    CLASS ACTION ALLEGATIONS

313.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Vestis securities between May 2, 2024 and May 6, 2025, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

314.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vestis' securities actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained

through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Vestis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

315. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct as alleged herein.

316. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

317. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Vestis' business and operations;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period; and

- whether the members of the Class have sustained damages and, if so, the proper measure of damages.

318.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    PRESUMPTION OF RELIANCE

319.    Plaintiff is presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for Vestis' securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

- Vestis' securities were actively traded on the NYSE;

- The market price of Vestis securities reacted promptly to the dissemination of public information regarding the Company;

- Vestis' stock was followed by several financial analysts, including those cited in this Complaint;

- The average weekly trading volume for Vestis stock during the Class Period was approximately 3.32 million shares;

- As a regulated issuer, Vestis filed with the SEC periodic public reports during the Class Period;

- Vestis regularly communicated with public investors via established market communication mechanisms; and

- During the Class Period, Vestis had over 131 million shares in the public float and the Company's market capitalization ranged between approximately $980 million and $2.19 billion.

320. Throughout the Class Period, Vestis was consistently followed by the market, including securities analysts and the media. The market relies upon Vestis' financial results and management to accurately present the Company's financial results. During the Class Period, Defendants continued to pump materially false and misleading information into the marketplace regarding Vestis and material facts concerning Vestis' service, customer experience, ability to cross-sell its existing customers, inventory balance, and the expectation that the Company's customer wins would outpace losses, and the Company would return growth in FY'25. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of Vestis' securities.

321. As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for Vestis securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

322. Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Vestis securities at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

323.    Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

324.    Had Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased Vestis securities at artificially inflated prices.

## XII.    NO STATUTORY SAFE HARBOR

325.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

326.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

327.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Vestis who knew that the statement was false when made.

## XIII.    CLAIMS FOR RELIEF

### COUNT I

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

328.    Plaintiff realleges each allegation as if fully set forth herein.

329.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

330.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vestis securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Vestis securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

331.    During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, all in an effort to maintain artificially high market prices for Vestis securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

332.    During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Vestis' allegedly materially misleading statements, and/or their associations with Vestis which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

333.    The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of Vestis to members of the investing public, including Plaintiff and the Class.

334.    As a result of the foregoing, the market price of Vestis securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiff and the other

members of the Class relied on the statements and business plans described above and/or the integrity of the market price of Vestis securities during the Class Period in purchasing Vestis securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

335.    Had Plaintiff and the other Class members of the Class been aware that the market price of Vestis securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Vestis securities at the artificially inflated prices that they did, or at all.

336.    As a result of the wrongful conduct alleged herein, Plaintiff and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiff's and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiff and other members of the Class purchased Vestis securities in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of Vestis securities through their misconduct as described herein.  Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, Defendants' concealment of material facts related to Vestis' business and operations, in violation of federal and state laws.

337.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Vestis securities during the Class Period.

## COUNT II

## FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

338. Plaintiff realleges each allegation as if fully set forth herein.

339. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

340. Vestis and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

341. The Individual Defendants acted as controlling persons of Vestis within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause Vestis to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

342. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of Vestis, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiff's and the Class's investments in Vestis securities within the meaning of Section 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

343. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their

close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

344.    The Individual Defendants knew or recklessly disregarded the fact that Vestis' representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

345.    By virtue of their high-level positions and their participation in and awareness of Vestis' operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

346.    As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

347.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase or acquisition of Vestis securities.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiff as Class Representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.      Granting Plaintiff leave to amend this complaint to conform to the evidence; and

E.      Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## XV.    JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

DATED: October 24, 2025               Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: */s/ Gregory M. Potrepka*

Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-1275)
Morgan Embleton (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zlk.com

*Lead Counsel for Lead Plaintiff and the Class*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner
Stuart Kaufman
Anna Klausner Parish
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com
anna@robertdklausner.com

*Additional Counsel for Lead Plaintiff*