**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BOARD OF TRUSTEES OF THE POLICE OFFICERS' RETIREMENT PLAN AND TRUST FUND FOR THE CITY OF MIRAMAR, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VESTIS CORPORATION, KIMBERLY T. SCOTT, and RICKY T. DILLON,<br><br>Defendants. | Case No. 1:25-cv-4844-GHW<br><br><br>Hon. Gregory H. Woods |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ......................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................................... 5

   A.   Defendants Assured Investors Pre-Class Period that Vestis Deployed Remedial Measures
        to Correct Customer Service Issues Impacting Sales ......................................................... 5

   B.   Contravening Defendants' Statements, Service Issues Were More Pervasive Than
        Disclosed and Raged Throughout the Class Period ........................................................... 6

        1.   Facility Inefficiencies and Operational Failures Resulted in Insufficient Inventory to
             Fulfill Orders .......................................................................................................... 7

        2.   Vestis Regularly Shorted Orders and Delivered Poor Quality Products Due to
             Insufficient Inventory ............................................................................................. 8

        3.   Installation Process Inefficiencies Delayed New Customer Sales ................................... 9

        4.   Widespread Dissatisfaction from Dismal Service Caused Rampant Customer
             Complaints, Credit Requests, Lowered Orders, Contract Deviations, and Buyouts ..... 10

        5.   Vestis Further Antagonized Customers with Deceitful Sales Practices ......................... 11

   C.   Defendants Knew Severe Production Issues Caused Customer Dissatisfaction, Retention
        Declines, and Revenue Shortfalls ................................................................................ 11

   D.   Defendants Revealed the Truth ................................................................................... 12

III.    ARGUMENT ........................................................................................................... 14

   A.   The FAC Adequately Pleads Materially False and Misleading Statements ...................... 14

        1.   Defendants' Operational Statements Were Materially Misleading ............................... 14

        2.   Defendants' Service Improvement and Customer Experience Statements Were
             Materially Misleading .............................................................................................. 17

        3.   Defendants' Financial Statements Were Materially Misleading ................................... 25

        4.   Defendants' Risk Warnings Were Materially Misleading ........................................... 28

        5.   Defendants' Misstatements Are Not Puffery .............................................................. 30

        6.   Defendants' Misstatements Are Not Inactionable Opinions ......................................... 33

        7.   The PSLRA's Safe Harbor Does Not Apply .............................................................. 35

   B.   The FAC Adequately Pleads a Strong Inference of Scienter .......................................... 37

        1.   Defendants Reviewed, Monitored, and Presented on Plant Efficiency, Sales, and
             Customer Experience and Retention ......................................................................... 37

2. Pre-Class Period Disclosures and Policy Changes Support Scienter Regarding Defendants' Continued Misstatements ............................................................... 43

3. Defendants' Terminations Were Suspicious ................................................... 44

4. The Core Operations Doctrine Further Supports Scienter ............................. 45

5. Plaintiff's Scienter Theory is More Compelling Than Defendants' ............................ 45

C. The FAC Adequately Alleges Loss Causation .................................................... 47

IV. CONCLUSION ................................................................................................................ 49

# TABLE OF AUTHORITIES

**Cases**

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
    19 F.4th 145 (2d Cir. 2021) .................................................................................... 14

*Beleson v. Schwartz*,
    419 F. App'x 38 (2d Cir. 2011) .............................................................................. 22

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
    556 F. Supp. 3d 100 (D. Conn. 2021) ..................................................................... 48

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010) ..................................................................... 24

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................................... 37

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ......................................... 16, 17, 18, 35

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
    967 F. Supp. 2d 771 (S.D.N.Y. 2013) ..................................................................... 20

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018) ......................................................... 24, 30, 49

*Dresner v. Utility.com, Inc.*,
    371 F. Supp. 2d 476 (S.D.N.Y. 2005) ..................................................................... 24

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................... 47

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ............................................................................. 15, 37

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................................ 34, 36

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................... passim

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018) .............................................................. passim

*Gimpel v. The Hain Celestial Grp., Inc.*,
    156 F.4th 121 (2d Cir. 2025) ......................................................... 22, 41, 44, 48

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..................................................................... 38

*Hawes v. Argo Blockchain plc*,
    2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024) ............................................................ 17

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. Dec. 22, 2005) ....................................................... 44

*In re APAC Teleservices, Inc. Sec. Litig.*,
1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999)................................................................ 19, 20

*In re Aphria Sec. Litig.*,
2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020)....................................................................... 16

*In re AppHarvest Securities Litigation*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023) ................................................................................. 29

*In re ASML Holding N.V. Sec. Litig.*,
2026 WL 851334 (S.D.N.Y. Mar. 27, 2026) ................................................................ 39, 40

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)................................................................. 31, 41

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
2025 WL 965265 (S.D.N.Y. Mar. 31, 2025)............................................................ 41, 42, 49

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) ................................................................................. 31

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017) ................................................................................... 31

*In re BioScrip Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................................................... 38

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ..................................................................... 15

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024)..................................................................... 38

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..................................................................... 42

*In re Citigroup Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ................................................................................. 42

*In re Curaleaf Holdings Sec. Litig.*,
519 F. Supp. 3d 99 (E.D.N.Y. 2021) ................................................................................... 22

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ........................................................ 33, 45, 49

*In re Eastman Kodak Co. Sec. Litig.*,
632 F. Supp. 3d 169 (W.D.N.Y. Sep. 27, 2022)................................................................. 35

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ....................................................................... 27

*In re Henry Schein Sec. Litig.*,
2019 WL 863885 (E.D.N.Y. Sep. 27, 2019) ....................................................................... 20

*In re IMAX Sec. Litig*,
587 F. Supp. 2d 471 (S.D.N.Y. 2008) ................................................................................. 45

*In re Liberty Tax, Inc. Sec. Litig.*,
435 F. Supp. 3d 457 (E.D.N.Y. 2020) ................................................................................. 48

*In re MF Global Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................................ 36

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ................................................................................ 26

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
    563 F. Supp. 3d 259, (S.D.N.Y. 2021) ......................................................................... 48, 49

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014) .................................................................................. 44

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y 1999) ......................................................................................... 26

*In re Peabody Energy Corp. Sec. Litig.*,
    2022 WL 671222 (S.D.N.Y. Mar. 7, 2022) ........................................................................ 32

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ........................................................................... 31, 35

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ......................................................... 23, 31, 43

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010) ................................................................................ 48

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) .................................................................... 32

*In re Solaredge Techs., Inc. Sec. Litig.*,
    2025 WL 1031154 (S.D.N.Y. Apr. 6, 2025) ................................................................. 39, 40

*In re STMicroelectronics N.V. Sec. Litig.*,
    2025 WL 2644241 (S.D.N.Y. Sep. 15, 2025) ............................................................... 35, 40

*In re Teva Sec. Litig.*,
    671 F. Supp. 3d 147 (D. Conn. 2023) ................................................................................ 22

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022) ................................................................................ 35

*In re UiPath, Inc. Sec. Litig.*,
    2025 WL 206509 (S.D.N.Y. July 23, 2025) ....................................................................... 48

*In re Vale S.A. Sec. Litig.*,
    2020 WL 2610979 (E.D.N.Y. May 20, 2020) .............................................................. 30, 36, 40

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ............................................................................................... 35

*In re Vroom, Inc. Sec. Litig.*,
    2025 WL 862125 (S.D.N.Y. Mar. 18, 2025) ...................................................................... 24

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 WL 4482102 (S.D.N.Y. Sep. 30, 2021) .............................................................. passim

*In re Xerox Corp. Sec. Litig.*,
    935 F. Supp. 2d 448 (D. Conn. 2013) ................................................................................ 48

v

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
    445 F. App'x 368 (2d Cir. 2011) ...................................................................................... 38

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022) .............................................................................. 32

*Lachman v. Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) .............................................................................. 33

*Leone v. ASP Isotopes Inc.*,
    811 F. Supp. 3d 563 (S.D.N.Y. 2025) .............................................................................. 22

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
    2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) .............................................................. 36, 37

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Group, PLC*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012) .............................................................................. 45

*Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................................ 17

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) ........................................................................................ 21, 36

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................................... 16, 32, 37

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) ....................................................................... 17, 21, 39

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...................................................................................................... 33, 34

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015) .............................................................................. 33

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)...................................................................... 40

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ........................................................... passim

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) ....................................................................... 39, 44, 45

*Plumbers, Pipefitters & Apprentices Local No. 112 Pension Fund v. Vestis Corp.*,
    808 F. Supp. 3d 1369 (N.D. Ga. Sep. 30, 2025)....................................................... 17, 31, 34

*Plumbers, Pipefitters & MES Local Union 392 v. Fairfax Fin. Holdings, Ltd.*,
    886 F. Supp. 2d 328 (S.D.N.Y. 2012) .............................................................................. 48

*Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings*,
    2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017)................................................................... 22

*Puddu v. 6D Glob. Techs., Inc.*,
    742 F. App'x 553 (2d Cir. 2018) ...................................................................................... 37

*Ray v. StoneCo Ltd.*,
    2024 WL 4308130 (S.D.N.Y. Sep. 25, 2024)............................................................. 37, 39, 40

*Rudani v. Ideanomics, Inc.*,
2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020)........................................................... 26

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024) ..................................................................... 44

*Saskatchewan Healthcare Emps. Pension Plan v. KE Holdings Inc.*,
718 F. Supp. 3d 344 (S.D.N.Y. 2024) ............................................................... 23, 28

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*,
2018 WL 1587457 (D. Conn. Mar. 31, 2018) .......................................................... 41

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010) ................................................................................... 35

*SRM Glob. Fund v. Countrywide Fin. Corp.*,
2010 WL 2473595 (S.D.N.Y. June 17, 2010) .......................................................... 22

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)........................................................ 29, 39

*TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*,
2025 WL 416872 (E.D.N.Y. Feb. 6, 2025) .............................................................. 44

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)......................................................................................... 37, 45

*Van v. Bright Health Grp., Inc.*,
2025 WL 3171688 (2d Cir. Nov. 13, 2025).............................................................. 29

*Villare v. Abiomed, Inc.*,
2021 WL 4311749 (S.D.N.Y. Sep. 21, 2021)........................................................... 33

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023) ......................................................... 26, 32, 34

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ................................................................................ 30

*Woolgar v. Kingstone Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020) ..................................................................... 38

*Yannes v. SCWorx Corp.*,
2021 WL 2555437 (S.D.N.Y. June 21, 2021) ..................................................... 27, 44

## Statutes

15 U.S.C. §78u-5(c)(1)(B)................................................................................................ 36

## Rules

Fed. R. Civ. P. 12(b)(6).................................................................................................... 14

Fed. R. Civ. P. 8 ............................................................................................................... 47

Fed. R. Civ. P. 9(b) .......................................................................................................... 14

vii

## I.    PRELIMINARY STATEMENT[1]

On the Class Period's first day—not a year into Vestis' debut as a stand-alone, publicly-traded workplace supplies company—Defendants disclosed deeply reduced FY2024 guidance targets and certain customer losses due to purportedly "isolated" service issues concerning delivery timeliness and completeness. Defendants Scott and Dillon, who admittedly dug "into [Vestis'] bowels" "to understand the root causes of" lost business, couched service issues as "short-term challenges" and assured "we are addressing procedural gaps and improving procedures[.]" Even while disclosing such "challenges[,]" Defendants maintained, "operating trends are improving *across our business*[,]" and "[r]etention is moving back in the right direction." Analysts—dismayed that Defendants were only now disclosing issues they knew about "for some time"—lambasted management's lack of "mea culpa," noted "there is now a significant mgmt credibility issue," and that Vestis moved "from show me to lost me."

Recognizing investors would thereafter flyspeck every update concerning operations, service, and customer experience, Defendants misrepresented throughout the Class Period that they were "improving [] service levels[,]" "ensuring *all the plants* have enough buffer stock[,]" that Vestis was "ordering on time" and "delivering on time" such that "product is available for customers[,]" that Vestis was "actually seeing *a step change in improvement related to shortages*[,]" and "improvements in service requests and [] customers [] responding very

---

[1] Unless otherwise noted: (i) capitalized terms have the same meanings as in the First Amended Class Action Complaint (ECF 33) ("FAC"); (ii) emphasis is added; and (iii) internal citations, brackets, ellipses, footnotes, and quotations are omitted. References to "¶" are to FAC paragraphs and "FS_" to alleged false statements (ECF 33-1). "Motion" or "DB_" refers to Defendants' brief supporting their motion to dismiss. ECF 46. "Ex." refers to Defendants' exhibits submitted with the Motion (ECF 47-1 through 47-33).

positively to the work that we are doing to take great care of them." Defendants even claimed with respect to operational performance and customer service that "*across the system, the whole system is rising and the level of play is getting stronger*."

However, six former Vestis employees corroborate and confirm that cost-cutting schemes and inefficient, outdated, and under-resourced production facilities resulted in product shortages causing customer orders to be delivered chronically late, missing product, or fulfilled with poor quality product. CW2, Production GM for Chicago's metropolitan region, recounted half of the equipment in Vestis' third-largest plant was down throughout the Class Period and described frequent fires and equipment failures that halted production. Texas-based plant manager, CW4, similarly attributed productivity issues to outdated equipment—some 30-45 years old. Consequently, dirty product accumulated in droves and washing and ironing machines were "always behind," such that overall Chicago-area output was consistently *25% behind schedule* and deliveries were "absolutely" missed.

Operational inefficiencies also caused Company-wide new-customer onboarding to exceed the industry standard 20–30-day timelines, averaging around 45 days and sometimes "over six months" resulting in missed revenue. Further, Vestis prioritized cost-control measures, like "piece budgets" (capping new product to replenish inventory) and "shorting" orders (providing less than agreed to), rather than meeting demand. Adhering to such practices meant foregoing one customer's order in favor of another's. Indeed, CW1— Territory Manger for the Southeast U.S.— recalled customers' orders being "just cut off" "altogether for a week." According to CW1, shorting customer orders was "a necessity" throughout the Class Period because insufficient inventory meant "the only way you could operate was cutting. You're robbing from Peter to pay

2

Paul every day." CW6, a Buffalo-based Regional Sales Executive, corroborated that Vestis would "have to steal" product intended for one customer to cover another. Worse, Vestis fulfilled orders with dirty products, riddled with mold, stains, holes, or metal fragments.

Accordingly, customers complained "constantly" about product shortages, missed deliveries, product quality, and: demanded credits; reduced orders to contractual minimums; sought contract deviations for better terms; negotiated buyouts; or canceled service. Desperate to retain customers (and revenue), Defendants exacerbated customer relations by deceitfully locking them into contracts, making it harder to change contract terms, and restricting credit eligibility to customers close to quitting (surreptitiously called "Accounts In Jeopardy") or those about to renew.

The Motion contends Plaintiff fails to plausibly allege falsity, scienter, and loss causation. However, Defendants barely grapple with Plaintiff's allegations or the CWs. Instead, Defendants raise puffery arguments already rejected by a federal district court in Georgia and mount an improper truth-on-the-market defense: positing they "candidly acknowledged…service challenges" and regularly updated investors regarding business risks. Yet, Defendants did not disclose Vestis' services issues' extent, including product quality and facility constraints, or that delivery issues were impacted by internal "shorting" practices and delayed new-client implementations. Moreover, Defendants misrepresented the extent of improvement—stating service levels were stable and that Class Period efforts were aimed at incrementally "enhanced service levels" rather than addressing the ongoing operational catastrophe that was wrecking the Company's business. Indeed, comparison of analysts' Class Period to post-Class Period reactions proves they were misled by Defendants' messaging.

3

The FAC also alleges scienter because Defendants admittedly assessed Vestis' operations personally "all the way to our [RSRs]" and to the "market center" and monitored sales *twice daily* and service requests *daily*. CWs confirmed such meetings and that Defendants received weekly customer attrition and plant productivity reports and accessed productivity and install delay data through databases. Scott even presented sales figures, retention data, and customer satisfaction surveys during monthly Town Hall meetings, including customer satisfaction consistently below targets throughout the Class Period and significantly missed sales and customer retention targets in October and November 2024.

Remarkably, even after these Town Halls, Defendants misattributed aggressive (and later-withdrawn) FY2025 forecasts to "commercial momentum," "efficient operations initiatives," and "customer experience." Doubling down, Defendants touted "new volume growth will exceed lost business driven by field sales productivity" (which Defendants admitted post-Class Period was false throughout January 2025) and reiterated "no material changes" affected Vestis' speculative risk factors—despite already enacting plans to terminate Dillon.

Finally, the corrective disclosures' tight fit with the alleged misstatements dooms Defendants' loss causation challenge. On May 6, 2025, Vestis withdrew its FY2025 guidance and revealed a $40.1M year-over-year revenue decline attributed to, *inter alia*, lost business exceeding new business, lower order volumes, service-related credits, a $15M bad debt expense related to collectability, and disclosed $30M of inventory investments and $60M in CAPEX for facility improvements. The Company's stock plummeted 38% in a single day and analysts understood they had been misled, remarking that "whatever little credibility VSTS had worked to restore is now gone" and Vestis had moved "[f]rom lost me to at a loss for words."

4

Defendants' Motion should be denied.

## II.    FACTUAL BACKGROUND

### A. Defendants Assured Investors Pre-Class Period that Vestis Deployed Remedial Measures to Correct Customer Service Issues Impacting Sales

In October 2023, Vestis became a standalone publicly-traded company. ¶37. Through its core "recurring rentals" business (94% of Class Period revenue), Vestis launders and provides workplace supplies, such as uniforms, floor mats, and linens, to customers on a recurring, typically weekly, basis. ¶¶47-49, 54.

Before the Class Period, Vestis experienced surging customer losses related to extensive, undisclosed service issues. ¶74. Publicly, Defendants attributed the losses to an "uptick in [SME] closures" and other "regrettable" undisclosed reasons. *Id*. Internally, however, Defendants knew, through "deep and granular" operational reviews (intended to ascertain such losses "root causes"), that customer attrition was caused by customer service issues. ¶¶74-77.

On May 2, 2024, the Class Period's first day, Defendants publicized their findings when announcing, *inter alia*, slashed FY2024 financial guidance and plans to address "very specific delivery matters[,]" including on-time and complete deliveries. *Id.* Defendants did not disclose other service issues, including product quality and facilities' constraints. Nor did Defendants disclose internal "shorting" practices and delayed new-client implementations impacting deliveries. Rather, Defendants downplayed service issues, characterizing them as an "underlying opportunity" for improvement that was known Company-wide "for some time." ¶77. Scott also assured she ***personally*** evaluated the "root causes" "very deeply" which were "isolated" to specific service challenges. *Id*. Scott further confirmed Vestis had "been addressing" those issues and actively had employees "in the field" working to "perfect truck and loading processes." ¶¶77, 275.

5

Analysts homed in on Vestis' service issues and scrutinized disclosures concerning same thereafter. For instance, a May 3, 2024 Jefferies report noted it was "the first time customer retention and service issues were made apparent publicly" and "there is now a significant mgmt credibility issue[.]" ¶78; ¶79 (Wolfe: "service shortfalls were not discussed" previously, and "***investors likely will require ideal execution from mgmt in the periods ahead*** to regain standing"); ¶80 (Barclays: Vestis was trending from a "show me" state toward "lost me"). Thus, the Class Period began at a pivotal moment—less than one year into Vestis' existence when Defendants needed to prove Vestis' business model while investors watched every move. ¶81.

## B. Contravening Defendants' Statements, Service Issues Were More Pervasive Than Disclosed and Raged Throughout the Class Period

Throughout the Class Period, Defendants repeatedly stated customer service, experience, and retention were improving and operations were becoming more efficient, all of which undergirded their positive revenue guidance, including that new volume wins would outpace losses during 2Q2025. *See* ECF 33-1. Yet, severe customer service issues continued, caused by rampant inventory shortages, purposeful cost control measures, decrepit facilities, and fulfilment inefficiencies. ¶¶82-83. Defendants also implemented tactics to thwart customers' efforts to seek remedies and trap them in multi-year contracts. ¶¶140-49, 153-55, 158, 180-89. Thus, all Class Period long, dissatisfied customers demanded credits, deviations, buyouts and cancellations that caused financial disaster. ¶¶139-40, 154-59.

6

### 1. Facility Inefficiencies and Operational Failures Resulted in Insufficient Inventory to Fulfill Orders

Throughout the Class Period, Vestis lacked sufficient product to fulfill orders. A primary cause was that Company plants could not timely process products—meaning products were taken out of circulation that should have been cleaned and sent back into the field to fulfill orders. ¶103.

CW2 confirmed plants suffered "years upon years of neglect" that went unaddressed, "even when problems were raised to leadership." ¶¶103-07. CW2 detailed a cumbersome new equipment request process whereby Vestis resisted and slow-rolled even modest investments, leaving requests pending "for months." ¶106. CW4 likewise analogized "trying to get new equipment" to "pulling teeth," even though as equipment aged, "maintenance" cost more than "replac[ing] it." ¶107. Thus, CWs explained outdated and non-functional equipment caused significant productivity gaps and severe unprocessed product backlogs, which caused service delays. CW4 described a 45-year-old ironer that went "down constantly" creating an inability to "fulfill your customers' needs." ¶¶105, 115, 118. CW2 estimated the Chicago plant—one of Vestis' largest—consistently operated *25% behind schedule throughout the Class Period*, and approximately half of its equipment was down at any given time. ¶¶104, 115-16.

Moreover, plants became overcrowded with soiled materials, inventory overflowed into parking lots, and fires frequently broke out due to delays and backlogs, which rendered products unusable and caused further delays. ¶¶103, 108-14, 117. CW2 recalled the Chicago plant frequently ran out of space as bags of dirty items "accumulate[d] for a while," and products that "often sat outside" for too long became unsalvageable—meaning even less inventory to fulfill orders. ¶¶113-14.

7

Vestis' operational decisions also contributed to a lack of usable product. For example, when uniform supply was low, Vestis permitted procurement of lower-grade products. ¶99. However, such low-grade options often "look[ed] like garbage," necessitating reorders, which delayed installation (sometimes 6+ weeks) and angered customers—some of whom cancelled service. *Id*. Another example were "piece budgets" which Vestis used to control costs by limiting new product injections for replenishing inventory. ¶93. Such practices contributed to Vestis' product shortages because senior managers would "hold orders" (*i.e.*, delay filling new customer orders) to avoid exceeding those budgets. ¶¶93-94. Indeed, CW1 stated, because of the piece budgets, "at some point, the GM would just cut off our order altogether for a week." ¶94.

### 2. Vestis Regularly Shorted Orders and Delivered Poor Quality Products Due to Insufficient Inventory

To compensate for widespread inventory deficiencies, Vestis regularly shorted customers' orders or fulfilled them with poor quality products throughout the Class Period. Indeed, Vestis never had enough product to "100% service" its customers throughout CW1's tenure, while CW6 described Vestis' "biggest problem" as product shortages, which were "constant" post-spin-off. ¶¶86, 88-89. Such shortages were Company-wide. *See* ¶¶38, 87 (CW1: the "same shortages" were "everywhere[,]" including Indiana, Wisconsin, and Georgia).

Given this "constant lack of product[,]" Vestis manually decided which customers received full orders—purposefully fulfilling some and shorting others. ¶¶85-86, 95-97. CW1 stated "the only way [Vestis] could operate was cutting" certain orders, meaning "robbing from Peter to pay Paul every day." ¶¶95-96; ¶97 (CW6: Vestis would "have to steal" one customer's orders to cover another's).

8

Vestis also frequently delivered poor quality and dirty products to customers due to the rampant inventory issues, which caused constant complaints. ¶¶84, 98-102. CWs recalled customers consistently complained about receiving dirty, smelly, or stained products, products with "holes" and "metal fragments in them," wrong-sized garments, and products improperly packaged to meet health and safety standards. ¶¶101-02; ¶100 (customers informed Indianapolis-based Account Executive, CW5, that uniforms were not being cleaned). CW6 confirmed Vestis' quality issues were "not occasional, isolated incidents" but occurred frequently and resulted in customers complaining to CW6 "multiple times a week" during the Class Period. ¶102. Worse, services problems never improved during the Class Period. *See, e.g.*, ¶89 (CW1: "everything always seemed to get worse. It would never get better. It'd only get worse"; CW6: "it was downhill from the very beginning" and "nothing improved").

### 3. Installation Process Inefficiencies Delayed New Customer Sales

CWs confirmed frequent delays in new order fulfillments contributed to customer dissatisfaction, as fulfillment regularly exceeded the 20–30-day industry standard—averaging ~45 days and extending anywhere from 60 days to "over six months." ¶¶130-31, 135. CW3, an Enterprise Architecture team member, explained new installations required several handoffs before orders were processed that caused a "pretty decent gap" between contract execution and completion of the new-customer installation. ¶¶51, 132. CW3 also recounted the stockroom order approval process and release to the distribution center took longer than it should have, and Vestis' antiquated "manual [request] processes" caused further fulfillment delays. ¶¶132-33.

### 4. Widespread Dissatisfaction from Dismal Service Caused Rampant Customer Complaints, Credit Requests, Lowered Orders, Contract Deviations, and Buyouts

Vestis' pervasive service issues caused "constant [customer] complaints" regarding poor quality, unclean supplies, and missing products or orders. ¶¶85, 88, 101, 139. Vestis responded by implementing arduous policies—including requiring customers to submit formal service requests via certified letter—to frustrate customers' entitlement to any remedy. ¶¶119, 127.

Dissatisfied customers also began requesting credits (*i.e.*, partial refunds) as recompense for product shortages and missed deliveries. ¶¶140-41. In fact, according to CW1, because Vestis was issuing "too many credits," Scott began overseeing and restricting credit approval. ¶¶147-50, 281. Through this policy, management issued credits only when "they thought it…was worth it" (*i.e.*, if the account threatened cancellation or was up for renewal), naming these select customers Accounts in Jeopardy ("AIJ"). ¶¶147-51. Service issues also caused customers to reduce order volumes and pursue contract cancellations and deviations (*e.g.*, removing product minimums). ¶¶139, 155.

Notwithstanding already rigid cancellation policies, Scott responded to the increasing customer requests by tightening the contract deviations process, including personally overseeing approving any changes—even small price rollbacks. ¶¶155-56. CW1 explained customers, frustrated by the process, opted to reduce orders to the minimum amounts permitted. ¶¶153, 156. Other customers chose to instead negotiate buyouts altogether just "to be done," even if it meant paying 25-50% of the remaining balance or liquidated damages. ¶¶158-59. Given that ~10-20% of customers in CW1's territory reduced order volumes to the minimum, CW1 noted such reductions had a "significant" effect on Company revenue and reputation. ¶¶153-57.

### 5. Vestis Further Antagonized Customers with Deceitful Sales Practices

CWs confirmed Vestis deployed deceptive sales tactics to force customers into contracts with unfavorable terms to mitigate attrition. ¶¶180, 186-87. CWs recalled Sales VP, Peter Rego, trained Account Executives to deceive customers into signing contracts—especially SMEs and those with less sophisticated bargaining or commercial experience. ¶¶180-81, 184-86. For example, sales employees were instructed to "not talk contracts" with customers and to refer to them as "service agreements." ¶183. Account Executives were directed to "flat out lie" if potential customers asked whether contracts were required and respond, "oh no, it is a service agreement." ¶¶182, 185. Salespeople were directed: "just have [prospective customers] sign the paperwork." ¶183.

CW5 and CW6 confirmed many customers were unaware of their contracts' terms because Vestis directed Account Executives to lock them into five-year terms while falsely characterizing them as "month-to-month" that could be "cancel[led] whenever[.]" ¶¶185-87. Likewise, because contracts automatically renewed absent the customer providing 60-day notice, CW1 stated many customers, who were waiting for their contracts to expire, remained trapped in them. ¶¶188-89. Unsurprisingly, CW1 stated "customers were not happy" and "all wanted to quit" upon discovering they were misled. ¶¶187-89.

### C. Defendants Knew Severe Production Issues Caused Customer Dissatisfaction, Retention Declines, and Revenue Shortfalls

CWs confirm Defendants knew Vestis was consistently underperforming throughout the Class Period, as Defendants regularly reviewed production, sales, retention, and customer satisfaction data. ¶¶165, 168, 173, 176-79. Indeed, Vestis utilized specialized software systems to track and monitor sales data, customer satisfaction, and operational efficiency, including

11

Salesforce, ABS, Spindle, and Tableau. ¶¶55-66, 148, 247. CWs noted these systems also integrated data into "executive-level dashboards," which were visible and accessible to Defendants. ¶¶17, 59, 66, 137.

Vestis management also held weekly regional operations meetings to discuss plant reports, metrics, and efficiency data compiled from Tableau, for which CW2 and CW4 prepared weekly plant productivity reports. ¶¶55, 64-65, 165-72. At these meetings managers confirmed Scott reviewed those plant productivity reports and utilized her review as a "threat." ¶¶165-72; *see, e.g.*, ¶168 ("Kim Scott's even looking at it. You guys got to get better."), ¶172 (Scott "wants to see improvement"). Indeed, Scott's name was visible as the last person to review plant productivity data in Tableau. ¶168.

Vestis also held weekly AIJ meetings to discuss at-risk customer accounts, from which customer attrition data was compiled and sent to Scott. ¶¶152, 258. Vestis also held weekly "APB" calls regarding "repetitive [customer] issues," especially those concerning larger accounts or customer "threat[s] to cancel service." ¶¶145-46. Scott also presented sales figures, retention data, and customer satisfaction surveys during monthly Town Hall meetings and consistently remarked on Vestis falling short of customer satisfaction targets ***throughout 2024***. ¶¶173-75, 178-79. CW4 likewise recalled Scott stating Vestis was missing sales and customer retention targets by a "***significant percentage***" during the October and November 2024 Town Halls. ¶177.

### D.  Defendants Revealed the Truth

On May 6, 2025, Vestis published the 2Q2025 Press Release, disclosing devastating results. ¶206. Although Scott represented just one quarter earlier (*see e.g.*, FS35) that Defendants expected "new volume wins to outweigh losses" in 2Q2025, the 2Q2025 Press Release revealed

12

revenue declined $40.1M year-over-year "primarily" due to a "$17.5 million decline from lost business in excess of new business," as well as a $15M bad debt expense related to "*updated estimates of collectability*" (*i.e.*, Vestis estimated it would collect significantly less from customers who refused to pay given the ceaseless service issues). ¶¶206-07. Vestis further *withdrew* previously-issued FY2025 guidance and would only provide quarterly guidance henceforth. ¶208.

On May 7, 2025, during the 2Q2025 Earnings Call, Company executives admitted 2Q2025 revenue was a "significant difference" from implied guidance and "volume changes with our existing customers" and "volume-related credits issued to customers to address service concerns" negatively impacted revenue. ¶¶213, 218. The 2Q2025 Earnings Presentation disclosed Vestis' rental decline due to "weaker existing customer volume (adds over stops) in January"—belying Defendants' January *31*, 2025 statements that Vestis was poised for "new volume wins to outweigh losses[.]" ¶¶211, 213; FS35. Vestis also disclosed a $30M inventory investment to address shortages and a $60M CAPEX investment for facility improvements. ¶¶218-19.

Analysts probed "what really has to be done" to fix service issues. ¶222. New management admitted service only began being addressed after the Individual Defendants' terminations, stating:

> In the service area, *we are now and what we've done over the last few weeks*, we are better organized and providing the right resources to implement both the improvements that need to be made in the plant and…in service[.] … And I understand your point around we've been working on these things. ***I would say we now have a renewed focus on making absolutely sure that we're getting these things implemented.***

*Id*. On this news, Vestis' common stock price plummeted approximately 38% ($3.27 per share), closing at $5.44 on May 7, 2025. ¶225.

Analysts were stunned. Baird noted "F2Q25 results still managed to negatively surprise, probably by a lot." ¶306. Wolfe remarked that while Defendants previously represented "they were reaching an inflection point on lost business and expected volumes from new growth to exceed its churn" that "execution failures continue to persist *leading to significant loss of credibility*." ¶310 ("churn is reflective of deeper underlying service operations"). Barclays revisited its 2Q2024 report with a 2Q2025 report titled "From 'lost me' to 'at a loss for words'" concluding "*whatever little credibility VSTS had worked to restore is now gone*." ¶311. Dispelling any notion that Defendants' Class Period representations were forthright, Barclays added, "[C]ommunication proved poor, forecasting clearly inadequate, and *the root cause/issues (service, culture) remain and management has so far been unable to rectify them*." *Id*.

## III.    ARGUMENT

On Rule 12(b)(6) motions, courts "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in favor of the plaintiff[.]" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021).  Under Rule 9(b), a plaintiff need only "create a plausible inference" of fraud.  *Id.* at 150-51.  Thus, courts "must be careful not to mistake heightened pleading standards for impossible ones."  *Id.* at 150.  The FAC adequately alleges material misrepresentations, scienter, and loss causation, warranting the Motion's denial.

### A.  The FAC Adequately Pleads Materially False and Misleading Statements

#### 1.  Defendants' Operational Statements Were Materially Misleading

Throughout the Class Period, Defendants materially misrepresented that Vestis operated efficiently and effectively managed its inventory. For instance:

- May 2, 2024: Scott assured, "operating trends are improving *across our business*" (FS1), and "operational initiatives are driving results" (FS3);

14

- August 7, 2024: Defendants were purportedly "very pleased with the progress that we're making around efficient operations" (FS13) and represented Vestis was "making great progress" in "ensuring **all the plants** have enough buffer stock and that we're ordering on time and we're delivering on time and that, that product is available for customers" (FS14);

- November 21, 2024: Scott reiterated Defendants "continue[d] to drive efficiencies **across our operations[.]**" FS22; *see* FS18, FS25 (similar);

- January 31, 2025: Dillon claimed Defendants "continue[d] to focus on inventory management through sales and operations planning and garment reuse initiatives" and was "***position[ing] the right inventory in our facilities to support growth…***" FS36.

- January 31, 2025: Scott emphasized, "all of the efforts that we really undertook" during 2Q2024, from driving "on-time performance to rolling out standard operating procedures to improve shortages[,] …is making a difference" (FS40) and  Vestis was "***generating savings and productivity from being more efficient from a logistics perspective***" (FS38; *see* FS11 (Dillon's similar statement)).

These statements were materially false and misleading when made because Vestis' operations were highly inefficient. Throughout the Class Period, Vestis experienced severe product shortages (*see* §II.B.2, *supra*) caused by outdated and downed plant equipment and fires, which exacerbated inventory issues. *E.g.*, ¶113 (plant inefficiencies created constant problems); §II.B.1, *supra*; *see also Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 300-02, 307 (2d Cir. 2015) ("appropriate inventory levels" misleading where CWs observed warehouses "stuffed to the rafters"); *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, *8, *10 (E.D.N.Y. Apr. 22, 2020) (efficiency statements misleading given undisclosed "equipment issues" and product "delays").

For instance, throughout the Class Period, Vestis' production output at its third-largest plant was *always 25% behind schedule,* Arlington Heights was even further behind, and  Rockford had productivity problems, such that deliveries were "absolutely" missed. ¶¶41, 115-16, 118; ¶170 (plants in Texas region "suffered really bad" productivity); *contra* FS1 ("across our business"),

FS14 ("all the plants"), FS22 ("across our operations"). Indeed, CW2 confirmed a production backlog around Mother's or Memorial Day in 2024 (preceding Defendants' August misstatements) was so severe that "over 100 carts" of unprocessed product sat outside. ¶¶114, 117; *Novak v. Kasaks*, 216 F.3d 300, 304, 315 (2d Cir. 2000) (inventory statements were "plainly false" given undisclosed internal practices); *In re Aphria Sec. Litig.*, 2020 WL 5819548, *8 (S.D.N.Y. Sept. 30, 2020) (pictures evidencing conditions inconsistent with statements support falsity).

Vestis was also not experiencing "improv[ment]" "efficien[cies]" "savings" or "productivity" from its operations (*see e.g.*, FS1, FS22, FS38)—instead, plant inefficiencies resulted in tons of unsalvageable product and destroyed equipment. ¶¶108-14. Indeed, outdated machinery caused significant productivity issues because equipment "constantly" broke, resulting in plant downtime. ¶¶105, 107. CW2 recalled a "faulty dryer" caused multiple fires at the Chicago plant, including one in late October 2024, and was "down for months" afterwards; yet, Vestis continuously resisted new equipment investments, "even when problems were raised to leadership." ¶¶104, 106-11. Accordingly, in touting Vestis' purported efficient operations progress, Defendants created an affirmative duty to disclose the "whole truth" about such strategy and the true nature of Vestis' operations. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, *9 (S.D.N.Y. Apr. 14, 2020) (Woods, J.).

For the same reasons, Defendants were also not ensuring "product is available for customers" or "position[ing] the right inventory in our facilities to support growth[.]" FS14, FS36. Cost saving measures, such as restricting new project injections and intentional shorting, exacerbated these issues further. ¶¶92-94; *see City of Providence v. Aeropostale, Inc.*, 2013 WL

16

1197755, *13 (S.D.N.Y. Mar. 25, 2013) (statements suggesting defendant took steps to rectify problems misleading where omitting such steps required "undoing" strategy decisions).

Defendants contend "Plaintiffs nowhere allege that Vestis was not doing that which it said it was[.]"[2] DB26. Wrong. Defendants ignore that, far from focusing on inventory or improving customer experience, the FAC alleges Vestis management let equipment replacement requests languish for "months" while product backlogs accumulated—exacerbating product shortages and fueling customer dissatisfaction. ¶¶106, 113-14; *see* §III.A.2, *infra*. Thus, contrary to Defendants' assertion (DB26), it was false to state Vestis was improving operations while "fail[ing] to mention[] the true nature of" Company "inventory levels" and operations. *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019).

### 2. Defendants' Service Improvement and Customer Experience Statements Were Materially Misleading

Many nearly identical statements concerning "Vestis's customer-retention prowess, its service-delivery capabilities, and its underlying financial health" have been found actionable. *Plumbers, Pipefitters & Apprentices Local No. 112 Pension Fund v. Vestis Corp.*, 808 F. Supp. 3d 1369, 1383 (N.D. Ga. Sep. 30, 2025) ("*Vestis I*"). Here too.

At the Class Period's outset, Defendants couched service gaps as "short-term challenges" being addressed through procedural improvements and thereby created a material misimpression that "operating trends are improving across our business" (FS1) and customers' experience

---

[2] Defendants' authorities are distinguishable. *See* DB26 citing *Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579-81 (S.D.N.Y. 2014) (unlike FAC's CWs, who described policies intended to antagonize customer service and experience issues, the *Lululemon* CWs did not aver defendants were not "dedicating additional resources to quality control"); *Hawes v. Argo Blockchain plc*, 2024 WL 4451967, *13 (S.D.N.Y. Oct. 9, 2024) (plaintiff alleged "no facts" indicating "the company had not…seen positive results from its risk management strategy").

remained "great" (FS5). For instance, on May 2, 2024, Scott claimed Vestis' service issues concerned "isolated reason codes, very specific delivery matters related to own [sic] time delivery, shortages on loads, and" assured Defendants:

- were "making sure that we are addressing procedural gaps and improving procedures by location where we have shortcomings related to service" (FS6; *see* FS3 (similar));

- "fe[lt] very confident that we've isolated these challenges and opportunities, and we have very clear, deliberate actions around specific things *like on-time delivery and stopping shortages and delivering full loads* to customers" (FS4); and

- were "***serving our customers really well*** as it relates to the relationship and the experience" (*id.*).

These statements were misleading when made because they "affirmatively created" a material misimpression "of a state of affairs that differed … from the one that actually existed." *Davis*, 2020 WL 1877821, *7. CWs corroborate and confirm Vestis purposefully shorted customers' orders, delayed or skipped deliveries entirely, and fulfilled orders with dirty, subpar products due to Company-wide inventory shortages, such that Vestis received "constant complaints" about shortages, quality, and missed deliveries. *See* ¶¶85-102, 120-23. For instance, CWs confirm "a constant lack of product" meaning shortages happened "all the time." ¶¶86, 88. CW6 recalled management asking, "how are we going to deliver to them if we're not getting the product?" ¶88; ¶91 (product injections were "not enough" to offset the backlog). Vestis' piece budgets worsened inventory shortages and drove the need to deploy poor quality products. ¶¶92-94; *see Aeropostale*, 2013 WL 1197755, *13 (improvement statements misleading given undisclosed strategy decisions).

Nevertheless, Defendants weaved a narrative of service improvement:

- August 7, 2024: "We are laser-focused on improving our service levels above and beyond what we have historically delivered…" FS9; *see* FS18, FS22, FS24 (similar).

18

- August 7, 2024: "[W]e *have made great progress* in terms of…*improving our service* levels." FS10; *see In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, \*19-20 (S.D.N.Y. Sep. 30, 2021) (Woods, J.) ("making great progress" misleading where "not consistent" with internal feedback).

- August 7, 2024: "[W]e've been heavily focused on stabilizing lost business," which was supposedly Vestis' "single best and easiest lever to pull for growth[,] … [a]nd so our focus right now is let's protect our base. Let's make sure that we are putting a lot of energy around delivering an outstanding customer experience[.]" FS12.

- November 21, 2024: "[W]e feel very confident we have [earned the right to charge favorable prices] *through our service initiatives* and the work that we have done to put our customer first." FS27; *see* FS25 (similar).

- November 21, 2024: "[W]e're seeing the *level of performance rise across the system* with particular focus on those locations that are underperforming versus the norm. … *We're seeing that happen on-time delivery already*[,]" and, with respect to operational performance and service quality, "*the whole system is rising* and the level of play is getting stronger. So I would just say we're going to continuously improve across the board, and we're doing that." FS28.

- January 31, 2025: *"[W]e are seeing improvements in service requests* and our customers are responding very positively[.] … So I would point to that as the key reason around why *our customers are staying."* FS40;

- January 31, 2025: "[W]e are seeing continued improvement in the customer experience, and *we can see that daily* in the reduction of service requests related to these key focus areas" (*i.e.*, "on-time delivery and [] shortages"). FS39; *see* FS35, FS37 (similar);

- January 31, 2025: "[W]e are actually seeing *a step change in improvement related to shortages*." FS41.

Defendants' public narrative was wholly at odds with reality. Indeed, service issues and customer complaints worsened throughout the Class Period. *See* ¶89 (CW1: "everything always seemed to get worse."); *id.* (CW6: "nothing improved"). According to CW4, during Town Halls throughout 2024, Scott consistently remarked that Vestis was falling short of its customer satisfaction targets. ¶179. There was never "a significant jump in customer satisfaction" during CW4's tenure. *Id.*; *see In re APAC Teleservices, Inc. Sec. Litig.*, 1999 WL 1052004, \*6 (S.D.N.Y.

Nov. 19, 1999) (claiming to "provid[e] superior service" misleading where defendant missed performance criteria); *In re Henry Schein Sec. Litig.*, 2019 WL 8638851, *16 (E.D.N.Y. Sep. 27, 2019) (touting "a strong commitment to customer service" misleading where statement "identified current, then-existing, sources of success").

As a result, CW2 stated Vestis issued customers an "eye opening" number of credits, which CW1 explained were warranted to address shortages. ¶¶140, 143, 150. Rather than "improving the customer experience" (FS35, FS37) or "delivering an outstanding customer experience" (FS12, FS25), Defendants devised Kafkaesque schemes to make credits and contract deviations difficult to obtain and entrap customers in contracts—ruining their experience and driving them away. ¶¶155-64, 180-89. Moreover, given that Defendants enacted policy changes around October or November 2024 to slow runaway customer credits (which were requested because of *poor* service), Defendants knew at the time of their November 2024 and January 2025 statements that customers were not "having a ***good experience***." FS39; *see also* FS18, FS22, FS24, FS35, FS37, FS39-FS41 (touting customer experience); *Davis*, 2020 WL 1877821, *9 ("statements regarding [customers'] positive feedback" misleading where "customers were expressing dissatisfaction").[3]

Defendants argue they candidly and fully disclosed Vestis' service issues. DB4, 18-22, 41-42. Not so. Defendants' narrow framing ***never*** informed investors that: customers received poor

---

[3] Defendants' reliance on *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 794 (S.D.N.Y. 2013) (DB19-20) is misplaced because the plaintiff did not allege defendants had any information "contradict[ing] their public descriptions of the production problems, or permit[ting] them to expound upon these issues earlier[.]" *Id*. Moreover, whereas the *Magna* plaintiff failed to allege how disclosures "were meaningfully different from [] information [] provided earlier," *id.* at 793, the FAC alleges Vestis' disclosures were a complete reversal from their Class Period misstatements. *See* §II.D, *supra*; §III.C, *infra*.

20

quality products (¶¶98-102); product shortages were significantly caused by degraded facilities missing production targets (*see* §II.B.1, *infra*); new customer service was impacted by delayed installations (¶¶99, 130-32); customers' orders were purposely shorted (¶¶85-86, 92); or Vestis implemented "piece budgets" to control costs (¶¶93-94).

Furthermore, during the Class Period, Defendants framed service issues narrowly—conveying that customers were "satisfied" (FS2) in the main, with some merely expecting "*enhanced* service levels" "above and beyond" what Vestis "historically delivered" "to accept higher levels of pricing" (FS9). ¶77. This obscured that Vestis was unable to achieve even its most basic functions, including consistently fulfilling its customers' orders every week. *See, e.g.*, ¶96 (CW1 never "had a 100% load"); *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (disclosure describing pollution abatement program and risks misleading when omitting "then-ongoing and serious" issues causing investors "to make an overly optimistic assessment"); *Lexmark*, 367 F. Supp. 3d at 34 ("general disclosure of a phenomenon's existence, without describing" impact misleading).

Essentially Defendants advance a truth-on-the-market defense—claiming dismissal is warranted because, throughout the Class Period, they purportedly disclosed "significant problems remained" and resolution progress "was unlikely to happen quickly."[4] DB9; *see also* DB19-21.

---

[4] Defendants' reference to "a delivery network optimization program" is irrelevant. DB12. This related to a "***footprint*** optimization" program started "several years" prior to determine where Vestis facilities should be situated to avoid "driving empty miles and wasted miles." Ex. 8 at 9. This had nothing to do with the decrepit facilities, product shortages, and missing deliveries that Defendants misrepresented throughout the Class Period. Nor did Defendants' updates concerning a standard operating procedure rollout at facilities, which hinged improvement on "cultural change" and holding teammates "accountable[,]" alert the market to the dilapidated conditions that were causing shortages. DB9; Ex. 5 at 15; §II.B.1.

However, truth-on-the-market is "intensely fact-specific and [] rarely an appropriate basis for dismiss[al]." *Wells Fargo*, 2021 WL 4482102, *21. Here, Defendants' statements failed to convey the extent of the service and operational issues plaguing Vestis "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements[.]" *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 142 (2d Cir. 2025); *In re Teva Sec. Litig.,* 671 F. Supp. 3d 147, 195-98 (D. Conn. 2023) (no "truth-on-the-market" despite misstatements following earlier-filed securities action).[5] Indeed, Scott's own statements—conveying that Vestis: made "great progress in terms of…improving our service levels" (FS10); saw "reduc[ed] [] service requests" (FS39; FS40); saw "*a step change* in improvement related to shortages" (FS41); saw the "level of [customer service] performance rise" (FS28); implemented initiatives "driving results" (FS3); and "gained a great deal of traction in terms of improving the customer experience" (FS37)—belie any such conclusion. *See Leone v. ASP Isotopes Inc.*, 811 F. Supp. 3d 563, 590-91 (S.D.N.Y. 2025) (rejecting truth-on-the-market because "later" misstatements "supersede or nullify earlier warnings").

Defendants next suggest analysts were fully informed by Defendants' disclosures. DB21. The cited reports *show the opposite*. First, Defendants quote a Jefferies' report suggesting the analyst questioned Vestis' ability to improve (DB21) but omit Jefferies stated: "[w]e view the F3Q

---

[5] Defendants' authorities are inapposite because the allegedly concealed information was publicly known. *See* DB19 citing *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings*, 2017 WL 4082482, *6 (S.D.N.Y. Aug. 24, 2017) (plaintiff apprised of risk because oil prices were publicly available); *Beleson v. Schwartz*, 419 F. App'x 38, 40-41 (2d Cir. 2011) (publicly available financial information evidenced defendants' dire position); *In re Curaleaf Holdings Sec. Litig.*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021) (illegal status of marijuana publicly known); *SRM Glob. Fund v. Countrywide Fin. Corp.*, 2010 WL 2473595, *8 (S.D.N.Y. June 17, 2010) (purportedly omitted language synonymous with earlier disclosure).

results as a nice step in the right direction in regaining management credibility" because, *inter alia*, "customer retention/losses didn't deteriorate" and "major changes to the organization structure were implemented" to "improv[e] customer service[.]" Ex. 23 at 1.[6] Defendants misrepresent Jefferies' 4Q2024/FY2024 report similarly. *Compare* DB21 *with* Ex. 9 at 1 (attributing positive share price movement to management's "plans to operate the company more efficiently and improve the customer experience"). Likewise, Defendants quote J.P. Morgan as stating there was a "long road ahead" following 3Q2024 (DB21), but omit that the analyst found Defendants' statements as conveying "business is stable" and "well-positioned to deliver sales/operations improvements[.]" Ex. 6 at 1. Defendants also quote a "Bears" perspective in Baird's 1Q2025 report (DB21) (*i.e.*, not the *analyst's* perspective) to suggest "[s]ervice turnarounds are difficult" but omit the report stated "[c]ustomer service KPIs appear to be improving … with management citing fewer service requests for deliver[y] delays and shortages." Ex. 13 at 2.

Thus, analysts' Class Period reports confirm they were misled concerning service performance, customer experience, and retention. ¶201 (Wolfe: "Mgt. stated its ongoing efforts around improving its customer experience for on-time delivery" increased retention); ¶203 (Jefferies: Vestis "has improved service levels" ensuring on-time deliveries and saw declined "common service requests"); ¶204 (similar). This supports falsity. *In re Salix Pharms., Ltd.*, 2016 WL 1629341, *10-11 (S.D.N.Y. Apr. 22, 2016) (falsity alleged where misstatements "led analysts to believe" falsehood). Analysts' reactions to Vestis' 2Q2025 disclosures support the same

---

[6] Defendants appended 26 exhibits to their Motion without articulating why each should be considered. ECF No. 47; DB4 n.1. The Court cannot consider them "to prove the truth of their contents." *Saskatchewan Healthcare Emps. Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 376 (S.D.N.Y. 2024) (Woods, J.)

conclusion. *E.g.*, ¶310 (management misrepresented "they were reaching an inflection point" but "execution failures continue to persist leading to significant loss of credibility"); *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 515 (S.D.N.Y. 2010) ("dramatic[]" share price decline following corrective disclosure demonstrated insufficient class period disclosures).

Defendants also assert certain statements concerning customer service improvement are *per se* inactionable. *See* DB23 (raising argument only as to FS3-FS4, FS10, FS25). Defendants' preferred authorities (DB23) do not draw such bright line, but instead merely found falsity was not pled. *See, e.g.*, *In re Vroom, Inc. Sec. Litig.*, 2025 WL 862125, *18-19 (S.D.N.Y. Mar. 18, 2025) ("[c]omplaint [did] not dispute" customer service statements); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 499 (S.D.N.Y. 2005) (customer service statements not actionable where complaint lacked allegations that problems were ongoing). Notably, Defendants never address the FAC's specific allegations concerning the undisclosed customer service failures and how such allegations contravene Defendants' actual statements. They may not do so on reply. *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 450 (S.D.N.Y. 2018) (Woods, J.).

Defendants further impermissibly ask the Court to interpret Scott's statement that Vestis was "seeing the level of performance rise across the system" and "seeing that happen [with] on-time delivery already" as relating only to "a new notification and measurement system[.]" *See* DB24-25; FS28. But Defendants' omit that Scott was responding to a Goldman Sachs question about "what proportion of your branches are hitting your desired goals[] [a]nd how long do you think it will take for ***the rest of your operations*** to achieve sufficient service quality[,]" to which Scott affirmed it was already occurring "across the system, the whole system is rising and the level of play is getting stronger." Ex. 8 at 16; FS28. Defendants compound this omission by

24

unreasonably assuming Scott was referring to statistics concerning "pilot locations" never mentioned in the Goldman question or Scott's response. DB25; Ex. 8 at 16. Plaintiff's more reasonable interpretation must be accepted. *Wells Fargo*, 2021 WL 4482102, *17.

### 3.    Defendants' Financial Statements Were Materially Misleading

Defendants falsely portrayed cross-selling and customer retention initiatives, and consequently, the Company's financial prospects. For instance, even as Vestis disclosed isolated service issues on May 2, 2024, Scott insisted that "[m]any of our customers are still having a great experience because we're cross-selling them" (FS5) and further assured "*we already see* the great progress we are making to cross-sell and gain penetration" with customers such that "[r]etention is moving back in the right direction." FS2; *see also* FS1, FS3. On August 7, 2024, Scott reiterated Defendants were "very pleased with the work [RSRs were] doing to cross-sell" and felt "very good that we can *continue to accelerate sales with that team*[.]" (FS15).

Then, on November 21, 2024, Scott emphasized that given the purported strides Vestis made with customer service, efficient operations, and sales and pricing, the Company "expect[ed] both revenue and Adjusted EBITDA to grow on an underlying basis in Fiscal 2025 *as we continue to deliver against our strategic priorities*." FS18. Defendants also: purportedly were "committed to achieving best-in-class performance related to retention, sales and margins" rendering Scott "encouraged by what we're beginning to see" (FS22); claimed Vestis had "continued to deliver strong results from route sales" (FS23; *see* FS26 (similar)); and stated "core revenue growth is expected to be 1 to 2 percentage points, reflecting our national account and *field sales growth trajectory [and] continued improvement in our route sales* and positive net pricing in fiscal '25"

25

(FS20; *see* FS19 (Scott's similar statement)). Dillon similarly asserted "confiden[ce] in [Vestis'] ability to deliver against our 2025 commitments and our trajectory heading into 2026." FS21.

Defendants' statements were materially misleading because Vestis was not meeting cross-selling, sales, or customer retention targets and instead, customers were seeking significant credits, lowering order volumes, and pursuing buyouts and cancellations. Indeed, faced with irate customers and product shortages, RSRs refused to cross-sell new products and thus missed cross-selling targets. ¶¶123-24; *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 227-28 (S.D.N.Y. 2023) (statements about increased sales from existing customers actionable given contradictory internal data).

Defendants also knew when making their November statements that Vestis was missing sales and customer retention targets by a "significant percentage" because, according to CW4, Scott's reported as much during October and November 2024 Town Halls. ¶177. Statements misrepresenting the factual underpinnings of a company's financial guidance are actionable. *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, *5-*6 (S.D.N.Y. Sept. 25, 2020); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141-42 (S.D.N.Y 1999). CWs also confirmed Vestis contemporaneously issued "so many" credits that "collectively" added up on Territory-wide and Company-wide bases that Scott implemented changes to discourage them. ¶¶143, 150; *see In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 627-28 (S.D.N.Y. 2003) (guidance statements actionable where defendants did not genuinely believe they were true).

Moreover, customers responded to dismal service and Scott's deviations policies by lowering orders to contract minimums, demanding buyouts, and canceling services. ¶¶153-164; ¶157 (10-20% of CW1's customers reduced volume to the minimum); ¶160 (FPL Food canceled

26

a coat contract, valued at $13-$15K a week in 2024); ¶164 ("customers from "all over" cancelled "every week" because "service was so poor"). Consequently, CW1 stated volume reductions had a "significant" effect on Company revenue, customer retention was going down, and new customers orders were too small to overcome the gap created by such losses. ¶¶157, 161; *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, *8-9 (S.D.N.Y. Jan. 20, 2015) (growth statements actionable where CWs confirmed they lacked reasonable basis).

On January 31, 2025, Scott further assured that in 2Q2025 "we expect to hit a significant milestone, with new volume outpacing customer losses driven by field sales productivity, national account wins, and lower customer churn." FS31; *see* FS32 (similar). Scott further stated she "believe[d] in our sequential revenue guidance ***because of the new customers we're winning***" and "***our growth with existing customers***[.]" FS33. Scott added that "a lot is working well at Vestis. ***Churn is in line with our expectations. Field sales productivity is ramping nicely***." FS34; *see also* FS35, FS39. Scott made such statements despite knowing that Vestis' had already experienced "[r]ental decline was primarily driven by weaker existing customer order volume [] in January." ¶211; *see Yannes v. SCWorx Corp.*, 2021 WL 2555437, *7 (S.D.N.Y. June 21, 2021) ("post-class period data" can "confirm" falsity of class period statement); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183-84 (S.D.N.Y. 2010) (same).

Defendants contend their cross-selling statements are not misleading because Scott disclosed purported unchallenged increases in route sales. *See* DB24-25. Wrong. Plaintiff alleges Scott's claim of "strong results from route sales" (FS23) "create[d] a materially misleading impression" by omitting Vestis was not meeting cross-selling metrics because RSRs resisted selling to irate customers. ¶¶123-24; *see also* FS2-FS3, FS5, FS15, FS26, FS39 (similar); *Davis,*

27

2020 WL 1877821, *7, *9 ("strong demand" actionable given access to contrary information).[7]

Furthermore, RSRs' "results" were undercut by inventory shortages, delays, and poor product quality from outdated, under-resourced facilities.[8] FS23.

### 4. Defendants' Risk Warnings Were Materially Misleading

Defendants' Class Period risk factors were materially misleading because the risks were framed as hypotheticals but already "transpired." *Davis*, 2020 WL 1877821, *11.

Between May 8, 2024 and February 5, 2025, Defendants' annual and quarterly SEC reports warned:

- "[I]t is *possible* that actual results *may* differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties[,]" including: (i) "the failure to retain current customers, renew existing customer contracts and obtain new customer contracts[,]" and (ii) "challenge of contracts by our customers" (FS7, FS16, FS42);

- "There have been *no material changes* to the risk factors disclosed in Part I, Item 1A, "Risk Factors" in our Annual Report on Form 10-K" for the prior fiscal year (FS8, FS17, FS43);

- "Our contracts *may* be subject to challenge by our customers . . . *[i]f* a large number of our customer arrangements were modified in response to any such matter, the effect *could be* materially adverse to our business, financial condition or results of operations" (FS30); and

- "The failure to renew a significant number of our existing contracts…*could have* a material adverse effect on our business, financial condition or results of operations…" (FS29).

---

[7] *KE Holdings Inc.*, 718 F. Supp. 3d at 384 (DB24) is inapt because the misstatement at issue generally claimed, and the corrective report agreed, that growth was affected by the number of brokerage stores and agents. By contrast, here, Vestis disclosed existing customers lowered orders rather than increasing them through cross-selling. ¶213.

[8] Though Defendants lump statements touting "great progress…improving our service levels" (FS10), "great progress…ensuring all the plants have enough buffer stock…" (FS14), and "seeing continued success with our efficient operations" (FS25) together as a part of their "accurate historical data" argument, Defendants point to no data for such statements. *See* DB23-25 (also omitting discussion of FS34, FS38, FS40).

CWs recounted customers frequently sought to cancel their contracts, negotiate buyouts, reduce their order volumes to the minimum invoice levels, and request other contractual deviations in response to Vestis' service issues. ¶¶153-164; *see* §II.B.4, *supra*. Indeed, CW1, CW2, and CW6 recalled customer cancellation requests occurred frequently. *See, e.g.*, ¶161 (CW1: it "always seemed like we were losing more than we were gaining."); ¶162 (CW2: Vestis had "at least three cancellations a week"); ¶164 (CW6: customers from "all over the place" cancelled "every week"). CW1 further recalled many customers being "so fed up" that they were willing to negotiate buyouts and "eat that cost to be done" or lower the invoice as much as they could and ride out the contract. ¶¶156-58; *see Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, *3 (S.D.N.Y. Feb. 5, 2024) (warning of "risk" misleading if it materialized); *Stary v. Teladoc Health, Inc.*, 2026 WL 878939, *7 (S.D.N.Y. Mar. 31, 2026) (similar).

Defendants maintained these risk warnings as late as *February* 2025 though Vestis admittedly already experienced "[r]ental decline [] primarily driven by weaker existing customer volume" in *January* and announced Dillon's "departure." FS42-FS43; ¶¶32, 211; *Van v. Bright Health Grp., Inc.*, 2025 WL 3171688, *3-4 (2d Cir. Nov. 13, 2025) (risk disclosures actionable where risk "materialized").[9]

Defendants also claim Vestis disclosed the very challenges addressed in the risk warnings. DB21-22. However, as discussed in §III.A.2, *supra*, Defendants' "truth-on-the market" defense is

---

[9] Defendants' risk factor statements are unlike the "generic" ones in *In re AppHarvest Securities Litigation*, 684 F. Supp. 3d 201, 268 (S.D.N.Y. 2023). DB22. Here analysts and investors were left with a misimpression that improving service was leading to better retention and increased volume from existing customers (*Compare* ¶¶200-01 *with* FS29-FS30), confirming Defendants' risk factors generated an "implied representation of fact about the Company." *AppHarvest*, 684 F. Supp. 3d at 269.

29

inappropriate at this stage. *See Wells Fargo*, 2021 WL 4482102, \*21; *Teladoc*, 2026 WL 878939, \*16. Moreover, Defendants' claim that they disclosed the truth rings hollow given their torrent of statements denying problems.[10] *See, e.g.*, FS2 ("[r]etention [was] moving back in the right direction"), FS40 ("customers are staying"); *Freudenberg*, 712 F. Supp. 2d at 194 (contradictory statements "nullified [] risk disclosures").

Finally, Defendants assert that the risk warnings are themselves forward-looking and thus, inactionable. DB21-22. However, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Davis*, 2020 WL 1877821, \*11.

### 5. Defendants' Misstatements Are Not Puffery

Defendants incorrectly assert nearly every alleged misstatement (FS1-FS5, FS9-FS15, FS18, FS21-FS25, FS27-FS28, FS33-FS37, FS39-FS41) constitutes inactionable optimism or puffery.[11] But "[w]hether a representation is mere puffery depends, in part, on the context in which it is made[,]" *Odebrecht*, 323 F. Supp. 3d at 443, requiring "a fact-specific analysis," *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, \*10 (E.D.N.Y. May 20, 2020).

Here, context shows Defendants continuously acknowledged the importance of Vestis' customer service and experience to retention and sales. *See, e.g.*, FS12 ("***we are putting a lot of energy around delivering an outstanding customer experience***" to protect customer base); FS2

---

[10] *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1195-96 (9th Cir. 2021) (DB22) is inapt, as the risk factors there, unlike here, expressly disclosed challenges "experienced to date" that were "expect[ed]" to "continue[.]"

[11] Defendants concede statements about "addressing procedural gaps" (FS6), "core revenue growth" (FS19-FS20), "continu[ing] to execute the strategy on cross-selling" (FS26), "new volume growth" (FS31-FS32), "generating savings and productivity from being more efficient" (FS38), and the risk factors (FS7-FS8, FS16-FS17, FS29-FS30, FS42-FS43) are not puffery.

(describing customer retention "one of the single most important levers in our recurring revenue model and *critical to our strategy* to strengthen the base"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (statements not immaterial where defendants "put the topic at issue"). Indeed, Defendants' statements aimed to reassure the market (often in response to analysts' inquiries) that Vestis was improving service and operating more efficiently after analysts put Defendants on notice that Vestis needed to "show me" results and "regain standing." ¶¶79-80; *see, e.g.*, FS14, FS28, FS39-FS41; *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (Woods, J.) (statements "to reassure" investors "during a time of concern" not puffery); *BHP*, 276 F. Supp. 3d at 79-80 (similar); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (similar).

In fact, analysts *did* materially rely on Defendants' statements evidencing they were misled. *See* ¶¶198-204, *e.g.*, ¶201 ("ongoing efforts around improving its customer experience…have led to its sequential retention rate increase"). Defendants admit this. *See* DB12 (quoting analyst relying on statements about "improv[ing] the customer experience"); *Salix*, 2016 WL 1629341, *12 n. 10 (rejecting puffery where analysts relied on statements and were misled).

Moreover, even before analysts put Defendants on notice regarding the importance of customer service at the Class Period's outset, Defendants' statements regarding the Company's "customer service and retention" were found to be "too essential to Vestis's business" to constitute immaterial puffery. *Vestis I*, 808 F. Supp. 3d at 1388. Customer service improvement was so important that Defendants concede Vestis made (incomplete and misleading) disclosures concerning it and touted executive-level hires (Bill Seward and Pete Rego) to address it. *See* DB4-8, 10; *accord In re Avon Sec. Litig.*, 2019 WL 6115349, *16 (S.D.N.Y. Nov. 18, 2019) (defendants'

"representations on the same topic" negated puffery and demonstrated statements' importance). Although Defendants seek refuge in various inapposite cases, DB26-29, courts recognize that statements concerning the strength of a company's existing customer base and associated business opportunities are not puffery. *See Wang*, 661 F. Supp. 3d at 229; *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, *11-12 (S.D.N.Y. Nov. 26, 2018) ("descriptions of the health of the business" not puffery).

Defendants' statements are also actionable because they misrepresented existing facts, *see Freudenberg*, 712 F. Supp. 2d at 189-91, and were "at odds" with "what was actually going on" at Vestis, *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 392 (S.D.N.Y. 2022). For instance, Defendants misrepresented customers "are still having a great experience" (FS5) and that Vestis "made great progress in terms of…improving our service levels" (FS10), was "focus[ed] on having the right inventories in our distribution centers and operating facilities to support growth" (FS11), and "driv[ing] efficiencies across our operations" (FS22), although CWs repudiated these claims. *See, e.g.*, ¶¶85-88 (customers complained constantly); ¶89 (service never improved), ¶¶91-97, 113-18 (describing product shortages, production backlogs and below target plant productivity); *Novak*, 216 F.3d at 315 (claiming inventory "was in good shape or under control" actionable where defendant "knew that the contrary was true"); *Davis*, 2020 WL 1877821, *9 (positive statements "material" given customers "dissatisfaction").

Defendants' cases accord. *See* DB28 (citing *In re Peabody Energy Corp. Sec. Litig.*, 2022 WL 671222, *13 (S.D.N.Y. Mar. 7, 2022) (acknowledging general statements "may be actionable if the declarant knew the contrary to be true"); *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL

32

1226627, *11 (S.D.N.Y. Mar. 30, 2021) (plaintiff failed to plead "[d]efendants knew that their statements were misleading when" made)).[12]

### 6. Defendants' Misstatements Are Not Inactionable Opinions

Defendants erroneously claim many misstatements are inactionable opinions because they include "we believe" or "I think." DB31-32 (citing FS4, FS13-FS15, FS18, FS21-FS22, FS26-FS27, FS31-FS35, FS37, FS39, FS41). But couching statements with "we believe" does not transform them into opinions because such words can "preface nearly any conclusion" yet "remain perfectly capable of misleading investors." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015).

Moreover, Defendants' misstatements embedded false facts regarding Company operations. *See, e.g.*, FS4 ("we feel very confident that ***we've isolated these challenges and opportunities***..."); FS13 ("we are very pleased with ***the progress that we're making around efficient operations***"); FS14 (Defendants felt "outstanding about the progress" given new leadership was "***ensuring all the plants have enough buffer stock and that…we're delivering on time and that, that product is available for customers***"); FS15, FS18, FS27, FS37, FS39, FS41. Defendants did not see progress at all during the Class Period with respect to operations and customer service, including on-time order fulfillment. *See* §§III.A.1- 2, *supra*. Thus, Defendants' purported "opinion[s,]" which "implie[d] facts or the absence of contrary facts," are actionable.

---

[12] Because Defendants misrepresented the present state of improvement while knowing facts undermining those statements' veracity, Defendants' authorities are inapt. *See* DB27-29 citing *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 648-49 (S.D.N.Y. 2015) ("express[ing] hope" strategies "would be successful"); *Villare v. Abiomed, Inc.*, 2021 WL 4311749, *13-14 (S.D.N.Y. Sep. 21, 2021) (general commentary about "future performance" not actionable); *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 131 (E.D.N.Y. 2020) ("opportunities for improvements" merely "vague expressions of [future] optimism").

33

*Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 175-76 (2d Cir. 2020); *Wang*, 661 F. Supp. 3d at 229 (statements about beliefs and expectations of business actionable where material information withheld).

Even if Defendants' misstatements are opinions, they remain actionable because they omitted material facts and Defendants "did not hold the belief…professed[.]" *Omnicare*, 575 U.S. at 184-89; *Vestis I*, 808 F. Supp. 3d at 1387 ("even if Defendants couched their positive assessments of Vestis's business as opinions," they remain liable "because they knew" inconsistent facts); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547 (S.D.N.Y. 2017) (similar); *see e.g.*, FS15, FS26 (Defendants monitored cross-selling daily but omitted RSRs were resisting it).

For example, on November 21, 2024, Scott was not "encouraged by what we're beginning to see" "related to retention, sales and margins" given she internally admitted Vestis was not hitting the sales and customer retention numbers promised to investors by "significant percentages[.]" *Compare* FS21, FS22 *with* ¶¶250, 177 ("[H]ere's the number we promised our investors. … *We're not going to meet that*.").

Likewise, on January 31, 2025, Defendants professed they were "very pleased" to expect "new volume wins to outweigh losses" exiting 2Q2025 despite Vestis *already* experiencing "weaker existing customer volume…***in January***" which they measured "twice daily." *Compare* FS35 *with* ¶¶211, 232; *see also* FS31-FS34 (similar); *Wells Fargo*, 2021 WL 4482102, *24 ("A reasonable investor expects not just that [the speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time."). Because Defendants knew contrary information when making such statements, "[t]hese allegations are

34

sufficient to infer that [Defendants] disbelieved the alleged statements at the time they were made."[13] *Petrobras*, 116 F. Supp. 3d at 380-81.

### 7. The PSLRA's Safe Harbor Does Not Apply

Defendants contend certain misstatements are forward-looking statements protected by the PSLRA's safe harbor. *See* DB29-31 citing FS18-FS21, FS31-FS32, FS34-FS35. However, such statements primarily relied on embedded past and present facts. *See, e.g.*, FS18 (tying guidance to "progress…executing against our efficient operations initiatives"); FS20 (tying guidance to "continued improvement in our route sales"); FS34 (tying guidance to improving churn and field sales productivity); FS35 (tying guidance to "customer experience" improvements). "[P]resent representations" like these, which Defendants knew were at odds with reality and rendered guidance unachievable (§§III.A.1-3, *supra*), are actionable. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016); *Aeropostale*, 2013 WL 1197755, *13 (similar).[14]

Even if Defendants' misstatements were purely forward-looking, the PSLRA offers no protection because any cautionary language was not meaningful and Defendants had actual knowledge of the statements' falsity. *See In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, *4 (S.D.N.Y. Sep. 15, 2025).

---

[13] *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 186 (W.D.N.Y. Sep. 27, 2022) (DB32) is inapposite because, unlike here, plaintiff failed to allege the defendant "did not believe, at the time he made [] statements" information conflicting with his statement.

[14] *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 210, 217 (S.D.N.Y. 2022) (DB30) is inapt because the alleged misstatements were "virtually indistinguishable from the future projections of which they are part" and the plaintiffs failed to allege defendants knew facts "outside of what they disclosed to investors." *Slayton v. Am. Express Co.,* 604 F.3d 758, 769 (2d Cir. 2010) did not hold that "we expect" or "we believe" statements are always forward-looking (*see* DB30), but instead found the statement at issue there was forward-looking in rejecting an argument that forward-looking statements must be located in a discrete section or identified as such.

First, Defendants cite the FY2024 10-K risk disclosures (DB31) but they were "in entirely different, unrelated documents" and thus, did not "accompan[y]" the forward-looking statements. *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, *25 (S.D.N.Y. Mar. 23, 2017) (Woods, J.); *see e.g.*, Ex. 8 at 4 (incorporating general "periodic and current [SEC] reports"), Ex. 11 at 4 (similar).

Second, Defendants' generic cautionary language that "actual results *may* differ materially… due to a variety of risks and uncertainties[,]" including Vestis' failure to retain or renew customers (Ex. 20 at 2, 13), also did not alert investors to the intentional practices driving product shortages or the unresolved customer service issues that were driving customer losses. *See Meyer*, 761 F.3d at 251 ("generic" risk warning insufficient "when undisclosed facts" would "substantially affect a reasonable investor's calculations of probability."). Plaintiff also alleges Defendants' risk disclosures were themselves misleading and Defendants' subsequent statements touting improvements nullified their prior disclosures. §III.A.4, *supra*; *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) ("cautionary language itself also must not be misleading").

Third, Plaintiff alleges Defendants made misstatements with "actual knowledge" of their falsity. 15 U.S.C. §78u-5(c)(1)(B); *see* §B.1, *infra*; *Fresno*, 268 F. Supp. 3d at 547-48. For instance, Defendants issued FY2025 revenue, adjusted EBITDA, and new volume guidance on November 21, 2024 despite admitting during the October and November 2024 Town Halls Vestis was missing such targets. FS18-FS20; ¶177. Similarly, Scott reaffirmed guidance on January 31, 2025, even though Vestis already experienced "[r]ental decline [] primarily driven by weaker existing customer volume[.]" *See* FS31-FS35; ¶211; *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2020

WL 1989424, *12 (S.D.N.Y. Apr. 26, 2020) (Woods, J.) (no safe harbor where defendants had actual knowledge projection was misleading).

### B.  The FAC Adequately Pleads a Strong Inference of Scienter

Allegations of conscious misbehavior or recklessness, *or* motive and opportunity to defraud support scienter. *See Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 556 (2d Cir. 2018). Defendants are reckless if they "knew facts or had access to information suggesting that their public statements were not accurate[.]" *Novak*, 216 F.3d at 311. Courts must consider "*all*" facts alleged "collectively" to determine if the scienter inference is "cogent and at least as compelling" as the competing inference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-24 (2007). Ties go "to the plaintiff" and motive is not required. *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

### 1.  Defendants Reviewed, Monitored, and Presented on Plant Efficiency, Sales, and Customer Experience and Retention

Defendants "knew facts or had access to information suggesting that their public statements were not accurate" which is sufficient to allege scienter. *Blanford*, 794 F.3d at 306; *contra* DB34.

***Data Reports and Reviews***: Throughout the Class Period, Defendants closely monitored customer satisfaction, reviewed customer attrition and operations data reports, and conducted Company-wide assessments of plant efficiency and productivity. ¶¶55-66, 152, 165, 168-73, 176, 249-50, 253, 259-66; *see Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300-01 (S.D.N.Y. 2018) (receipt of reports concerning, and access to software platforms exhibiting, relevant data evidenced scienter); *Ray v. StoneCo Ltd.*, 2024 WL 4308130, *13 (S.D.N.Y. Sep. 25, 2024) (Woods, J.) ("access to internal company data and reports" supported scienter).

The FAC adequately alleges Defendants "reviewed specific reports" which "alerted them to the problems they [] allegedly misrepresented." *Galestan*, 348 F. Supp. 3d at 301; *contra* DB38-39. CW2 and CW4 confirmed Scott regularly reviewed plant productivity and efficiency reports showing customers were not receiving product and facilities lagging behind productivity targets, and that Scott specifically stressed the numbers needed "improvement." ¶¶116, 168-70, 172, 265; ¶64 (C-suite executives used Tableau scorecards). CW1 likewise confirmed customer retention numbers were negative all Class Period, and that "every manager had access" to customers' service complaints and requests that went unanswered within 36-48 hours were specifically escalated to Scott. ¶¶126-29, 161. Scott and Dillon also had an "executive-level dashboard" that reported metrics including installation delays which regularly exceeded industry standards.[15] ¶¶66, 131, 137, 268; *see In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, *16 (S.D.N.Y. Mar. 29, 2024) ("access to information" sufficient).

Defendants contend the FAC fails to allege scienter because Scott and Dillon purportedly did not actually review the reports. *See* DB39. Defendants are wrong. *See* ¶167 (Scott requested standardized reports); ¶¶232-46 (seeking out information to control "levers" "dials" and "knobs"). Defendants concede as much in their brief ***and admitted it during the Class Period***. *See* DB39 (system log showed "last viewed by Kimberly Scott" and "issues eventually escalated up to

---

[15] Defendants' authorities are therefore distinguishable. *See* DB38-40 citing *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (no "facts indicating that the content of the reports or data" available to defendants that "was inconsistent with their statements"); *In re BioScrip Sec. Litig.*, 95 F. Supp. 3d 711, 738 (S.D.N.Y. 2015) ("*must have known*" statements insufficient where plaintiffs alleged no "facts available to Defendants that would have illuminated the falsities"); *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 238 (S.D.N.Y. 2020) (plaintiffs alleged no "specific contradictory information" to which defendants had access); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587-88 (S.D.N.Y. 2011) (same).

Scott[.]"); ¶227 (Individual Defendants "conduct[ed] assessments all the way to" RSRs and analyzed service issues). For instance, Scott and Dillon admitted they analyzed "incredibly deep into this business" to assess customer quit causes, understand service issues, and improve retention. ¶¶237-40. Scott likewise affirmed she and Dillon monitored Vestis' sales performance and customer service issues *daily*. *See e.g.*, ¶232 ("twice daily process to manage and measure route sales"); ¶¶243-44 ("we look every day at leading indicators around service-related requests"); *see Teladoc*, 2026 WL 878939, *13 ("use of 'we' on a call" with another defendant creates inference they both "were personally monitoring those metrics"); *see Stadium Cap.*, 2024 WL 456745, *5 (daily monitoring supports scienter). Nevertheless, Defendants overstate Plaintiff's burden. *See, e.g., In re Solaredge Techs., Inc. Sec. Litig.*, 2025 WL 1031154, *13 (S.D.N.Y. Apr. 6, 2025) (Woods, J.) (defendants' "awareness of [] content of [] reports" sufficient for scienter); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617-18 (S.D.N.Y. 2015) (allegation defendant "read the reports…not required").

*Meetings and Presentations*: Throughout the Class Period, Defendants frequently addressed sales performance, customer satisfaction, and retention data during recurring internal and external meetings. *See Galestan*, 348 F. Supp. 3d at 300 (defendants' "participat[ion] in numerous meetings and conference calls" where relevant issues "were discussed" sufficient); *Ray*, 2024 WL 4308130, *13-14 (similar); *Lexmark*, 367 F. Supp. 3d at 36-37 (similar); *Freudenberg*, 712 F. Supp. 2d at 198 (similar). For example, Scott led monthly Town Hall meetings attended by senior leadership (*i.e.*, Dillon) and reported "shortfalls" and missing satisfaction, retention, and sales targets by "significant percentages[.]" ¶¶173, 249-50; *see In re ASML Holding N.V. Sec. Litig.*,

39

2026 WL 851334, *11, 18 (S.D.N.Y. Mar. 27, 2026) (discussing "declining [] numbers" in "townhalls" supports scienter)

Vestis leadership also attended regular meetings to review data reports and to investigate customer complaints, install delays, and credits, then flowed such information up to Defendants. ¶¶253-59. Multiple CWs confirmed Vestis held AIJ meetings addressing at-risk accounts, the information from which was sent to Scott. ¶¶257-59; *see also* ¶¶254-56 (describing "state of the business" calls and weekly APB meetings); *Solaredge*, 2025 WL 1031154, *13 ("reports …shared with [defendants]" sufficient for scienter). CW2 and CW4 also confirmed Vestis held Weekly Regional Plant Efficiency Meetings to present plant data, which Scott subsequently reviewed. ¶¶260-66. Similarly, CW3 recounted Vestis' Enterprise Architecture group (including Scott's Executive Assistant) regularly met throughout CW3's tenure to discuss customer credits and installation delays. ¶267; *Galestan*, 348 F. Supp. 3d at 300-01 (defendants' direct reports' knowledge supports scienter); *Ray*, 2024 WL 4308130, *14 (similar).

Defendants also regularly discussed Vestis' purported service improvements, sales, and customer experience and retention during earnings calls throughout the Class Period and answered analysts' questions with granular details. ¶¶230-32, 274-76; *see Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, *7 (S.D.N.Y. Oct. 5, 2016) (frequent discussion of issues during earnings call support scienter); *Vale*, 2020 WL 2610979, *17 (similar). Indeed, Defendants repeatedly touted "great visibility" into Company operations and business particulars. ¶¶239, 291; *STMicroelectronics*, 2025 WL 2644241, *3, *5 (visibility statements supported scienter).

*Plant Visits*: Scienter is further supported by Scott's and other senior leadership's visits to plants where they personally witnessed product shortages and delays. ¶¶117, 270-73; *see*

*Freudenberg*, 712 F. Supp. 2d at 198 (facility visits evinced scienter). For instance, Scott met employees at the Greenville, SC facility and personally "mapp[ed] out their process" for managing the plant's shortages. ¶271; Ex. 5 at 14; *see Avon*, 2019 WL 6115349, *20 ("absurd to suggest" ignorance of "widespread [] problem" given CEO's personal visits). Senior Vestis leadership also observed the Chicago plant's severe production backlogs, including the Regional VP's who regularly visited all Class Period and the VP of Field Operations who, upon seeing 100+ carts of product outside the facility in May 2024, exclaimed, "holy shit...I didn't realize it was this bad." ¶¶117, 272; *see Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, *11 (D. Conn. Mar. 31, 2018) (COO's personal facilities visits supported scienter where facilities, "were visibly not operating at capacity" and "excess inventory" was stored in "parking lots").

**The CWs Must Be Credited**: Defendants' attempts to undermine the FAC's robust scienter allegations by attacking the CWs fails. DB35-38.[16] Plaintiff's CW allegations are reliable because they "support **the probability** that a person in the position occupied by the source would possess the information alleged." *Gimpel*, 156 F.4th at 140. Each CW is described by either their title or team, relevant responsibilities, and employment timeframe with sufficient detail to surpass this probabilistic threshold. ¶¶38-46. Indeed, allegations that CWs "experienced firsthand" the alleged customers service issues, inefficient facilities, and delays suffices. *In re Axsome Therapeutics, Inc. Sec. Litig.*, 2025 WL 965265, *9 (S.D.N.Y. Mar. 31, 2025); *see also* §II.B.1-5, *supra*.

Defendants assert CWs must have "direct communications" with the Individual Defendants to support scienter. DB35. Wrong. *Avon*, 2019 WL 6115349, *21 ("notion that [] CWs cannot be

---

[16] Defendants only raise challenges to the CWs in the context of scienter—conceding the CWs are sufficiently reliable to support falsity. *See* DB35.

believed because none had direct contact with any individual Defendant is contrary to law"); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.,* 2018 WL 2382600, *10 (S.D.N.Y. May 24, 2018) (similar). Nevertheless, Defendants concede CW1 and CW4 *did* have such direct communications. *See* DB36, n. 4, 5 (CW1 met with Scott concerning services issues; CW4 attended Town Halls where Scott presented); ¶¶89, 174-79.

Without citation, Defendants claim CWs needed to "directly address[]" Scott or personally send the Individual Defendants reports. DB36 n.5. Not so. *See Chi. Bridge & Iron Co.,* 2018 WL 2382600, *10 ("[L]ack[] [of CWs'] direct contact" with defendants "does not undermine their evidence[,]" and scienter alleged where CWs "detail[] the types of relevant information made available to senior executives via" databases and meetings); *Axsome,* 2025 WL 965265, *9 (similar).[17]

Further "[t]he fact that this case involves corroboration from multiple sources" emanating from "several geographic areas" supports scienter. *Freudenberg*, 712 F. Supp. 2d at 197; *contra* DB36. Moreover, Defendants' argument that CWs were localized to "specific plants" and therefore not "privy to Company-wide practices" (DB36) ignores the CWs' exposure to other regions' ongoings. *See e.g.*, ¶¶41, 87 (CW1 communicated with Territory Managers in Indiana and Wisconsin); ¶¶166-67 (CW2 attended "region[al] wrap up[s]" where each region presented productivity, and slide decks spanning the "East Coast to the West Coast" were "standardized"); ¶¶170-71 (CW4 attended regional weekly calls, where other plants' productivity "suffered really bad"). The CWs were not "low-level" (DB3, 31, 36-37) but instead, included a General Manager,

---

[17] *In re Citigroup Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010) (DB36) is inapt, as there, unlike here, the CW merely alleged defendant attended *one meeting before* plaintiff alleged defendant "became aware of significant impairments[.]" *Id.* at 245 n.6.

Plant Manager, Enterprise Architecture team member, and CWs who directly interacted with customers. *See* ¶¶38-46. Corroboration from CWs who "span different levels of the Company hierarchy," as here, *bolsters* scienter. *Galestan*, 348 F. Supp. 3d at 301. Further, Defendants' own admissions to monitoring corroborates the CWs. ¶¶227-48. Finally, Defendants' contention that the CWs' allegations are not temporally sufficient because they describe issues "throughout" the Class Period is incorrect. DB37; *see Salix*, 2016 WL 1629341, *14 (issues occurred and were reported over numerous quarterly reports); *Galestan*, 348 F. Supp. 3d at 300-02 (crediting reports circulated periodically "during the Class Period.").

### 2. Pre-Class Period Disclosures and Policy Changes Support Scienter Regarding Defendants' Continued Misstatements

Scienter is further bolstered here because Defendants' misstatements occurred on the heels of announced customer losses and service issues, and occurred while Defendants enacted policies to address ongoing, pervasive customer issues—including policies *to monitor the exact issues* Defendants misrepresented. ¶¶277-82.

For instance, after Defendants disclosed service issues on the Class Period's first day, analysts made clear that any updates would be heavily scrutinized given credibility concerns. *See* §II.A, *supra*. To quell these concerns, Defendants stated they "conduct[ed] assessments all the way to our [RSRs,]" had "gone very deeply into evaluating these root causes at the grassroots level down to our market center[,]" and "instituted a twice daily process to manage and measure route sales." ¶¶77, 227, 232, 239; ¶243 (admitting tracking customer service requests daily). Defendants also enacted policy changes to oversee and approve customer requests for contract deviations and credits. ¶¶279-82. Defendants concede this. DB41. Such intentional policy shifts support scienter.

43

*TCP Diversified Tech. Fund v. Gaotu Techedu Inc.,* 2025 WL 416872, *11 (E.D.N.Y. Feb. 6, 2025) (policy and "business changes" indicate knowledge).

At the start of the Class Period, Defendants also affirmatively represented that they saw "operating trend[]" improvement "across our business[,]" "[r]etention [] moving back in the right direction" and "customers [being served] really well[.]" FS1-FS2, FS4. Thus, Defendants either knew the ongoing issues, or were severely reckless in disregarding them. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 319 (S.D.N.Y. 2024) (defendants' detailed statements supported scienter or defendants were reckless if they "didn't monitor these topics but made definitive statements as if they did"). Certainly, Defendants "cannot simultaneously argue" they disclosed the truth but lacked scienter. *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 460 n.21 (S.D.N.Y. Dec. 22, 2005).

### 3. Defendants' Terminations Were Suspicious

The Individual Defendants' terminations and the abrupt resignation of CAO Bryan Johnson mere months before the corrective disclosures further supports scienter. ¶¶283-87; *Yannes*, 2021 WL 2555437, *6 (termination close to fraud's revelation supports scienter); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (similar); *Dentsply Sirona Inc.*, 732 F. Supp. 3d at 322 ("house-cleaning and reforms do not follow innocent mistakes").[18] Defendants' contention that there was nothing "inherently unusual" about departures "following disappointing financial results" ignores that Vestis initially cast the Individual Defendants' terminations as mere departures. DB41; *see Gimpel*, 156 F.4th 121, 150 (2d Cir. 2025) (suspicious departures support

---

[18] Defendants' argument suggesting timing **weakens** any scienter inference because it was "well before the end of the supposed fraud" is inapt. DB41 n.10; *Orthofix*, 89 F. Supp. 3d at 619 (executive departures that "occurred in the lead-up to" corrective disclosure supported scienter).

scienter). Scott's and Dillon's terminations occurred less than three years after joining Vestis. *See id.* at 149. (departure after two years suspicious). Further, Dillon's termination occurred simultaneously with Defendants' January 2025 false statements, and right before those in February 2025. *See Orthofix,* 89 F. Supp. 3d at 619.[19]

### 4. The Core Operations Doctrine Further Supports Scienter

Scienter is bolstered because Defendants' misstatements concerned Vestis' core operations. Recurring rentals comprised ~94% of total Company revenue and Defendants consistently emphasized the benefits and importance of "protect[ing] [Vestis'] recurring revenue base" and improving customer retention. ¶¶288-93; *In re IMAX Sec. Litig*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) ("single largest component of total revenue" was core operation). Contrary to Defendants' assertion (DB40), the FAC does not rely on core operations alone. *See* §III.B.1-B.3.

### 5. Plaintiff's Scienter Theory is More Compelling Than Defendants'

Considered "holistically[,]" the FAC alleges an overwhelming scienter inference that is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324, 326. Defendants offer a paltry competing inference: that they were candid about customer service issues and operational challenges and transparent about efforts to resolve them. DB42. That is belied by Vestis' own disclosures. *See e.g.*, ¶222 ("we *now* have a renewed focus on making absolutely sure

---

[19] Because Plaintiff alleges Defendants' terminations were suspicious, Defendants' authorities are distinguishable. *See* DB40-41 citing *Lighthouse Fin. Grp. v. Royal Bank of Scotland Group, PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012) (terminations accompanied by "large valuation mistakes[,]" not fraud) and *Diebold Nixdorf,* 2021 WL 1226627, *14 (no reasoning suggesting departures were "out-of-the-ordinary").

45

that we're getting these things implemented"); Ex. 17 at 4 (discussing impacts from improvements to cleaning quality and shortages made during 2Q2025); ¶214.

Rather, the more compelling inference is Defendants, who faced significant credibility issues for hiding customer losses and services issues at the outset of the Class Period, misleadingly portrayed those issues as improving (in a reckless gamble that they would) such that the Company's financial prospects were about to turn positive. *See* §§II.B-C, III.A.1-A.3, *supra*. Indeed, at the outset of the Class Period, Defendants massively lowered FY2024 guidance from 4-4.5% revenue growth to zero to negative growth. ¶76; FS1. This no-growth guidance allowed Vestis to report operations "in line with expectations," although underlying service and facility challenges persisted. *See e.g.*, Ex. 5 at 4; Ex. 8 at 4. By November 21, 2024,[20] Defendants needed to issue FY2025 guidance aligned with improvement levels that investors expected. Defendants guided flat to 1% revenue growth, undergirded by increased pricing and volume from existing customers, despite knowing Vestis was not meeting sales targets and operations had not improved to justify higher prices or larger volumes. FS19; *see* ¶177. On January 31, 2025, relying on unsustainable measures like contract buyouts and liquidated damages to mask issues, and a gamble that Vestis would perform better in the later quarters of FY2025, Defendants reaffirmed the Company's baseless guidance during the 1Q2025 Earnings Call—even though existing volume from new customers had **already declined in January**. FS31-FS32, FS34. Instead, Scott was ousted on March 19, 2025, and Vestis was forced to come clean about the "significant difference from the growth [] implied in [FY2025] guidance" and operations during the 2Q2025 Earnings Call. ¶¶213, 286; s*ee also* ¶208 (withdrawing FY2025 guidance and shifting to quarterly

---

[20] *See* ¶37 n. 2 (1Q2025, consisting of three months, ended December 27, 2024).

guidance). "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Davis*, 2020 WL 1877821, \*13.

### C. The FAC Adequately Alleges Loss Causation

Loss causation is reviewed under Rule 8's lenient standard. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Davis*, 2020 WL 1877821, \*14 (burden "is not a heavy one"). The FAC need only allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura,* 544 U.S. at 346-47. This occurs when a plaintiff pleads "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Abramson*, 965 F.3d at 179. Corrective disclosures need not be a "mirror image tantamount to a confession of fraud." *Freudenberg,* 712 F. Supp. 2d at 202. The FAC easily meets these standards.

Plaintiff alleges that, on May 6, 2025, Vestis disclosed, *inter alia*, disappointing financial results relating to and correcting Defendants' Class Period misstatements, including: (i) revenue decline from "lost business in excess of new business" stemming from "weaker existing customer volume" (*compare* ¶¶206, 212-13, 217 *with, e.g.*, FS32 (misrepresenting "***new volume growth will exceed lost business***")); (ii) a $15M "bad debt" expense Vestis could not collect from dissatisfied customers (*compare* ¶¶206-07, 213-14, 224 *with, e.g.*, FS39 (claiming "***we are seeing continued improvement in the customer experience***")); (iii) a $30M inventory investment to improve customer service (*compare* ¶218 *with, e.g.*, FS11 (linking reduced inventory costs to "***having the right inventories in our distribution centers***")); and (iv) exorbitant CAPEX investments ($14M in 2Q2025 and $60M in FY2025) "related to market center facility improvement" (*compare* ¶219 *with, e.g.*, FS38 (touting "***we're generating savings and productivity from being more***

47

*efficient*")).[21] Thus, contrary to Defendants' assertion (DB44), the alleged disclosures concerned the same "subject of the fraudulent statement[s] or omission[s]" alleged.[22] *Abramson*, 965 F.3d at 179. The ensuing massive 38% stock price decline further supports loss causation.[23] ¶225; *See Gimpel*, 156 F.4th at 151.

Defendants self-servingly summarize the disclosures as "lost business in excess of new[,]" "customer service issues[,]" and "lower order volume[s]" to contend they mirrored earlier disclosures and that Vestis revealed nothing new. DB43-44. Defendants are wrong. Because of Defendants' Class Period rosy statements, investors had not previously understood Vestis' service issues extent or the toll those issues were taking on customers. *See, e.g.*, ¶310 (Wolfe: Defendants claimed "they were reaching an inflection point…execution failures continue to persist leading to significant loss of credibility"); *see* §III.A.1-2, *supra*; *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 141 (D. Conn. 2021) ("contemporaneous analyst commentary" supports loss causation). Defendants' own authority (DB43) accords. *See In re Omega Healthcare Invs., Inc.*

---

[21] *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 493-95 (D. Conn. 2013) (DB43), decided at summary judgment, is distinguishable because defendants explicitly disclosed ongoing negative effects rather than conveying improvement as Defendants did.

[22] Defendants' cited authorities are distinguishable. *See* DB44 citing *Plumbers, Pipefitters & MES Local Union 392 v. Fairfax Fin. Holdings, Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012) (press release disclosing investigation into contracts did not reveal that defendant was engaging in fraudulent accounting), *In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, *19 (S.D.N.Y. July 23, 2025) (corrective disclosure "reflected no contradiction, no correction, and no concession of past inaccuracy"), and *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 471 (E.D.N.Y. 2020) (no allegations defendant omitted anything about past performance).

[23] The FAC's corrective disclosures "caused the stock value to plummet abruptly" and were unrelated to general market conditions (¶312), unlike the "gradual decline" coinciding with "marketwide" forces in *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010) (DB43).

*Sec. Litig.*, 563 F. Supp. 3d 259, 269-71 (S.D.N.Y. 2021) (loss causation alleged where defendants "downplayed the full extent of the issues" during class period).

Still, Defendants' oversimplified summary ignores newly-disclosed information including that Vestis had withdrawn FY2025 guidance, was slowing "cost reduction" and "investing" tens of millions to help Vestis "retain customers[,]" and was only now "start[ing] to" discuss "the amount of credits that we issue." ¶¶220, 223; *Axsome*, 2025 WL 965265, *10-11 (new-disclosed information sufficient for loss causation).

Finally, where Defendants failed to analyze the corrective disclosures or explain why such disclosures do not share the same subject as the misstatements, their loss causation challenge fails. *See* DB43-44; *Odebrecht*, 323 F. Supp. 3d at 450 (issue conceded where not argued).

## IV.    CONCLUSION

Wherefore, Defendants' Motion should be denied. If any part is granted, Plaintiff respectfully requests leave to amend. *See Diebold Nixdorf*, 2021 WL 1226627, *15 & n.25 (granting amendment after dismissal put plaintiff "on notice of the [complaint's] deficiencies").[24]

DATED: April 14, 2026                Respectfully submitted,

                                     **LEVI & KORSINSKY, LLP**

                                     By: */s/ Gregory M. Potrepka*

                                     Shannon L. Hopkins (SH-1887)
                                     Gregory M. Potrepka (GP1275)
                                     Morgan M. Embleton (admitted *pro hac vice*)
                                     Tyler C. Winterich (admitted *pro hac vice*)

---

[24] Because Plaintiff's §10(b) claim is adequately alleged, it's §20(a) claim is too. *See Davis*, 2020 WL 1877821, *15.

1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zlk.com
twinterich@zlk.com

*Lead Counsel for Lead Plaintiff and the Class*

**KLAUSNER, KAUFMAN, JENSEN &
LEVINSON**
Robert D. Klausner
Stuart Kaufman
Anna Klausner Parish
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com
anna@robertdklausner.com

*Additional Counsel for Lead Plaintiff*

50

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7.1(c) and this Court's order, ECF 42, I hereby certify that Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Class Action Complaint contains 13,995 words, excluding the case caption, table of contents, table of authorities, signature block, and the certificate of compliance.


DATED: April 14, 2026                                    By: */s/ Gregory M. Potrepka*
                                                              Gregory M. Potrepka