USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _______________
DATE FILED: 7/31/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BOARD OF TRUSTEES OF THE POLICE OFFICERS' RETIREMENT PLAN AND TRUST FUND FOR THE CITY OF MIRAMAR, *individually and on behalf of all others similarly situated*,

Plaintiff,

-v-

VESTIS CORPORATION, *et al.*,

Defendants.

1:25-cv-4844-GHW

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

## I. INTRODUCTION

Vestis Corporation ("Vestis" or the "Company") sells and rents supplies like uniforms and linens to corporate clients. The core of Vestis's business is its "recurring rental" business—Vestis provides recurring pick-up, laundry, and replacement services to its customers. Since it was spun-off as an independent company, Vestis was plagued by operational inefficiencies and customer service problems, in particular, an inability to fulfill orders timely and an inability to complete orders, resulting in low customer retention. On May 2, 2024, the first day of the class period, Vestis disclosed its operational inefficiencies and customer service issues, halted planned customer price increases, and adjusted its forward-looking guidance for the fiscal year 2024 ("FY2024") downward. Following Vestis's disclosure, its stock price plummeted; prompting securities litigation regarding the Company's alleged concealment of its customer service and operational problems.

This case begins after Vestis disclosed its operational problems. In this case, Lead Plaintiff is not suing over Vestis's failure to disclose its operational and customer service problems. Rather, here, Lead Plaintiff asserts that in the period following Vestis's disclosure of its problems, the Company misled investors by optimistically touting Vestis's "continued improvement," despite

Vestis's knowledge that "customer service . . . never improved at all," and that customer orders were still being delivered late, were sometimes incomplete, and were still being fulfilled with soiled or substandard products.

On May 6, 2025, Vestis adjusted its forward-looking revenue projections for 2025 downward and announced that two of its executives—Kimblery T. Scott and Ricky T. Dillon, who both had departed from the Company months prior—did not depart voluntarily, but had been terminated. Following that announcement, Vestis's stock price dropped again. Lead Plaintiff asserts that the drop in stock price was partially attributable to Vestis's misrepresentations regarding its progress in improving customer service and reducing operational inefficiencies. As a result, Lead Plaintiff asserts that Vestis's optimistic statements regarding improvements in operations and customer service were materially false and misleading in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Defendants moved to dismiss all of Lead Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Lead Plaintiff failed to adequately plead that Defendants' statements were false or misleading and failed to allege facts to support a strong inference that Defendants had the requisite scienter at the time the statements were made. Because Lead Plaintiff's claims that Vestis's statements suggested that it was improving its operations divorce the statements from their context, which showed that it had not, most of the statements challenged in this case are not actionable. But three of the statements Lead Plaintiff challenges are actionable because a reasonable investor would have understood those three statements to suggest that Vestis had improved its operational and customer problems, a suggestion that is contradicted by the accounts of the confidential witnesses. Therefore, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

## II. BACKGROUND

### A. Facts[1]

#### 1. The Parties

Defendant Vestis Corporation is a Delaware corporation with its principal office located in Roswell, Georgia. *Id.* ¶ 30. Vestis previously operated as a segment of Aramark Corporation until it was spun-off as a standalone company on September 30, 2023. *Id.* ¶ 37. Vestis provides supplies like uniforms and linens to corporate clients throughout the United States and Canada. *Id.* ¶ 5. The core of Vestis's business is its "recurring rental" business—Vestis rents workplace supplies, primarily uniforms, to its customers and provides recurring pick-up, laundry, and replacement services. *Id.* ¶¶ 47–48. During the class period,[2] Vestis's "recurring rentals comprised the overwhelming majority of the Company's total revenue." *Id.* Vestis's common stock trades on the New York Stock Exchange. *Id.* ¶ 30.

Defendant Kimberly T. Scott was Vestis's Chief Executive Officer, President, and a member of Vestis's board of directors from September 30, 2023 until her termination on March 18, 2025. And Defendant Ricky T. Dillon was Vestis's Executive Vice President and Chief Financial Officer from September 30, 2023 until his termination on February 14, 2025 (collectively, the "Individual Defendants"). *Id.* ¶¶ 31–33.

#### 2. From its Birth as a Stand-Alone Company, Vestis Had Significant Operational and Customer Service Problems

From the time that Vestis was spun out as a standalone company, the Company was troubled—it suffered from operational inefficiencies, poor customer service, and an inability to

[1] The facts are taken from the Amended Complaint, *see generally* Dkt. No. 33 ("AC"), and are accepted as true for the purposes of this motion. *See, e.g.*, *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] Lead Plaintiff brings this lawsuit on behalf of a putative class of purchasers who purchased Vestis securities between May 2, 2024 and May 6, 2025 (the "Class Period"). AC ¶ 1.

fulfill customer orders—problems that resulted in poor customer retention rates. *Id.* ¶ 74; Dkt. No. 47-2 at 11. During its first year operating as a standalone company, Vestis experienced a "torrent of customer losses," including the loss of three national business accounts, for what its executives described as "'regrettable' reasons." AC ¶ 74.

On the first day of the Class Period, Vestis announced its second quarter ("2Q")[3] FY2024 results in a press release and earnings call. *Id.* ¶ 6. During the earnings call, Vestis disclosed that its revenue growth was lower than expected, that customer losses "more than offset[] [] new business growth," and that it expected revenue to continue declining into the 3Q of FY2024. Dkt. No. 47-2 at 6–7. As a result, Vestis "slashed [it]s FY2024 guidance" and announced that revenue was expected to continue to decline. AC ¶ 76.

During the earnings call, Vestis emphasized that it had undertaken "a deep-dive into the underlying reasons for such [customer] losses." *Id.* ¶ 74 (Ms. Scott explaining that Vestis was "going pretty deep and granular to understand what are those patterns and trends around why customers leave"). Ms. Scott explained that she personally had "very deeply" evaluated the "root causes of th[e] lost business, [which] led us back to service efficacy." Dkt. No. 47-2 at 9. Ms. Scott disclosed that Vestis's customer losses were the result of persistent customer service issues, namely "on-time delivery and stopping shortages and delivering full loads to customers." AC ¶ 75; Dkt. No. 47-2 at 5. As she explained in detail, "[b]ased on the reason codes cited by our customers when they cancel service with us, we know that more than 70% of cancellations are due to [customer service] causes that are within our control," *id.* at 5—"very specific areas that [Vestis] could action around," *id.* at 9. As a result, Ms. Scott stated that she was confident that Vestis had "isolated the[] challenges" which had resulted in the customer losses. *Id.* at 9.

[3] Vestis's fiscal year "does not correspond to the calendar year, but rather ends on the Friday nearest to September 30th." AC ¶ 13 n.2. This opinion uses the abbreviations "2Q," "3Q," and "4Q" to denote the second, third, and fourth fiscal quarters respectively.

And during the earnings call, Ms. Scott emphasized that Vestis was working to fix the operational inefficiencies and that it was "focused on enhancing [its] service process." *Id.* at 5. As Ms. Scott explained, Vestis was "taking actions to enhance [] service in order to deliver a higher level of customer satisfaction, loyalty[,] and retention," *id.*, and had identified opportunities to "perfect the truck and loading process." *Id.* at 9 (identifying that, among other improvements, Vestis had "rolled out telematics across [its] fleet" of delivery trucks to ensure on-time deliveries). Despite Vestis's focus on addressing its customer service problems moving forward, it also disclosed during the call that because "service efficacy and price sensitivity go hand-in-hand," the Company had decided not to increase customer pricing until it had fully addressed its customer service and retention issues. Dkt. No. 47-2 at 10. Following the call and Vestis's disclosure of its ongoing operational and customer service problems, the price of Vestis's stock dropped by forty-five percent. Dkt. No. 47-3 at 1.

Vestis's disclosure of its ongoing service issues "shocked" the market—analysts were "particularly troubled by management withholding information regarding customer retention." AC ¶ 78. The Company's disclosure of its problems also prompted securities litigation. Interestingly, the start of the Class Period in this case marks the end of the Class Period in *Plumbers, Pipefitters & Apprentices Loc. No. 112 Pension Fund v. Vestis Corp.*, 808 F. Supp. 3d 1369 (N.D. Ga. 2025) ("*Vestis I*"). In *Vestis I*, the plaintiff alleged that Vestis's disclosures during the 2Q FY2024 earnings call revealed its substantial business failings—issues the market did not know about prior to the disclosures. *Id.* at 1379 ("On the morning of May 2, 2024, Vestis disclosed calamitous financial results . . . [o]n the ensuing earnings call, Plaintiffs allege, Vestis was forced to reveal the truth."). This case is unlike *Vestis I*. Here, Lead Plaintiff alleges that despite the purported corrective disclosures at issue in *Vestis I*—which revealed Vestis's problems to the market—Vestis thereafter misled investors by touting improvements, while allegedly failing to improve its operations at all.

### 3. Vestis's Customer Service Issues Persist Throughout the Class Period

Lead Plaintiff alleges that, despite Vestis's optimistic assurances throughout the Class Period that it was focused on its customer service problems and operational inefficiencies, Vestis's problems persisted. *Id.* ¶¶ 82–83. Lead Plaintiff's contention rests on a series of allegations from confidential witnesses ("CWs").[4] Specifically, Lead Plaintiff's allegations rely on statements from the CWs, as described below. Later in the opinion, the Court analyzes whether the CWs' allegations are sufficient to plead the existence of company-wide problems, given the nature of the CWs' respective roles within the Company's operations.

According to the CWs, throughout the Class Period, customer orders continued to be delivered chronically late and were still frequently missing product or fulfilled with soiled or substandard product. *Id.* ¶ 10. And, according to the CWs, the customer service issues were the result of significant dysfunction within the company; efforts to raise the problems with management were unsuccessful. *See id.* ¶ 107.

First, according to CW1, Vestis "received 'constant complaints' from customers about product shortages" throughout the Class Period, resulting from company-wide inventory backlogs

[4] CW1 was Aramark's and then Vestis's "Territory Manager for the Southeast United States" from June 2021 to May 2025. AC ¶ 38. CW1 reported to "General Manager" William Turner, who reported to the "Vice President of the South Region" Paul Schmid, who in turn reported to Ms. Scott. *Id.* CW1 was responsible for "overseeing routes, route service representatives ('RSRs'), customer complaints, and customer retention" within CW1's territory near Thomasville, Georgia. *Id.* CW2 was a "General Manager Designate" from May 2024 to July 2024 and a "General Manager of Production" at one of Vestis's production centers (or "plants") outside Chicago, Illinois from July 2024 to February 2025. *Id.* ¶ 40. CW2 reported to the "Regional Vice President" Nancy Hunsinger, who reported to Chief Operating Officer Bill Seward, who in turn reported to Ms. Scott. *Id.* CW2 managed plant operations, including individuals employed at CW2's plant. *Id.* ¶ 41. CW3 was employed on Vestis's "Enterprise Architecture team" until CW3 left the Company in the fourth quarter of 2024. *Id.* ¶ 42. CW3 reported to the "Vice President of Enterprise Architecture." *Id.* CW3 was responsible for "project implementation." *Id.* CW4 was the "Plant Manager" of the Odessa, Texas plant from January 2022 to December 2024. *Id.* ¶ 43. CW4 reported to General Manager Clint Rodgers and a district operations manager. *Id.* CW4 was responsible for overseeing production employees employed at the Odessa plant. *Id.* CW5 was an "Account Executive" in Vestis's Indianapolis office from January 2025 to June 2025. *Id.* ¶ 45. CW5 reported to a sales manager, who reported to the "Director of Sales," who reported to the "Senior Vice President of Sales," who in turn reported to Ms. Scott. *Id.* CW5 was responsible for generating new rental accounts within CW5's territory. *Id.* CW6 was an "Account Executive" until March 2024 when CW6 transitioned to the role of "Regional Sales Executive" in the company's Buffalo, New York office. *Id.* ¶ 46. CW6 was responsible for generating new sales and rental accounts within CW6's region. *Id.* ¶

and a "constant lack of product." *Id.* ¶¶ 85–86. CW6 corroborated CW1's account of events, opining that "product shortages were the Company's 'biggest problem,'" and that because of the product shortages, deliveries were repeatedly "delayed or missed altogether." *Id.* ¶ 88. And "CW1 recalled that all Territory Managers participated in a roundtable meeting in either late 2023 or early 2024 with Defendant Scott where . . . [she] was specifically informed about the shortages." *Id.* ¶ 89. In CW1's opinion however, the meeting did not lead to improvements. *Id.*

CW6 agreed with CW1s assessment, stating that "it was downhill from the very beginning" and "nothing improved." *Id.* According to CW1, Vestis's response to product shortages was not to purchase new product to fulfill its needs but rather to "rob[] from Peter to pay Paul"—to take product from one customer's order in an attempt to fulfill an order which was to be processed sooner. *Id.* ¶¶ 91, 95. "CW6 corroborated CW1, stating that the service team often had to manage shortages with a 'bait and switch' meaning that Vestis personnel would 'have to steal' product intended for one customer to cover deliveries for another, usually larger customer." *Id.* ¶ 97.

Second, Lead Plaintiff alleges that "CWs confirmed that significant product quality issues" also persisted company-wide throughout the Class Period. *Id.* ¶ 98. "When CW5 asked customers for feedback, they mentioned product quality issues, including that uniforms were not being cleaned." *Id.* ¶ 100. CW2 also recounted that customers in CW2's region regularly complained about quality issues. *Id.* ¶ 101. CW6 similarly recalled that customers would regularly call CW6 to complain about product quality—stating that customers would frequently receive unusable and soiled product. *Id.* ¶ 102. And "CW6 explained that these were not occasional, isolated incidents but instead, customers personally complained to CW6 multiple times a week regarding quality issues during the Class Period." *Id.* ¶ 102.

Third, Lead Plaintiff alleges that Vestis's plants were outdated and that it "neglected to make necessary improvements such as investing in new equipment [or] repairing existing equipment,"

further contributing to delays in processing orders. *Id.* ¶ 103. And Lead Plaintiff alleges that "because of the Company's severe backlog of unprocessed products," "Vestis's facilities had frequent fires that contributed to delays." *Id.* ¶¶ 103, 109–112 ("CW2 recounted that fires, spanning smoldering fires to full flames, happened monthly during the summer from May or June until October of 2024."). CW5 described the facilities in CW5's region as "outdated, dirty, and like a 'sweat shop.'" *Id.* CW2 also recounted that the Chicago plant had been neglected for years—in CW2's estimation, about half of the plant's equipment was nonfunctional at any given time. *Id.* ¶ 104. CW4 stated that because Vestis's equipment was old and outdated, the equipment would "go[] down constantly." *Id.* ¶ 105. And the CWs recounted that while they "constantly" raised issues regarding outdated equipment with management, Vestis "resisted and slow-rolled even modest investments in equipment." *Id.* ¶¶ 106, 107 (alleging that CW2 recalled that "plant managers constantly raised outdated equipment as a problem," but that "trying to get new equipment is like pulling teeth").

Fourth, Lead Plaintiff alleges that new customers often waited weeks, if not months, after signing a contract before Vestis would fulfil the new customer's first order. *Id.* ¶¶ 130–32, 135. According to CW6, for smaller customers, it would often take Vestis "over six months" from the date the customer had signed a contract with Vestis to fulfill the customer's first order. *Id.* ¶ 135. CW3 attributed such delays in order fulfillment to inefficiencies in onboarding new customers, inefficiencies in stockroom approval and release of orders, and an inability to quickly add "the customer's logo and employee name patch" on certain products like uniforms. *Id.* ¶¶ 132–33.

#### 4. Vestis's Alleged Practice of Locking Customers into Contracts While Misinforming Customers about their Terms

Lead Plaintiff alleges that throughout the Class Period, Vestis pressured sales personnel to deceive prospective customers about its contracts. Specifically, Lead Plaintiff alleges that Vestis

employed what Lead Plaintiff describes as deceptive sales tactics including: instructing its sales personnel to never use the word "contract" and instead to only use the phrase "service agreements," and "lying" to prospective customers that they would be permitted to end Vestis's services "whenever they desired" while "locking new customers into contractual arrangements . . . for years-long terms." *Id.* ¶ 180. According to CW6, because Vestis only referred to its contracts as "sales agreements," some customers started service without knowing that they had entered into a binding contract. *Id.* ¶ 183. And according to both CW6 and CW5, Vestis instructed its sales personnel to sign up new customers for service agreements with five-year terms while telling the customers that the service agreement was only a "month-to-month" agreement and that they could "cancel whenever." *Id.* ¶¶ 185, 187.

#### 5. Dissatisfied Customers Complain, Seek Credits, and Pursue Contract Cancellations

According to the CWs, "Vestis['s] consistent product shortages and order accuracy issues infuriated customers, driving them to raise complaints and seek relief through Vestis['s] arduous complaint process." *Id.* ¶¶ 119–29. Vestis required that its customers "submit a formal service request" to get Vestis to fix their problems. *Id.* ¶ 128. According to CW1, certain service requests were marked "Office of the President," "which referred to Defendant Scott's Office." *Id.* And, according to CW1, Vestis's policy was that if no one had responded to a service request within thirty-six to forty-eight hours, the service request "would make its way up to Kim Scott." *Id.* ¶ 129. Because of the persistent customer service issues, CW1 recalled that RSRs in CW's region, faced with irate and often yelling customers, had largely abandoned trying to "cross-sell" new products to Vestis's existing customers. *Id.* ¶¶ 123–24. Lead Plaintiff also alleges that because of Vestis's poor customer service, customers routinely "sought credits, reduced order volumes, and pursued contract deviations and buyouts." *Id.* ¶ 140. However, Vestis allegedly "utilized burdensome processes" for customers seeking such relief and "ruthlessly pursued contractual enforcement provisions . . . to

deter its customers from cancelling service"—"creating a vicious cycle that exacerbated customer dissatisfaction and contributed to [] customer losses." *Id.* ¶ 139.

Lead Plaintiff alleges that Vestis issued a significant number of credits to dissatisfied customers for product shortages and incomplete deliveries. *Id.* ¶¶ 140–29. According to CW2 and CW4, because of the high number of credits issued, the issuance of credits to dissatisfied customers was a topic of discussion "all the time." *Id.* ¶¶ 141–43. CW1 recalled being told that credits were "the last-ditch effort" and "to do whatever [CW1] could to where [Vestis] did not have to issue a credit." *Id.* ¶ 147. CW1 recalled that in response to the large number of issued credits, Vestis modified its credit policy such that Territory Managers could no longer approve and issue credits themselves. *Id.* ¶ 148. Instead, Territory Managers were required to submit credit requests with "detailed explanations" as to why a customer was requesting a credit and why a credit should be issued to a credit approval chain that included "GMs, the credit review team, and then the COO or [Ms.] Scott." *Id.* ¶¶ 147–49. Under the new credit approval process, credit requests were frequently "kicked back," delaying approval of the requests. *Id.* ¶ 149. And according to CW1, CW4, and CW6, accounts which were either "about to come up on a renewal" or accounts where the customer was "threatening to quit" were dubbed "Accounts in Jeopardy" ("AIJ"), which were discussed during weekly AIJ meetings. According to CW4, customer attrition data gathered in preparation for and discussed during the weekly AIJ meetings was compiled into reports which were forwarded to Ms. Scott. *Id.* ¶¶ 151–52.

And a number of dissatisfied customers would allegedly not cancel their contracts, but instead sought alternative means to reduce the services they received, including by "lowering their order volumes to the minimum invoice amounts permitted under their contracts" or by seeking "contract deviations." *Id.* ¶ 153. According to CW1, Ms. Scott personally oversaw contract deviations beginning in either late 2023 or early 2024. *Id.* ¶ 155.

Ultimately, some Vestis customers terminated their contracts altogether, despite what Lead Plaintiff describes as an arduous process for effectuating cancellation. *Id.* ¶ 158. Lead Plaintiff alleges that terminating a contract was a difficult process—requiring that the customer send a certified letter requesting cancellation and affording Vestis thirty days to attempt to fix any problems underlying the cancellation request. *Id.* Because of the alleged difficulty in cancelling a contract, some customers would instead agree to a contract buyout either by paying out a portion of the remaining balance or by paying liquidated damages. *Id.* According to CW1, in 2024, one of Vestis's largest customers—a meat processor that supplied Walmart—bought out the remainder of its contract. *Id.* ¶ 159.

**6. Vestis Tracks and Monitors Customer Dissatisfaction, Retention, and the Company's Financial Performance with Multiple Software Systems**

During the Class Period, Vestis and the Individual Defendants were allegedly well-aware that operational inefficiencies and customer service problems persisted across the Company, that Vestis continued to lose customers, and that Vestis's bottom-line suffered as a result. *Id.* ¶ 15. First, Lead Plaintiff asserts that Ms. Scott closely tracked, monitored, assessed, and discussed data regarding customer service and satisfaction, production, and sales throughout the Class Period through the Company's "specialized software systems". *Id.* ¶¶ 55 (alleging that Vestis used Salesforce, "ABS," Microsoft Power Business Intelligence ("MPBI"), Tableau, Spindle, and Oracle to track operational and customer service metrics), 66 (alleging that the Individual Defendants had access to an "executive-level dashboard" within MPBI). Second, Lead Plaintiff asserts that the extent to which Ms. Scott tracked customer service, customer-retention, customer-dissatisfaction, sales, and productivity-related data is evidenced by various statements made by Ms. Scott during the Class Period "tout[ing] how closely they monitored [the] data and the granularity of their review." *Id.* ¶¶ 16, 237.

Third, Lead Plaintiff alleges that throughout the Class Period, Vestis's "senior leadership" regularly held meetings during which they reviewed data and reports discussing Vestis's customer service issues—Lead Plaintiff does not allege that either Ms. Scott or Mr. Dillon attended any of these meetings, only that some information compiled during the meetings was forwarded to Ms. Scott for review. *Id.* ¶¶ 253–69. Fourth, Lead Plaintiff asserts that changes made to Vestis's contract deviation and credit policies during the Class Period support an inference that the Individual Defendants knew the severity of Vestis's ongoing problems. *Id.* ¶¶ 279–89. Fifth, Lead Plaintiff asserts that the fact that both Mr. Dillon and Ms. Scott were fired during the Class Period supports an inference that the Individual Defendants had knowledge of Vestis's continued problems. *Id.* ¶¶ 283–87. Finally, Lead Plaintiff asserts that because Vestis's core business is its recurring rentals, the core operations doctrines bolsters an inference of scienter. *Id.* ¶¶ 288–95.

As to Ms. Scott's access to Company records, Lead Plaintiff alleges that Ms. Scott accessed Vestis's software systems to monitor operational and customer service data as part of Vestis's strategic plan to improve customer service, and that she received weekly productivity reports on those issues. *Id.* ¶¶ 165, 227. According to CW2, the Tableau system—which tracked metrics like whether all the soiled laundry had been washed, whether all items had been processed that day, a plant's load percentage, and whether customers were receiving complete and timely orders—would often indicate that it was "last viewed" by Ms. Scott. *Id.* ¶¶ 168, 169. According to CW2, the fact that Ms. Scott was personally viewing productivity metrics in Tableau was "used as a kind of threat" by CW2's supervisors to drive performance. *Id.* ¶ 168. And according to CW4, each plant compiled a "weekly productivity" report, each plant's reports were compiled into a single spreadsheet for each region, and the regional spreadsheets were sent to Ms. Scott. *Id.* ¶¶ 169–72.

And Ms. Scott also allegedly reviewed sales, retention, and customer satisfaction data throughout the Class Period in preparation for Vestis's monthly "Town Hall" meetings, during

which she presented that data to an audience of Vestis management and senior leadership. *Id.* ¶¶ 173–74. Mr. Dillon is not alleged to have presented during the Town Hall meetings, nor is he alleged to have attended them. During the Town Hall meetings, Ms. Scott discussed both regional and Company-wide sales and customer retention metrics, including data derived from customer satisfaction surveys and sales reports. *Id.* ¶¶ 176–77. CW4 recalled that by late 2024, the tone of the monthly Town Halls was grim, with Ms. Scott reporting that Vestis was not meeting investor expectations for either its sales or customer retention projections. *Id.* ¶ 177. Lead Plaintiff also alleges that Ms. Scott would meet with Vestis's Territory Managers who informed her of product shortages and low morale, among other problems. *Id.* ¶ 228. Finally, Lead Plaintiff alleges that Ms. Scott visited Vestis's plants to "spend time on the ground . . . mapping out their process of how they manage shortages." *Id.* ¶ 271.

With respect to Mr. Dillon's access to the Company's records, Lead Plaintiff relies on a single statement made by him during Vestis's 2Q FY2024 earnings call to show that he both had access to and reviewed customer experience, service, and retention data. *Id.* ¶ 240. Apart from that one statement made by Mr. Dillon, Lead Plaintiff relies exclusively on Ms. Scott's use of the word "we" when discussing her access to Company records in certain statements, to assert that Mr. Dillon reviewed Vestis's records. Lead Plaintiff asserts that Ms. Scott's use of the word "we" shows that she was speaking on behalf of both herself and Mr. Dillon when she discussed what assessments had been conducted and what data had been reviewed regarding the Company's problems. *Sd.* ¶¶ 227 ("[S]peaking on behalf of 'we' . . . both Individual Defendants[] affirmed that they were conducting customer satisfaction and leadership assessments."), 232, 233 ("Scott (again speaking collectively for 'we,' including Dillon).").

### 7. The Challenged Statements

Lead Plaintiff alleges that during the Class Period, Vestis and the Individual Defendants made public statements optimistically touting the Company's improvements in its operations, customer service, and customer satisfaction, touting its ability to meet its forward-looking projections, and identifying "potential" risks to its business, despite its knowledge that Vestis did not improve "at all" but rather continued to have "pervasive . . . issues, including product shortages, delayed or missed deliveries, poor-quality products, and delayed new customer installations," which resulted in dissatisfied customers who sought credits, contract deviations, lowered invoices to the order minimum, and who pursued contract buyouts and cancellations. *Id.* ¶¶ 195, 296. The AC identifies[5] forty-three[6] statements (the "Challenged Statements") alleged to be false and misleading.[7]

---

[5] The AC identifies the allegedly false and misleading statements with bold and underlined text in a chart appended to the complaint. Dkt. No. 33-1. The Court adopts the numbering, naming, and citation convention used by Lead Plaintiff to identify the statements throughout this opinion.

[6] The AC identifies forty-three allegedly "False Statements" ("FS"). Dkt. No. 33-1. Because Lead Plaintiff identifies multiple statements within each False Statement, the Court breaks the Challenged Statements into separate statements when analyzing whether each statement is independently false or misleading.

[7] The Challenged Statements are: FS1 ("[O]perating trends are improving across our business."); FS1 ("We are advancing our strategic plan, particularly in . . . customer penetration through cross-selling on routes."); FS2 ("[W]e already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers."); FS2 ("Retention is moving back in the right direction."); FS3 ("We are building on our customer-first culture, by improving our service efficacy in order to strengthen customer loyalty and improve retention rates."); FS3 ("Our cross-sell logistics and operations initiatives are driving results."); FS4 ("So we feel very confident that we've isolated these challenges and opportunities, and we have very clear, deliberate actions around specific things like on-time delivery and stopping shortages and delivery full loads to customers."); FS4 ("[O]ur teammates are serving our customers really well as it relates to the relationship and the experience."); FS5 ("Many of our customers are still having a great experience because we're cross-selling them and we're having great success gaining some more penetration."); FS6 ("[W]e are . . . making sure that we are addressing procedural gaps and improving procedures by location where we have shortcomings related to service."); FS7 ("[I]t is possible that actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties," including "the failure to retain current customers, renew existing customer contracts and obtain new customer contracts," and "challenge of contracts by our customers."); FS8 ("There have been no material changes to the risk factors disclosed in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended September 29, 2023."); FS9 ("We are laser-focused on improving our service levels above and beyond what we have historically delivered as we build a truly differentiated experience for our customers."); FS10 ("[W]e have made great progress in terms of . . . improving our service levels."); FS11 ("We continue our focus on inventory management through . . . operations planning . . . as we focus on having the right inventories in our distribution centers and operating centers to support growth."); FS12 ("And that's why we've been heavily focused on stabilizing lost business, and we continue to focus on that because the single best and easiest lever to pull for growth is just to hold on to more customers than you did before. And so our focus right now is let's protect our base. Let's make sure that we are putting a lot of energy around delivering an outstanding customer experience so that we can protect what we already have, and that's lever #1."); FS13 ("So we are very pleased. . . . [W]e

are very pleased with the progress that we're making around efficient operations); FS14 ("[W]e're making great progress."); FS14 ("So ensuring all the plants have enough buffer stock and that we're ordering on time and we're delivering on time and that, that product is available for customers."); FS14 ("[B]ut we feel outstanding about the progress we've made since we spoke with your last quarter in terms of mobilizing around these opportunities."); FS15 ("We are very pleased with the work they're doing to cross-sell. . . . So we're very pleased."); FS15 ("[S]o we feel very good that we can continue to accelerate sales with that team."); FS16 ("[I]t is possible that actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties," including "the failure to retain current customers, renew existing customer contracts and obtain new customer contracts," and "challenge of contracts by our customers."); FS 17 ("There have been no material changes to the risk factors disclosed in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended September 29, 2023."); FS18 ("I am excited about the commercial momentum that is building across Vestis, the progress we are making executing against our efficient operations initiatives, and the way our organization has embraced our mission to deliver a best-in-class customer experience."); FS18 ("As a result, we expect both revenue and Adjusted EBITDA to grow on an underlying basis in Fiscal 2025 as we continue to deliver against our strategic priorities."); FS19 ("This core growth will be driven by positive contribution from both net volume growth and pricing."); FS20 ("[C]ore revenue growth is expected . . . reflecting . . . field sales growth trajectory as we—as well continued improvement in our route sales."); FS21 ("We are confident in our ability to deliver against our 2025 commitments."); FS22 ("We continue to drive efficiencies across our operations, and we remain highly focused on elevating our customers' experience."); FS22 ("We are committed to achieving best-in-class performance related to retention, sales and margins, and I'm encouraged by what we're beginning to see."); FS23 ("[W]e also continued to deliver strong results from route sales."); FS24 ("We remain laser-focused on delivering a best-in-class customer experience that will support retaining and growing with our existing customers."); FS25 ("[W]e are seeing continued success with our efficient operations initiatives."); FS25 ("[W]e are building a customer-centric culture with a keen recognition of the important of delivering an outstanding customer experience in order to frow the lifetime value of our customer base."); FS26 ("[W]e continue to execute the strategy on cross-selling."); FS27 ("[W]e feel very confident we have done through our service initiatives and the work that we have done to put our customer first."); FS28 ("[W]e're seeing the level of performance rise across the system with particular focus on those locations that are underperforming versus the norm."); FS28 ("We're seeing that happen on-time delivery already."); FS28 ("And across the system, the whole system is rising and the level of play is getting stronger. So I would just say we're going to continuously improve across the board, and we're doing that."); FS29 ("Our failure to retain our current customers, renew our existing customer contracts on comparable terms and obtain new customers contracts could adversely affect our business, financial condition or results of operations."); FS29 ("The failure to renew a significant number of existing contracts, including on the same or more favorable terms, could have a material adverse effect on our business, financial condition or results of operations, and the failure to obtain new business could have an adverse impact on our growth and financial results."); FS30 "Our contracts may be subject to challenge by our customers, which if determined adversely, could affect our business, financial condition, or results of operations."); FS30 ("The resolution of these disputes in a manner adverse to our interests could negatively affect revenue and operating results. If a large number of our customer arrangements were modified in response to any such matter, the effect could be materially adverse to our business, financial condition, or results of operations."); FS31 ("In the second quarter, we expect to hit a significant milestone, with new volume outpacing customer losses driven by field sales productivity, national account wins, and lower customer churn."); FS32 ("Toward the end of the second quarter, we expect new volume growth will exceed lost business driven by field sales productivity."); FS33 ("I believe in our sequential revenue guidance because of the new customers we're winning . . . our growth with existing customers."); FS34 ("To recap, a lot is working well at Vestis. Churn is in line with our expectations. Field sales productivity is ramping nicely."); FS34 ("We continue to expect this core performance to be driven by positive contributions from both net volume and pricing for the full year fiscal 2025."); FS35 ("[W]e expect new volume wins to outweigh losses as we kind of exit the second quarter."); FS35 ("So we're very pleased that we expect to see that shift, and we'll start to see positive volume growth in the system."); FS35 ("[W]e're very pleased to see the fruits of our labor around improving the customer experience."); FS36 ("We continue to focus on inventory management through sales and operations."); FS36 ("The increase during the quarter is to position the right inventory in our facilities to support growth as we prepare for several large installs."); FS37 ("[W]e feel really confident that we've gained a great deal of traction in terms of improving the customer experience."); FS38 ("So we're generating saving and productivity from being more efficient from a logistics perspective."); FS39 ("And I'm really proud to say that we are reducing those service requests related to those key Pareto

These statements were all made by the Individual Defendants on earnings calls or in public filings during the Class Period. Later in the opinion, the Court analyzes whether each seperate Challenged Statement was false or misleading when made category-by-category using as examplars statements highlighted in the parties' briefing.

### 8. The Market Reacts to Vestis's Adjusted Revenue Forecasts

On May 6, 2025, Vestis again announced that revenue had declined; primarily because lost business exceeded the amount of its revenue generated from new business. *Id.* ¶ 206. As a result, Vestis withdrew its full-year forward-looking revenue forecasts for FY2025 and adjusted its forecasts for the 3Q FY2025 downward. *Id.* ¶ 208. On May 7, 2025, before the market opened, Vestis held its earnings call for 2Q FY2025. Consistent with the Company's prior disclosures, during the 2Q FY2025 earnings call, Vestis stated that "the main reason for the decrease was lower adds over stops . . . [*i.e.*] volume changes with [] existing customers." *Id.* ¶ 213. That same day, Vestis revealed that Ms. Scott and Mr. Dillon, who had previously left the Company, had been terminated. Lead Plaintiff alleges that Vestis had previously "downplayed" the basis for their respective departures

bars in those key areas around on-time delivery and shortages."); FS39 ("So overall, we are seeing continued improvement in the customer experience, and we can see that daily in the reduction of service requests related to these key focus areas."); FS39 ("[W]e're seeing great success cross-selling our existing customers multiple products and services."); FS39 ("And that is also a great indicator that our customers are having a good experience because they're choosing to buy more from Vestis."); FS40 ("And so we have been hyper focused as a team on really driving a delightful experience for our customers from on-time performance to rolling out standard operating procedures to improve shortages and to make sure our customers get everything they want the first time that it's delivered and its really shifting our team's focus around delighting the customer."); FS40 ("We are definitely seeing that, that body of work is making a difference, and we are seeing improvements in service requests and our customers are responding very positively to the work that we are doing to take great care of them. So I would point to that as the key reason around why our customers are staying."); FS41 ("And so we have rolled out a very robust standard operating procedure."); FS41 ("[W]e are actually seeing a step change in improvement related to shortages."); FS41 ("We're also seeing an improvement related to shortages for those who have mastered the on-time delivery and the notification."); FS41("So we feel really good about where we are related to the customer experience."); FS42 ("[I]t is possible that actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties," including "the failure to retain current customers, renew existing customer contracts and obtain new customer contracts," and "challenge of contracts by our customers."); FS43 ("There have been no material changes to the risk factors disclosed in Part I, Item IA, 'Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended September 27, 2024.").

from the Company. *Id.* ¶¶ 284, 287. Following Vestis's announcement, the price of Vestis common stock declined by nearly 38% in less than a day. *Id.* ¶ 225.

### B. Procedural History

Lead Plaintiff commenced this action on June 9, 2025, Dkt. No. 1, and filed the AC on October 24, 2025, Dkt. No. 33. Lead Plaintiff asserts claims against Vestis, Ms. Scott, and Mr. Dillon for violating Section 10(b) of the Exchange Act and Rule 10b-5. AC ¶¶ 1, 4. Lead Plaintiff also asserts Section 20(a) claims against the Individual Defendants for exercising their control over Vestis to induce it to make the allegedly false or misleading statements. *Id.* ¶¶ 338–47.

On February 12, 2026, Defendants moved to dismiss the AC. *See generally* Dkt. No. 45. Defendants filed a memorandum of law in support of their motion that same day. *See generally* Dkt. No. 46 ("Mem."). Defendants filed thirty-three exhibits in connection with their motion to dismiss. *See generally* Dkt. No. 47 ("De Simone Decl."). Lead Plaintiff filed an opposition to the motion to dismiss on April 14, 2026. *See generally* Dkt. No. 48 ("Opp'n"). Defendants filed their reply on May 27, 2026. Dkt. No. 53.

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of N.Y Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). However, "the tenet that a

court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Furthermore, on a motion to dismiss, the Court can consider statements made in a company's public filings with the SEC. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Here, in addition to factual allegations in Lead Plaintiffs' AC, the Court has also considered Vestis's disclosure documents, public filings with the SEC, and the transcripts of the various calls during which the challenged statements were made.[8] However, the Court can consider them "'only to determine what the documents stated,' and 'not to prove the truth of their contents.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer*, 937 F.2d at 774).

[8] While Lead Plaintiff contends that "Defendants appended 26 exhibits to their Motion without articulating why each should be considered," Opp'n at 23 n.6, Lead Plaintiff does not contend that the Court may not consider the documents (nor does Lead Plaintiff contend that the documents are not integral to the AC), only that the Court cannot consider them to prove the truth of their contents.

### B. Section 10(b) and Rule 10b-5 Liability

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b). To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

## IV. DISCUSSION

### A. Actionable Material Misrepresentations or Omissions

#### 1. Legal Standard

"Under Rule 10b–5(b), it is unlawful to (1) 'make any untrue statement of a material fact,' or (2) 'omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 138 (2d Cir. 2025) (quoting 17 C.F.R. § 240.10b–5(b)). "These prongs correspond to two actionable theories under Section 10(b) and Rule 10b–5: (1) a false statement, *i.e.*, 'an actual statement . . . that is . . . "untrue" outright,' and (2) a half-truth, *i.e.*, a 'representation[ ] that state[s] the truth only so far as it goes, while omitting critical qualifying information.'" *Id.* (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016)). "A classic contract-law example of a half-truth is 'the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might

bisect the property.'" *Id.* at 138–39 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188–89 (2016)).

"To determine whether a statement is misleading, [a court's] inquiry is objective, from the perspective of a 'reasonable investor,' considering not only a statement's 'literal truth' but also its 'context and manner of presentation.'" *Id.* at 139 (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)). "'The test for whether a statement is materially misleading under Section 10(b) . . . is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor."'" *City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 295 (2d Cir. 2025) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2nd Cir. 2004) (quoting *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991))). And "literally true statements" are actionable if they "create a materially misleading impression . . . ." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund*, 592 F.3d at 366 (internal quotation marks omitted). Accordingly, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021).

An omission is actionable if the omitted information was subject to "an affirmative legal disclosure obligation" or the omitted information is "necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011). "It bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011) (internal quotations and citations omitted). And there is no "generalized duty requiring defendants to

disclose the entire corpus of their knowledge." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366. "Just because 'a reasonable investor would very much like to know [a] fact' does not create any obligation to speak up." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 363 (2d Cir. 2022) (quoting *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014)).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). "For securities-fraud claims, although '§ 10(b) and Rule 10b–5 do not create an affirmative duty to disclose any and all material information,' once 'a company speaks on an issue or topic,' it must 'tell the whole truth.'" *Gimpel*, 156 F.4th at 139 (quoting *Matrixx Initiatives, Inc.*, 563 U.S. at 44, then quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)) (internal citations omitted). "That is, when a company does speak, it assumes 'a duty to be both accurate and complete,' and adequate disclosure is required to make other statements, 'in light of the circumstances under which they were made, not misleading.'" *Id.* (quoting *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002), then *Meyer*, 761 F.3d at 250)) (internal citations omitted).

To incur liability, misrepresentations or omissions must be material. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson*, 485 U.S. at 240 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola*, 295 F.3d at 329 (internal quotation marks and citation omitted).

#### i. Statements of Opinion

As a threshold question, the Court must determine whether a statement is one of fact or of

opinion under the federal securities law. *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 40 (2d Cir. 2024), *cert. denied sub nom. BDO USA, LLP v. New England Carpenters Guaranteed Annuity & Pension Funds*, 146 S. Ct. 261 (2025). "In general, a fact is 'a thing done or existing or an actual happening,' while an opinion is 'a belief, a view, or a sentiment which the mind forms of persons or things.'" *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)). A statement of fact 'expresses certainty about a thing,' while a statement of opinion does not." *Id.* (quoting *Omnicare*, 575 U.S. at 183). "Statements of opinion often include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact." *Id.* at 40–41 (quoting *Omnicare*, 575 U.S. at 183–84).

"But not all statements of opinion include such qualifying language." *Id.* at 41. Rather, "[c]ertain statements address issues so plainly subjective, . . . that the statement is one of opinion not just by virtue of the words used but also because of the nature of the information conveyed." *Id.* The "inquiry [] turn[s] on whether the relevant statement reflects the speaker's determination of 'a matter of objective fact' or instead expresses the speaker's judgment about a matter that lacks 'any objective standard,'" the "latter statement . . . is 'inherently subjective.'" *Id.* (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109–10, 113 (2d Cir. 2011)). An opinion is "a statement [that] turns on the exercise of subjective judgment." *Id.* And "opinions lead double lives"—a statement of "opinion may implicitly convey 'facts about how the speaker has formed the opinion [] or . . . about the speaker's basis for holding that view." *Id.*

"[S]ubjective statements of opinion are generally not actionable as fraud." *Afr. v. Jianpu Tech. Inc.*, 2022 WL 4537973, at *5 (S.D.N.Y. Sept. 28, 2022) (quoting *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015*), aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)). The Supreme

Court has emphasized that it is "no small task for an investor" to meet the standard for pleading an actionable statement of opinion. *Omnicare*, 575 U.S. 175, 194 (2015).

Nonetheless, "[s]tatements of opinion are actionable if (1) the speaker did not hold the belief she professed, (2) the supporting facts she supplied were untrue, or (3) the speaker omitted information whose omission makes the statement misleading to a reasonable investor." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 43 (2d Cir. 2025), *cert. denied sub nom. Shanda Games Ltd. v. Monk*, 146 S. Ct. 366, 223 L. Ed. 2d 196 (2025) (internal citations, quotations, and alterations omitted); *see Tongue*, 816 F.3d at 209–10 (applying *Omnicare* to claims arising under Section 10(b) and Rule 10b-5). "In other words, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020).

When challenging a statement of opinion on the grounds that the supporting facts supplied were untrue, a plaintiff must show that "the embedded fact is not one as to which reasonable minds can differ." *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 42. And "[w]ith respect to th[e] [third] basis for challenging a statement of opinion, *Omnicare* held that the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." *Id.* That is because a reasonable investor "expects not just that [the speaker] believes the opinion (however irrationally), *Omnicare*, 575 U.S. at 189, but that it "rests on some meaningful . . . inquiry," "fairly aligns with the information in the issuer's possession at the time," and does not "reflect baseless, off-the-cuff judgments." *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 41 (citation modified) (quoting *Omnicare*, 575 U.S. at 188–90).

"In assessing what a reasonable investor would expect, the Supreme Court stressed the importance of context, such as 'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-

the-cuff judgment[], of the kind that an individual might communicate in daily life.'" *Abramson*, 965 F.3d at 175 (quoting *Omnicare*, 575 U.S. at 190) (alterations in *Abramson*). "Finally, . . . '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts' and thus that a statement of opinion does not imply false information to a reasonable investor simply because there is 'some fact cutting the other way' that the speaker omitted." *Id.* (quoting *Omnicare*, 575 U.S. at 190). Thus, a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* (quoting *Omnicare*, 575 U.S. at 194). The "core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 575 U.S. at 194).

**ii. Corporate Optimism and Puffery**

General statements of optimism and puffery are nonactionable under federal securities laws "because these 'vague descriptions' . . . are too general to cause a reasonable investor to rely upon them." *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408 (2d Cir. 2023) (concluding that characterizations of study methodology as "rigorous," "extensive," "thorough," "systematic," "unique in . . . completeness and transparency," "the best science," and "very advanced" "are precisely the type of puffery that [we] have consistently held to be inactionable"); *see also Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016) (noting that statements of optimism and puffery are not "sufficiently specific [such] that a reasonable investor could rely on [them] as a 'guarantee of some concrete fact or outcome'" (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014))).

Puffery falls into two categories. "The first category of puffery encompasses 'subjective statements of opinion which cannot be proven false.'" *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 96 (2d Cir. 2023) (discussing puffery under New York law pursuant to New York General Business law §§ 349 and 350) (quoting *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 60

(2d Cir. 2022)). "This form of puffery encompasses 'subjective statements . . . which cannot be proven false.'" *Id.* (quoting *Int'l Code Council, Inc.*, 43 F.4th at 60). It "often manifests as exaggerations or overstatements that mention nothing specific, but rather amount to general claims of superiority expressed in broad, vague, and commendatory language." *Id.* (internal quotations omitted) (quoting *Int'l Code Council, Inc.*, 43 F.4th at 59–60). "The second type of puffery involves exaggerated, blustering, and boasting statements that are objective—and therefore technically provable—but upon which no reasonable buyer would be justified in relying." *Id.* (internal quotations omitted) (quoting *Int'l Code Council, Inc.*, 43 F.4th at 59–60). "Even if a claim is provable as false, if it is so patently hyperbolic" that it could not mislead a reasonable investor, it is non-actionable puffery. *Id.*

"General statements about reputation, integrity, and compliance with ethical norms are inactionable puffery." *Singh*, 918 F.3d at 63. So too are "[v]ague positive statements regarding a corporate entity's risk-management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable." *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 164 (2d Cir. 2025) (citation modified) (concluding that "statements regarding [defendant's] 'strict financial discipline' and 'robust' systems" were nonactionable); *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements regarding "what [the defendant] is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" were non-actionable). Even "misguided optimism is not a cause of action, and does not support an inference of fraud" because the Second Circuit has "rejected the legitimacy of 'alleging fraud by hindsight.'" *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). Allegations

that a defendant should have been "more alert and more skeptical" are insufficient; speakers are "not required to take a gloomy, fearful or defeatist view of the future . . . ." *Id.* at 1129–30.

However, like opinion statements, statements of optimism and puffery can be actionable where they are "determinate and verifiable," *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418, and they "contradict facts that are known to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or where they amount to "'misrepresentations of existing facts' that were made even though the speaker 'knew that the contrary was true,'" *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (quoting *Novak*, 216 F.3d at 315). A plaintiff must "point to an[] objective, black-and-white-standard by which to verify" whether the challenged statement is untrue. *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418.

**iii. Forward-Looking Statements**

"Two doctrines—one statutory, the other judge-made—protect certain forward-looking statements from serving as the basis for claims of securities fraud." "First, the PSLRA creates a statutory 'safe harbor' for certain [forward-looking] statements." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020). "Second, courts have long protected forward-looking statements, under the bespeaks-caution doctrine." *Id.*

The PSLRA includes several definitions of forward-looking statements. *See* 15 U.S.C. § 78u–5(i)(1)(A)–(C). Under the safe-harbor provision, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies.'" *Id.* at 245–46 (quoting *Slayton*,

604 F.3d at 766). However, the Second Circuit has held that "'[a] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements." *Id.* (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)); *see also Makor Issues & Rts, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").

However, there are limits to the safe harbor's reach. "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772; *see also City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013) ("[G]eneric and mere boilerplate words of caution—for example, a statement at the beginning of a conference call that states merely that 'forward-looking statements are subject to certain risks and uncertainties'—are insufficient to put investors on notice of the risks at hand and therefore to inoculate these statements.") (quoting *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 265 n.3 (2d Cir. 2010) (summary order))). In other words, for cautionary language to qualify as "meaningful" it "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *Slayton*, 604 F.3d at 771 (quoting H.R. Conf. Rep. 104–369, at 43 (1995)). "'Vague' disclaimers are inadequate." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 247 (quoting *Slayton*, 604 F.3d at 772).

The judicially created "bespeaks-caution doctrine is a corollary of 'the well-established principle that a statement or omission must be considered in context.'" *Iowa Pub. Emps. Ret. Sys.*, 620 F.3d at 141 (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1996)). The doctrine provides that a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially

misleading." *Id.*; *accord Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) ("Pursuant to the judicially-created 'bespeaks caution' doctrine, certain alleged misrepresentations, which are accompanied by meaningful cautionary statements, are considered immaterial as a matter of law."). "In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Iowa Pub. Emps. Ret. Sys.*, 620 F.3d at 141.

However, the bespeaks-caution doctrine also has limits to its reach. To apply [the doctrine], . . . the cautionary language must pertain to the specific risk that was realized." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). "'[C]autionary language [that] did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss' is insufficient." *Id.* (quoting *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002)). And "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173 (citing *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")); *see also Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021).

Because "[c]autionary language in securities offerings is just about universal[,]" "the key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of such language. Plaintiffs may do this by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359. The Court must evaluate the language "on a case-by-case basis. In all cases, however, the court must keep in mind that a complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." *Id.* Thus, "[w]hen there is

cautionary language in the disclosure, the Court analyzes 'the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.'" *Rombach*, 355 F.3d at 173–74 (quoting *Halperin*, 295 F.3d at 357).

### 2. Application

#### i. The CWs' Statements Show Company-Wide Problems

Because Lead Plaintiff relies on the CWs' statements to plead falsity—that the specific operational inefficiencies and customer service problems that Lead Plaintiff identifies as the basis for why the Challenged Statements were false or misleading occurred across the Company—the Court addresses the sufficiency of Lead Plaintiff's CW allegations at the outset. Here, the CWs held roles that allow the Court to infer that the problems they perceived persisted across the Company.

"A complaint may rely on information from confidential witnesses if they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 314). In *New Jersey Carpenters*, the plaintiffs attributed a number of allegations to "eight unnamed prior employees" of the defendant who had held various positions within the company. *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp.*, 709 F.3d 109, 118 (2d Cir. 2013). The defendants argued that, given the CWs' discrete roles, their allegations should be discounted because "those few employees could have conceivably described [the company's] practices at only a tiny fraction of its 432 offices." *Id.* at 123. But the Second Circuit rejected that argument: while it recognized that the employees had worked only at regional offices, it nonetheless determined that the allegations were sufficient because the

complaint did not include allegations supporting the inference that the relevant practices were experienced only in those regions, rather than on a company-wide level. *Id.* at 123–24. Additionally, courts in this District "have found at the pleading stage that the accounts of confidential witnesses support a company-wide inference where, for example, they emanate from several geographic areas; (2) span different levels of the company hierarchy; and (3) remain consistent across different time period[s]." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 262–63 (S.D.N.Y. 2023) (internal quotation marks omitted).

Here, the CWs had roles within the Company that allow the Court to infer that the specific operational inefficiencies and customer service problems identified by Lead Plaintiff persisted throughout the Class Period on a company-wide basis. The CWs included the Territory Manager for the Southeast United States; a General Manager of Production at Vestis's Chicago, Illinois plant; an individual on the Company's Enterprise Architecture Team; the Plant Manager for Vestis's Odessa, Texas plant; and account executives employed in the Company's Indianapolis, Indiana and Buffalo, New York offices. AC ¶¶ 38–46.

The CWs worked out of multiple offices, held different roles at the Company, and were responsible for different regions—including the 250-mile radius around Thomasville, Georgia; Chicago, Illinois; Odessa, Texas; Indianapolis, Indiana; and Buffalo, New York. *Id.* Their experience spans years before the alleged events—for example, CW1 worked as a Territory Manager at Aramark pre-spin-off and continued to work at Vestis post-spin-off from June 2021 to May 2025—up through the Class Period. *See, e.g.*, *id.* ¶ 38.

CW1 is alleged to have met with Ms. Scott to discuss the Company's ongoing customer service problems while CW4 is alleged to have attended the recurring Town Halls during which Ms. Scott presented on the customer service problems and discussed revenue projections. *Id.* ¶¶ 89, 174–79. And the CWs "experienced firsthand" Vestis's operational inefficiencies, customer service

problems, poor facility management, and customer dissatisfaction. *In re Axsome Therapeutics, Inc. Sec. Litig.*, No. 22 CIV. 3925, 2025 WL 965265, at *9 (S.D.N.Y. Mar. 31, 2025) (holding that Defendants' arguments disputing scienter were not persuasive, even though the confidential witness had no direct contact with the individual defendants because "CW1 experienced firsthand the supply delays").

Defendants argue that because the CWs worked in "localized operations roles in specific plants or defined geographies," and because Vestis employed approximately 19,600 workers at over 350 different sites, the CWs do not speak to "Company-wide issues or problems." Mem. at 36–37. Defendants' argument mirrors the argument that the Second Circuit rejected in *New Jersey Carpenters Health Fund* and is not persuasive for the same reasons. 709 F.3d at 123–24. Moreover, the AC "provide[s] no basis for believing" that the problems the CWs describe were isolated to "factors unique to the [CWs'] relevant offices." *New Jersey Carpenters*, 709 F.3d at 124. Rather, the CWs' accounts of Vestis's customer service issues "all corroborate one another's." *In re SolarEdge Techs., Inc. Sec. Litig.*, No. 1:23-CV-9748, 2024 WL 4979296, at *8 (S.D.N.Y. Dec. 4, 2024); *see, e.g.*, AC ¶¶ 88–89 (corroborating Company-wide product shortages), 97, 105 (corroborating that plants have outdated equipment), 120–23 (corroborating "constant customer complaints"), 141 (corroborating frequent issuance of credits to dissatisfied customers). For example, CW1 recounted that, based on conversations that CW1 had with other Territory Managers employed in Indiana and Wisconsin, the "same [product] shortages" were "everywhere." AC ¶¶ 87, 88 (describing that all Territory Managers participated in a roundtable meeting with Ms. Scott where each informed her about "the numerous service problems in their respective Territories").

Accordingly, the Court credits the CWs' mutually reinforcing and sufficiently particularized allegations that throughout the Class Period the specific operational inefficiencies and customer service problems identified by Lead Plaintiff were company-wide problems.

### ii. Some, But Not All, of the Challenged Statements Are Not Alleged to Be False or Misleading

Some,[9] but not all, of the Challenged Statements are not actionable because Lead Plaintiff has not adequately pleaded that the statements in this category were false when made with the requisite particularity.

---

[9] The Challenged Statements that are nonactionable because Lead Plaintiff has not adequately pleaded falsity with the requisite particularity are: FS1 ("We are advancing our strategic plan, particularly in . . . customer penetration through cross-selling on routes."); FS2 ("Retention is moving back in the right direction."); FS2 ("[W]e already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers."); FS3 ("We are building on our customer-first culture."); FS3 ("Our cross-sell logistics and operations initiatives are driving results."); FS4 ("So we feel very confident that we've isolated these challenges and opportunities, and we have very clear, deliberate actions around specific things like on-time delivery and stopping shortages and delivery full loads to customers."); FS5 ("Many of our customers are still having a great experience because we're cross-selling them and we're having great success gaining some more penetration."); FS6 ("[W]e are . . . making sure that we are addressing procedural gaps and improving procedures by location where we have shortcomings related to service."); FS9 ("We are laser-focused on improving our service levels above and beyond what we have historically delivered as we build a truly differentiated experience for our customers."); FS11 ("We continue our focus on inventory management through . . . operations planning . . . as we focus on having the right inventories in our distribution centers and operating centers to support growth."); FS12 ("And that's why we've been heavily focused on stabilizing lost business, and we continue to focus on that because the single best and easiest lever to pull for growth is just to hold on to more customers than you did before. And so our focus right now is let's protect our base. Let's make sure that we are putting a lot of energy around delivering an outstanding customer experience so that we can protect what we already have, and that's lever #1."); FS14 ("[W]e're making great progress."); FS14 ("So ensuring all the plants have enough buffer stock and that we're ordering on time and we're delivering on time and that, that product is available for customers."); FS15 ("We are very pleased with the work they're doing to cross-sell. . . . So we're very pleased."); FS15 ("[S]o we feel very good that we can continue to accelerate sales with that team."); FS22 ("We continue to drive efficiencies across our operations, and we remain highly focused on elevating our customers' experience."); FS22 ("We are committed to achieving best-in-class performance related to retention, sales and margins, and I'm encouraged by what we're beginning to see."); FS23 ("[W]e also continued to deliver strong results from route sales."); FS24 ("We remain laser-focused on delivering a best-in-class customer experience that will support retaining and growing with our existing customers."); FS25 ("[W]e are seeing continued success with our efficient operations initiatives."); FS26 ("[W]e continue to execute the strategy on cross-selling."); FS30 "Our contracts may be subject to challenge by our customers, which if determined adversely, could affect our business, financial condition, or results of operations."); FS30 ("The resolution of these disputes in a manner adverse to our interests could negatively affect revenue and operating results. If a large number of our customer arrangements were modified in response to any such matter, the effect could be materially adverse to our business, financial condition, or results of operations."); FS33 ("I believe in our sequential revenue guidance because of the new customers we're winning . . . our growth with existing customers."); FS34 ("To recap, a lot is working well at Vestis. Churn is in line with our expectations. Field sales productivity is ramping nicely."); FS36 ("We continue to focus on inventory management through sales and operations."); FS36 ("The increase during the quarter is to position the right inventory in our facilities to support growth as we prepare for several large installs."); FS38 ("So we're generating saving and productivity from being more efficient from a logistics perspective."); FS39 ("So overall, we are seeing continued improvement in the customer experience, and we can see that daily in the reduction of service requests related to these key focus areas."); FS39 ("[W]e're seeing great success cross-selling our existing customers multiple products and services."); FS39 ("And that is also a great indicator that our customers are having a good experience because they're choosing to buy more from Vestis."); FS40 ("And so we have been hyper focused as a team on really driving a delightful experience for our customers from on-time performance to rolling out standard operating procedures to improve shortages and to make sure our customers get everything they want the first time that it's delivered and its really shifting our team's focus around delighting the customer."); FS40 ("We are definitely seeing that, that body of work is making a difference, and we are seeing improvements in service requests and our customers are responding very positively to the work that we are doing to take great care of them. So I would point to that as the key reason around why our customers

First, statements[10] identifying that Vestis was "advancing [its] strategic plan," "isolating" its customer service issues "by market center," "continue[d] to execute the strategy on cross-selling," and was "laser-focused on improving [] service levels," are not alleged to have been false because these statements discuss ongoing efforts; they are not promising successful efforts. *See, e.g.*, FS1, FS6, F9, FS26.

For example, Lead Plaintiff has not adequately pleaded falsity with respect to the statements[11] describing how Vestis had "isolated" its problems and was "focused on" improving its operational inefficiencies, customer service problems, and on reducing customer dissatisfaction. The AC alleges that Vestis's efforts were unsuccessful; not that it was not focused on addressing the problems. To the contrary, Lead Plaintiff's own scienter allegations "agree with the defendant's purported misstatement[s]." *See, e.g.*, *Saskatchewan Healthcare Emps.' Pension Fund v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 401 (S.D.N.Y. 2024). Lead Plaintiff alleges that Ms. Scott "dug deep" to

---

are staying."); FS41 ("[W]e are actually seeing a step change in improvement related to shortages."); FS41 ("We're also seeing an improvement related to shortages for those who have mastered the on-time delivery and the notification."); FS41 ("So we feel really good about where we are related to the customer experience.").

[10] *See, e.g.*, FS1 ("We are advancing our strategic plan, particularly in . . . customer penetration through cross-selling on routes."); FS3 ("We are building on our customer-first culture, by improving our service efficacy in order to strengthen customer loyalty and improve retention rates."); FS4 ("So we feel very confident that we've isolated these challenges and opportunities, and we have very clear, deliberate actions around specific things like on-time delivery and stopping shortages and delivery full loads to customers."); FS6 ("[W]e are . . . making sure that we are addressing procedural gaps and improving procedures by location where we have shortcomings related to service."); FS9 ("We are laser-focused on improving our service levels above and beyond what we have historically delivered as we build a truly differentiated experience for our customers."); FS11 ("We continue our focus on inventory management through . . . operations planning . . . as we focus on having the right inventories in our distribution centers and operating centers to support growth."); FS12 ("And that's why we've been heavily focused on stabilizing lost business, and we continue to focus on that because the single best and easiest lever to pull for growth is just to hold on to more customers than you did before. And so our focus right now is let's protect our base. Let's make sure that we are putting a lot of energy around delivering an outstanding customer experience so that we can protect what we already have, and that's lever #1."); FS22 ("We continue to drive efficiencies across our operations, and we remain highly focused on elevating our customers' experience."); FS22 ("We are committed to achieving best-in-class performance related to retention, sales and margins, and I'm encouraged by what we're beginning to see."); FS24 ("We remain laser-focused on delivering a best-in-class customer experience that will support retaining and growing with our existing customers."); FS26 ("[W]e continue to execute the strategy on cross-selling."); FS36 ("We continue to focus on inventory management through sales and operations."); FS40 ("And so we have been hyper focused as a team on really driving a delightful experience for our customers from on-time performance to rolling out standard operating procedures to improve shortages and to make sure our customers get everything they want the first time that it's delivered and its really shifting our team's focus around delighting the customer.").

[11] *See supra* note 10.

"isolate" Vestis's specific customer service problems and to understand the reasons for customer loss and that she identified targeted areas for improvement. Lead Plaintiff also alleges that Ms. Scott gave presentations to Vestis employees on the status of the Company's problems. And Ms. Scott personally oversaw training certain Vestis personnel, met and spoke with Vestis's frontline workers to better understand the Company's problems, traveled to underperforming plants, and monitored data regarding customer service and plant operations with significant granularity. As Ms. Scott stated, she monitored "leading indicators around service-related requests" and "manage[d] services requests on a very tactical and daily basis." *Id.* ¶ 243. Lead Plaintiff's allegations show that Ms. Scott was an in-the-trenches executive undertaking efforts to isolate and address the Company's problems—they show that Vestis had "isolated its challenges and opportunities," and was "laser-focused on improving service levels," and "on stabilizing lost business." *See, e.g.*, FS4, FS11, FS12. Lead Plaintiff has not adequately pleaded falsity as to the statements describing the Company's "focus on" fixing its problems. And Lead Plaintiff's allegations regarding Ms. Scott's efforts to stay on top of the issues undermines Lead Plaintiff's argument.

Nor are the CWs' allegations adequate to plead that these statements[12] were false when made because the CWs "do not allege that the company . . . was not doing that which it said it was doing" nor do they "allege that the company failed to do anything at all with respect to" its focus on addressing operational and customer service problems. *Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014), *aff'd sub nom. In re Lululemon Sec. Litig.*, 604 F. App'x 62 (2d Cir. 2015). Instead, the CWs' accounts also do not show that Defendants' alleged misrepresentations were false—the CWs allege that Ms. Scott was "engaged in a year-long transparent process to address" Vestis's continued operational and service issues, that she closely "monitored and disclosed leading indicators," and that the CWs knew that certain data and reports were sent directly to her for review. Mem. at 42.

[12] *See supra* note 10.

Such allegations do not support the conclusion that statements regarding Ms. Scott's "focus on" improving the Company were false when made.

The CWs' allegations also do not show that Defendants' alleged misstatement that Vestis was "focus[ed] on inventory management," FS11, was false when made. Again, the AC alleges that Vestis's focus on inventory management did not resolve its inventory problems, not that the Company was not focused on addressing its inventory issues. According to CW1, managers preferred to reuse existing stock rather than order new uniforms, AC ¶ 99. And as Lead Plaintiff alleges, [o]ne component of [the Company's] efficient operations strategy . . . aimed to reuse garments for products and reduce the issuance of new products." *Id.* ¶ 71. And while the CWs recalled that "significant product quality issues resulted from . . . the reuse initiative," *id.* ¶ 98, this allegation is insufficient to plausibly allege that Vestis was not "focused on" inventory management, because it does not show that Vestis "failed to do anything at all with respect to" its focus on improving inventory management, only that again, the Company's efforts proved unsuccessful. *Lululemon Sec. Litig.*, 14 F. Supp. 3d at 580. Accordingly, Lead Plaintiff has also not adequately pleaded falsity as to this statement because it has not alleged that Vestis was not focused on inventory management, only that its efforts proved unsuccessful.

As another example, Lead Plaintiff has also not adequately pleaded that the statement that Vestis was "advancing [it]s strategic plan" was false when made. FS1. Lead Plaintiff alleges that, leading up to the Class Period, Vestis outlined a strategic plan to accelerate growth, which included four targeted areas of improvement and specific action items for each area. AC ¶¶ 67–73 ("The strategic plan sought to provide: (i) high quality revenue growth, (ii) efficient operations, (iii) disciplined capital allocation, and (iv) a performance-driven culture."). But because Lead Plaintiff does not allege that Vestis failed to advance the strategic plan, merely that advancements did not

resolve the Company's problems, it has not adequately pleaded falsity. *Lululemon Sec. Litig.*, 14 F. Supp. 3d at 580.

For instance, several action items of Vestis's "strategic plan to accelerate growth," identified the need for increased reliance on data analytics and reporting to "trend customer behaviors" and to monitor "financial metrics," and "inventory." AC ¶¶ 67–73. Again, Lead Plaintiff does not allege that Vestis did not increase its reporting and monitoring of customer service and plant performance data. To the contrary, Lead Plaintiff's allegations are inconsistent with finding that the purported misstatement regarding the Company's advancement of its plans was false because Lead Plaintiff alleges that during the Class Period Vestis implemented "a new, twice daily process to manage and measure RSR cross-selling performance." *Id.* ¶ 232.

Another component of the strategic plan "involved creating a performance-driven-culture . . . [by] mobilizing [] employees to take great care of its customers, and cross-sell its base." Lead Plaintiff does not allege that Vestis failed to mobilize its employees "to take care of its customers." Rather, as Lead Plaintiff alleges, Ms. Scott personally met with Territory Managers to understand their concerns, led presentations designed to provide employees insight into the company's operations and to push for improved performance, and even personally oversaw training of RSRs. And as already noted, the CWs' statements show that Vestis had advanced its garment reuse initiative—one component of its plan to improve efficient operations—because the CWs state that the "reuse initiative" itself posed additional problems. *Id.* ¶ 98. As a result, these allegations are also insufficient to adequately plead falsity because they do not show that Vestis was not "advancing" its strategic plan.

And as Lead Plaintiff asserts, Vestis "adjusted policy" in response to its continued customer service and operational program throughout the Class Period—including through, among other newly implemented practices, its efforts to "develop[] a very robust . . . standard operating

procedure related to how to manage shortages" and by modifying Vestis's credit and contract deviation policy "to ensure more executive visibility." *Id.* ¶¶ 275, 279. Similarly, during Vestis's 3Q FY2024 earnings call, Ms. Scott identified a number of "strategic changes" Vestis had implemented, such as the formation of a "sales center of excellence," "a new exciting customer delivery notification system," and a new "dedicated customer experience team." Dkt. No. 47-8 at 5. Because Lead Plaintiff alleges that Vestis was adjusting policy and implementing new initiatives throughout the Class Period, the Court cannot conclude that the statement that Vestis was "advancing [its] strategic plan" is adequately pleaded to have been false when made.

In sum, Lead Plaintiff's assertion that Vestis was ultimately unable to turn things around is insufficient to demonstrate falsity as to the statements[13] describing how Vestis and its executives were "focused on" attempting to do so. And Lead Plaintiff's own allegations are consistent with the purported misstatements that Vestis was "advancing [its] strategic plan," "isolating" its customer service issues "by market center," "continue[d] to execute the strategy on cross-selling," and was "laser-focused on improving [] service levels." *See, e.g.*, FS1, FS6, F9, FS26. Accordingly, the Court cannot conclude that Lead Plaintiff has adequately pleaded falsity as to these statements.[14]

Nor are statements in this category[15] misleading by omission because Lead Plaintiff has not plausibly alleged an omission. Lead Plaintiff contends that these statements are misleading by omission because the statements "created a misimpression of business success . . . [that triggered] a duty to disclose . . . the rampant customer service issues that were impeding success." Dkt. No. 33-1. But the alleged omitted fact does not undermine these statements because, as discussed, the statements describe ongoing efforts; they are not promising successful efforts. Vestis can be "focused on" isolating and addressing its problems, even if its efforts proved unsuccessful. "Under

[13] *See supra* note 10.
[14] *See supra* note 10.
[15] *See supra* note 10.

plaintiffs' theory, if a defendant made the statement 'we have (or intend, or hope, or need, or are trying) to do X,' defendant would actually be representing that it has achieved X. Logically, such a leap is unsound." *In re N. Telecom Ltd. Sec. Litig.*, No. 93 CIV. 4384, 1994 WL 455534, at *6 (S.D.N.Y. Aug. 22, 1994). In any event, a reasonable investor would not understand these statements to suggest that Vestis had eliminated its customer service problems because Vestis disclosed the problems to the market on the first day of the Class Period and had only recently begun efforts to course correct. *See id.* ¶ 79. Accordingly, the statements are also not misleading by omission.

Second, some[16] of the Challenged Statements are not actionable because Lead Plaintiff's contention that they are false and misleading divorces the statements from the context in which they were presented. The Court has reviewed these statements in context and concludes that they are inactionable[17] because Lead Plaintiff cherry-picks portions of the statements from context to argue

---

[16] The Challenged Statements that are not alleged to have been false when read in context are: FS2 ("Retention is moving back in the right direction."); FS2 ("[W]e already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers."); FS3 ("Our cross-sell logistics and operations initiatives are driving results."); FS5 ("Many of our customers are still having a great experience because we're cross-selling them and we're having great success gaining some more penetration."); FS14 ("[W]e're making great progress."); FS14 ("So ensuring all the plants have enough buffer stock and that we're ordering on time and we're delivering on time and that, that product is available for customers."); FS15 ("We are very pleased with the work they're doing to cross-sell. . . . So we're very pleased."); FS15 ("[S]o we feel very good that we can continue to accelerate sales with that team."); FS22 ("We continue to drive efficiencies across our operations, and we remain highly focused on elevating our customers' experience."); FS23 ("[W]e also continued to deliver strong results from route sales."); FS25 ("[W]e are seeing continued success with our efficient operations initiatives."); FS33 ("I believe in our sequential revenue guidance because of the new customers we're winning . . . our growth with existing customers."); FS34 ("To recap, a lot is working well at Vestis. Churn is in line with our expectations. Field sales productivity is ramping nicely."); FS36 ("The increase during the quarter is to position the right inventory in our facilities to support growth as we prepare for several large installs."); FS38 ("So we're generating saving and productivity from being more efficient from a logistics perspective."); FS39 ("So overall, we are seeing continued improvement in the customer experience, and we can see that daily in the reduction of service requests related to these key focus areas."); FS39 ("[W]e're seeing great success cross-selling our existing customers multiple products and services."); FS39 ("And that is also a great indicator that our customers are having a good experience because they're choosing to buy more from Vestis."); FS40 ("We are definitely seeing that, that body of work is making a difference, and we are seeing improvements in service requests and our customers are responding very positively to the work that we are doing to take great care of them. So I would point to that as the key reason around why our customers are staying."); FS41 ("[W]e are actually seeing a step change in improvement related to shortages."); FS41 ("We're also seeing an improvement related to shortages for those who have mastered the on-time delivery and the notification."); FS41("So we feel really good about where we are related to the customer experience.").

[17] There is some overlap between the statements for which Lead Plaintiff has not adequately pleaded falsity and statements that are inactionable puffery or statements of opinion. Some of the statements that are inactionable because

that the statements were false when made. And in taking the statements out of context to assert falsity Lead Plaintiff either: (1) ignores the accurate historical data underlying the statements that Defendants disclosed in tandem with the statements; or (2) distorts the statements' plain meaning. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171.

Some of these statements[18] are not alleged to have been false because the statements merely comment on or convey accurate historical data that was disclosed in tandem with the statements. "It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012) (summary order) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997)); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) ("The seven 6-Ks . . . are not actionable as a matter of law because they are simply accurate statements of past earnings and growth."). Statements regarding the Company's "great progress" in cross-selling[19] are not plausibly pleaded to have been false because the statements are premised on accurate historical data and Lead Plaintiff does not contend that the underlying data was false or otherwise fabricated—"[t]here is no allegation that [Defendants] failed to accurately report any of [the] [] figures." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 404. Rather, as Defendants contend, when making these statements, Vestis "disclosed in tandem" the historical data underlying such "great progress." Mem. at 24.

they are not alleged to have been false when made, *see supra* note 9, are also inactionable because they are either puffery or statements of opinion that are not misleading by omission, as analyzed below.

[18] *See supra* note 16.

[19] *See also, e.g.*, FS2 ("[W]e already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers."); FS5 ("Many of our customers are still having a great experience because we're cross-selling them."); FS15 ("We are very pleased with the work they're doing to cross-sell. . . . So we're very pleased."); FS15 ("[S]o we feel very good that we can continue to accelerate sales with that team."); FS23 ("[W]e also continued to deliver strong results from route sales."); FS34 ("Field sales productivity is ramping nicely."); FS39 ("[W]e're seeing great success cross-selling our existing customers multiple products and services."); FS39 ("And that is also a great indicator that our customers are having a good experience because they're choosing to buy more from Vestis.").

For example, Lead Plaintiff has not adequately pleaded that Ms. Scott's statement "we also continued to deliver strong[20] results from route sales," FS23, was false when made because immediately following the statement she identified the underlying data—that Vestis's "route sales increased approximately 50% in fiscal 2024 and added more than 100 basis points of in-year revenue growth at high margin flow." *Id.* She also stated that Vestis had "sustained this momentum into 2025, with route sales continuing to grow more than 50% on a year-to-date basis." *Id.* Importantly, Lead Plaintiff does not contend that Vestis's route sales did not increase by approximately 50% or that Vestis did not actually add more than 100 basis points of in-year revenue growth. Instead, Lead Plaintiff contends that Ms. Scott's statement was false when made based on CW1's statements.

However, CW1's statements do not support the contention that Ms. Scott's statement that the Company delivered "strong results from route sales," was false when made. According to CW1, some unspecified number of RSRs, faced with irate customers "yelling" at them for product shortages, had largely abandoned attempting to cross-sell new products to Vestis's existing customers. *Id.* ¶¶ 123–24. CW1's account of what some RSRs were doing is not corroborated by any of the other CWs. CW1's statement that some unnamed and unspecified numbers of RSRs in CW's territory, the Southeast United States, is insufficient to plead falsity as to this statement because CW1's statement does not show that a significant number of RSRs were not delivering strong results. In fact, that other RSRs were successfully cross-selling is supported by the 50% increase and the addition of more than 100 basis points of in-year revenue growth resulting from their efforts, as Ms. Scott stated. *Id.* ¶ 38. Because Lead Plaintiff has not alleged that the data underlying the statement was false, Lead Plaintiff has not adequately pleaded that this statement was false when made.

[20] *See supra* note 17.

As another example, Ms. Scott's statement that "[m]any[21] of our customers are still having a great experience because we're cross-selling them, and we're having great success gaining more penetration," FS5, is not plausibly pleaded to have been false or misleading when made for substantially the same reason—because the statement is premised on "accurate historical data" which Ms. Scott outlined earlier during that same earnings call. *Boca Raton Firefighters*, 506 F. App'x at 39 (summary order) (internal quotations omitted); *see also* FS2 ("[W]e already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers."[22]). Earlier in the call, Ms. Scott explained that Vestis's strategy to cross-sell additional products and services to existing customers . . . is progressing well and ahead of plan. . . . Sales per RSR are up approximately 100% versus prior year, and we've seen a 20% increase in the number of routes with sales activity." Dkt. No. 47-2 at 6. And she explained that Vestis "delivered 700 basis points of revenue growth from new business." *Id.*

Again, Lead Plaintiff does not allege that sales per RSR had not improved, that Vestis did not actually see a 20% increase in the number of routes with sales, or that Vestis did not deliver 700 basis points in revenue from new customers. And as noted above, CW1's statement that some unnamed, unspecified number of RSRs who CW1 spoke to indicated that they had stopped cross-

---

[21] Lead Plaintiff has not adequately pleaded falsity as to this statement for an additional and independent reason—because Lead Plaintiff does not allege that each and every one of Vestis's customers had a bad experience with Vestis. Accordingly, this statement, FS5, presents a denominator problem because "many" does not mean all, or even "most." *See Many*, Merriam Webster https://www.merriam-webster.com/dictionary/many (last visited July 11, 2026) (defining "many" as "being one of a large but *indefinite* number" (emphasis added)).

[22] Lead Plaintiff has also failed to allege falsity as to this statement for an additional and independent reason—because the statement is referencing cross-selling to a subset of Vestis's customers, its "satisfied and loyal customers." FS2. Vestis's "satisfied and loyal customers," FS2, are not among the subset of "angry," AC ¶¶ 123–24, customers, that according to CW1, some unnamed and unspecified number of RSRs in CW1's region elected not to cross-sell to. In any event, this statement is inactionable puffery. *See supra* note 17. And Ms. Scott's statement that "[w]e're also seeing an improvement related to shortages *for those who have mastered the on-time delivery and notification*" is also not alleged to have been false when made for substantially the same reason; the statement references a subset of the Company's employees. FS41 (emphasis added). This statement, too, refers to an improvement in shortages Ms. Scott observed amongst a subset of Vestis's employees: employees "who have mastered the on-time delivery and notification" system that Vestis implemented as part of its strategic plan. And Lead Plaintiff has not alleged falsity as to this particular subset of Vestis employees.

selling when faced with angry customers does not undermine the historical data underlying the statement, which suggests that other RSRs had not stopped cross-selling. Accordingly, Lead Plaintiff has not adequately pleaded that this statement was false when made.

Lead Plaintiff argues that these statements, even if literally true, were nonetheless misleading by omission because "Defendants created a misimpression of the success of Vestis's business," which obligated Vestis to disclose information regarding its "rampant customer service issues." *See, e.g.*, Dkt. No. 33-1 at FS1. Lead Plaintiff's argument is not persuasive for two principal reasons. First, because, as noted and as described below, some[23] of these statements are inactionable for an independent reason—because they are puffery. That some of the statements are alleged to have omitted facts as to Vestis's "rampant customer service issues" "does not cure their generality." *In re Norfolk S. Corp. Bond/note Sec. Litig.*, No. 25-739, 2026 WL 555420, at *2 (2d Cir. Feb. 27, 2026) (summary order).

And second, "[a] defendant does not put specific issues underlying its performance 'in play' simply by providing accurate information about its financial performance." *In re Norfolk S. Corp. Bond/Note Sec. Litig.*, No. 23-CV-4068, 2025 WL 641089, at *5 (S.D.N.Y. Feb. 27, 2025), *aff'd sub nom. In re Norfolk S. Corp. Bond/note Sec. Litig.*, 2026 WL 555420 (citing *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272–73 (S.D.N.Y. 2021) (concluding that quantitative and qualitative statements regarding the company's fourth quarter financial results did not trigger an obligation to disclose specific information about the company's deteriorating financial condition)). Because Defendants' "mere reporting of accurate financial metrics . . . did not trigger a duty to disclose" the

---

[23] *See supra* note 17. *See also e.g.*, FS2 ("[W]e already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers."); FS5 ("Many of our customers are still having a great experience because we're cross-selling them and we're having great success gaining some more penetration."); FS22 ("We continue to drive efficiencies across our operations, and we remain highly focused on elevating our customers' experience."); FS23 ("[W]e also continued to deliver strong results from route sales.").

specific customer service issues that Lead Plaintiff identifies as persisting throughout the Class Period, these statements[24] are also not misleading by omission. *Id.*

Here, the statements[25] accurately describing Vestis's success in increasing cross-selling to existing customers did not obligate Defendants to make additional disclosures with respect to Vestis's customer service issues because a reasonable investor would not understand these statements to imply facts about metrics other than cross-selling. Lead Plaintiff does not contend that Vestis was under an affirmative duty to disclose its continued customer service problems. And a reasonable investor would not understand those statements to imply anything about customer service because the subject matter of the statements—success in cross-selling—is not related "closely enough to the allegedly omitted information" about other customer service metrics "such that a reasonable investor might have drawn inferences" about those metrics. *Buhrke Fam. Revocable Tr. v. U.S. Bancorp,* 726 F. Supp. 3d 315, 340 (S.D.N.Y. 2024). "Each of th[e]se statements were nothing more than accurate descriptions of the growth" in cross-selling to Vestis's existing customers; a reasonable investor would not understand these statements to imply that other customer service metrics were also improving. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 404 (concluding that accurate statements describing the growth of diabetes products sales were not actionable as omissions because "the omission of the alleged illegal marketing is not 'sufficiently connected to defendants' existing disclosures'"). Accordingly, accurate statements reporting on Vestis's growth with respect to cross-selling to its existing customers are not actionable as omissions because the statements did not trigger an obligation for Defendants to speak regarding the subject of customer service problems more broadly. *In re Norfolk S. Corp. Bond/Note Sec. Litig.*, 2025 WL 641089, at *5.

---

[24] *See supra* notes 16 & 19.
[25] *See supra* note 19.

Likewise, Lead Plaintiff has not adequately pleaded falsity as to some[26] of the Challenged Statements because Lead Plaintiff divorces the statements from the context in which they appear and in doing so, distorts the statements' plain meaning. But Lead Plaintiff "may not cherry pick certain public statements for [the] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171. A reasonable investor would not understand these statements, in context, to suggest that Vestis was improving all its problems across the Company. For example, Lead Plaintiff contends that Ms. Scott's statement "we're making great progress," FS14, was false or misleading because "Vestis was not 'making great progress' with 'improv[ing] on-time delivery[,]' 'loading processes and load shortages[,]' or 'service levels.'" Dkt. No. 33-1 at FS14. But that is not what Ms. Scott said. To achieve this tortured conclusion, Lead Plaintiff selectively quotes both Ms. Scott and the call of the question to create a Frankenstein-esque statement. But Ms. Scott's statement did not include the terms "'improv[ing] on-time delivery[,]' 'loading processes and load shortages[,]' or 'service levels,'" at all; those phrases were mentioned by the questioner. Read in its proper context, a reasonable investor would not understand Ms. Scott's statement to suggest that Vestis had made progress toward fixing its problems.

Rather, relevant context makes clear that Lead Plaintiff misstates Ms. Scott's answer to suggest that she incorporated language from the call of the question, when in fact, her answer specifically disclaimed commenting on whether Vestis had seen improvements to the metrics identified by the questioner. Ms. Scott explicitly noted that "it was too early" to talk about changes in customer service metrics—"So we've done a lot of work around this. *It's too early to start talking about step change in metrics yet because we've just been working diligently on implementing these new processes* over the last quarter, but we're making great progress." *Id.* (emphasis added). In contrast to Lead

[26] *See supra* note 16.

Plaintiff's contention that Ms. Scott represented that Vestis was seeing these metrics improve, her answer emphasized caution, as she had repeatedly done throughout that same earnings call. *Id.* And context makes clear that Ms. Scott's reference to "great progress" was referring to Vestis's diligent work in "implementing these new processes" in order to eventually see a change in its customer service metrics, not progress in achieving a change in the metrics identified by the questioner, upon which she specifically disclaimed commenting. As a result, Lead Plaintiff has not adequately pleaded that this statement was false when made because a reasonable investor would not understand Ms. Scott to be suggesting that Vestis had seen improvements to the metrics identified by the question.

Likewise, Lead Plaintiff had also not adequately pleaded that Ms. Scott's statement "[s]o ensuring all the plants have enough buffer stock and that we're ordering on time and we're delivering on time and that, that product is available for customers," was false when made when the statement is considered in context. FS14. Importantly, Lead Plaintiff omits the immediately preceding and following sentences, which clarify that Ms. Scott was discussing the job functions of one particular employee—Vestis's "logistics leader." The full context in which the statement appears is as follows—

> Lastly and most importantly though, we've moved the leadership of this responsibility under our logistics leader, who you just heard me mentioned is having really great success with the initiatives he's driving on optimization, and he's now taken ownership for all of what we call tactical inventory. So ensuring all the plants have enough buffer stock and that we're ordering on time and we're delivering on time and that, that product is available for customers. And he's bringing a whole another level of sophistication and metrics and data-based execution to this area of shortages and on-time delivery.

*Id.* Context makes clear that Ms. Scott was not suggesting that *Vestis* was "ensuring" that challenges as to buffer stock, on-time deliveries, or product shortages were addressed. Rather, Ms. Scott was clearly describing the reassignment of specific inventory responsibilities to Vestis's "*logistics leader*," whose job responsibilities included "ensuring all the plants have enough" buffer stock, and overseeing on-time ordering, on-time delivery, and product shortages. Accordingly, because Ms.

Scott was merely describing the job functions of one of Vestis's employees and not suggesting that the Company was taking on these responsibilities, this statement is not alleged to have been false when made. Lead Plaintiff's contention rests on a tortuous edit of Ms. Scott's statement that is contrary to its plain meaning.

As another example, Lead Plaintiff has not adequately pleaded that Ms. Scott's statement "we are actually seeing a step change in improvement related to shortages," was false when made because here too, Lead Plaintiff divorces the statement from context to distort its plain meaning. FS41. Lead Plaintiff omits the first half of Ms. Scott's statement, in which she cabins her commentary to a particular subset of Vestis's plants piloting a new operating procedure—"*in the locations that have been using that standard operating procedure for an extended period of time*, we are actually seeing a step change in improvement related to shortages." *Id.* (emphasis added). While Lead Plaintiff contends that "Defendants had not 'rolled out a very robust standard operating procedure,'" Dkt. No. 33-1 at FS41, Lead Plaintiff does not allege facts to support that Ms. Scott's statement was false as to those pilot locations implementing Vestis's new operating procedure. The CWs do not speak to Vestis's new standard operating procedure, nor do any of the CWs state that they worked at the "locations that have been using that standard operating procedure." As a result, Lead Plaintiff has not adequately pleaded that this statement was false when made.

By contrast, Lead Plaintiff has adequately pleaded that three[27] of the Challenged Statements—the statements asserting that, in context, Vestis had "made great progress in terms of" improving its customer service problems and that "operating trends [were] improving across" the entire Company without qualification—were false when made because the statements are

[27] The Challenged Statements that Lead Plaintiff has plausibly alleged were false or misleading when made are: FS1 ("[O]perating trends are improving across our business."); FS28 ("[W]e're seeing the level of performance rise across the system with particular focus on those locations that are underperforming versus the norm."); FS28 ("We're seeing that happen on-time delivery already.").

contradicted by the CWs' particularized allegations. These three statements were not mere promises that Vestis was working toward effectuating improvements in customer service and efficient operations. Rather, a reasonable investor could understand these three statements as representations that Vestis had achieved improvements across the Company.

Lead Plaintiff has adequately pleaded that Ms. Scott's statement "operating trends are improving across our business" was false when made because a reasonable investor could understand this statement to mean that Vestis had improved its operations wholesale and on a company-wide basis. This statement is contradicted by the CWs' particularized allegations that Vestis's operational inefficiencies persisted throughout the Class Period—that Vestis's operations "never got better," AC ¶ 89—across the Company. And this statement is not otherwise qualified or limited in context. Accordingly, because a reasonable investor could understand this statement to suggest company-wide improvements to all aspects of Vestis's operations, and because such a suggestion is contracted by the CWs' statements, Lead Plaintiff has adequately pleaded that the statement was false when made.

And Lead Plaintiff has adequately pleaded that Ms. Scott's statements that "we're seeing the level of performance rise across the system with particular focus on those locations that are underperforming versus the norm," and "[w]e're seeing that happen [with] on-time delivery already," FS28, were false or misleading when made. Earlier in the same earnings call, Ms. Scott discussed "a new on-time delivery notification and measurement system that will allow us to better measure and manage our delivery performance," that Vestis had recently implemented at a "pilot location," and the customer service improvements she had seen at that pilot location. Dkt. No. 47-8 at 6. But Ms. Scott did not limit these two statements to improvements seen at Vestis's pilot location. Rather, a reasonable investor could understand these statements to mean that Vestis was seeing improvements

with respect to customer service and on-time delivery "across the system," including at "underperforming" locations. FS28.

Lead Plaintiff's proffer that reasonable investors would understand these two statements as referencing improvements "across the whole organization," Dkt. No. 33-1 at FS28, is also supported by Ms. Scott's additional statements in response to the same question. Ms. Scott stated that "[s]o pockets of outstanding performance, pockets of opportunity[] [a]nd across the system, the whole system is rising and the level of play is getting stronger."[28] FS28. Here, again, Ms. Scott did not limit her claims of improvement to either the "pockets of outstanding performance," or the "pockets of opportunity." Because she reiterated that "the whole system is rising," Lead Plaintiff has plausibly pleaded that a reasonable investor would understand her two statements as referring to Company-wide improvements with respect to customer service and on-time delivery.

And Ms. Scott's claims that she saw improvements to customer service and on-time delivery "across the entire system" are contradicted by the CWs' accounts. The CWs allege with particularity that Vestis's customer service issues generally, and on-time delivery specifically, "never g[o]t better"—that the Company's customer service problems began before and persisted throughout the Class Period without improvement, resulting in continued customer dissatisfaction and attrition. AC ¶ 89. As a result, Lead Plaintiff has adequately pleaded that these two statements were false when made.

#### iii. Some, But Not All, of the Challenged Statements Are Inactionable Opinion Statements or Puffery

[28] Lead Plaintiff also asserts that this statement was false and misleading when made. This statement, however, is not independently actionable, as described below, because it is puffery.

Some[29] of the statements alleged to have been false or misleading are not actionable because they are either puffery or are statements of opinion[30] which are not rendered misleading either by the

[29] The Challenged Statements that are nonactionable because they are either puffery or non-misleading opinion statements (or both) are: FS1 ("We are advancing our strategic plan, particularly in . . . customer penetration through cross-selling on routes."); FS2 ("[W]e already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers."); FS3 ("We are building on our customer-first culture, by improving our service efficacy in order to strengthen customer loyalty and improve retention rates."); FS3 ("Our cross-sell logistics and operations initiatives are driving results."); FS4 ("[O]ur teammates are serving our customers really well as it relates to the relationship and the experience."); FS4 ("So we feel very confident that we've isolated these challenges and opportunities, and we have very clear, deliberate actions around specific things like on-time delivery and stopping shortages and delivery full loads to customers."); FS5 ("Many of our customers are still having a great experience because we're cross-selling them and we're having great success gaining some more penetration."); FS6 ("[W]e are . . . making sure that we are addressing procedural gaps and improving procedures by location where we have shortcomings related to service."); FS9 ("We are laser-focused on improving our service levels above and beyond what we have historically delivered as we build a truly differentiated experience for our customers."); FS10 ("[W]e have made great progress in terms of . . . improving our service levels."); FS11 ("We continue our focus on inventory management through . . . operations planning . . . as we focus on having the right inventories in our distribution centers and operating centers to support growth."); FS12 ("And that's why we've been heavily focused on stabilizing lost business, and we continue to focus on that because the single best and easiest lever to pull for growth is just to hold on to more customers than you did before. And so our focus right now is let's protect our base. Let's make sure that we are putting a lot of energy around delivering an outstanding customer experience so that we can protect what we already have, and that's lever #1."); FS14 ("[B]ut we feel outstanding about the progress we've made since we spoke with your last quarter in terms of mobilizing around these opportunities."); FS13 ("So we are very pleased. . . . [W]e are very pleased with the progress that we're making around efficient operations."); FS14 ("[W]e're making great progress."); FS15 ("We are very pleased with the work they're doing to cross-sell. . . . So we're very pleased."); FS15 ("[S]o we feel very good that we can continue to accelerate sales with that team."); FS18 ("I am excited about the commercial momentum that is building across Vestis, the progress we are making executing against our efficient operations initiatives, and the way our organization has embraced our mission to deliver a best-in-class customer experience."); FS21 ("We are confident in our ability to deliver against our 2025 commitments."); FS22 ("We continue to drive efficiencies across our operations, and we remain highly focused on elevating our customers' experience."); FS22 ("We are committed to achieving best-in-class performance related to retention, sales and margins, and I'm encouraged by what we're beginning to see."); FS23 ("[W]e also continued to deliver strong results from route sales."); FS24 ("We remain laser-focused on delivering a best-in-class customer experience that will support retaining and growing with our existing customers."); FS25 ("[W]e are building a customer-centric culture with a keen recognition of the important of delivering an outstanding customer experience in order to frow the lifetime value of our customer base."); FS27 ("[W]e feel very confident we have done through our service initiatives and the work that we have done to put our customer first."); FS28 ("And across the system, the whole system is rising and the level of play is getting stronger. So I would just say we're going to continuously improve across the board, and we're doing that."); FS33 ("I believe in our sequential revenue guidance because of the new customers we're winning . . . our growth with existing customers."); FS34 ("To recap, a lot is working well at Vestis. Churn is in line with our expectations."); FS35 ("So we're very pleased that we expect to see that shift, and we'll start to see positive volume growth in the system."); FS35 ("[W]e're very pleased to see the fruits of our labor around improving the customer experience."); FS36 ("We continue to focus on inventory management through sales and operations."); FS37 ("[W]e feel really confident that we've gained a great deal of traction in terms of improving the customer experience."); FS39 ("And I'm really proud to say that we are reducing those service requests related to those key Pareto bars in those key areas around on-time delivery and shortages."); FS40 ("And so we have been hyper focused as a team on really driving a delightful experience for our customers from on-time performance to rolling out standard operating procedures to improve shortages and to make sure our customers get everything they want the first time that it's delivered and its really shifting our team's focus around delighting the customer."); FS41 ("And so we have rolled out a

omission of information about the extent of the Company's lack of improvement with respect to its continued poor customer service and operational failings or because the opinion statement lacked a reasonable basis.

First, some,[31] but not all, of the Challenged Statements are inactionable puffery—"they convey[] no meaningful, objective data that an investor would rely upon." *Ray v. StoneCo Ltd.*, 2024

very robust standard operating procedure."); FS41("So we feel really good about where we are related to the customer experience.").

[30] There is substantial overlap between the statements that are inactionable as puffery and the statements that are inactionable opinion statements. *Compare infra*, note 31 *with, infra*, note 32. Some of the statements that the Court has analyzed as opinions, *infra*, note 32, the Court has also analyzed as puffery, *infra*, note 31, and concludes that the statements are inactionable on both grounds.

[31] The following challenged statements are inactionable puffery: FS1 ("We are advancing our strategic plan, particularly in . . . customer penetration through cross-selling on routes."); FS2 ("[W]e already see the great progress we are making to cross-sell and gain penetration with our satisfied and loyal customers."); FS3 ("We are building on our customer-first culture, by improving our service efficacy in order to strengthen customer loyalty and improve retention rates."); FS3 ("Our cross-sell logistics and operations initiatives are driving results."); FS4 ("[O]ur teammates are serving our customers really well as it relates to the relationship and the experience."); FS5 ("Many of our customers are still having a great experience because we're cross-selling them and we're having great success gaining some more penetration."); FS6 ("[W]e are . . . making sure that we are addressing procedural gaps and improving procedures by location where we have shortcomings related to service."); FS9 ("We are laser-focused on improving our service levels above and beyond what we have historically delivered as we build a truly differentiated experience for our customers."); FS10 ("[W]e have made great progress in terms of . . . improving our service levels."); FS11 ("We continue our focus on inventory management through . . . operations planning . . . as we focus on having the right inventories in our distribution centers and operating centers to support growth."); FS12 ("And that's why we've been heavily focused on stabilizing lost business, and we continue to focus on that because the single best and easiest lever to pull for growth is just to hold on to more customers than you did before. And so our focus right now is let's protect our base. Let's make sure that we are putting a lot of energy around delivering an outstanding customer experience so that we can protect what we already have, and that's lever #1."); FS14 ("[B]ut we feel outstanding about the progress we've made since we spoke with your last quarter in terms of mobilizing around these opportunities."); FS14 ("[W]e're making great progress."); FS15 ("We are very pleased with the work they're doing to cross-sell. . . . So we're very pleased."); FS15 ("[S]o we feel very good that we can continue to accelerate sales with that team."); FS18 ("I am excited about the commercial momentum that is building across Vestis, the progress we are making executing against our efficient operations initiatives, and the way our organization has embraced our mission to deliver a best-in-class customer experience."); FS22 ("We continue to drive efficiencies across our operations, and we remain highly focused on elevating our customers' experience."); FS22 ("We are committed to achieving best-in-class performance related to retention, sales and margins, and I'm encouraged by what we're beginning to see."); FS23 ("[W]e also continued to deliver strong results from route sales."); FS24 ("We remain laser-focused on delivering a best-in-class customer experience that will support retaining and growing with our existing customers."); FS25 ("[W]e are building a customer-centric culture with a keen recognition of the important of delivering an outstanding customer experience in order to frow the lifetime value of our customer base."); FS27 ("[W]e feel very confident we have done through our service initiatives and the work that we have done to put our customer first."); FS28 ("And across the system, the whole system is rising and the level of play is getting stronger. So I would just say we're going to continuously improve across the board, and we're doing that."); FS34 ("To recap, a lot is working well at Vestis. Churn is in line with our expectations. Field sales productivity is ramping nicely."); FS35 ("So we're very pleased that we expect to see that shift, and we'll start to see positive volume growth in the system."); FS35 ("[W]e're very pleased to see the fruits of our labor around improving the customer experience."); FS36 ("We continue to focus on inventory management through sales and operations."); FS37 ("[W]e feel really confident that we've gained a great deal of traction in terms of improving the customer experience."); FS40 ("And so we have been hyper focused as a team on really driving a delightful experience for our customers from on-time performance to rolling out standard operating procedures to improve shortages and to make sure our customers get everything they want the first time that it's

WL 4308130 at *9 (internal quotation omitted) (quoting *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569–70 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019)). Read in context, the descriptive terms used in these statements, such as "great progress," "customer-first," "truly differentiated," "best-in-class," "customer-centric," "delightful," "strong," and "robust" are largely "neither quantifiable nor factual, but rather subject to interpretation, within reason"—and the statements are therefore, not actionable." *Saskatchewan Healthcare Emps.' Pension Fund*, 718 F. Supp. 3d at 385 (internal quotations and citation omitted); *see also, e.g.*, *In re Vroom, Inc. Sec. Litig.*, No. 21 CIV. 2477, 2025 WL 862125, at *26 (S.D.N.Y. Mar. 18, 2025) (statements regarding "exceptional" customer support and experience and "delighted customer[s]" were inactionable puffery); *Ray v. StoneCo Ltd.*, 2024 WL 4308130, at *9 (concluding that characterizations of returns as "healthy" and "strong" were "inactionable puffery"); *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 408 (concluding that characterizations of study methodology as "unique in . . . completeness and transparency," "the best science," and "very advanced" "are precisely the type of puffery that [we] have consistently held to be inactionable"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (concluding that statements that the compliance program was "robust" or "best-of-class" were inactionable puffery).

And the descriptive terms used in these statements merely describe Vestis's business in vaguely positive terms and without any objective referent for the positive terms, such as the references to Vestis's goal to build a "best-in-class," "customer-first," "outstanding," and "truly differentiated" customer service experience: these statements do not include any objective benchmark against which such vaguely positive and subjective terms are to be measured. Because these descriptive terms, read in the context in which they appear, lack an objective referent, for this

---

delivered and its really shifting our team's focus around delighting the customer."); FS41 ("And so we have rolled out a very robust standard operating procedure."); FS41("So we feel really good about where we are related to the customer experience.").

reason too, they are not "determinate and verifiable," and as a result, they are not the type of statements upon which a reasonable investor would rely. *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418; *In re Synchrony Fin. Sec. Litig.,* 988 F.3d at 171. *Cf. Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 227–28 (S.D.N.Y. 2023); *Baxter v. MongoDB, Inc.*, No. 1:24-CV-5191, 2026 WL 1192420, at *21 (S.D.N.Y. Apr. 30, 2026) (concluding that some uses of the terms "stable" and "steady" were not puffery in context because the terms had an objective referent against which to measure whether, namely "prior consumption rate data.").

Next, generic statements describing how Vestis is "building on [its] customer-first culture," is "laser-focused on improving [] service levels above and beyond," is "heavily focused on stabilizing lost business," is "mobilizing around opportunities," and is "mak[ing] sure that [it is] putting a lot of energy into" improving customer experience, are also inactionable puffery. Such statements are nothing more than "aspirational generalization[s]"; they are not the types of statements upon which a reasonable investor would rely. *Baxter v. MongoDB, Inc.*, No. 1:24-CV-5191, 2026 WL 1192420, at *22 ("[S]tatements generically describing how MongoDB is 'innovating both on the product and go-to-market dimensions to accelerate workload acquisition,' is 'focused on what [it] can control,' and is spending a 'tremendous amount of time focusing on' workload acquisition are also inactionable puffery." (internal citations omitted)); *see also In re Vale S.A. Sec. Litig.*, 2017 WL 1102666 at *22 (concluding that statements as to what the defendant was "focused on" and "aiming to do" are inactionable "aspirational generalizations"); *Diabat v. Credit Suisse Grp. AG*, No. 23 CIV. 5874, 2024 WL 4252502, at *84 (S.D.N.Y. Sept. 19, 2024) (statement as to company's "focus[] on the execution of [its] strategic plan" was inactionable puffery); *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 368 (S.D.N.Y. 2021) ("The statement that Uber 'aim[s] to go above and beyond local requirements to ensure your conform and safety' is also aspirations puffery.").

The language included in these statements that Vestis is "focused on" and variations thereof and is "mak[ing] sure that [it] is," "suggests a company actively working to improve . . . rather than one expressing confidence in their complete (or even substantial) effectiveness." *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019); *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 183 (statements "with qualifiers such as 'aims to,' 'wants to,' and 'should'" are puffery because they are "explicitly aspirational"). Lead Plaintiff argues that these statements "were knowingly and verifiably false when made," because Vestis knew it was not improving aspects of its operations and customer service, but this "does not cure their generality." *In re Norfolk S. Corp. Bond/note Sec. Litig.*, 2026 WL 555420, at *2 (summary order). As a result, they are not actionable.

And statements such as "[o]ur cross-sell logistics and operations are driving results," that Vestis "feels outstanding about the progress [it has] made . . . in terms of mobilizing around opportunities," is pleased with "work . . . to cross-sell" and confident in "the work . . . done to put [it]s customers first," is "excited about the commercial momentum that is building," has made "great progress . . . to cross-sell," and that it has "gained a great deal of traction in terms of improving the customer experience," simply "vaguely and enthusiastically describe [defendant's] performance and expectations of business success." *Xerox Corp.*, 300 F. Supp. at 569, *aff'd sub nom.* 771 F. App'x 51. These statements too are not the type of statements upon which a reasonable investor would rely. *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368 (E.D.N.Y. 2024) (concluding that "Our better-than-expected growth in Q1" was inactionable puffery); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 364 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020) (concluding that the statement "demand keeps growing" is inactionable puffery). And these statements are mere "general statements of optimism"; they are too non-specific for a reasonable investor to rely upon. *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund*, 704 F. Supp. 3d at 445.

"[E]xpressions of . . . corporate optimism do not give rise to securities violations[] [because] [u]p to a point, companies must be permitted to operate with a hopeful outlook." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170 (quoting *Rombach*, 355 F.3d at 174). Indeed, even "misguided optimism is not a cause of action." *Shields*, 25 F.3d at 1129 (quoting *Denny*, 576 F.2d at 470).

Next, some,[32] but not all, of the Challenged Statements are inactionable statements of opinion. These statements are clearly signaled as statements of opinion because they include "qualifying language . . . that conveys a lack of certainty about the thing being expressed[] [and] marks the statement as reflecting the speaker's impression or point of view rather than an objective truth." *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 40–41 (quoting *Omnicare*, 575 U.S. at 183–84). Lead Plaintiff challenges a number of statements that include qualifying language clearly signaling that the statements are expressions of opinion. Among them statements in which the Individual Defendants expressed, for example, that they "feel confident," "feel outstanding about the [] progress made," that they were "very pleased with" and "proud of" efforts to reduce service requests, and that they "believe[d] in [Vestis's] revenue guidance."

Likewise, some of the statements are opinions because they reflect subjective judgments that are not objectively determinable. *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757–

[32] The Challenged Statements which are inactionable statements of opinion are: FS4 ("So we *feel* very confident that we've isolated these challenges and opportunities, and we have very clear, deliberate actions around specific things like on-time delivery and stopping shortages and delivery full loads to customers."); FS13 ("So we are very *pleased*. . . . [W]e are very *pleased* with the progress that we're making around efficient operations); FS14 ("[B]ut we *feel* outstanding about the progress we've made since we spoke with your last quarter in terms of mobilizing around these opportunities."); FS15 ("We are very *pleased* with the work they're doing to cross-sell. . . . So we're very *pleased*."); FS15 ("[S]o we *feel* very good that we can continue to accelerate sales with that team."); FS18 ("I am *excited* about the commercial momentum that is building across Vestis, the progress we are making executing against our efficient operations initiatives, and the way our organization has embraced our mission to deliver a best-in-class customer experience."); FS21 ("We *are confident* in our ability to deliver against our 2025 commitments."); FS27 ("[W]e *feel* very confident we have done through our service initiatives and the work that we have done to put our customer first."); FS33 ("I *believe* in our sequential revenue guidance because of the new customers we're winning . . . our growth with existing customers."); FS35 ("So we're very *pleased* that we expect to see that shift, and we'll start to see positive volume growth in the system."); FS35 ("[W]e're very *pleased* to see the fruits of our labor around improving the customer experience."); FS39 ("And I'm really *proud* to say that we are reducing those service requests related to those key Pareto bars in those key areas around on-time delivery and shortages."); FS41("So we *feel* really good about where we are related to the customer experience.").

58 (S.D.N.Y. 2018). For instance, statements expressing that Vestis "feel[s] very confident that" and "feel[s] outstanding about" its ability to "isolate [] challenges and opportunities" and to "mobilize around these opportunities, is "pleased with" work that its employees are doing to cross-sell to existing customers, is "excited about the commercial momentum" at Vestis, and "believes in" Vestis's revenue guidance execute are prototypical nonactionable statements of opinion. These statements express subjective judgments about Vestis's ability to isolate challenges and operationalize its plans. *See e.g. In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170; *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 315 (S.D.N.Y. 2024) (concluding that statements that the team had "done a great job" of managing risks were inactionable as both puffery and opinions because they "express only a subjective state of mind" and because a reasonable investor would not understand them as conveying any "specific message").

Because statements in this category[33] are opinion statements, they are actionable only if "(1) the speaker did not hold the belief she professed, (2) the supporting facts she supplied were untrue, or (3) the speaker omitted information whose omission makes the statement misleading to a reasonable investor." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 43. Here, Lead Plaintiff argues that the opinion statements are actionable for three reasons: (1) because the statements "embedded false facts," (2) because Ms. Scott "did not hold the belief" she professed; and (3) because the statements omitted information as to the Company's ongoing customer service problems. Opp'n at 33–34. The Court addresses each argument in turn using exemplar statements highlighted in the parties' briefing.

First, Lead Plaintiff's argument that the opinion statements "embedded false facts" is not persuasive. This argument is not persuasive because as discussed extensively above with respect to falsity, Lead Plaintiff has not adequately pleaded that the embedded facts were false. For example,

[33] *See* supra note 32.

Lead Plaintiff argues that Ms. Scott's statement expressing confidence that Vestis had "isolated these challenges and opportunities," FS4, embedded false facts because Vestis's customer service problems did not improve.[34] *Id.* at 33. Again, a reasonable investor would not understand Ms. Scott's statement as promising successful efforts. And again, the AC alleges that Vestis's efforts were unsuccessful, not that it had failed to isolate its problems. Rather, as Lead Plaintiff alleges, during the Class Period, Ms. Scott "dug in quite deeply around why are customers choosing to leave Vestis," AC ¶ 239—she spent a significant amount of time "really digging in to understand the root causes of [] lost businesses," *id.* ¶ 237, and "very aggressively digging into reason codes related to the customer experience," *id.* ¶ 239.

As one more example, because Lead Plaintiff has not adequately pleaded that Ms. Scott's statement that she was "pleased with the progress that [Vestis] was making around efficient operations" embedded false facts, the statement is not an actionable opinion statement. FS13. Contrary to Lead Plaintiff's argument that Defendants "did not see progress at all," Opp'n at 33, Ms. Scott explained the basis for her opinion, which was limited to particular operational metrics.[35] Ms. Scott explained that Vestis was measuring its "efficient operations" progress "as it relates to the

[34] Lead Plaintiff also identifies Ms. Scott's statement expressing that she felt "outstanding" about the Company's progress in "ensuring all the plants have enough buffer stock," embedded false facts. Opp'n at 33 (quoting FS14). First, this statement is not an opinion statement because the statement that Ms. Scott felt "outstanding" is included in separate, following sentence and does not appear in the statement itself. In any event, as also described above, Lead Plaintiff has not adequately pleaded that this statement was false in context because Ms. Scott was merely describing the job function of one particular Vestis employee; she was not suggesting that the Company was "ensuring" that the identified tasks were completed.

[35] As another example, Ms. Scott's opinion statement that she was "really proud to say that we are reducing those service requests related to those key Pareto bars in those key areas around on-time delivery and around shortages," FS39, is inactionable for substantially the same reasons. Lead Plaintiff divorces the statement from its relevant context; the context makes clear that Ms. Scott was expressing pride with improvement in a particular subset of a subset of Vestis's customer service problems—the reduction of service requests contributing to the generation of certain "Pareto bars," comprising the overall categories of "on-time delivery and shortages," AC ¶ 243—she was not expressing pride that Vestis was improving in the areas of on-time delivery and shortages overall. *See* Dkt. No. 33-1 at FS39 (quoting statement as "really proud to say that we are reducing those service requests related to . . . on-time delivery and around shortages," while omitting the limiting portions of the statement); *see also* AC ¶ 247 n.9. The Court also notes that the parties did not provide the Court with the Pareto chart Ms. Scott was referencing when making this statement. As a result, the Court, in analyzing this statement, does not have access to the full context in which this statement appeared, namely the underlying visual aid.

number of optimization events . . . in terms of making sure we're accelerating progress." Dkt. No. 47-5 at 13. She also explained then when Vestis looked at its optimization events it saw "a reduction in fuel consumption, . . . a consolidation of footprint," a reduction in "shuttles and empty miles between wash facilities and cross-docks," and "reuse of existing garments that are already in our stock rooms," which resulted in a "$20 million [] inventory cash benefit." *Id.* Read in the context in which her statement appears, Ms. Scott's statement did not embed false facts because a reasonable investor would not understand that she was expressing pleasure that Vestis had improved all of its operational metrics, only the specific metrics which she immediately identified as the basis for her opinion. Accordingly, like the other opinion statements,[36] this statement also did not embed false facts.

Second, Lead Plaintiff's argument that the opinion statements are actionable because Ms. Scott "did not hold the belief she professed" is not persuasive for substantially similar reasons. For example, Lead Plaintiff argues that because Ms. Scott knew contrary information regarding continued customer losses at the time she made the statement expressing confidence that Vestis had "isolated" its problems, her knowledge is sufficient to infer that she was not in fact "confident." Opp'n at 33 (citing FS4). Again, Ms. Scott was expressing confidence that Vestis had isolated its customer service problems; she was not expressing confidence that Vestis would ultimately fix its problems. And Lead Plaintiff has not alleged that Ms. Scott had access to contrary information suggesting that the Company had not identified its customer service and operational problems.

Finally, the statements classified as statements of opinion[37] are not actionable as omissions because Lead Plaintiff has not adequately pleaded an omission. *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 44 (citations and quotations omitted). Read in the context in which they appear, a

---

[36] *See* supra note 32.
[37] *See* supra note 32.

reasonable investor would not understand these opinion statements as implying that Vestis's operations, customer service, or customer satisfaction and retention were improving. *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 42 ("[T]he appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor.").

For example, Lead Plaintiff has not adequately pleaded that Ms. Scott's statement that she "feel[s] very confident that we've isolated these challenges and opportunities, and we have very clear, deliberate actions around specific things," FS4, is an actionable opinion statement because the alleged omission of the Company's customer service issues does not undermine the statement. Again, Ms. Scott statement would be understood as an expression of her confidence with Vestis's *isolation* of its customer service issues and opportunities to fix those issues—she was not expressing confidence that Vestis would successfully *fix* those issues or take advantage of the identified opportunities. The alleged omitted fact as to Vestis's customer service issues does not undermine this statement nor does it conflict with what a reasonable investor would take from it. [38] *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d at 257 (internal quotation omitted).

The same is true for the opinion statements[39] that merely express that Ms. Scott was "pleased with" the work Vestis's route service representatives were doing—such statements are not rendered misleading by the purported omission of information as to Vestis's failure to improve aspects of its operations and customer service. For example, read in context, Ms. Scott's statement

---

[38] And Ms. Scott's statement "we feel outstanding about the progress we've made since we spoke with you last quarter in terms of mobilizing around these opportunities," is also a nonactionable opinion statement for substantially the same reasons. FS14. Again, the alleged omitted fact does not undermine this statement because—even assuming that Vestis failed to improve on its operational and customer service problems—this fact does not undermine Ms. Scott's confidence that Vestis had gotten better at "mobilizing around" its opportunities for improvement. Vestis can "mobilize around' identified opportunities for improvement, even if it is ultimately unable to effectuate improvement. Ms. Scott's statement that "I am excited about the commercial momentum that is building across Vestis, the progress we are making executing against our efficient operations initiatives, and the way our organization has embraced our mission to deliver a best-in-class customer experience, FS18, is also not actionable for the same reason—Ms. Scott can be confident about Vestis's ability to execute its initiatives, without implying anything regarding whether those initiatives will ultimately prove successful. *See also* FS41.

[39] *See* supra note 32.

that she was "very pleased with the work [Vestis's route sales representatives are] doing to cross sell" and "felt very good that" Vestis could "continue to accelerate sales within that team" is not misleading by the omission of information regarding Vestis's unrelated customer service problems. FS15. Rather, this statement expresses Ms. Scott's pleasure with one particular team's work. The inclusion of the alleged omitted information as to the Company's customer service problems more broadly does not undermine this statement because Ms. Scott can be "pleased with" the work of some Vestis employees even if Vestis was not improving other aspects of its operations.

In any event, even if Ms. Scott "knew but fail[ed] to disclose some fact cutting the other way,"—that some subset of the route sales representatives "faced with irate customers . . . did not try to cross-sell new products to [] existing customers," *id.*—that does not mean that her expression of "pleasure" was misleading because "'[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts.'" *Abramson*, 965 F.3d at 175 (quoting *Omnicare*, 575 U.S. at 190). A statement of opinion does not imply false information to a reasonable investor simply because there is 'some fact cutting the other way' that the speaker omitted." *Id.* (quoting *Omnicare*, 575 U.S. at 190).

As one more example, Ms. Scott's statement that she was "pleased" with Vestis's progress "around efficient operations" is not misleading by omission because the alleged omitted fact does not undermine the statement. A reasonable investor would not understand this statement, in context, to suggest that Vestis was improving all aspects of its customer service problems because Ms. Scott identified the specific areas of improvements in operations that she was referencing. Dkt. No. 47-5 at 13. And throughout her remarks, Ms. Scott emphasized that Vestis's operational problems were significant, that to date Vestis had been "focused on stabilizing," that Vestis was still implementing changes, and that resolving the issues was unlikely to happen quickly. Dkt. No. 47-5 at 13, 14.

In sum, some,[40] but not all, of the Challenged Statements are inactionable either because they are puffery or because they are statements of opinion that are not plausibly pleaded to be misleading by the omission of information as to Vestis's failure to improve its operations and customer service metrics, or both.

#### iv. Forward-Looking Statements Protected by Cautionary Language

Finally, some[41] of the statements challenged by Lead Plaintiff are not actionable because they are forward-looking statements accompanied by meaningful cautionary language. A threshold issue in determining the applicability the PSLRA's safe harbor provision or the bespeaks-caution doctrine is a determination of whether the challenged statements are forward-looking in nature. "As a general rule, statements whose truth cannot be ascertained until some time after the time they are made are 'forward-looking statements.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (internal quotation marks and citation omitted) (collecting cases). In discussing the bespeaks-caution doctrine in particular, the Second Circuit has contrasted "forward-looking" statements with statements of "present or historical facts," in other words, statements regarding "facts [that] exist and are known." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96–97 (2d Cir. 2004). "A forward-looking statement (accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-

---

[40] *See supra* note 29.

[41] The Challenged Statements that are inactionable forward-looking statements are: FS18 ("As a result, we *expect* both revenue and Adjusted EBITDA *to grow* on an underlying basis in Fiscal 2025 *as we continue to* deliver against our strategic priorities."); FS19 ("This core growth *will be* driven by positive contribution from both net volume growth and pricing."); FS20 ("[C]ore revenue growth *is expected* . . . reflecting . . . field sales growth *trajectory* as we—as well *continued* improvement in our route sales."); FS31 ("In the second quarter, we *expect* to hit a significant milestone, with new volume outpacing customer losses driven by field sales productivity, national account wins, and lower customer churn."); FS32 ("Toward the end of the second quarter, we *expect* new volume growth *will* exceed lost business driven by field sales productivity."); FS34 ("We continue to *expect* this core performance *to be* driven by positive contributions from both net volume and pricing *for the full year fiscal 2025*."); FS35 ("[W]e *expect* new volume wins to outweigh losses *as we kind of exit the second quarter*.").

looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction." *Iowa Pub. Emp. Ret. Sys.*, 620 F.3d at 143.

The statements in this category[42] are inherently forward-looking and none contain present statements of factual that the Court can sever. The Second Circuit has acknowledged "the common-sense proposition that words such as 'expect' identify forward-looking statements." *Slayton*, 604 F.3d at 769. Here, all of these statements "use linguistic clues . . . to designate [the] statement as forward-looking, *id.*, including explicitly forward-looking, future-tense, and contingent or predicative language such as "we expect," and "will be," *see, e.g.*, FS18, FS19.

Where a forward-looking statement "'contain[s] some elements that look forward and others that do not,' [the] 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 245 (internal citation omitted). Lead Plaintiff makes a novel argument that these statements are not purely forward-looking because they "t[ie] guidance" to past and present embedded facts. Opp'n at 35. Inherent in Lead Plaintiff's "tying argument" is an acknowledgement that the present facts are not embedded in the forward-looking statements themselves.[43] Lead Plaintiff cites no support for the idea that a forward-looking statement is not purely forward-looking when present facts are embedded elsewhere in the document where the forward-looking statement was made. As a result, the Court affords this argument little weight.

In analyzing Defendants' risk disclosures in their entirety, the Court concludes that a reasonable investor would not have been misled as to the risks associated with Vestis's failure to

---

[42] *See supra* note 41.

[43] For example, Lead Plaintiff asserts that FS18 is not purely-forward looking because it "t[ies] guidance to 'progress . . . executing against our efficient operations initiatives.'" Opp'n at 35. To the extent Plaintiff is contending that FS18 is single statement, that argument does not alter the Court's analysis here. The Court has already broken up what Lead Plaintiff labels as one statement under the heading FS18 into separate statements and has analyzed each separate statement under that label, including the statement "progress . . . executing against our efficient operations initiatives," separately.

improve its customer service and operational inefficiencies given the on-point risk disclosures. *Rombach*, 355 F.3d at 173–74. Investors were specifically warned in both Vestis's Form 10-Ks and 10-Qs[44] that "Vestis's failure to retain its current customers, renew its existing customer contracts on comparable terms and obtain new customers could adversely affect Vestis' business, financial condition, or results of operation," as disclosed by Vestis repeatedly throughout the Class Period. Dkt. No. 47-20 at 2, 14 (noting failure to retain or obtain new customers "could have a material adverse effect on our business . . . [and] could have an adverse impact on [] growth and financial results); Dkt. No. 47-25 (same). Similarly, investors were warned that the Company's "success depends on [its] ability to" retain its current customers, renew existing contracts, and obtain new customer contracts "on commercially favorable terms." Dkt. No. 47-20 at 13. Investors were warned that "there can be no assurance that [Vestis] will be able to obtain new business, renew existing customer contracts at the same or higher levels of pricing or that our current customers will not turn to competitors, cease operations, elect to in-source, or terminate contract with us." *Id.* And investors were warned of specific factors that could contribute to reduced customer retention or the ability to acquire new customers, including the "quality, price, and responsiveness of our services." *Id.*

Investors were also warned that "contracts may be subject to challenge by its customers by its customers, which if determined adversely could affect Vestis' business, financial condition, or results of operation. *Id.* And in its Form 10-K, Vestis discussed its "value creation strategy," emphasized that it will continue to "focus on retaining customers," and that it believed "there is a

---

[44]"[C]autionary language may be incorporated by reference." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 215 (quoting *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020) ("[C]onference calls both contained meaningful cautionary language about the nature of the forward-looking statements . . . on the contemporaneously filed press releases, which were incorporated by reference into the conference calls.")). Here, the cautionary language from Defendants' Form 10-Qs and 10-Ks was incorporated by reference into the earnings calls and press releases. *See, e.g.*, Dkt. No. 47-3 at 4 ("[T]his call may contain forward-looking statements . . . [s]uch risks and other factors are set forth in our periodic and current reports with the Securities and Exchange Comission."); Dkt. No. 47-7 at 6.

significant opportunity to increase [] wallet share . . . through cross-selling." *Id.* at 9. Investors were warned that Vestis's current efficient operations "include significant cost inputs," that Vestis had "identified key areas of opportunity to reduce [] operating costs," that a "comprehensive analysis of plant network and customer flows . . . has revealed a significant opportunity . . . related to routing and scheduling efficiencies and transport and logistics improvement." *Id.* at 9.

Finally, Vestis's Form 10-K disclosed that revenue in FY 2024 decreased by .7% compared to the prior fiscal year and that sales growth was "partially offset by the impact on revenue from customer losses." Dkt. No. 47-23 at 35. Vestis's Form 10-Q similarly disclosed that for the first six months of FY2024, "increases [in revenue] were partially offset by $4 million of lower year-over-year direct sales and $128 million of prior year sales associated with lost customers, of which roughly 77.0% were customers who ceased doing business with us during fiscal 2023."). Dkt. No. 47-25 at 28, 29. It warned that "[r]etention is a leading indicator, in that the financial impact from the lost business will be realized over the 12 months after the billings cease for the lost customer." *Id.* at 28. Vestis made identical disclosures regarding the impacts of customer losses to its revenue in its 3Q FY2024 Form 10-Q. Dkt. No. 47-27 at 29 (nine month disclosures noting "increases were partially offset by $6.9 million of lower year-over-year direct sales and $193.5 million of prior year sales"). In short, Vestis disclosed the exact risk of which Lead Plaintiff complains—that because of failures in "the quality . . . and responsiveness of [its] services," existing customers elected not to renew or to terminate their contracts and Vestis was unable to offset those losses with new customer acquisitions. *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 255 (S.D.N.Y. 2020); Dkt. No. 47-20 at 13.

Lead Plaintiff contends that the Company's "generic cautionary language" was not "meaningful" because the disclosures did not break out the specific customer service and operational problems contributing to the Company's customer losses. Opp'n at 36. But "the anti-

fraud laws do not require cautions to be articulated with maximum specificity." *Sec. & Exch. Comm'n v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 92 (S.D.N.Y. 2024). "This is particularly so when there is ample disclosure of the broader risk." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). And cautionary language need not "identify all factors" to be considered meaningful. *Slayton*, 604 F.3d at 771 (citing 44, 1995 U.S.C.C.A.N. at 743).

Here, Vestis's cautionary language was meaningful because the risk disclosures conveyed substantive, company-specific information about factors that could cause customers not to renew their contracts or could cause Vestis not to obtain new customers. Investors were specifically warned that "Vestis's failure to retain its current customers, renew its existing customer contracts on comparable terms and obtain new customers could adversely affect Vestis' business, financial condition, or results of operation," as repeatedly disclosed by Vestis in multiple filings throughout the Class Period. Dkt. No. 47-20 at 2, 14. And the Company disclosed that Vestis's ability to retain customers and obtain new ones depended on the "quality . . . and responsiveness of our services." *Id.* at 13. Because the Company's risk disclosures identified specific factors impacting contract renewals, the risk disclosures were not simply "kitchen-sink disclaimer[s], listing garden-variety business concerns that could affect any company's financial well-being." *Cf. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016) (concluding that "[t]he jury reasonably could have found" that the disclosure "was not meaningful cautionary language" because the disclaimer was "irrelevant to" and did "not bear even tangentially on Vivendi's liquidity risk"). And Vestis's "warnings were substantively repeated throughout the Class Period." *Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471, 485 (S.D.N.Y. 2023).

That Vestis's risk disclosures did not break out the specific customer service problems contributing to customer attrition does not mean that the risk disclosures were not meaningful[45] because "a defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor." *Slayton*, 604 F.3d at 773. Rather, because Vestis's risk "disclosure [was] [] broad enough to cover [the] [] specific risk,"—the specific customer service and operational failings Lead Plaintiff identifies as contributing to customer retention—it is not rendered meaningless "simply because it fails to discuss the specific risk." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 579 (citing *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730–31 (2d Cir. 1998)). In sum, because Vestis's risk disclosures incorporated meaningfully cautionary language that was sufficient to apprise investors of the risk of customers failing to renew their contracts, the forward-looking statements are not actionable.[46]

Next, Lead Plaintiff asserts that Vestis's cautionary language is itself misleading,[47] because the risk that existing customers would not renew their contracts and that Vestis would not obtain

---

[45] In any event, the specific customer service and operational problems were disclosed to the market. Throughout the Class Period Vestis repeatedly disclosed its customer service and operational problems, explained their impact on customer retention and pricing, and described Vestis's strategic plan to address the Company's shortcomings. As Lead Plaintiff alleges, the Company disclosed its problems on the very first day of the Class Period.

[46] Because the Court concludes that the forward-looking statements were accompanied by meaningful cautionary language the Court need not address Defendants' alternative argument for dismissal—that Lead Plaintiff has not adequately pleaded actual knowledge.

[47] FS7 ("[I]t is possible that actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties," including "the failure to retain current customers, renew existing customer contracts and obtain new customer contracts," and "challenge of contracts by our customers."); FS8 ("There have been no material changes to the risk factors disclosed in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended September 29, 2023."); FS16 ("[I]t is possible that actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties," including "the failure to retain current customers, renew existing customer contracts and obtain new customer contracts," and "challenge of contracts by our customers."); FS17 ("There have been no material changes to the risk factors disclosed in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended September 29, 2023."); FS29 ("Our failure to retain our current customers, renew our existing customer contracts on comparable terms and obtain new customers contracts could adversely affect our business, financial condition o results of operations."); FS29 ("The failure to renew a significant number of existing contracts, including on the same or more favorable terms, could have a material adverse effect on our business, financial condition or results of operations, and the failure to obtain new business could have an adverse impact on our growth and financial results."); FS30 "Our contracts may be subject to challenge by our customers, which if determined adversely, could affect our business, financial condition, or results of operations."); FS30

new customers had already materialized at the time the risk disclosure statements were made. Opp'n at 35. Here, however, the materialization of the risk of customer attrition was disclosed. *Rombach*, 355 F.3d at 173; *Steamfitters Loc. 449 Pension Plan*, 412 F. Supp. 3d at 366. And here, the materialization of the risk of customer attrition was disclosed in the very same documents in which the challenged risk disclosures appeared. *In re UiPath, Inc. Sec. Litig.*, 755 F. Supp. 3d 498, 514 (S.D.N.Y. 2024) ("The Company's SEC filings did not fail to disclose adverse events that had already occurred."). Because the materialization of the risk was disclosed, the risk statements are not themselves actionable.

Here, the materialization of the risk was disclosed in the same document[48] because Vestis's Form 10-Q and Form 10-K disclosed its customer attrition problems in detail. First, the Form 10-Q specifically disclosed that for the first six months of FY2024, "increases [in revenue] were partially offset by $4 million of lower year-over-year direct sales and $128 million of prior year sales associated with lost customers, of which roughly 77.0% were customers who ceased doing business with us during fiscal 2023."). Dkt. No. 47-25 at 28–30. And Vestis warned that "[r]etention is a leading indicator, in that the financial impact from the lost business will be realized over the 12 months after the billings cease for the lost customer." *Id.* at 28. And the Form 10-Q compared Vestis's financial results from FY2024 to FY2023, broke out the comparative financial results into

("The resolution of these disputes in a manner adverse to our interests could negatively affect revenue and operating results. If a large number of our customer arrangements were modified in response to any such matter, the effect could be materially adverse to our business, financial condition, or results of operations."); FS42 ("[I]t is possible that actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties," including "the failure to retain current customers, renew existing customer contracts and obtain new customer contracts," and "challenge of contracts by our customers."); FS43 ("There have been no material changes to the risk factors disclosed in Part I, Item IA, 'Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended September 27, 2024.").

48 Because in this case, the materialization of the risk was disclosed in the same document in which Vestis's cautionary language appeared, the Court need not determine whether a reasonable investor would not have been misled as to the materialization of the risk in light of Vestis's repeated disclosures throughout the Class Period regarding the Company's customer attrition problems and the loss of major accounts. *Steamfitters Loc. 449 Pension Plan*, 412 F. Supp. 3d at 366 ("However, months before Skechers released its Q315 earnings, Greenberg disclosed this very risk."); *see also, e.g.*, AC ¶ 74 (alleging that during the 1Q FY2024 earnings call, Ms. Scott disclosed the loss of a large, national account and was losing business from smaller customers).

both three- and six-month comparisons, and specifically identified the impact of customer attrition on Vestis's revenue, *id.* at 28–30. The Form 10-Q devoted several fulsome pages to breaking out and disclosing the impact of customer attrition on the Company's financial results. *Id.* at 28–30. Likewise, Vestis's customer losses were disclosed in its Form 10-K. Dkt. No. 47-22 at 35–37. The Form 10-K disclosed that the risk of customer attrition had actualized because it explicitly stated that "sales growth was partially offset by the impact on revenue from customer losses along with lower year-over-year direct sales." *Id.* at 35. And as with the Form 10-Q, Vestis's Form 10-K also compared Vestis's financial results from FY2024 to FY2023, broke out those financial results, and specifically identified the impact of customer attrition on Vestis's revenue. *Id.*

Because Vestis made "fulsome disclosures about its financial condition . . . [such that] investors were able to track . . . whether revenue was adversely affected by . . . the [defendant's] failures to expand its business" a reasonable investor would not understand Vestis's risk disclosures to suggest that the risk of customer attrition had not materialized. *In re UiPath, Inc. Sec. Litig.*, 755 F. Supp. at 514. Lead Plaintiff does not contend that the underlying data regarding the customer losses and the impact on Vestis's revenue was false. *Id.* As a result, the Court cannot conclude that a reasonable investor, reading the document in its entirety would understand Vestis's risk disclosures[49] to suggest that the risk of customer attrition was "hypothetical." Because the materialization of the risk of customer attrition was disclosed in Vestis's Form 10-K and Form 10-Q—the same documents in which the statements in this category[50] were made—the risk disclosures are not false or misleading.

---

[49] Vestis made similar disclosures regarding the impacts of customer losses to its revenue in its 3Q FY2024 10-Q and 1Q FY2025 10-Q. Dkt. No. 47-27 at 29 (nine-month disclosures noting "increases were partially offset by $6.9 million of lower year-over-year direct sales and $193.5 million of prior year sales"); Dkt. No. 47-30 at 27–30.
[50] *See supra* note 47.

In any event, as to the risk disclosure statements regarding customer challenges[51] to contracts, Lead Plaintiff has not adequately pleaded that the risk of customers challenging their contracts had materialized when these statements were made because the CWs do not allege that Vestis's customers had challenged their contracts. Context makes clear that the word "challenged," as used in these statements refers to litigation or arbitration and not Vestis's internal processes. The language included in the statements, such as "if determined adversely," implies the existence of a third-party decision-maker. FS30. Likewise, the clause "[if] a large number of our customer arrangements were modified in response to any such matter," also shows that the "challenges" are not individualized requests for modifications brought directly to Vestis because the "challenges" may result in a binding determination, such as a court order, requiring that Vestis modify its contracts wholesale. *Id.* And the challenges are referred to as "matters," a term indicative of a third party proceeding. *Id.* And Vestis's Form 10-K clarifies that "our customers may challenge our contract terms or our interpretation of our contract terms," which could "result in disputes between us and our customers," again referring to external disputes. Dkt. No. 47-20 at 15.

And the CWs' allegations describe how dissatisfied customers sought credits, lowered orders to the minimum allowable pursuant to their contracts, and pursued contract deviations, cancellations, and buyouts. Dkt. No. 33-1 at FS30. But none of the CWs allege that customers sought to "challenge" their contracts. As a result, Lead Plaintiff had not adequately pleaded that the risk that customers would "challenge" their contracts had materialized at the time the statements were made.

---

[51] *See* FS30 ("Our contracts may be subject to challenge by our customers, which if determined adversely, could affect our business, financial condition, or results of operations."); FS30 ("The resolution of these disputes in a manner adverse to our interests could negatively affect revenue and operating results. If a large number of our customer arrangements were modified in response to any such matter, the effect could be materially adverse to our business, financial condition, or results of operations.").

In sum, because some of the Challenged Statements are forward-looking statements accompanied by meaningful cautionary language, and because Vestis disclosed that it had suffered customer losses, the forward-looking statements[52] and risk disclosures[53] are not actionable.

#### v. The Actionable Challenged Statements

Having concluded that some, but not all, of the Challenged Statements are inactionable because Lead Plaintiff has not plausibly pleaded falsity, and because they are puffery, statements of opinion that are not rendered misleading by omission of the alleged fact that Vestis was not improving its operations or customer service, or were forward-looking statements accompanied by meaningful cautionary language, the Court pauses to identify the challenged statements that remain.

The challenged statements that are actionable are—

> Mr. Scott's May 2, 2024 statement made in Vestis's 2Q 2024 Press Release "operating trends are improving across our business." FS1;
>
> Ms. Scott's November 21, 2024 statement during Vestis's 4Q FY2024 Earnings Call, "we're seeing the level of performance rise across the system with particular focus on those locations that are underperforming versus the norm." FS28;
>
> Ms. Scott's November 21, 2024 statement during Vestis's 4Q FY2024 Earnings Call, "We're seeing that happen on-time delivery already." FS28.

#### vi. The Remaining Actionable Statements Are Material

Having concluded that three of the Challenged Statements are actionable, the Court briefly addresses Defendants' threshold argument that because "Vestis repeatedly disclosed . . . that customer service and operations issues and losses were affecting the business," none of the statements are false or misleading. Mem at 18–20. Because the only remaining actionable statements are alleged to have been false when made, the Court need not address whether Vestis's prior disclosures foreclose Lead Plaintiff's omission-based claims. Accordingly, the Court only

---

[52] *See supra* note 41.

[53] *See supra* note 47.

addresses this argument as to the three remaining statements alleged to have been false when made. And given the high bar for dismissing misstatements on materiality grounds, the Court cannot conclude that the three remaining actionable misstatements are immaterial in light of Vestis's prior disclosures.

Determining whether an allegedly false statement is material is a "fact-specific inquiry" that is ill-suited for resolution on a motion to dismiss. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). On "a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)).

Here, Defendants have not met the high bar for dismissing the remaining statements as immaterial on a motion to dismiss. The Court cannot conclude that the three remaining misstatements are obviously unimportant to a reasonable investor in light of the Company's disclosures because these three statements do not merely suggest that Vestis was working on its problems. Rather, a reasonable investor could understand these statements to suggest that Vestis's customer service and operational problems had improved on a company-wide basis. And the suggestion that Vestis had improved its customer service and operational problems wholesale, is contradicted by the CWs' well-pleaded allegations. Accordingly, because a reasonable investor could understand these three statements as suggesting that Vestis had improved, the Court cannot conclude these statements are immaterial.

### B. Scienter

#### 1. Legal Standard

Lead Plaintiff has adequately pleaded that the actionable Challenged Statements were made by Ms. Scott with a wrongful state of mind. Under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA, a plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 51. The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (2007).

"The requisite state of mind in a section 10(b) and Rule 10b–5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313). "In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit." *Id.* That standard can be satisfied "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks and citation omitted). A plaintiff need not rely exclusively on one of these theories. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.* (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In Re Carter-Wallace Sec.*

*Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks and citation omitted). A plaintiff alleging recklessness must allege "conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (internal quotation marks and citation omitted). "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted). "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* (internal quotation marks and citation omitted).

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 51 (quoting *Tellabs*, 551 U.S. at 314). If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton*, 604 F.3d at 777. An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). "But generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) (citation modified). "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard.'" *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987)).

"While 'the absence of a motive allegation is not fatal,' motive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'" *Slayton*, 604 F.3d at 776 (quoting *Tellabs*, 551 U.S. at 325). Absent a showing of motive, "the strength of [Plaintiff's] circumstantial allegations must be correspondingly greater." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142). In sum, "[t]he inquiry on a motion to dismiss is as follows: '[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007).

And Rule 9(b) requires that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009*); see also Saskatchewan Healthcare Emps.' Pension Fund v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 385 (S.D.N.Y. 2024); *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) ("[Plaintiff] improperly attempts to group-plead the scienter requirement."); *The Penn. Ave. Funds v. Inyx Inc.*, No. 08-cv-6857, 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("'[G]roup pleading' of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" (quoting 15 U.S.C. § 78u–4(b)(2))).

**2. Application**

The AC adequately pleads facts that raise a strong inference of scienter through recklessness. And the "core operations" doctrine bolsters an inference of scienter here. The Court assesses Lead Plaintiff's scienter allegations holistically, accepting the whole factual picture painted by the Complaint, and concludes that Lead Plaintiff's allegations give rise to an "inference of scienter [] at

least as compelling as any opposing inference of nonfraudulent and nonreckless intent." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009).

**i. Lead Plaintiff Has Adequately Pleaded Scienter Through Conscious Misbehavior or Recklessness as to Ms. Scott**

Lead Plaintiff has adequately pleaded a strong inference of scienter through conscious misbehavior or recklessness because it has adequately pleaded that the Ms. Scott was aware of contrary information when she made the actionable Challenged Statements. *Novak*, 216 F.3d at 308. A plaintiff makes "an adequate showing of scienter through recklessness where the complaint alleges that the defendants had access to certain information . . . and supports those allegations with particular facts." *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 522 (E.D.N.Y. 2025). Here, Lead Plaintiff adequately pleads facts showing that Ms. Scott had access to data about Vestis's operations and customer service problems. Lead Plaintiff alleges that certain customer service requests and attrition reports were "escalated" directly to Ms. Scott for review. AC ¶¶ 232, 245, 259. Lead Plaintiff also alleges that data regarding customer satisfaction, retention, and sales were readily available via Vestis's internal software systems, in particular such data was available through the Tableau system and an "executive-level dashboard" on the Power BI system, both of which Ms. Scott had access to. *Id.* ¶¶ 247, 268. Likewise, Lead Plaintiff alleges that information from recurring meetings held to discuss the efficiency of plant operations and to discuss "accounts in jeopardy" was "elevated to Defendant Scott." *Id.* ¶ 259. And Lead Plaintiff alleges that Vestis implemented a software process during the Class Period that tracked and measured cross-selling performance twice daily, and because, once a week, a regional spreadsheet on plant productivity was also "sen[t] up to Kim Scott." *Id.* ¶¶ 260, 265. And Lead Plaintiff alleges, throughout the Class Period, Ms. Scott closely "monitored customer satisfaction data," operational data, cross-selling data, data about customer quits, and customer service data. *Id.* ¶ 237.

Throughout the Class Period, Ms. Scott allegedly spent considerable time meeting with Vestis's "frontline teammates"—Ms. Scott "personally [met] with Territory Managers" regarding customers' issues throughout the Class Period. *Id.* ¶¶ 228, 235. During these meetings, the CWs recount that Ms. Scott "was personally informed of" Vestis's continued problems with product shortages and low morale. *Id.* And Ms. Scott emphasized to investors that she had "spent a significant amount of time" meeting with Vestis's sales team to assess the team's functioning and training. *Id.* ¶¶ 230–31. Similarly, Ms. Scott described to investors how she personally visited Vestis's Greenville, South Caroline facility where she "spent a couple of days on the ground . . . mapping out their process of how they manage shortages." Based on Ms. Scott's own statements, the accounts of the CWs, and her personal involvement with Vestis's frontline workers, it is a reasonable inference that she had access to and was informed about Vestis's lack of improvement with respect to its operational and customer services problems. All the while, Ms. Scott was publicly telling investors that "operating trends are improving across our business," FS1, and that Vestis had seen Company-wide improvements with respect to "on-time delivery already," FS28.

Lead Plaintiff has also adequately pleaded facts that support the inference that Ms. Scott reviewed and was aware of customer service, retention, and operational data to which she had access for at least two, independent reasons. First, according to CW2, on several occasions when CW2 would check plant operations reports in Tableau—which indicated the last person to view a particular report—"it would say last viewed by Kimberly Scott." *Id.* ¶ 263. And according to CW2, CW2's supervisor would use Ms. Scott's monitoring of plant operations metrics in Tableau to push employee performance. *Id.* ("They would broadcast it and be like 'Look guys. See? Kim Scott's even looking at it. You guys got to get better.'"). It is reasonable to infer from CW2's account that

Ms. Scott had access to, and in fact reviewed, plant operational efficiency metrics using this software.

Second, Lead Plaintiff has pleaded that Ms. Scott reviewed the data because Ms. Scott said that she did so—Ms. Scott made repeated public statements in which she touted that she was deeply reviewing the underlying data, that she recognized its importance, and in which she explained how Vestis used that data. As Ms. Scott stated, she "look[ed] every day at leading indicators around service-related requests . . . we manage service requests on a very tactical and daily basis." AC ¶ 243. Because Ms. Scott's statements were "specific" to the customer service and operational challenges at issue in this case, "'[t]he specificity of [such] statements regarding [the issue] is strong circumstantial evidence that [Defendant] w[as] receiving some form of specific information' regarding the relevant issue." *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d at 522 (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (concluding that the defendants' specific statements about the issues sufficed to establish recklessness); then citing *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012) (finding that scienter can be inferred based on the defendant's specific statements about a specific issue); then citing *San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 320 (S.D.N.Y. 2024) ("Although Plaintiffs don't identify the specific document containing the contradiction, they don't need to."))).

For instance, during Vestis's 2Q FY 2024 earnings call, Ms. Scott explained that she had been closely and personally monitoring metrics regarding customer experience, service, and retention to understand the "root causes" of the Company's lost business. *Id.* ¶¶ 233 (Ms. Scott noted that "we're . . . closely monitoring the productivity levels" of Vestis's sales teams"), 237–38. As she explained,

> So as we have been evaluating the lost business and really digging in to understand the root causes of that lost business, it's led us back to service efficacy. . . .

> These challenges have been in our business for quite some time, and I've dug in quite deeply into these root causes of quits to really understand how do you get to the root of this and improve customer retention. And so you've got to go really deep and far to get to the right answer. And so as I've explored this and listen to customer feedback, it's just really clear that we are not tight on our processes as it relates to disciplined loading of trucks, delivering on time, delivering full loads. . . .
>
> [W]e've spent a lot of time over the last few months very aggressively digging into reason codes related to the customer experience . . . I've dug into quite deeply around why are customers choosing to leave Vestis.

*Id.* ¶¶ 237–239. And Ms. Scott detailed that "[b]ased on the reason codes cited by our customers when they cancel service with us, we know that more than 70% of cancellations are due to causes that are within our control." *Id.* ¶ 241.

Similarly, during Vestis's 1Q FY2025 earnings call, Ms. Scott touted that "we look every day at leading indicators around service-related requests" and that "we use that data and usage patterns to judge our customers' potential." *Id.* ¶ 243. And throughout the Class Period, Ms. Scott led monthly "Town Hall" meeting during which she presented both regional and national data relevant to customer satisfaction, operational efficiency, and the Company's financial performance. *Id.* ¶ 249. CW4 recalled that during both the October and November 2024 Town Halls, the tone of these meetings was grim, and Ms. Scott reported that Vestis was "missing [] targets and not hitting the sales and customer retention number promised to investors by 'significant percentages.'" *Id.* ¶ 250. "These are not some generic statements about [defendant's] policies and procedures," rather "[t]hey are very specific in addressing the very same issue . . . that became the centerpiece of this litigation. *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d at 525; *City of Pontiac Gen. Employees' Ret. Sys.*, 875 F. Supp. 2d at 372 (same).

It is reasonable to infer from these statements that because Ms. Scott was reviewing customer service and satisfaction metrics in order to determine the "root cause" of Vestis's customer retention problem, because she was reviewing the data closely enough to present on the

data during the Town Hall meetings and indicate that Vestis was not meeting targets, and because she was reviewing that data "every day," that she was aware that Vestis was not improving all aspects of its efficient operations or customer service. *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-CV-6978, 2024 WL 456745, at *5–6 (S.D.N.Y. Feb. 5, 2024). And because Ms. Scott repeatedly stated that she was in fact monitoring contemporaneous statistics with respect to customer service and efficient operations, the statements provide "strong circumstantial evidence that [the defendants] were receiving some form of specific information" as to consumption rates. *City of Pontiac Gen. Employees' Ret. Sys.*, 875 F. Supp. 2d at 372; *see also In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906, 2024 WL 1348749, at *16 (S.D.N.Y. Mar. 29, 2024). Accordingly, because Lead Plaintiff has adequately pleaded that Ms. Scott[54] had access to and was aware of data with respect to Vestis's efficient operations and customer service, it has adequately pleaded a strong inference of conscious misbehavior or recklessness.

**ii. The "Core Operations" Doctrine Bolsters an Inference of Scienter**

"Under the core operations doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." *In re AppHarvest Securities Litig.*, 684 F. Supp. 3d 201, 246 (S.D.N.Y. 2023) (quoting *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *17 (S.D.N.Y. May 19, 2023)). "The core operations doctrine, however, 'has been thrown into

[54] Because Mr. Dillon was not the maker of the three remaining actionable statements, the Court need not analyze whether Lead Plaintiff has adequately pleaded a strong inference of scienter through recklessness as to him. In any event, Lead Plaintiff does not allege facts to support its assertion that Ms. Scott's use of the term "we" necessarily meant Ms. Scott and Mr. Dillon to the exclusion of all others. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 695 ("[G]uilt by association is impermissible."); *The Penn. Ave. Funds*, 2010 WL 743562 at *12 ("'[G]roup pleading' of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that' each defendant acted with the required state of mind." (quoting 15 U.S.C. § 78u–4(b)(2))). Nowhere does Ms. Scott identify which individuals (if any) other than herself on whose behalf she was purporting to speak when she used the word "we." And other Vestis executives—namely, Bryan Johnson, Vestis's Chief Accounting Officer, and Michael Aurellio, Vestis' Senior Director of Investor Relations—were present on the calls during which Ms. Scott used the word "we." Lead Plaintiff does not allege facts to support its assertion that Ms. Scott's use of the word "we" meant only Mr. Dillon, to the exclusion of these other Vestis employees who were also present.

doubt by the enactment of the PSLRA in 1995.'" *Id.* (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 239 (S.D.N.Y. 2022)); *see also In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *In re AppHarvest*, 648 F. Supp. 3d at 246 (quoting *In re Turquoise Hill*, 625 F. Supp. 3d at 239) (citation modified). "Put differently, 'core-operations allegations are 'supplementary'; that is, they are not independently sufficient means to plead scienter.'" *Id.* (quoting *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 398 (S.D.N.Y. 2022)).

Here, because Lead Plaintiff has adequately pleaded scienter through conscious misbehavior and recklessness, Lead Plaintiff's "core operations" allegations bolster an inference of scienter.

Lead Plaintiff has also adequately pleaded corporate scienter because it adequately pleaded scienter as to the Company's CEO. Pleading corporate scienter requires "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). "[M]ost courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter." *Id.* "[T]he most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Id.* "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker." *Id.* Here, because Lead Plaintiff has adequately pleaded scienter as to Ms. Scott, Lead Plaintiff has also adequately pleaded corporate scienter.

**C. Loss Causation**

Lead Plaintiff has adequately pleaded loss causation with respect to the remaining actionable statements. "Loss causation has long been a requirement in securities and other fraud cases." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 183 (2d Cir. 2015). A plaintiff's burden in adequately pleading loss causation "is not a heavy one," a plaintiff "must simply give [] 'some indication' . . . of a plausible causal link between th[e] loss and the alleged misrepresentations." *Id.* at 187. In a recent decision, the Second Circuit wrote that "where [] the share price went down once the misrepresentation was revealed, we have tended to find that to be enough plausibly to show causality rather than coincidence." *Huey v. Anavex Life Scis. Corp.*, No. 25-1752, 2026 WL 1838665, at *8 (2d Cir. June 26, 2026) (noting that a "[a] plausible causal link is easy to establish where the share price declines while the market does not."). As Judge Calabresi explained, "a key determinant of what showing is necessary to establish plausible loss causation is the *timing* of the alleged loss in relation to the corrective disclosure," such as where a plaintiff "show[s] a loss on the exact day of the corrective disclosure." *Id.* (emphasis in original). Accordingly, "plaintiff sufficiently pleads loss causation when they allege that their share's 'price fell significantly after the truth became known.'" *Id.* (quoting *Abramson*, 965 F.3d at 179 (internal quotation omitted)).

This case is among those described by Judge Calabresi where "[a] plausible causal link is easy to establish," because Lead Plaintiff alleges that Defendants made the corrective disclosure mere hours before the market opened, and once the market opened, the price of Vestis's shares declined significantly. Lead Plaintiff alleges that after the market closed on May 6, 2025, Vestis announced that revenue had declined, and as a result, that it was withdrawing its full-year forward-looking revenue forecasts for FY 2025 and adjusting its forecasts for the third quarter of FY 2025 downward. AC ¶¶ 206–08. And Lead Plaintiff alleges that before the market opened on May 7,

2025, Vestis disclosed that customers were lowering order volumes, receiving sizeable credits for inadequate service, and ending service completely due to continued issues with customer service. *Id.* ¶ 210. Following Vestis's announcement, the price of Vestis common stock declined by nearly 38% in less than a day—from a closing price of $8.71 per share on May 6, 2025 to $5.44 per share on May 7, 2025. *Id.* ¶ 225 (alleging an "unusually heavy trading volume" of Vestis stock that day). And Defendants do not contend that Lead Plaintiff's loss "coincide[d] with a marketwide phenomena of loss." *Huey*, 2026 WL 1838665, at *8 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)). Accordingly, because Lead Plaintiff alleges that Vestis's stock price dropped "the exact day of the corrective disclosure" Lead Plaintiff has adequately pleaded loss causation. *Id.*

**D. Section 20(a) Claims**

Because Lead Plaintiff has adequately pleaded that Ms. Scott is liable for a primary violation of Section 10(b), it has also adequately pleaded its Section 20(a) claims. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007; *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009).

## V. LEAVE TO AMEND

Lead Plaintiff has requested that it be granted leave to replead the complaint if the Court granted any part of Defendants' motion. Opp'n at 49. Defendants' motion to dismiss is granted in part with leave to amend as described below. Under Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). And "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI*, 493 F.3d at 108 (citation omitted). However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

Here, the Court cannot conclude that further amendment would not cure the deficiencies in the AC with respect to the Challenged Statements for which Lead Plaintiff has not adequately pleaded falsity or with respect to the opinion statements. To the extent that any such statement was also determined by the Court to be puffery, Lead Plaintiff may not advance that statement in any amended complaint. Accordingly, the Court grants Lead Plaintiff leave to file a second amended complaint solely to cure the deficiencies identified with respect to the category of statements for which Lead Plaintiff has not adequately pleaded falsity, the opinion statements no later than 14 days from the date of this order.

As for all of the other claims, amendment would be futile as those claims involve Challenged Statements that are inactionable either because the statements are puffery, because the statements are inactionable risk disclosures, or because the statements are forward-looking statements protected by meaningful cautionary language. Accordingly, the remaining claims are dismissed with prejudice and without leave to amend.

## VI. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. Claims arising from statements not alleged to have been false when made or from the opinion statements are dismissed with leave to amend. And all claims against Mr. Dillon are dismissed with leave to amend. As such, all other claims are dismissed with prejudice. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 45.

SO ORDERED.

Dated: July 31, 2026
New York, New York

GREGORY H. WOODS
United States District Judge